**Pages 1 - 133**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
VS. ) **NO. CR 18-00513 EMC**
)
STARKIST COMPANY, )
)
Defendant. )
)

San Francisco, California
Wednesday, June 12, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

U.S. DEPARTMENT OF JUSTICE
Antitrust Division
450 Golden Gate Avenue, Room 10-0101
San Francisco, California 94102
**BY: ANDREW J. MAST**
**UNITED STATES ATTORNEY**

For End Payer Plaintiffs:

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
Symphony Towers
750 B Street, Suite 1820
San Diego, California 92101
**BY: BETSY C. MANIFOLD, ATTORNEY AT LAW**

(Appearances continued on following page)

Reported By: Marla F. Knox, RPR, CRR
Official Reporter

**APPEARANCES:** (cont'd)

For End Payer Plaintiffs:

PRITZKER LEVINE LLP
180 Grand Avenue, Suite 1390
Oakland, California 94612
**BY: BETHANY L. CARACUZZO, ATTORNEY AT LAW**

For Direct Purchaser Plaintiffs:

STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
**BY: STEVE SIX, ATTORNEY AT LAW**

For Direct Purchaser Plaintiffs:

HAUSFELD
600 Montgomery Street, Suite 3200
San Francisco, California 94111
**BY: CHRISTOPHER L. LEBSOCK, ATTORNEY AT LAW**

For Commercial Food Preparers Plaintiffs:

CUNEO GILBERT & LaDUCA LLP
4725 Wisconsin Ave. NW, Suite 200
Washington, DC 20016
**BY: JONATHAN W. CUNEO, ATTORNEY AT LAW**

For Defendant:

LATHAM & WATKINS LLP
505 Montgomery Street - Suite 2000
San Francisco, California 94111
**BY: NIALL LYNCH, ATTORNEY AT LAW**
**ASHLEY M. BAUER, ATTORNEY AT LAW**

STARKIST
225 North Shore Drive, Suite 400
Pittsburgh, PA 15212
**BY: R. SCOTT MEECE, ATTORNEY AT LAW**

**Wednesday - June 12, 2019** **2:37 p.m.**

**P R O C E E D I N G S**

**---000---**

**THE CLERK:** Calling criminal action 18-513, United States of America versus Starkist Company.

Counsel, please come to the podium and state your appearances for the record.

**MR. MAST:** Good afternoon, Your Honor. Andrew Mast on behalf of the United States.

**THE COURT:** All right. Thank you, Mr. Mast.

**MR. LYNCH:** Good afternoon, Your Honor, Niall Lynch on behalf of Starkist Co. With me is Ashley Bauer, my partner working with me on this matter. We also have three representatives of the company here today who are prepared to allocute if the Court permits. We have the current CEO of Starkist Co., Andrew Choe, if he can stand up.

**THE COURT:** Thank you, Mr. Choe.

**MR. LYNCH:** We also have Scott Meece, the current General Counsel of Starkist. He is also present.

**THE COURT:** All right. Thank you.

**MR. LYNCH:** And we also have Archie Soliai, who has flown for more than 20 hours from American Samoa to be here because he would like the Court to hear how the fine in this case might impact the workers in American Samoa, and he is also in attendance. So if he can also stand up.

**THE COURT:** All right. Great. And he did. Thank you.

We have others.

**MS. SPITALIERI:** Good afternoon, Your Honor. Jill Spitalieri, U.S. Probation.

**THE COURT:** All right. Thank you, Ms. Spitalieri.

**MS. MANIFOLD:** Betsy Manifold, Wolf Haldenstein on behalf of the End Payer Plaintiffs. We are the crime victims, the End Payer Plaintiffs.

**MS. CARACUZZO:** And Bethany Caracuzzo, Pritzker Levine, also on behalf of End Payer Plaintiffs.

**THE COURT:** Thank you.

**MR. SIX:** Good afternoon, Your Honor. Steve Six of Stueve Siegel Hanson. I represent two direct action Plaintiffs in the MDL and Southern District. Also appearing under the Crime Victims Rights Act, and we have filed a pleading that we sent to the Court on May 24th. It was filed May 24th.

**THE COURT:** That's the direct purchaser's --

**MR. SIX:** Joining the direct purchaser's motion and with a slight clarification.

**THE COURT:** Okay.

**MR. LEBSOCK:** Good afternoon, Your Honor. Chris Lebsock from the Hausfeld firm for the direct purchaser class; and we are here to answer any questions that the Court might have about our submission or proposal.

**THE COURT:** All right. Thank you.

**MR. CUNEO:** Your Honor, Jonathan Cuneo. And I'm here under the Crime Victims Rights Act on behalf of Commercial Food Preparers, but I'm not a member of the bar of this court. I'm a member of the District of Columbia Bar and the New York Bar, and I was hoping the Court would let me briefly address it at an appropriate moment.

**THE COURT:** So you are here to represent under the Crime Victims Act --

**MR. CUNEO:** Correct.

**THE COURT:** -- the Commercial Food Preparers?

**MR. CUNEO:** Correct.

**THE COURT:** And that case -- has that settled, or what is the situation with it?

**MR. CUNEO:** Your Honor, there are three families of Defendants in that case, and the Commercial Food Preparers have a proposed settlement with one of them.

**THE COURT:** Okay. Just one?

**MR. CUNEO:** Correct, and not Starkist.

**THE COURT:** Okay.

**MR. CUNEO:** And we are --

**THE COURT:** All right. And your case is also in San Diego?

**MR. CUNEO:** Yes, sir.

**THE COURT:** All right. The first question I have is

procedural, and that is how should we conduct these proceedings in view of the fact that there was a fair amount of confidential and sensitive information which is material which is likely to be discussed, and I'm trying to figure out a way -- whether there is an easy way to sort of talk around it in code, but I don't see how we can avoid numbers and this sort of thing. But on the other hand, the public has a very strong interest in these matters. So why don't we hear the parties' thoughts about procedural --

**MR. MAST:** Yes, Your Honor. What the Government would propose is I think certain numbers that are sealed, such as the settlement offers or projected civil settlements that are sort of the highest confidential nature, that I would refer Your Honor to numbers either in the pleadings or on pages.

For some of the other numbers that are sealed, the Government's view is that it is not so sensitive that it can't be listed or stated in open court. It is one thing to remove it from a pleading that is filed on the docket and available for -- in perpetuity, but it is another thing to conduct a proceeding, as Your Honor stated.

So if the Court is willing, we would propose referring to some of the numbers that are sealed.

**THE COURT:** Well, would that include the projected growth?

**MR. MAST:** From the Government's perspective we think

it would be helpful to be able to refer to those numbers. If Defense objects strongly, we can try and proceed by way of, like I said, referring to numbers in the pleadings as we go.

**THE COURT:** All right.

**MR. LYNCH:** Your Honor, I think to the extent we can keep information under seal, we would like to. We understand that that is probably not practical. The primary area we are focused on in terms of confidentiality is our estimated civil liability, and those are, I think, relatively discrete. We are prepared to talk about our -- the CAGR and growth issues publicly.

**THE COURT:** Okay. All right. That's fine.

**MR. LYNCH:** There were two issues I was just -- there are other parties in litigation, Chicken of the Sea and Bumblebee, and some of their financial information is referred to, and I can't speak on their behalf in terms of protecting their confidentiality. I will try to keep that information confidential as much as possible, but we also don't want it to impact our ability to, you know, effectively advocate on behalf of Starkist.

**THE COURT:** All right. So why don't we try to proceed along those lines. And if I slip up or if you hear something that probably should not be made public, anyone, please feel free to speak up and I will try to adjust.

Yes, Mr. Cuneo.

**MR. CUNEO:** Your Honor, I have an idea for the Court's consideration -- and that is speaking merely for the CFPs -- we are victims, and we would love the Court to take into account our views before the Court imposes a sentence; makes up its mind. If we were to go early, I would get up and leave and that way there wouldn't be an issue.

**THE COURT:** Okay. Well, that's a possibility. I could take the input because it is on a discrete issue, although that's the part that is most sensitive in terms of confidentiality.

**MR. CUNEO:** I agree with you. And there are certain things that, as you know, we petitioned the Court for small bits -- small bits to be unsealed or made available at least, under some protective rule in the civil litigation. But that's not something that we intend to argue anymore than just making our point and explain to you why we think that is important.

If that was the case and the Court would hear us, then I would -- speaking just for the Commercial Food Preparers -- leave, and you wouldn't have to worry about anything that crossed my ears.

**THE COURT:** Let me ask if the other crime victim representatives share that view procedurally.

**MS. MANIFOLD:** Good afternoon, Your Honor. We would be more than happy to speak first. I think it is appropriate to hear from the victims first so the Court has that on its

mind in terms of hearing the other evidence.

I think it would be fine for us to stay. My preference would be to stay, not leave the courtroom.

**THE COURT:** You have no problem presenting your client's perspective at the outset of this hearing?

**MS. MANIFOLD:** I have no problem with that, Your Honor.

**THE COURT:** All right.

**MR. LEBSOCK:** Chris Lebsock for the direct purchaser Plaintiffs.

I think that would be fine from our perspective too, and I would be extremely brief unless the Court has specific questions for me.

**THE COURT:** All right. Well, maybe we should do that in case we find ourselves in a situation where we do need to take the rather extreme step of closing the hearing, that won't affect people who want to and have the right to say something.

**MR. LYNCH:** I think that's fine, Your Honor. I would prefer not to close the hearing at any point.

**THE COURT:** I'm hoping not to.

**MR. LYNCH:** Right. And we are not dealing with witness safety and the like.

**THE COURT:** Right.

**MR. LYNCH:** We are dealing with financial numbers.

**THE COURT:** Right.

All right. Well, why don't I go ahead and take that suggestion and hear -- now, this is all in the context of the two provisions that we are all aware of in terms of the Court's power or obligation to reduce the fine. One is that there is mandatory duty to reduce the fine if -- to the extent necessary to prevent an impairment of the ability to make restitution, I understand there is a legal question whether the -- in the plea agreement sort of foregoing formal criminal restitution in favor of the civil payments, whether this really is restitution within the meaning of the sentencing guideline.

But there is also the discretionary provision under Section 8C3.3(b), which gives the power and the authority of the Court -- but not the obligation -- to reduce the fine if necessary to avoid substantially jeopardizing the continued viability of the organization.

Now, those two kind of dovetail to a certain extent because even though the Court is not obligated and could impose a fine even if it does jeopardize the continued existence of an organization. It is my preference to keep in mind the payments -- whether you call it restitution, damages -- available to the victims as a high priority here.

So whether it is under the first provision or the second provision, my intent is to be mindful of the sort of hierarchy of things here, and I think payment -- whether by way of settlement or whether you call it restitution or whatever -- is

an important factor.

So with that backdrop, whether it is under the mandatory provision or the discretionary provision, I think it is relevant to hear. And I have seen, you know, the briefs; and we are going to get into what the ability to pay is.

And I will say in advance that I think I have indicated, as my clerk has indicated to you, that I'm reserving the possibility of actually hearing some live testimony because right now I feel like there are some ships passing through the night, and there may be some advantage to have a focused evidentiary hearing; and I have certain things that I would like to focus on.

Before we get there, why don't I hear from the victims?

**MR. LEBSOCK:** Very well, Your Honor.

**MR. LYNCH:** Should I sit down?

**THE COURT:** Yeah, you may.

So who wants to go first?

**MS. MANIFOLD:** Mr. Cuneo.

**MR. CUNEO:** Thank you very much, Your Honor. I thank you for letting me appear and speak, and I found your remarks to be extremely heartening.

I want to start by saying that the Crime Victims Rights Act affords my clients certain rights, and one of them has been the right to confer with the attorney for the Government in the case. And as a litigant and as a citizen, I would report to

the Court that I believe the Government has done an exemplary job of that.

I have had several conversations with Mr. Mast. I met him about a minute and a half ago, but he has been responsive and most helpful in providing guidance. I just thought I would say that.

**THE COURT:** Good. Thank you.

**MR. CUNEO:** Okay. Now, our position is that -- and I think the Court has already given its views, so I'm not going to try to address the question of what amount of set-aside or what procedure should be employed.

Looking at the pleadings that have been before the Court, from our perspective is a little bit like watching two dogs fight under a rug. I mean, I can't tell who is winning and exactly who is right. And the Court has that information, and we don't. And our choice there is to trust in the Court, which we do.

And our second request -- our second point I wanted to make is there are certain very narrow categories of information that are directly relevant to the continued prosecution of the case; whereas, we can hope that we can achieve a settlement with Starkist. There is no certainty of that. And we are not seeking to unseal all of the financial information, but rather narrow categories that deal with fund payments and transfers to its parent, which is -- that is directly at issue in the civil

case.

Right now, for the moment, both Starkist and its parent are in the case. And as our expert, Mr. Rossi, explains, the fund transfers are directly relevant to his analysis of the -- to the transactions with the parent, which, in turn, are relevant under the law to whether the parent can be held liable.

So that's Item Number 1. And those are more fully described in our papers. And really, you know, we say we want the unredactions on page 8 and 9. It is really only on page 9. The 8 is in error.

**THE COURT:** And you are asking precisely for what?

**MR. CUNEO:** For the portion of the information on page -- that is designated in Mr. Rossi's declaration -- but on page 9, specifically the first one -- to be made available, either in the civil proceeding, subject to a protective order. We are certainly willing to abide by that, but that is something that is directly relevant to -- possibly relevant to the liability of the parent in the civil case.

**THE COURT:** All right. I'm not sure I have jurisdiction over that part. Why wouldn't that be under Judge Sammartino's, because it doesn't -- your access to that doesn't -- it is not obvious to me how that affects what is before me now, which is the appropriate level of the fine to be assessed against Starkist.

**MR. CUNEO:** First of all, I'm not sure Judge Sammartino has this information.

Second, the purpose of this proceeding --

**MR. LYNCH:** Your Honor, can the Court just identify what section he is referring to? It may be something they already have.

**THE COURT:** Okay. Maybe you can be more specific.

**MR. CUNEO:** I'm referring to pages -- page 9.

**MR. LYNCH:** Of what document?

**MR. CUNEO:** Of Document Number 51, which is the redacted version -- I'm sorry, it's the United States sentencing memorandum.

**THE COURT:** Of the U.S. sentencing memorandum?

**MR. CUNEO:** Yeah. I'm sorry, Your Honor.

**MR. LYNCH:** I gather that is not a Starkist document you are referring to?

**MR. CUNEO:** It is a United States document.

**THE COURT:** All right. That's --

**MR. CUNEO:** I misspoke.

**THE COURT:** All right. That's the one that has discussion about debt, dividends and --

**MR. CUNEO:** Correct. Right.

And the second one is on page 15 -- this is explained by Mr. Rossi -- again, lines 13 through 20. And the third one is on page 18 where there are restitution and damage figures that

have been blacked out.

Now, the overall purpose of the Crime Victims Rights Act is to help crime victims. We got a letter. We are a crime victim. We are not seeking anything that is radical. We are not see seeking to turn over -- go on a fishing expedition. We are just trying to get these three simple bits of information. Just as simple as that, Your Honor. And Mr. Rossi's expert declaration supports that.

**THE COURT:** So it is page 9 and page 15, which line?

**MR. CUNEO:** Page 13 through 20.

**THE COURT:** And then on page 18, it is the lines 17 through 19, or --

**MR. CUNEO:** On page 18, sir, it is 7 through 10.

**THE COURT:** On the table?

**MR. CUNEO:** Yes.

Mr. Rossi also notes -- I don't have it right before me -- but page 16, lines 8 through 14, I think.

**THE COURT:** What is Starkist's view of this?

**MR. LYNCH:** A couple things, Your Honor.

The Plaintiffs are here trying to re-litigate the very issue we litigated here a couple weeks ago when they asked to get access to information in the pre-sentence report. Mr. Cuneo wasn't present for that, but the DPPs and IPPs were; and that was in regard to their request to be heard but also to get an unredacted version of the pre-sentence report of which

much of this information is contained.

Your Honor, you ruled against them on that point, and this is simply an effort just to re-litigate the issue. But more broadly, the overall issue of the relationship between Starkist and its parent is an issue that is central to the matter before Judge Sammartino.

Plaintiffs' counsel refers to their expert. We have filed our expert report. Professor Daines from Stanford Law School, he has reviewed the relationship between Don Juan and Starkist and found it to be completely appropriate. We are troubled by the fact without doing its own internal -- its own investigation, the DOJ has simply adopted the arguments in the Plaintiffs' briefs without actually trying to analyze whether the allegations are true. There is nothing improper about the relationship between Don Juan and Starkist.

**THE COURT:** All right. But I'm -- in terms of resolving that, the merits question, though, my question is: This request for unredaction is not particularly pertinent or directly pertinent to what is before me right now.

**MR. LYNCH:** Not at all, Your Honor.

**THE COURT:** It may be relevant to the San Diego litigation, but right now this court is the repository of this information; and I'm just not sure who is the -- if this can't be resolved short of motion work -- it is interesting -- I'm not sure who is --

**MR. LYNCH:** This is the first time --

**THE COURT:** -- who is the decision maker.

**MR. LYNCH:** This is the first time we have ever heard about it, these specific requests. And so we think this could be resolved outside of this particular proceeding. We think it is an issue for Judge Sammartino and the issues there. They have full discovery to get requested information about the relationship we produced --

**THE COURT:** Because the interested parties in this information really are the requester and Starkist. It is not of any particular interest to the Government, right, one way or the other?

**MR. MAST:** That's correct, Your Honor.

I would note generally that the CVRA does not provide an avenue for discovery. It gives the victims an opportunity to be heard.

**THE COURT:** That's why it feels like this is not the right venue.

**MR. LYNCH:** I agree.

**THE COURT:** Except for the fact that the information resides here. So I don't know if Judge Sammartino, how she feels about issuing an order about this Court's file. I will indicate that given that the Government has no particular interest, it doesn't affect the proceeding here. So I would be neutral, and I would -- frankly, for the record -- state that

if this issue were to be brought before Judge Sammartino and she were to decide -- as any other custodian of a record -- if she thinks it is appropriate, I would comply and accommodate whatever order.

So I guess I'm telling you that I don't feel comfortable making this decision because it may turn on what the balance of interests are in the -- for the need for it in the underlying litigation in San Diego. I don't know what the calculus would be, but it wouldn't shock me that this is all contextual. So your access to information on that suit may turn on relevancy questions, may turn on need questions, all of that informed by the facts and proceedings before Judge Sammartino of San Diego, of what I have almost no knowledge.

So it is weird, frankly, for me to try to opine on that. I'm sitting here simply as the custodian of this information.

**MR. LYNCH:** I would say in one issue you are the appropriate venue, and that is with regard to information that he has referred to that is actually contained in the pre-sentence report or that was presented to probation as part of this sentencing hearing. And in that regard, we litigated this issue about a month ago when the direct purchaser Plaintiffs and end purchaser Plaintiffs requested to get an unredacted copy of the sentencing report, and you denied that request. This is simply an end run around that same request.

**THE COURT:** Well -- and I stand by my ruling at the

pre-sentence report for reasons that this Court has an interest in will remain absent some, you know, further litigation in this court.

The fact that there may be information contained in the pre-sentence report that finds itself elsewhere does not necessarily preclude another court from saying that is relevant. So I'm not saying that all information is privileged. That document is sort of privileged, if we use "privileged" in the loose sense.

So I will state for the record that I will defer to whatever Judge Sammartino -- if she is the appropriate one -- I think her court would be -- to resolve this conflict with respect to access to otherwise hereto for confidential information, that I -- a decision either way will not affect, I don't think, this Court's mission at this point, which is to render the appropriate sentence. So I will defer to Judge Sammartino.

**MR. CUNEO:** Thank you.

**MR. LYNCH:** Thank you, Your Honor.

**THE COURT:** Thank you. All right.

Who would like to present?

**MR. LEBSOCK:** Thank you, Your Honor. Chris Lebsock, again, for the direct purchaser Plaintiffs.

**THE COURT:** Yes.

**MR. LEBSOCK:** First of all, thank you for allowing us

the opportunity to speak. We appreciate that.

For the most part I'm going to rely on the papers we submitted. And if the Court has any questions, of course, we can attempt to answer that.

But the Court last time we were here asked why -- what is our motivation. And our motivation, as we laid out in the papers was, number one, we have an interest, I think, to ensure that Starkist is fined in an appropriate manner that does not compromise the -- Starkist's ability to appropriately resolve the situation with its victims, our Plaintiffs. And so that is our interest.

We do not agree with Starkist that they are the least culpable party in this conspiracy. They have pled guilty. That required them to acknowledge the fact that what they did was knowing and voluntary, and so we don't agree that they are the least culpable party here.

That said, we do not have access to all of the current financial information, and we leave it to this Court to decide what the appropriate fine is going to be. If the Court decides that $100 million is too much, under all of the facts and circumstances, we ask that the Court give a credit of some amount that can be used to resolve the case with the victims. And fundamentally, that is our position.

**THE COURT:** All right. Thank you.

I have a -- I do have a couple of questions. I actually

wanted to get the response of Starkist and the Government to your procedural suggestion of sort of a dollar-for-dollar credit kind of idea.

Before we get there, I do have a question about the current status. So who -- a number of obviously large entities have opted out of the class and there have been -- you know, a fairly significant number of folks who have settled. How many -- what is the size of your class at this point? I'm just --

**MR. LEBSOCK:** Well, that's a complicated question, I think. It depends, because there have been settlements -- Mr. Lynch may know a little more than I do, frankly, on some of this; but there have been a number of large settlements. But it is not at all clear to me at the moment whether all of those large purchasers have settled with all of the Defendants.

We are learning some about that as time goes by and that some big purchasers -- I think, Wal-Mart might be an example of that -- has fully settled with all of the Defendant groups. But if you are asking, I can't tell you exactly who has settled with whom as we sit here today. I do have an idea of what I think the damages to the direct purchasers are.

**THE COURT:** Outside of those who have brought their own --

**MR. LEBSOCK:** Outside of those who have brought their own cases.

**THE COURT:** And what would that prosecution --

**MR. LEBSOCK:** It is roughly $135 million, to my recollection.

**THE COURT:** Is that in the complaint or is that --

**MR. LEBSOCK:** It is not in the complaint.

**THE COURT:** And is that prior to any enhancement --

**MR. LEBSOCK:** Yes, that would be single damages.

**THE COURT:** All right. And the status of the case, I understand there is a motion for class certification pending before Judge Sammartino?

**MR. LEBSOCK:** That is true.

**THE COURT:** It has been argued already.

**MR. LEBSOCK:** It has been argued. And we are coming up on approximately six months. So from our perspective we think something is coming soon.

**MR. LYNCH:** Your Honor, I can elaborate on the number of settlements that have occurred to date.

**THE COURT:** Sure.

**MR. LYNCH:** So currently in the courtroom today are primarily the three classes -- the direct purchaser class, the end pair class and the food -- Commercial Food Preparer class. This was a unique case in which there were literally hundreds of separate direct action Plaintiffs who filed their own complaints. I mean, he mentioned Wal-Mart, Kroger -- the company that owns Safeway -- Ralph's and virtually every major

supermarket in the United States filed their own independent lawsuits. And we have settled the vast majority of them.

I think by our estimate -- and this is, again, an estimate -- roughly 75% of the direct sales of -- during the relevant period have been settled. So Starkist has actively sought to settle these matters; has been quite successful in settling them with the direct action Plaintiffs. We have not settled them with the direct action -- the classes at this point, and still face substantial civil liability from these classes.

**THE COURT:** Are there very many direct action suits left?

**MR. LYNCH:** There are three, one of which is here. AWG is one. Winn-Dixie is another. And the final is W. Lee Flowers. So very, small minor but still, you know, engaged in the litigation.

**THE COURT:** And those are all before Judge Sammartino as well?

**MR. LYNCH:** Yes.

**THE COURT:** And obviously they are not affected by class certification, but they are waiting for the next event?

**MR. LYNCH:** Well, I mean, all I can say is -- and I think it is a general concern about the Plaintiffs' interactions here -- all the settled companies -- companies that we have settled with are not here complaining. They are

completely satisfied. We have resolved our claims for them.

I am concerned that many of the lawyers here are actually using this as a vehicle to, you know, exert undue pressure on Starkist to settle.

I think the DPPs are a perfect example. We have met with them. We have been waiting for them to give us an offer for a settlement. We met with them in person in March. I have repeatedly asked them for a response and not gotten one, and instead we have got filings in this case.

And I just think this is an inappropriate venue for them to try to litigate issues that are before Judge Sammartino or unfairly exert pressure on Starkist, which has been more than willing to settle with all of its major customers, but has faced more obstacles with some of the classes.

**THE COURT:** So how is that -- I want to make sure I understand what you are saying.

Their potential use of this suit as to exert pressure on Starkist seems to me from the filing -- one of the proposals, for instance, is a, you know, kind of a designated dollar-for-dollar credit. I mean --

**MR. LYNCH:** We don't object to that.

**THE COURT:** I was going to say, it may be you are on sort of the same side of the fence. It is not clear to me how they are using this as leverage.

**MR. LYNCH:** Well, I will say certain other aspects of

their filings -- Starkist is the least culpable entity here. They have, I think, unfairly identified former employees as being engaged in conduct that are not charged. The Department of Justice had the full cooperation of Chicken of the Sea, which got full immunity. It had the full cooperation of Bumblebee, in which they gave them a 40% cooperation discount. And at the end of the day, they charged Starkist, the last company to plead guilty, with the shortest period of time involving conspiratorial conduct and only a single individual.

So I think the charges speak for themselves that we are the least culpable. And on that point, I do want to draw the Court's attention to information that the Plaintiffs have in the civil litigation that the EPPs filed, and I would like to present the Court with a copy of it because since they were filed under seal, they are harder to identify by way of a document number, but if I could hand up to the Court a document that the EPPs filed in this case.

**THE COURT:** In this case?

**MR. LYNCH:** In this case.

This was attached as an expert report by the EPPs. This is a page from that report. They were filed under seal so we don't know the exact ECF number. It was indirect purchaser end pair Plaintiffs' statement in connection with Defendant Starkist co-evidentiary hearing. This is an interrogatory response from one of the other companies involved in this

investigation identifying all the agreements they reached with particular other companies. So this was submitted by a cooperating company under a sworn affidavit, and they lay out all the agreements they reached, and it is clear --

**THE COURT:** "They" being --

**MR. LYNCH:** At the top of the list, if you look, it says: Table 1, COSI.

**THE COURT:** Yep.

**MR. LYNCH:** They allege agreements that did not involve Starkist that occurred years before Starkist's participation in 2011.

So I bring this up only to rebut the repeated claims that somehow Starkist is not the least culpable. We believe we are, and we believe that is relevant to the 3553 factors that the Court needs to consider as well.

**MR. MAST:** Your Honor, if the Government might respond to some of what has just been stated.

**THE COURT:** Yeah.

**MR. MAST:** As we will address, the only issue before the Court right now is whether Starkist has the ability to pay its fine. Its culpability and relative culpability has already been negotiated, and the plea agreement addresses the factors set forth in 3553(a), and Starkist has agreed that a fine of $100 million satisfies the factors set forth in 3553(a). So, frankly, it is irrelevant.

But I will also state that Starkist was the largest employee involved -- company involved. Multiple employees were involved in the criminal conduct. That is documented by the PSR as well as the submissions by the Plaintiffs. And it is improper to raise those arguments here when really what this hearing is supposed to be about is Starkist's ability to pay a criminal fine.

**THE COURT:** Let me make that clear. That is the focus of what I'm doing.

Whatever the arguments -- exculpatory, inculpatory with respect to degree of culpability -- largely water under the bridge as far as I'm concerned. I think the key, as I stated at the outset, is to impose a fine frankly that is closer -- is close to the guideline range is one starting point here, but the biggest factor is the ability to pay; and the range has already been prescribed by the plea agreement here.

And I have understood that the low range of 50 million is -- would be based on ability to pay and not jeopardizing restitution or payment as opposed to the other 3553 factors. I mean, some of that -- I'm not going to ignore those because there are arguments about unwarranted disparity, and I think relative culpability has some relevance to this; but the driving factor here that I'm looking to first and foremost in my mind is the ability to pay. That's what I'm trying to apply here, Section 8-- Section 3.3 factors.

**MR. LYNCH:** I agree, Your Honor.

I just -- Starkist is entitled to defend itself to what we think are false allegations of greater culpability, and it was -- we didn't make that argument. DPPs made that. This was something that was submitted by the EPPs. We think it is relevant to the Court to consider. And we also think it is relevant to rebut some of the claims from the Government as to our level of culpability. They have said in their papers that this conspiracy could not have existed without Starkist.

**THE COURT:** All right. We will get into that later. We are getting sidetracked here. I did want the Government's response to this procedure mechanism that has been suggested by the DPP of structuring a fine in a way to sort of accommodate and maybe hedge the bet with respect to preserving -- there has been one proposal, set-aside a fund, et cetera, et cetera; but the DPP proposal is, for instance, to assess the maximum fine but to allow credit based on payments made. And that can be structured many ways. That can be payments over an expected -- for instance, one could say if the expected ultimate settlement amount is 75,000 -- 75 million, or 80 million, whatever the number is -- you could structure it so that there is a sort of -- I don't know, can you? Can the Court structure that? I don't even know if it is legal.

**MR. MAST:** The issue the Government has with the Plaintiffs' proposal for a set-aside fund or a

dollar-for-dollar credit is what the Government hopes to demonstrate today is that Starkist has the ability to settle all of its civil damage claims and pay a fine of $100 million and remain a viable company. And any dollar-for-dollar settlement fund would amount to a windfall for Starkist because it would not pay more than $100 million.

What the Government proposes is a $100 million fine, and that Starkist hasn't met its burden establishing an inability to pay; and it will have more than sufficient funds to settle all of the remaining civil liability, which I note have come in drastically at lesser amounts than Starkist originally estimated.

So the Government's position is that the Plaintiffs are not in any jeopardy of not being paid --

**THE COURT:** I understand that's the Government's position, and I may or may not agree with that.

But if the Court had some questions about that or some reluctance, for instance, and decided that, Well, there is a -- you know, there are certain risk ranges in here, and depending on what parameter used, a growth factor you used whether it is 0.1 or some other -- or 3.9 may make a difference in depending on cap X and everything else that has to be done, it may come into a range where it is close. Let's say it is a close call.

Is it legally possible for the Court to structure a fine -- I know you don't like it, and maybe -- but is it

legally permissible to do it that way?

**MR. MAST:** Well, first of all, I very much hope to convince the Court that it is not a close call.

But second, the plea agreement doesn't provide for restitution. And, in fact, it is 11C1(c) plea agreement. And so if the Court departs from the terms specified in the plea agreement, then Starkist has the right to withdraw its plea, and the Government has the right to withdraw its plea.

**THE COURT:** Of course, that depends on whether you consider this restitution or not, as opposed to ability to pay.

For instance, let's say it is not just payment, but let's say it is key to some other risk factor out there -- I guess as we sort of did in the Bumblebee tuna case. I mean, can the sentence -- the fine imposed have certain contingencies, conditions? It seems like we did. We already did it once to some extent.

**MR. LYNCH:** I agree, Your Honor.

**THE COURT:** I just want to know legally if there are any prescriptions in that regard, other than the terms of the 11C1(c)plea agreement.

**MR. MAST:** Right. The terms of the 11C1(c) plea agreement, I believe, govern -- the Court has the option to either accept the terms or reject the terms; and any deviation from that, really starts us from anew. It starts us fresh.

**THE COURT:** Let's put that aside for a moment. Are

there any statutory or regulatory prescriptions?

**MR. MAST:** The Government is not aware of any statutory restrictions on those proposals.

**MR. LYNCH:** In fact, Your Honor, there are other -- I don't have the cites with me. There are other resolutions and other contexts. SCC, DOJ, and other non-antitrust contexts where there have been funds created. We have proposed -- again, we obviously strongly disagree, but one case is *Nacchio* -- *SCC versus Nacchio* apparently had a fund situation. That is just one example.

But the notion of setting aside a $50 million fine and a $50 million fund, or whatever you want to call it, is to recognize, as the Court said at the very beginning, the primacy of restitution and providing the victims of this conduct --

**THE COURT:** Careful of your use of the word "restitution." You are going to run into the 11C1(c).

**MR. LYNCH:** Okay. Compensation to the victims of this conduct. And that is the primary concern for Starkist, and it is also the primary concern of the Court and under the sentencing guidelines. And the Government seems concerned solely with getting its $100 million fine, regardless of what happens to the victims.

And one example is that -- of that is in the reply brief, their rather cavalier attitude towards Starkist having to file for bankruptcy. They suggest it is a casual event, Chapter 11,

re-org. But what they don't mention is that Chapter 11 will completely undermine the claims of all the other Plaintiffs, and the Plaintiffs will get pennies on the dollars of any compensation. So that would not be true to the sentencing guidelines or the statute that says compensation for victims should come first.

**MR. MAST:** And, Your Honor, I hope we can address Starkist's assertion that it might file claims for bankruptcy in more detail later, but the Government sees it basically as an empty scare tactic. It submitted a report from Kenneth Klee, their expert, after the PSR was finalized. It was not submitted to probation. The argument was not hashed out during the pre-sentence investigation report. And, frankly, it doesn't have any merit.

The expert who submitted the report doesn't even -- did not appear to review the entirety of the loan agreement for which he opines a 100 million fine -- $100 million fine would result in an event of a default.

But I want to discuss that in the context of our broader argument, which is that Starkist has the ability to pay a $100 million fine and plenty of room left over to settle its claims.

**THE COURT:** I understand that is your position. I understand the argument about the Klee report being incomplete because, as I recall, it does not take into account the

guarantee that is signed by the parent.

**MR. MAST:** It doesn't take into account the guarantee. It doesn't take into account the fact that Starkist disclosed its potential liability when it obtained the loan. This loan agreement was obtained by Starkist after it signed the plea agreement. And during the course of discussions with its lender, it disclosed the fact that it was facing a $100 million fine.

The notion that something that is disclosed in anticipation, the lender goes in with eyes wide open, and then would see a $100 million fine and trigger the event of default provision is meritless. And Dr. Klee didn't review that correspondence. He didn't review the guarantee.

So, yes, our opposition is that Starkist is -- certainly has not established -- met its burden that it is facing any jeopardy of Chapter 11 bankruptcy.

**MR. LYNCH:** Your Honor, I don't know if this is the appropriate --

**THE COURT:** No.

**MR. LYNCH:** But we disagree.

**THE COURT:** I understand that.

Is there anything more that you want to --

**MR. LEBSOCK:** I have nothing more, Your Honor. If you have any other questions, I'm happy to answer them.

**THE COURT:** Well, I mean, the other question -- and

this is a redaction -- a substantial portion of your brief referring to exchange of funds and transfer of funds as you see it; and I know that is a big issue in the civil litigation. But it does -- that question does touch and it was touched on by the whole Techpack thing.

It does go to the question of, you know, assets available or not, I suppose, to a certain extent. I don't -- I'm hesitant to get into too many specifics here because it is confidential, but there are additional transactions referred to in the DPP brief that go beyond what the Government -- which was focused on the Techpack --

**MR. LYNCH:** And I'm prepared to answer each and every single one of them. In fact, our expert report, Professor Daines, addresses each of them. So let's take Techpack.

**THE COURT:** Yeah. Let me know -- the critical question on Techpack that maybe I missed, you say in your brief that it was not transferred --

**MR. LYNCH:** Correct.

**THE COURT:** -- to the parent.

**MR. LYNCH:** Correct.

**THE COURT:** But the Government says -- and I forget whether the DPP says this or not -- it was transferred to a subsidiary.

**MR. LYNCH:** That's incorrect too. It is completely

wrong. So if I could describe what happened, I think it will clarify.

In 2014 Starkist made an investment into a company called -- a preexisting company called Techpack, which is an innovative packaging company. They are a minority owner of it. The majority owner is another Don Juan entity called Don Juan Systems. So it is important that -- we own it. We own part of it. There is no transfer of assets. It is an asset on our books. And the investment was done because -- for strategic reasons, because we actually buy packaging from Don Juan Systems, and we are looking forward to the possibility of using maybe some of the innovations that Techpack has in packaging. We don't currently buy from Techpack, but we are an owner of it. We own shares in it. It is an asset. And the first time --

**THE COURT:** There has been no transfer?

**MR. LYNCH:** No.

**THE COURT:** Of any interest?

**MR. LYNCH:** No, not at all. That is completely false, that allegation.

The other thing is the initial investment was done in 2014 before this investigation even came up. So the idea that somehow we were hiding assets in 2014 for an investigation we didn't know about is absurd.

The second point is we made a second investment in 2017.

It was not a transfer. It was a further investment. We have shares in it, and there are -- it is a valuable asset. It is a strategic asset of ours. And I think it is interesting that Dr. Zuehls, in reviewing all of our assets, indicated that that was not an asset that could be sold; that we didn't have any non-key assets.

**THE COURT:** The 2017 purchase?

**MR. LYNCH:** Yes -- no, that was just a further investment.

**THE COURT:** In Techpack?

**MR. LYNCH:** Correct, yeah.

The other investment we made, which was of a smaller amount, 12 million in Silver Bay -- that is a salmon company -- and we sell salmon. It is a strategic additional investment.

And let me just address a couple other points --

**THE COURT:** And none of those have been transferred out of the ownership --

**MR. LYNCH:** Correct.

**THE COURT:** -- ownership interest currently or held by Starkist has been transferred?

**MR. LYNCH:** Correct.

The one -- another reference they make is to a dividend that was given in 2016 of $20 million from Starkist to Don Juan Industries, our parent.

Now, they suggest something improper with that. Starkist

Industries is our sole shareholder. They own the company. They are seeking some returns on their investment. There have been no dividends in 2017. There has been no dividends in 2018 or '19. There was no dividends in 2015 or '14.

This is one dividend that stands out as a return on investment. We did well in 2015, and they decided to give part of it back to the parent as part of the return on their investment.

Doctor -- Professor Daines has analyzed the types of dividends that have been given to other subsidiaries throughout the United States and analyzed that, in fact, the dividends that Starkist gave to Don Juan Industries are actually below the average of what typical subsidiaries in the United States provide to their parents. There is absolutely nothing improper about what occurred.

Now, I don't want to belabor this because these are issues before Judge Sammartino; but the fact that the Government and the Plaintiffs keep identifying this require us to really shut these down because they are completely improper, and they really go to a larger issue, which I think is really unfair for Starkist, which is some effort to have Don Juan Industries pay for the fine of Starkist. That is not something they did with Bumblebee.

Bumblebee is owned by a very large and profitable private equity company called Lion Capital. They never sought Lion

Capital's assets. They specifically said in the Bumblebee plea that the Court could only look at Bumblebee's assets and not Lion Capital. The same should apply to us. We should be looked at our assets in Starkist and not Don Juan.

**THE COURT:** Let me get a factual response about the transfer or not.

**MR. MAST:** Yes, Your Honor.

So, Your Honor, the reason the Government assumed that the Techpack investment had been transferred is because Starkist's expert, Rajiv Gokhale, indicated that he did not count the entirety of that investment in his analysis of Starkist's finances because he assumed it would be transferred to an entity affiliated with Don Juan Industries.

The fact that Starkist now claims that it sits on its books at the value it claims it sits on its books indicates beyond any doubt that Starkist can pay its criminal fine. It states it has the value on its books, and its expert did not consider that investment as part of its inability to pay analysis at all.

So whether Starkist transferred the funds -- transferred the investment, what that would reflect, if it did, would show that Starkist's finances are actually much stronger than their balance sheets purport to be. But if Starkist has not transferred the asset, which is our understanding now from Starkist's response to our sentencing memo, if that's the case,

then Techpack needs to be liquidated. It needs to be sold or Starkist needs to be reimbursed for that investment which amounted to more than sufficient funds to pay the criminal fine, and we can end this hearing now. Because Starkist --

**THE COURT:** Essentially you are saying Starkist wants it both ways.

**MR. MAST:** Exactly.

**MR. LYNCH:** No.

**THE COURT:** So let me ask for the response.

**MR. LYNCH:** This is absurd. We have the Department of Justice telling Starkist how it should run its business, what strategic assets it shouldn't own and which assets it should own.

**THE COURT:** No. I think they are saying it should be accounted for if your expert doesn't account for anything.

**MR. LYNCH:** It is accounted for. I'm not sure what he is referring to.

**MR. MAST:** Your Honor --

**THE COURT:** Wait. Hold on. One at a time.

**MR. LYNCH:** I am not sure what he is referring to. I mean, this may just, again, raise the reason why an evidentiary hearing is needed, because I think there is -- he is now stating that he got it wrong; that he got it wrong; that we didn't transfer the assets, which is correct.

Now, the question is should we litigate it? It is a

strategic asset. I mean, you could have said --

**THE COURT:** Look, the critical question now is it accounted for in terms of the assets and therefore the equity --

**MR. LYNCH:** No. It was clearly identified in our audited financial statements as an asset. So it was considered. I don't know exactly what he is referring to with regard to --

**THE COURT:** Is the value attributed to this asset?

**MR. LYNCH:** Yes. Yes, it is valued at something between 120 and $150 million. It has actually increased in value.

But let me address the liquidation issue. We can't liquidate the asset under our current senior facility agreement, our loan agreement. The loan agreement prevents the sale of any asset more than $30 million; otherwise, that will require the full repayment of the loan.

Banks are not going to loan money with the company as collateral and then have a company start selling off parts of its business. So there is a contractual prohibition against Starkist selling off assets more than $30 million. So this notion of liquidating it is a non-starter. We are not allowed to do it.

**MR. MAST:** Your Honor, if I might respond.

And I do want to direct the Court's attention to

specifically where Starkist's expert indicates that he is not counting this investment. It is in Rajiv Gokhale's report, paragraph 20.

**THE COURT:** The original report?

**MR. MAST:** The original report, note 34. And it discusses both the Silver Bay investment as well as the Techpack investment.

**THE COURT:** What page?

**MR. MAST:** 10. Your Honor, I apologize. Bear with me one moment, Your Honor.

(Pause in proceedings)

**THE COURT:** You said footnote 34 about Silver Bay?

**MR. MAST:** And it carries onto the next page, I believe.

This starts on page 10 and carries on to page 11.

**THE COURT:** All right. The bottom line, last point is Due to the related nature of these equity investments to Starkist's operations and prospects, we did not separately include the value of these investments in our ATP analysis.

**MR. MAST:** So, Your Honor, according to Starkist's own inability to pay report, their own expert, they didn't count an asset that is sufficient to pay the entirety of their criminal --

**THE COURT:** Except counsel is saying it is a liquid asset. It can't be liquidated because of the facility of the

loan.

**MR. MAST:** And I hope we can discuss the loan agreement, because the loan agreement provides for exceptions, specifically --

**THE COURT:** Well, we may do that. We may do that in an evidentiary hearing. But right now I have got counsel standing here.

Do you have a further factual response to transfer or not as to the --

**MR. LEBSOCK:** As of the information that we have in the civil litigation, we have no evidence that there was any transfer of the interest in Silver Bay or Techpack to any other entity within the Don Juan Starkist conglomerate.

**THE COURT:** I appreciate that. Thank you for your presentation.

**MR. LEBSOCK:** Thank you.

**THE COURT:** Let me hear from -- who is next?

**MS. MANIFOLD:** Good afternoon, Your Honor. Betsy Manifold, Wolf Haldenstein, on behalf of the in-payer Plaintiffs.

**THE COURT:** Yes.

**MS. MANIFOLD:** Again, thank you for the opportunity to be heard.

We represent what are often referred to as the ultimate victims, the consumers in 31 states who purchased Starkist tuna

and paid elevated prices as a result of the conspiracy. I have the pleasure of representing the Plaintiffs in deposition and in testimony in the civil case. We represent teachers. We represent professors. We represent single mothers. We represent the myriad of consumers that actually overpaid for canned tuna. So thank you for the opportunity to tell this Court about these people and make them aware of the damages that they have suffered.

I noticed that Starkist's Counsel pulled out a part of our expert report that sets forth confidentially what we calculate our damages to be, and I would just merely refer the Court to that. It follows a little bit after page 12 that the Starkist Counsel pulled out. So we do set forth in some detail the damage that our class suffered and how we calculate that. We also calculate the dollar amount that breaks out as to Starkist.

I agree with Mr. Cuneo from the Commercial Food Preparers. We are a little bit in the dark about the details of Starkist's financial situation. It is a little bit like coming in in the middle of the conversation. You are not really quite sure what is going on. I appreciate the Court's comments early on that there is discretion on behalf of the Court, and we agree that the Court can exercise that discretion to somehow formulate a response as to how the payments are going to be made or how a set-aside might be provided to the victims in this case so that

we can be assured that we can be paid.

We don't really know if Starkist has the ability to pay or if it is going to interfere with the financial viability of the company. So I would request that the Court, as I'm sure it will, provide careful scrutiny to the financial information that has been provided. Look at the transfer of assets that are set forth in Table 4 in the DeMaio report which the direct class Plaintiffs provided -- and to review all the information provided to the Court.

In the end, to us it doesn't matter about the financial health of Starkist or about the viability of the corporation. I mean, those things are relevant, but the important thing to us is that our client receive some sort of payment. And I don't want to use the word "restitution," but in the hopes that there be some sort of set-aside here that the victims can be -- that can recover.

And I think that's really it in a nutshell. If the Court has any questions for me, I would be happy to answer. And thank you again for the opportunity to tell the Court about the ultimate victims here.

**THE COURT:** All right. I appreciate that.

Let me ask the Government about that mechanism. It is sort of similar to the dollar-for-dollar credit. But what the EPPs are asking for is an actual sort of set-aside fund as part of the structure.

So do you have any legal opinion about the legal permissibility about something like that?

**MR. MAST:** Again, Your Honor, I'm not aware of any statutory prohibition about the creation of a set-aside fund of the nature described by any of the classes of the Plaintiffs. What I can say is that the Government's strong position is that Starkist has the ability to pay its fine as well as civil damages that will then exceed $100 million.

If it gets a $100 million fine and pays damages, even at the new range established by Starkist -- and I won't refer to the numbers -- but even at the new updated range established by Starkist, if it fits into that range of civil damages, it is not going to have any problem paying a $100 million fine. And, therefore, any set-aside funds would amount to a windfall for Starkist.

Because really the Court is capped at $100 million in this, pursuant to the terms of the plea agreement, it can't order restitution pursuant to the terms of the plea agreement. So any set-aside funds can't exceed the amount of criminal -- you know, the criminal fine set forth in the plea agreement. And given that it would cap at $100 million, it would amount to a windfall for Starkist.

**MR. LYNCH:** Your Honor, just one quick comment on this.

**THE COURT:** Yeah.

**MR. LYNCH:** Regardless of the legal ability of the Court to do this, factually it is impossible. We don't have the cash. We have six -- approximately $6 million in the bank today. This is something actually that we agree with the Government's expert, Dr. Zuehls.

Dr. Zuehls says in his report that Starkist does not have the money to pay a fine, to pay civil restitution or civil damage claims. Doesn't have the ability to borrow it. And, in fact, the sole basis on which it can pay a fine is through future cash flows.

So that's the way we had put forward a proposal that we would be agreeable to a fine of 50 million under an installment plan as outlined in our papers, and that we would also -- with future cash flows so we don't have the money now -- with future cash flows we would allocate 50 million to resolving the claims against the remaining civil litigants, and we would update the Court and the DOJ regarding our progress.

If we were able to settle them for less than 50, then the difference would revert back to the DOJ in an increased fine. That is our proposal. But it is important for you to know we don't have the money. We have 6 point -- I think we have $6 million currently. It was just checked today by the CEO; $6 million in the bank.

**THE COURT:** So your proposal is 50 over time, and then anything less than 50 paid out --

**MR. LYNCH:** In the civil claims.

**THE COURT:** In civil -- well --

**MR. LYNCH:** So 50 million is the fine. We are --

**THE COURT:** And you are not saying 50 over some base number. Just 50?

**MR. LYNCH:** Correct.

**THE COURT:** Which -- above and beyond what has already been agreed to or are you talking about --

**MR. LYNCH:** So we have put down already -- we have settled -- I will say it -- approximately $55 million we spent in settlements. We agree to pay the Government a $50 million fine, paid out without interest in installments over five years. And we lay that out in our initial sentencing memorandum on, I think, the first footnote.

In addition, we agree that with -- through future cash flow -- that is as our business progresses -- we will set aside another 50 million to pay off civil claimants. And we will update the Court on the progress of that, and the DOJ, if, for some reason -- say, for example, we are able to settle our civil claims for 30 million, the remaining 20 million would revert back to the DOJ as a further penalty to increase the amount of the fine. That's our proposal.

**THE COURT:** And that's 50 beyond the settlement already made of 55?

**MR. LYNCH:** Correct. Correct.

**MR. MAST:** And as you see, Your Honor, it caps Starkist's total liability for its conduct at $100 million.

**MR. LYNCH:** Their expert says our civil liability is as low as 67 million.

**MR. MAST:** And --

**THE COURT:** Well, it caps it at 100, but the reality is it is going to be less than that because something is going to be paid.

**MR. MAST:** It is going to be less than that. And my understanding is that the civil settlements, at least portions of them, are tax deductible. You can write that off, as opposed to a criminal fine. If that proposal comes to fruition, I don't expect the Government to see a penny over $50 million, even though Starkist has substantial assets --

**THE COURT:** I understand. I understand the Government's position.

**MR. LYNCH:** And if they don't get more than 50, then all the better. That means that the Plaintiffs in the civil case have been compensated.

**THE COURT:** Well, unless, in fact, Starkist has additional capacity and reserves and that becomes unfined, so to speak.

**MR. LYNCH:** Correct. And that's the basis --

**THE COURT:** That's the Government's concern.

**MR. MAST:** Your Honor, this does bring me to an

important point because the Government has the ability and proposes an installment schedule and has the ability to petition the Court --

**THE COURT:** I understand that. They don't want to be at your mercy. They want to be -- if they were able to petition, they would probably feel a little better, but right now you have the discretion --

**MR. LYNCH:** Absolutely, Your Honor.

**THE COURT:** -- to petition, and you would say you would exercise that discretion, as you have in the past responsibly, to make sure that the company is not driven out of the business, to make sure that -- I understand those arguments.

**MR. LYNCH:** Thank you, Your Honor.

**THE COURT:** Let me ask Counsel, do you have anything more to add to this?

**MS. MANIFOLD:** I don't -- I can't really comment on the exchange just because we don't have access to the financial information to make that determination.

**THE COURT:** Right.

**MS. MANIFOLD:** So we wish the Court well.

**THE COURT:** Thank you.

Yes.

**MR. SIX:** Good afternoon, Your Honor. Steve Six. I represent Associated Wholesale Grocers. It is the nation's

largest grocery cooperative serving 35 states, independent grocery providers in those states. I will be exceedingly brief and make two points.

First, as we indicated in our filing, if the Court does a set-aside or a fund, we request that it applies to all Plaintiffs, not just class Plaintiffs because the classes may or may not get certified.

Second, at the plea hearing, prior counsel for Starkist was here saying that restitution was important. I heard Your Honor say that restitution was important. Mr. Lynch said that restitution was important. And on behalf of his clients it was important.

And, of course, in this context what we are talking about is payment for overcharge in the civil case pending in the Southern District, not criminal restitution here.

And I think the message, given that we have Starkist here, that certainly I think it might be appropriate if the Court thought so, to deliver to Starkist, is it is settling civil cases under a preponderance of the evidence standard for overcharges that they imposed. What Starkist has -- the approach they were taking in the civil case so far -- and I won't talk about settlements -- but through their expert reports is their constraining their civil liability to the same period as the guilty plea period. And, of course, if the Government was prosecuting under a preponderance of the

evidence standard, we might be talking about 2008 to 2016, not 2011 to 2013.

So I think if Starkist really is interested in getting the Court's leniency on this, they ought to commit to the Court and commit to the civil Plaintiffs that they are going to make payment for that preponderance of the evidence standard in the civil case and not constrain it to what I think is an artificial constraint imposed by beyond a reasonable doubt and the negotiations that obviously occurred leading to the guilty plea period.

And that's all I have, Your Honor. Thank you.

**THE COURT:** All right. Well, I assume, then, for counsel for Starkist who are negotiating the civil complaint are aware of the appropriate standard of proof therein; and I assume there has been a lot of back-and-forth about risks on both sides, and the whole question about certifiability and not on the class side in terms of -- and causation analysis and economic analysis of loss and all that.

But everybody knows that is done under a civil standard in that context.

**MR. SIX:** Yeah. I just make the point, because we did recently get expert reports; and the focus of those reports is on 2011 to 2013, the guilty plea period. And I think that's just not quite apples-to-apples in terms of the other case, but --

**THE COURT:** Right. Well, your point informs the potential magnitude of the civil risk -- the civil financial risk to Starkist; that they are facing claims for an extended limitations period under a lower standard of proof than criminal. And so -- and I understand that, and I assume they understand that as well.

**MR. SIX:** I'm --

**THE COURT:** We are in the business here of trying to predict; and this is, you know, what the numbers are going to be. So I understand that.

**MR. SIX:** Thank you, Your Honor.

**THE COURT:** Thank you.

Let me ask at this point a -- an important procedural question. We can get into the merit stuff. There is a lot of stuff to talk about. But it is apparent that -- and I know the Government's position is no matter sort of what the ultimate payout is and settlements are in the civil range -- if it is anywhere near even what the Defendant predicts, there is still plenty of cash flow and everything, that may be subject to some debate.

But I guess the question is: Would it make sense for the Court to defer imposing sentence to see what gestates with respect to the civil cases, particularly since Judge Sammartino has had the class certification motion, which I assume is a major piece of -- major decision-making tree -- it always is in

class actions, in my experience -- to -- and I assume if she had it -- someone said for six months -- that some decision will be forthcoming soon.

And to see, you know, how that is playing out in that arena so at least -- we have got probably three or four big variables which we are going to talk about. This is one of them. And I understand the Government feels like it kind of doesn't matter. It is not a material variable, but it may be depending on how the other variables are treated.

And since there is no restitution in this action -- and that often is a reason not to defer judgment because that defers restitution justice to the victims -- here, that is being worked out in the civil arena. This is really the punitive -- important, but it does not involve restitution.

What is the harm, I guess, in let's say continuing this hearing for some period of time? And I will back that up with the notion that I am inclined to perhaps take some testimony. I'm not going to have a multi-week trial on this, but there are some specific issues of contention that may be worth hearing from some of the witnesses on and which would give us time to then put that on.

**MR. MAST:** Well, Your Honor, I don't think it is necessary. And I do hope to go through a full presentation of the Government's points regarding Starkist's ability to pay.

Deferring sentencing is not necessary because, first, it's

Starkist's burden to establish its inability to pay. If it is talking about projected speculative civil settlements -- which were initially estimated to be drastically higher than they have settled -- Starkist hasn't met its burden of establishing an inability to pay.

But even more importantly, Starkist, in its own long-range plan, projects paying down its debt by more than $100 million from the beginning of 2019. Starkist would rather spend its money on anything but a criminal fine. So the longer this waits -- the longer this proceeds, the more Starkist is able to spend money on anything but a criminal payment.

And then they can come back and say, Well, in 2019 our long-range plan was pretty bad; but now it is actually much, much worse. And the reason -- and this isn't just with debt pay-downs. Starkist between year-end 2017 and year-end 2018 dramatically purchased additional inventory, which presumably only makes sense if you intend to sell that inventory.

So it is inconsistent with Starkist's projections of zero growth, but it is also a way that Starkist has the ability to turn what could be liquid assets into illiquid assets in the form of purchasing fish that it can then can and sell.

So deferring sentencing -- every Defendant before Your Honor would presumably love to defer sentencing for as long as possible, but Starkist pleaded guilty to a multi-year antitrust conspiracy; and it has failed to established its

burden establishing its inability to pay. And there is no reason to defer sentencing, waiting to see what speculative hypothetical civil settlements --

**THE COURT:** Well, let's talk concretely. If we were to defer for, let's say, 90 or 120 days -- I'm not talking about a year or something longer -- the risk you are contending with is not so much fraudulent transfers as much as turning liquid assets into illiquid assets or paying down debt and thereby reducing cash flow or cash availability.

It seems like that is something that the Court could take into account because this is discretionary at this point. If I don't count this as restitution, I have discretion to say, Hey, I don't care if you are going to go bankrupt.

**MR. MAST:** And I think, Your Honor --

**THE COURT:** I have the ability to not reduce the fine, and I can take that into account.

**MR. MAST:** And I think, Your Honor, if you look at Starkist's debt levels in 2011 -- and some of this might be under seal.

**THE COURT:** They have a very good ratio.

**MR. MAST:** Yes. And by the end of the forecast period, by 2024, Starkist is projecting a fraction of that amount of debt.

**THE COURT:** Well, of course, the Government's argument is that with that great ratio, they should be able to get a

loan if they need to refinance. I understand there is an instrument that has got a cap and everything; but if things are going well, it seems like the Government is saying, Well, they get financing to build a $77 million plant here. They can get -- so, I mean, if worse comes to worse and I impose, let's say, the $100 million fine you ask for, you seem confident that even if they don't have liquid assets, they will figure out a way to --

**MR. MAST:** Your Honor, the Government is confident that 90 days from now Starkist would have the ability to pay its fine, but it's fundamentally -- every Defendant before Your Honor would love to defer sentencing as long as a period --

**THE COURT:** I understand. Justice delayed is justice denied.

**MR. MAST:** Exactly.

**MR. LYNCH:** Can I comment on the what I call several misstatements by the Government?

**THE COURT:** Well, I first want to get your reaction to my question about deferring sentence to get more information.

**MR. LYNCH:** I do think it makes sense to have an evidentiary hearing, and we can do that relatively soon. I think you would benefit from hearing from actual witnesses who actually run this company and also are our expert and also an opportunity for us to rebut many of the false claims by

Dr. Zuehls. So in that regard, we are more than willing to delay it for purposes of an evidentiary hearing.

With regard to a more open-ended delay, we have concerns about that. The civil litigation, while we are waiting for a class certification hearing, that is just one step in a very -- multi-year process that the civil litigation is going through. After that, we are still working on expert reports and depositions. We haven't even filed motions for summary yet.

There is a possibility of trials. We don't know when the civil litigation will end. I mean, literally it could be several years; and we have no control over that.

The notion about -- we are not trying to delay sentencing. We want to be sentenced in a relatively timely way because having this $100 million possible fine hanging over our heads, it is causing the company great harm. It is creating great uncertainty. It is hard for the company to plan. It is hard for -- the company has already decided that it probably can't go forward with its plant expansion in American Samoa because it doesn't have the money.

As long as there is continued uncertainty as to what this fine will be, it will cause the company to have to restrict itself in terms of its ability to be competitive, to compete, to innovate, to produce new products because it doesn't know if it has the money. So in that regard I would be against an open-ended delay, but we are absolutely in support of an

evidentiary hearing.

But just two points that Mr. Mast raised, the claim that we are somehow spending down our debt, the debt payments are required by the banks. Banks are not giving us interest-only loans. They are requiring a return when they lend us money, much like anyone getting a mortgage or any other type of loan.

**THE COURT:** Is there a history of refinancing?

**MR. LYNCH:** Well, they refinance every three years, so it is the length of the loan. We pay roughly -- we don't pay the first year, but we pay $10 million every six months; that is required by the banks. Those terms are absolutely consistent with the previous loans and the previous loans. It has been the same loan. We have not changed them.

**THE COURT:** Has there been a change in the pattern of intervals --

**MR. LYNCH:** No.

**THE COURT:** -- in Which refinance occurs?

**MR. LYNCH:** No. And, again, that is another false allegation that the Government's expert report and Government's initial papers that somehow we're accelerating debt payments. We are not. We are paying according to what the banks require us when they made the loan, and those are absolutely consistent with the loan payments in the previous loans. There is no difference.

The other point is inventory. And we have brought this to

the Government's attention on several occasions, but they continue to raise it; and it is a complete falsehood. The notion that we have uncharacteristically high inventory in 2018, that is simply false. We -- if you look at it as a percentage of overall sales, we have roughly 37% revenue at the end of 2018. It was higher in 2016 and 2015. It was closer to 40 percent. In 2017 it was low because we had a five-week factory shutdown in order to install EPA compliance materials. The factory was shut down for five weeks. Therefore, we had unusually low inventories then, so it seems higher today.

Let me give you an example of why inventory is at probably a low level now. When we supply our customers, if we don't supply them in time, they penalize us. Our penalties from customers for failure to deliver was at its highest in 2018 than it has ever been. That suggests our inventory is dangerously low, not that it is high. And as a percentage of sales, it is lower than it has historically been. We have repeatedly clarified that to the Government, and they repeatedly keep raising this false claim that our inventories are unusually high. They are not. It is just simple math.

**MR. MAST:** Your Honor, if I might respond.

First of all, I think Counsel's projections about the duration of the civil litigation make a 90-day deferment basically meaningless. So I don't think that --

**THE COURT:** That assumes I buy it because in my

experience sometimes a decision on a class certification spurs movement. Particularly if the civil litigants are aware that they have some risk because if this Court imposes a fine and goes ahead, let's say, in 120 days, they are well aware that I could impose the maximum fine; and -- which could raise their risk. So let's say -- I'm not saying anything would happen, but you never know. There is a chance -- there is a window there that something might stimulate some movement. So I don't --

**MR. MAST:** I understand --

**THE COURT:** I'm not talking about an open-ended. I am talking about-- and I understand. I'm not going to do this forever, but 120 days, maybe that makes sense.

But go on.

**MR. MAST:** Your Honor, just that -- just that deferring sentencing for 90 days with the hopes that some speculative assertion from Starkist regarding its civil liability comes to fruition indicates that Starkist hasn't met its burden establishing inability to pay today, its sentencing date.

I do want to address the inventory because it is simple math. In 2017, which was a high growth year, Starkist upped its inventory, at the end of 2018. So 2017 and 2018 were high growth years for Starkist. And then it upped its inventory, presumably with the intention to sell. Whether it is

historically low or historically high doesn't matter. It shows that Starkist is expecting further revenue in the near term and is inconsistent --

**THE COURT:** It goes to the question of projected.

**MR. MAST:** Projected.

**THE COURT:** I understand there are several indicators. I understand. I read the briefs on that.

**MR. MAST:** Your Honor, with respect to just projections generally, I just -- I do want to emphasize that the burden lies with Starkist. It is not the Government's burden to show that Starkist's projected zero growth rate is reasonable. It is Starkist's burden to show it is reasonable, and its growth rate -- which contradicts its own business decisions, which contradicts industry reports, which contradicts statements made by its competitors in terms of the competitive outlook of the industry -- it is Starkist's burden to show that its growth rate is reasonable.

Same thing with respect to financing. It is Starkist's burden to show it can't borrow money. Starkist hasn't indicated that it tried and failed to obtain additional loans. Starkist hasn't indicated that it sought to borrow money from its parent, which is explicitly authorized under the terms of its loan agreement that it can borrow beyond $50 million from its parent company.

And so Starkist has failed to meet its burden showing its

inability to pay, and now is the time for sentencing because it has had ample opportunity. This is not an ordinary sentencing. We have had a four-month pre-sentence investigation report. We have had sentencing memos and replies. We have had multiple expert reports from Starkist's experts, a last-minute expert report from a bankruptcy expert. And so there has been an abundance of procedure giving Starkist the opportunity to show that it can't afford a $100 million fine, and it has failed to do so.

**THE COURT:** Let's talk -- I have some specific questions about the various categories here.

Let me first ask, there is a chart in the United States response memorandum, which is on page 9, which shows the U.S. per capita consumption of cans of tuna. And what I was looking for -- I understand there is a difference in the expert analysis in terms of whether, you know, the Government's expert looked at global sales, which Starkist says is not accurate because the domestic sales is a different animal.

Does this chart tell us sort of the direction of sales of tuna, shelf-stable tuna in the U.S. that there has been a decline, kind of an up-and-down but more or less steady decline from the '90s to 2016?

**MR. LYNCH:** Yes, that's absolutely correct. It has been an over 40% reduction.

**THE COURT:** I figured you'd say that. I mean, it is

in your brief, but --

**MR. MAST:** Yes. First of all, Your Honor, it doesn't pertain to Starkist. That's a chart of overall canned tuna consumption.

**THE COURT:** Right.

**MR. MAST:** And more importantly, that pertains to cans of tuna sold. It doesn't pertain to profits.

**THE COURT:** I'm going to get to that.

So I had a couple of questions from that. That is canned tuna?

**MR. MAST:** Correct.

**THE COURT:** Now there is the whole issue of pouched tuna.

**MR. MAST:** Correct.

**THE COURT:** What percent -- maybe it is in here -- and I don't know if this is private information or not. I'm trying to get an understanding of the relationship in terms of percent of the sales that goes relative to pouch versus how important -- how big of a piece of the pie is pouched tuna these days.

**MR. MAST:** So I think at this point of time, pouched tuna represents a relatively small percentage of Starkist's overall sales. However, the projections of growth in the industry -- and this was alluded to by the CEO of Bumblebee in public statements -- stating that the growth of the industry --

the outlook of the industry is strong because there is a shift. Yes, canned tuna is declining, but pouched tuna is growing. And Starkist is the market leader in pouched tuna.

**THE COURT:** So what is -- I need to know the idea of the magnitude.

**MR. LYNCH:** Your Honor, I can identify that for you.

In Dale Zuehls' supplemental report -- and he attaches an article regarding Bumblebee's CEO, and it has a pie chart showing you the size of the market and what tuna pouches account for.

**THE COURT:** Okay.

**MR. LYNCH:** They account for 16.2 percent. That would be -- unfortunately I don't have a document number.

**THE COURT:** Okay. I just needed to know the -- that's a growing number -- at least evidently, but at this point it is only 16.2 percent.

**MR. LYNCH:** So this would be the declaration of Andrew Mast in support of the United States sentencing memorandum.

**THE COURT:** But you are citing Zuehls' final report?

**MR. LYNCH:** It is a supplemental report that he submitted. It is Exhibit N of the Andrew Mast declaration that is part of Zuehls' supplemental report that he filed in February, and it has an article.

**MR. MAST:** Your Honor, I think before the Court -- this was submitted in Starkist's submissions rather than the

Government's submissions. I think Defense counsel is referring to what the Government may have submitted to probation.

**MR. LYNCH:** We think it might be ECF78.

**THE COURT:** And, unfortunately, I don't have --

**MR. LYNCH:** You know what, I can show you a copy right here. I can just take it out.

That was attached to a supplemental report by Dale Zuehls in February. It is part of an article, but it does show you that canned tuna, both chunk light and solid white, are over 50 percent of the market. Pouches are approximately -- I think I said 14 or 15 -- I forget what the number was.

**THE COURT:** 16.2 percent.

**MR. LYNCH:** Yeah.

**THE COURT:** Well, let -- okay. That raises the question, which is -- the next question is even if sales are down -- and I don't -- you know, now the sales -- has the -- is there a chart here of the sales of Starkist in the tuna field? This is U.S. -- is there a chart?

**MR. LYNCH:** I can show you -- I have a chart that I think is actually rather illustrative and helpful. This is -- if I could bring it to the Court's attention.

**THE COURT:** Yep.

**MR. LYNCH:** This was attached -- this was part of our response to the DPP and EPP submission. It is attached, declaration of myself; and it is a page from Professor Daine's

report, and it gives a chart of Starkist net sales, gross profit and operating income for 2008 to 2018.

Now, I think this is illustrated for a couple of reasons, if I can explain. First off, revenue is misleading. As you see, the green line is net sales. That's -- all the money coming in from the sale of --

**THE COURT:** For all goods.

**MR. LYNCH:** Cans and pouches entirely.

**THE COURT:** Not just tuna but includes salmon.

**MR. LYNCH:** Well, salmon is .6 percent of our sales, so it is very, very small. Most of what we sell -- I would say 98 percent of what we sell is canned tuna and pouches.

So if you see net sales is rather high, you know, close to 800 million. It seems like, Wow, that is rather profitable. Then look at gross profits. Gross profits are, you know, far lower, but the gross profits are not an accurate figure of what we have in terms of payment.

You have to take away many different costs before you get to what is called "operating income." And I think what is interesting and is relevant to the growth issues that we talked about -- so just -- I think just a very brief explanation of this because it is throughout the report. So we have the green line, which is net sales. You then take away the cost of goods sold, which is essentially the fish cost. So the fish costs minus revenue gets you gross profit.

**THE COURT:** Margin looks like it is around 15 percent?

**MR. LYNCH:** Probably less.

**THE COURT:** Somewhere around there.

**MR. LYNCH:** But, yes, you will see that in 2016 to 2018 revenue spiked; but there wasn't a corresponding spike in gross profits because fish costs were going up. That's why revenues seemed to go up. Fish costs were going up. We passed on those costs, but operating profit -- I mean -- gross profit remained relatively flat.

And then if you look at operating income -- which is gross profit minus marketing, trade freight, brokerage, other general expenses -- we are close to zero. And that's still not the amount of money we had to pay a fine. You still have to separate and subtract income taxes, appreciation, capital expenditure, interest expense and principal payments on our loan. You can see we are down to zero. And if you add up all the other payments we add, we are really not profitable at all, despite spikes in the --

**THE COURT:** So this operating income is before taxes and debt service?

**MR. LYNCH:** Yeah, it is before income taxes. So gross profit is exactly just revenue minus fish costs or costs of good sold.

**THE COURT:** But operating income then takes into account fixed costs and other things.

**MR. LYNCH:** Exactly. Marketing, trade freight, brokerage and other general expenses.

**THE COURT:** But not debt service or taxes.

**MR. LYNCH:** Correct. Correct. That's -- then you get down to actually cash -- free cash flow. So you take operating profit and then you subtract taxes. You subtract capital expenditures. So the EPA upgrades we need to make. You subtract increase in working capital if we have to --

**THE COURT:** Are these numbers on this chart substantiated, for instance, by tax returns or audited --

**MR. LYNCH:** Yes. We have audited financial statements that we do -- I think it is KPMG does audited financial statements. And these are all subject to review by them, and they are audited financial records.

**THE COURT:** This chart, which I assume was prepared for this proceeding --

**MR. LYNCH:** This was prepared by our expert Professor Daines in the civil case.

**THE COURT:** Right. So my question is: Did he derive these records directly from --

**MR. LYNCH:** Yes.

**THE COURT:** -- the CPA audited return or tax return?

**MR. LYNCH:** Yes. Absolutely. Which is also what our expert, Gokhale, relied on as well.

And I just think it is illustrative because we are

throwing a lot of things at you, like revenues increasing, or operating -- or gross profits increasing. But, I mean, when you really look at what cash is available, it is a much, much smaller amount of money. And this is something --

**THE COURT:** All right. Let me ask for a response because you have made a big point. You have a different chart in your brief, which says, Well, profits -- you can't just look at sales, and sales -- you have to look at profit. And here there is one chart that suggests, Well, profit is not necessarily so great.

And yet you have -- I wonder if -- your number, it sure looks different than your number on page 10.

**MR. LYNCH:** Yeah, I don't know where they got -- are you talking about their gross profit chart?

**THE COURT:** Yes.

**MR. LYNCH:** That was something new to us. We don't know how that was made or what that was based on, but I think it is a misleading chart.

**MR. MAST:** Well, Your Honor, it is based on Starkist's own financials. This is Exhibit 1 to Mr. Gokhale's report, which indicates -- which indicates the profit numbers for Starkist, and that even despite --

**THE COURT:** Which? His initial --

**MR. MAST:** This is --

**THE COURT:** The rebuttal or the original?

**MR. MAST:** I believe this is the original report, and it's --

**THE COURT:** It is which? Exhibit 1.

**MR. MAST:** Exhibit 1. And I think if you go to the -- yeah, he has Appendix B before that, which is a list of prior publications. And then you turn to -- I think it is the third page of Exhibit 1 -- you see Starkist's unlevered free cash flow.

So this -- these gross profit numbers came from Starkist's own financials.

**THE COURT:** Well, that's cash -- unfortunately, I think it is cut off. Is that unlevered cash flow, free cash flow?

**MR. MAST:** No, I don't think we are looking at the same, Your Honor -- oh, Starkist unlevered free cash flow is the title; and it starts out with stacked cases, which are the cases or cans of tuna sold, is the first line in that row. And then you go down below net sales to gross profit.

**THE COURT:** Which line is that? Because part of my thing is cut off here.

**MR. MAST:** One.

**THE COURT:** I have Exhibit 2 is the one --

**MR. LYNCH:** Which document are you on just so --

**THE COURT:** I'm on the expert report of Mr. Gokhale dated February 1st. Is that right? Am I on the right one?

**MR. LYNCH:** That was his initial report.

**THE COURT:** Yeah. That's what I thought.

And then Exhibit 2 is something called Starkist unlevered free cash flow, and it has got -- down on the column, rows 1 through 28.

**MR. LYNCH:** Let me turn to that for a second. I apologize.

**MR. MAST:** Your Honor, I want to make sure we are on the same document as well. Yes, 1 through 28.

**THE COURT:** Which line is the gross profit line?

**MR. MAST:** Line 8.

**THE COURT:** Line 8.

And that is what your chart is based on?

**MR. MAST:** Exactly.

**THE COURT:** Now, does that correspond with the other chart that I was given?

**MR. LYNCH:** It actually -- it appears to be similar. It is just the way they framed it. They made it look like a dramatic spike. When you look at 2011, it does seem to be close to 80 million.

**THE COURT:** So it is just a scale of the --

**MR. LYNCH:** Exactly.

**THE COURT:** -- segmentation of the chart.

**MR. LYNCH:** That's what it appears to be. And I think it is misleading actually in that regard.

**MR. MAST:** Well, it is based on Starkist's numbers.

**THE COURT:** In any event, regardless of the chart, I am going to look at the actual numbers. It shows a substantial jump in 2013, a further jump in 2014, a further jump in 2015, and then a drop in 2016, slight recovery in 2017. So it has been fairly flat in the last four years from 2015 to 2018.

**MR. LYNCH:** Which is consistent with our growth figures as well, Your Honor, which we have been having a substantial debate over with the Government.

**MR. MAST:** Well, gross profit has been rising, albeit at a slower rate than it was during the conspiracy.

**THE COURT:** The conspiracy period ended 20 --

**MR. LYNCH:** December 2013.

**THE COURT:** 2013.

So if you look at the untainted or unaffected period, you know, over the four-year period, it looks like about 10 percent growth -- my math isn't right.

**MR. LYNCH:** No. Are you looking at line 8?

**THE COURT:** I am looking at line 8. So 2014, 167; 2018, 186. That is a difference of -- that is about 12 percent if I'm not mistaken.

**MR. MAST:** I mean, Your Honor --

**THE COURT:** Over four years.

**MR. LYNCH:** I don't know that gross profit is the appropriate figure to look at. I mean, if you look at

operating income as a percentage of growth, if you look at 2015, it is .9; negative 15 in 2016; negative 38 in 2017, in line 12. Gross profit is not the money we have. You have to take away a lot of other expenses.

**THE COURT:** Right, it is one indicator.

**MR. LYNCH:** Yeah.

**THE COURT:** But you have other arising expenses.

**MR. MAST:** And operating income is much easier, malleable. In projections they have a capital expenditure that is projected at $77 million.

**THE COURT:** That is my second question.

**MR. LYNCH:** That is after operating income. Capital expenditures come after operating income, which leads to then available free cash flow.

**MR. MAST:** Your Honor, I think this all just illustrates that the Court should hold an evidentiary hearing.

**THE COURT:** Well, I told you at the outset I'm sort of inclined because even taking that same number, you have charts that appear different until you get to it; and then there are things that need to be flushed out.

One of the other questions I have is what about the effect of the decision not to invest in the Samoa facility, which means that 77 million not in capital is spent. On the other hand, presumably that will affect sales and profit because that was for mainly pouched sales. It was a pouched facility.

**MR. LYNCH:** Correct.

**THE COURT:** If that's the big high growth area, the plus from one perspective is that frees up some cash for some debt obligations that would have been incurred and, therefore, lower debt service because now you are not leveraging 77 million one way or another, whether by cash or by debt. But one could say, Well, then the revenue is not going to be what you thought it was going to be, especially for a high margin -- higher margin, faster growing segment.

So what I don't see in the reports -- maybe I missed it -- are both experts kind of post-decision in light of this non-investment decision, how does that affect the overall cash available? How does that affect the cash flow?

**MR. LYNCH:** We did do that analysis. This has been a relatively recent decision recognizing the financial difficulties of the company that they are not going to be able to build this factory in the timetable that they wanted in 2020. It doesn't impact the EPA expenses. The EPA expenses --

**THE COURT:** Yeah, I understand that.

**MR. LYNCH:** And Mr. Gokhale did an analysis of -- and he still concluded that based on his analysis that Starkist would not be able to pay more than a $50 million fine, even if we forego --

**THE COURT:** I haven't seen Dr. Zuehls' analysis post-decision.

**MR. MAST:** No, Your Honor. And, frankly, the -- Starkist's sort of pattern of behavior of putting up one reason why it can't pay a criminal fine and then the Government refuting it and then coming up with another reason is indicative of the overall picture of its ability to pay. But the Government first learned of its intention not to pursue this expansion in American Samoa in its response to the Government's sentencing memo. Before that time, it said it was essential to its operations, essential to its plan; and Mr. Gokhale did do an analysis, and he shows that Starkist, with the savings from the expansion in American Samoa, that its net free cash flow will be $171.5 million.

**MR. LYNCH:** And if you were to subtract that number from our estimated -- our minimum estimated civil liability, you get to a fine of less than $50 million.

**MR. MAST:** And, Your Honor, a couple points responding to that.

First -- and this was raised in our initial sentencing --

**THE COURT:** But that still assumes the CAGR of .1 percent?

**MR. MAST:** Correct.

**MR. LYNCH:** Correct.

**THE COURT:** And so your argument is that given the civil liability, unless the civil liability is, for instance, 71 million, you don't have 100 million --

**MR. LYNCH:** Correct. And we have already spent -- we have told you the amount we have already spent towards it. So given our estimate of what total civil liability will be, given that free cash flow figure even without the factory in American Samoa, we still can't pay more than $50 million. In fact, it is under 50 million in terms of the free cash flow.

**MR. MAST:** Your Honor, that is inaccurate because Starkist has already borrowed money for its civil claims that are not part of that free cash flow analysis.

Moreover, in 2017 -- and this point wasn't even responded to in Starkist's response to the sentencing memo. In 2017 Starkist on its balance sheet recorded a $40 million liability accounting for Starkist's criminal fine. What that means is Starkist's balance sheets are $60 million stronger -- or excuse me -- $40 million stronger than they appear. Its free cash flow is $40 million weaker than it appears. It has essentially already set aside that money for payment, from an accounting perspective.

**MR. LYNCH:** That is absolutely false. It is an accounting concept of setting aside a reserve. We don't have 40 million set aside.

**MR. MAST:** And Mr. Gokhale, in his report, did not -- when he is analyzing Starkist's balance sheets, he is considering that liability already accounted for. So this is --

**THE COURT:** This underscores why we might benefit from live testimony and cross-examination.

Let me ask you this question: I assume he ran other iterations besides .1 percent?

**MR. LYNCH:** Yes.

**THE COURT:** So if he went to another number like 1 percent, what would that -- instead of 171, what is that number?

**MR. LYNCH:** I don't have the calculation in front of me.

**THE COURT:** I had trouble, frankly, reading these tables, but I want to know would it be useful to see?

**MR. LYNCH:** We can have him do that.

**THE COURT:** On both sides. If you tweaked the variables, what do you end up with? Because I'm interested in whether the methodology is also different or whether it is the input assumptions --

**MR. LYNCH:** Your Honor, the Government has had ample opportunity --

**MR. MAST:** It is not hard --

**MR. LYNCH:** The Government has had ample opportunity to argue the merits, and I have been patient. We are clearly on the merits now. I do have a few points that I want to make -- in light of the way the hearing has evolved -- I haven't had an opportunity to say. But I do want to comment on

what Mr. Gokhale did and what Dr. Zuehls did, and also just overarching issues to consider when sentencing Starkist.

If I could just get five minutes of your time on that, if that would be permissible.

**THE COURT:** All right. Then I will give you five minutes to respond.

**MR. MAST:** Thank you, Your Honor.

**MR. LYNCH:** Okay. So, Your Honor, Mr. Gokhale concluded that Starkist's five-year free cash flow is $94.8 million. You take away the civil settlements we have already made, and you are already closer to 40 million.

**THE COURT:** How does that -- how does that compare to the 171 that you --

**MR. LYNCH:** So the 171 is if you add the 70-some-odd million of --

**THE COURT:** Which is now given.

**MR. LYNCH:** It is delayed certainly, yeah.

**THE COURT:** Well --

**MR. LYNCH:** Under -- this is pre-American Samoa analysis.

So this must cover all -- exist all the civil settlements, including the ones we have paid because we have just paid them this year. So that wasn't subtracted yet, and the criminal fine and any future civil settlement.

Dr. Zuehls -- and this analysis is based on the company's

information, their long-range plan, which they use to provide to creditors, to lenders, and they also provide it to auditors. They have no incentive to --

**THE COURT:** I understand that. Your position, even though this was created during the course of litigation, it was not a litigation-driven document. It is an internal document --

**MR. LYNCH:** Correct.

**THE COURT:** -- for which Starkist has an incentive not to down-play it for economic reasons?

**MR. LYNCH:** Correct.

And I think that's in contrast -- I think the Court really has to take on what Dr. Zuehls has done in this case. And what he has done is absolutely unreliable.

He has based his analysis on assumptions of growth rate that are simply unreliable. His initial growth rates of 3.7 to 4.8, they were based on third-party reports of global canned consumption, which are not reliable for the United States. They are not consistent with the growth rate of Starkist over the last five years, and they are also not consistent with what he did with Bumblebee, which I will get to in a second.

Also, his civil settlement assumptions are completely off point. He has, at the low end, $67 million. And we have already almost taken up that entire amount in existing settlement, and we haven't even settled the classes yet.

We also think his analysis contains significant errors that absolutely overstate our free cash flow by tens of millions of dollars. And Mr. Gokhale's rebuttal report identifies each of those.

But -- and this is critical -- Mr. -- Dr. Zuehls issued his report in the beginning of this year, and he referred to 20 iterations he did. We specifically asked him, What were your assumptions. We want to be able to test them; to look at them. To see what he relied on in terms of growth and other factors, and the Government refused to hand them over. They refused to give them to the probation officer.

We repeatedly asked them by letter for them, and we also asked for the Bumblebee information. Lo and behold, we don't get them until we file our opening sentencing memorandum; and what do they show? On their face he has now done 35 iterations, and one-third of them show that we cannot pay a $100 million fine. This was never disclosed to us before. It was never disclosed to the Court or to the probation officer, which I think really undermines the recommendations of the probation officer.

Now, if you correct just the very obvious errors -- math errors and other sort of computational errors in his analysis -- all 35 show we cannot pay $100 million. He completely undermines Dr. Zuehls' report, and that is again in our rebuttal report of Mr. Gokhale.

Also, I think this is really important, particularly under 3553 and disparate treatment. He did the same analysis for Bumblebee, and he presented that to you; and Bumblebee got a reduction down to $25 million. But when you looked at his analysis for Bumblebee, he used different growth rates. Half of his iterations, he did 16 of them for Bumblebee, were negative .5 percent growth rate. They ridiculed us for showing flat growth rate.

And yet Dr. Zuehls, when he analyzes Bumblebee's analysis -- and they are in the same market as us. They sell to the same customers -- half of the iterations show negative growth. He doesn't have that at all for Starkist. The lowest in the second iteration is 1 percent.

Also Dr. Zuehls includes what we call a cash cushion. And I have a document on it that I would like to share with the Court. He basically concludes at the end of the day -- and I will share this with the Court. This was given to us just I think about two weeks ago by the Government, May 28th. This is Dr. Zuehls' iterations on Bumblebee. And look what they show.

At the end of the day he has at the bottom, total possible fine, 84 million. That means he thinks that Bumblebee has 84 million to pay a fine, but the recommendation is for a $25 million fine. So he claims that they should only pay 30 percent of their available cash over the next five years to pay a fine.

When he analyzes Starkist's analysis, there is no cash cushion. He analyzes our available cash as 155 million after civil settlements and says we should pay 100 million, which is 65 percent of our available cash. It is absolutely inconsistent and unfair disparate treatment for Starkist versus Bumblebee.

And then finally on Bumblebee, look at his analysis of potential civil liability. Potential civil liability is at the low end of $210 million for Bumblebee up to 520. That is simply incredibly high compared to Starkist. Starkist is 67 to 230.

**THE COURT:** There is a lot more experience in actual settlement now than there was at the time of Bumblebee.

**MR. LYNCH:** True, but we have to compete with Bumblebee. We are asking for the same treatment that the Government gave to Bumblebee.

**THE COURT:** Well, that doesn't mean you ignore evidence, intervening evidence. That one I don't find very --

**MR. LYNCH:** Okay. But, nevertheless, what does the data show on growth? And that is a key dispute.

We claim that we are going to have flat growth. They claim we are going to have 3.7 to 8.4 percent growth. Let's look at what was the actual purchases by consumers, and what he looked to for; that is, the Nielsen data. Nielsen is a third-party company that collects SKU data that is actually

like when you purchase products in a supermarket. They looked at that data, and companies in the tuna industry buy this stuff and look at it all the time to see growth and declines. They found for the end of 2008 the total --

**THE COURT:** 2018.

**MR. LYNCH:** 2018, I'm sorry. 2018. They have found that the growth of both pouched and canned combined was negative .8 percent.

**THE COURT:** Year over year?

**MR. LYNCH:** Year over year, for the total industry.

**THE COURT:** What was it for 2017 over '16?

**MR. LYNCH:** I don't have that, but we can get that for you.

But all I'm saying is that it is consistent with our flat growth analysis.

Also --

**THE COURT:** Now, I'm still curious. The gross operating profit showed an increase from 2014, '15, '16, '17 or maybe '15, '16, '17, and '18. Whether it is figure 13 or the page from Dr. Gokhale's report that we looked at earlier, and yet you said, Well, cost of tuna -- the cost of fish has been going up, which would suggest that if sales were flat and costs were higher, you would have a decline in gross operating profit; but whatever the reason is it appears that the --

**MR. LYNCH:** I'm not sure what line --

**THE COURT:** The profit -- line 8.

**MR. LYNCH:** Yeah.

**THE COURT:** -- from 2014 went from 167 to 186, with some fluctuation in between, to 2018. So over that four-year or five-year period, there was an increase in gross -- I understand there is net profit, net operating income, et cetera, et cetera. But this takes into account the rising costs of goods, the fish.

What appears to be -- the court reporter has been going at this for a long time.

Let me ask this one question. There has been an increase in gross operating profit. And I understand that is different from net operating income; but it went from -- like I said, in 2014, from 167 and change to --

**MR. LYNCH:** I'm not sure I'm looking at the same document you are because I see a decline in 2016.

**THE COURT:** There was a decline. I'm saying overall. If you take the end point and the beginning point, there is ups and downs. It went up pretty good in 2015. It went down in 2016. It went up pretty well in 2017. Slight in 2018. Net over those four years, there was a -- about a 20 million increase over four years, about 5 million. It is about a 2 1/2 to 3 percent if you do -- just do rough, crude numbers.

So, you know, doesn't that support the notion that notwithstanding the decline and the Nielsen survey, that

somehow Starkist is doing okay? At least before you take away fixed expenses and everything else?

**MR. LYNCH:** Well, let's look at the last five years, okay. If you look at the last five years -- it is in our brief. It is in the report. If you analyze Starkist's growth in the last five years, I think, you know, that is a fair assessment. I believe the growth is -- I don't have the figure in front of me. It might be around 1 percent, but that includes the 2017 year, which even Dr. Zuehls recognizes was an extraordinary year in terms of excess sales.

If you exclude that, the growth over the last five years was negative. I mean, again, it depends how you look at it. I think looking at overall consumer demand of canned tuna going down, looking at actual purchases under Nielsen of negative .8 percent, I think it leads to a conclusion that flat growth over the next five years is a reasonable assessment particularly if we cannot expand our pouch sales like the way we wanted to originally with an American Samoa plant.

So all of those together combine to suggest that we experienced that flat growth is an accurate assessment of the market.

**THE COURT:** All right. Let's take a brief break, and I will give you your ten minutes or whatever it was.

**MR. LYNCH:** Your Honor, because we have visitors who have come from American Samoa, if we can also just make sure we

allocate time for them to speak, if that's okay.

**THE COURT:** I will do that.

Let's take a ten-minute break and we will come back.

(Recess taken at 4:37 p.m.)

(Proceedings resumed at 4:53 p.m.)

**THE COURT:** Remind me again where the pie chart came from.

**MR. LYNCH:** That was from Dr. Zuehls' supplemental report to the probation officer that he submitted February 1st. And it is attached, I believe, to our Lynch declaration in support of the response. We realized that Dr. Zuehls' first two reports had not been submitted by the Government so we submitted them. And it is an article relating to Bumble Bee's CEO.

**THE COURT:** All right.

**MR. LYNCH:** And there is some information --

**THE COURT:** Great. Thank you.

**MR. LYNCH:** Your Honor, I do want to respond to a question that you asked about Nielsen data going back several years.

**THE COURT:** Yeah.

**MR. LYNCH:** I was able to track down -- again, this is shelf stable tuna. So it includes pouch, which has been increasing, but also the decreasing canned. So this is combined together and our -- my quick analysis showed in

2008 --

**THE COURT:** 2018?

**MR. LYNCH:** -- 2018 in the form of units, it was -- the Nielsen data showed that consumption was down 1.94 percent.

**THE COURT:** In the U.S.?

**MR. LYNCH:** In the U.S., correct. In 2017 according to units sold, it was up 1.24 percent. In 2016 it was down 3.19 percent. In 2015 down .4 percent.

If you would like, Your Honor, we can provide that to you in some sort of written submission or if there is the evidentiary hearing, we can present it at the time. Again, that is in terms of units sold.

**THE COURT:** Okay.

**MR. LYNCH:** I do have just two minutes of final comments, and then we can move onto whatever topic; but I just want to finish up.

Again, I have gone through the reports. The criticisms we have of Dr. Zuehls, I think an evidentiary hearing would expose those and show them to be unreliable. In terms of the other key factor, our civil liability -- as the Court has heard from the various Plaintiff classes -- we have settled a substantial number of cases, but the classes haven't been settled; and they are asking for a combined 1.5 billion in damages -- we have given our estimates of settlements which are lower; but nevertheless, we are facing huge risks at a low burden of

proof.

We do think full civil settlements are a proper substitute for criminal restitution, and we would direct the Court to the case citation in our response brief, Ninth Circuit, *U.S. versus Thompson* which is 830 F3d 1049. It is from 2016, the Ninth Circuit. And it stands for the proposition that in the context of a conspiracy case, the Court is allowed to look -- in calculating restitution or evaluating restitution -- to conduct outside the four corners of the charged conduct to the overall harm to the victims as long as it is related to the core conduct. And in this case, it is. As you know, the civil Plaintiffs have alleged broader time periods of the conspiracy. We have pled to a narrower period, but the courts are allowed to look to the broader period for purposes of restitution.

And in this case under the plea agreement, the Government has agreed that the civil cases should serve as a replacement for restitution.

Now, the probation officer did not look to restitution at all as a basis to reduce the fine because we believe they misapplied the law. In any event, we think that that clarifies the point as to why all the civil liability should be considered under Section A of the inability to pay section of the United States Sentencing Guidelines.

Just a few final minor points regarding the pre-sentence report, we are not clear -- but he wrote that it's not clear

that a hundred million dollar fine will necessarily substantially jeopardize the organization. It is not clear to us if he was applying a clear and convincing standard by using that language, but the standard is preponderance as the Court knows.

The probation officer also did not also have Dr. Zuehls' most recent report or underlying iterations which suggests that they did not have a complete record upon which to make a recommendation.

And, finally, the pre-sentence report recommends probation in this case; but we think it is unnecessary. Both the Government and Starkist have recommended no probation. Bumble Bee received no probation. And in that regard, we think that is inappropriate.

So I do want to answer any additional questions. And if we have time and opportunity for our representatives to allocute, but I want to hand it back to the Court after making those points.

**THE COURT:** I want to give Mr. Mast a chance because the hour is late.

**MR. MAST:** Thank you, Your Honor. Your Honor, it is the mission of the antitrust division to promote economic competition. It takes good faith and ability to pay claims seriously. It deals with them frequently. It has an established process to analyze inability to pay claims. And

though it is not the Government's burden, it retains Dr. Dale Zuehls, an outside forensic accounting expert, obtains financial substantial discovery. And after reviewing the various financial records, Dr. Zuehls assesses the company's ability to pay its fine generally from three sources; issuing stock or debt, disposable assets or capital and future earnings.

With respect to future earnings Dr. Zuehls performs a series of financial projections to determine a company's excess cash flow. He doesn't rely on one single scenario. And his methodology has been used in dozens of cases including this one.

And Dr. Zuehls over the years has regularly concluded that companies do not have an ability to pay. The Government is not interested in criminal fines bankrupting companies. But here, Starkist claims did not pass muster, and I know Your Honor is inclined; but I'm going to take a stab at trying to simplify things to avoid the need for an evidentiary hearing by relying simply on Starkist numbers. And with your permission, I would like to just put two numbers up on an easel which demonstrate Starkist's ability to pay.

According to Starkist's own projections, it will have $171.5 million in future cash flow. According to its most recent submission, it retains an investment of Techpack worth $155 million. This is not essential to Starkist's business.

In fact, the expert whom Starkist purported, expressly did not include it as part of its inability to pay analysis. So there you have a total of Starkist assets available for a fine paid over installments as recommended by the Government. And according to Starkist's own estimates of its potential civil liability, there is ample funds available to pay both the Government and to pay the civil Plaintiffs, whether we consider a broader conspiracy involving more products, whether it is a longer time period. According to Starkist's own estimates, they have sufficient funds to pay the Government its fine and to settle their civil claims based on their own projections.

This takes CAGRs off the table. This takes projected civil settlements at Counsel's word for it, and it is available. And Counsel alluded to the Government not interjecting itself in Starkist's business decisions earlier.

Starkist has pleaded guilty to a multiyear conspiracy affecting over half a billion dollars in a staple American household product. It absolutely has to pay its criminal fine before it gets to expand profits, make capital expenditures.

**THE COURT:** Is that future cash flow that is in Dr. Gokhale's report, does that assume there is no cash flow coming from the Techpack investment?

**MR. MAST:** Correct. That is what Dr. Gokhale's report stated.

**THE COURT:** So if they were to liquidate or sell

Techpack somehow, that will not impact the future cash flow?

**MR. MAST:** According to Dr. Gokhale's report, it would not. And that is essential. This is the money that is undisputed. This is Starkist's own financial numbers. Now, Starkist says it can't liquidate Techpack. It says it can't obtain financing for loans, but the burden rests with Starkist.

Pursuant to the loan agreement, there are multiple exceptions to borrowing money. First of all, Starkist didn't raise the argument that its loan agreement prevented borrowing money during the course of the pre-sentence investigation report. That was raised for the first time in response to the Government's sentencing memo. And when the Government looked closely at that loan agreement, it noted numerous exceptions. It can borrow as much money as it wants from the parent company, as subsidiary debt. It can obtain written approval from the lender.

Starkist hasn't shown that it sought to obtain a loan from a lender and been turned down. Starkist hasn't established that it requested to borrow money from its parent company, and the burden rests with Starkist.

Starkist addressed the Government's methodology in Bumble Bee. First of all, Starkist has already agreed that a hundred million dollars fine comports with Section 3553(a). Its attempt to seek or reduce fine based on Bumble Bee's finances is improper under the plea agreement.

But, second, Bumble Bee's fine was not 25 million. It was 81 million assuming a prerequisite sale occurred, and this is the appropriate comparison between Starkist and Bumble Bee. And Bumble Bee accepted responsibility for its actions and provided substantial assistance to the Government which Starkist did not.

Importantly, Bumble Bee is not similarly situated. The inability to pay analyses conducted by Dr. Zuehls occurred two years prior, and Bumble Bee's finances differed drastically from Starkist. You will recall looking at Starkist growth figures from 2015, 2016 -- the time period under which Dr. Zuehls's was analyzing Bumble Bee's inability to pay claim -- that was before the rapid growth rate that Starkist experienced of a growth of 6.6 percent in 2018 and 13.4 percent in 2017. So it is an apples-to-oranges comparison that is inappropriate under the plea agreement but also irrelevant.

Moreover -- and most importantly -- Starkist completely misunderstands Dr. Zuehls' conclusions about Bumble Bee.

Dr. Zuehls didn't create an $80 million cushion or any cash cushion for its inability to pay. Bumble Bee's inability to pay conclusion was based -- it hinged on the terms of a specific debt covenant that Bumble Bee had indicating that any judgment in excess of 25 million would trigger specific events of default that Bumble Bee would be unable to pay and recover from.

Bumble Bee's debt during the pre-sentence investigation report was publicly downgraded to a negative rating by the ratings agencies. Bumble Bee, unlike Starkist, attempted but failed to refinance existing debt. Contrast this with Starkist which has successfully refinanced its existing debt after the plea agreement was signed disclosing the potential of a hundred million dollar fine to the -- to its lenders; and, nevertheless -- based on the strength of Starkist's balance sheets and the guarantee of its parent -- obtained complete refinancing of its debt. Starkist hasn't indicated that it sought refinancing of additional debt to relieve itself of the debt covenants. In fact, Starkist entered this specific loan agreement understanding that it faced a hundred million dollar fine.

Bumble Bee, in contrast, its debt covenants existed and loan agreements existed long before the investigation began.

So the conclusion from Dr. Zuehls was not based on these relative proportions of estimated cash flow. It was based on the fact that if Bumble Bee got a dollar over a $25 million fine, default would be triggered and there was no way out of it.

**THE COURT:** Let me ask you: The current refinance you say was entered into after the 11C1(c) plea agreement here?

**MR. MAST:** It was after the plea agreement was signed. I believe it was before the plea hearing took place. But in

October of 2018 is when the refinance agreement was signed, and those were disclosed -- the possibility of a hundred million dollar fine was disclosed in clear written form -- this is with our papers -- to the lenders in which they outlined the prospect of a hundred million dollar fine.

**THE COURT:** You say lenders, plural?

**MR. MAST:** It is one loan agreement with multiple lenders.

**THE COURT:** Well, let me stop right there. Is that accurate, that lenders who refinanced in October 2018 were aware of the plea agreement?

**MR. LYNCH:** Yes, they were aware of the plea agreement. It was described to them accurately as between 50 and 100 million dollars. They were made fully disclosed.

I think it is important to note that after being aware of it, they still insisted on some relevant terms of the loan agreement. One, they insisted on a scheduled payment of 10 million every six months consistent with previous agreements. They also said we could not borrow more than 50 million all with the knowledge that we were going to be fined. And partly because of that, we couldn't borrow more than 50 million. We are already up to that. And the Techpack argument is a red herring. We can't sell Techpack under this --

**THE COURT:** I'm going to a different place, Counsel.

Normally a lender isn't going to lend or refinance millions of dollars without doing due diligence, correct? And their due diligence would have obviously taken into account the possibility of a fine of a up to a hundred million dollars.

They must have concluded there was enough -- in some worlds you call it debt-to-value ratio or whatever it is -- ratios and cash flow analysis that they were comfortable enough to make the refinance loan taking into account the real possibility of a hundred million dollar fine. Doesn't that suggest an independent third party thought this was doable?

**MR. LYNCH:** No, because there is a very important distinction. There is a parent guarantee paid for -- we had to pay for that. We had to go to our parent -- or at least, I believe, Don Juan Enterprise -- and say to them, We can't get a loan unless you guarantee it. And in exchange for that we had to pay them for that -- for that -- the right to get that guarantee.

So I think that suggests -- the fact that we needed a guarantee suggests our financial fragility because we needed that. And we negotiated an arm's length -- as we would -- even though it was our parent, it was an arm's length negotiation. And that -- the terms of that have been audited and found to be fair market value.

So that's what -- I mean, that suggests the opposite which is, you know, when you make a loan for a house, I mean, you

don't always get a guarantee. You only need a guarantee if somehow there is a question as to your credit worthiness.

**THE COURT:** Well, let me turn it back to you, Mr. Mast. If the fact that a guarantee -- if this is accurate -- was required and had to be paid for, which means Starkist couldn't get it on its own with the hundred million dollar potential fine, doesn't that --

**MR. MAST:** First of all, Your Honor, Don Juan has historically, as long as we are aware of, always guaranteed Starkist debt. In an earlier loan agreement -- my colleague is showing me -- from April 2016, Starkist's loan was guaranteed by Don Juan Enterprises. It did not have the prospects of the criminal fine at that point.

That loan agreement, likewise, contained the boiler plate language of a $50 million limitation on additional financing. It was limited to $50 million in that loan agreement. It was able to refinance again and again as Counsel has stated every three years.

Moreover, as Your Honor alluded to, the lender being aware is a third party -- a neutral third party -- assessing financial of Starkist. Don Juan was well aware of Starkist's financial situation and signed up to guarantee a loan based on the information. I mean, of all parties that would have an insight into Starkist finances, Don Juan perhaps is the closest insight. And, nevertheless, Don Juan agreed to guarantee the

debt on the terms that were set forth. Don Juan is a signatory on the guarantee page. It understood the liability that Starkist was facing and pledged to guarantee the loan.

**MR. LYNCH:** Your Honor, the existence of a guarantee three years ago just again underscores that this is a challenging market; that over 30 years has seen declines in consumption. It means that Starkist not only needed a guarantee in 2018. They needed it in 2016 and possibly before. All of that suggests the weak financial state of the company and the fact that it does need a guarantee; needs to pay for it. It actually infers the absolute opposite point that the Government is trying to make.

**THE COURT:** All right. Let's go back. Let me go -- I interrupted you, so go on and make the rest of your points.

**MR. MAST:** Your Honor, the notion that Starkist can't borrow additional money is completely unsupported by any factual support. Bumblebee became forward and said, Here is a loan we tried to obtain. We couldn't do it. And that's -- that is before Your Honor in the sentencing paperwork.

Starkist, in contrast to Bumblebee, has historic low levels of debt right now. $290 million in 2011. And it was functioning, paying down its debts, growing at the rates Your Honor has seen. And at the end of the projection period, in 2024, Starkist asserts it is going to have $50 million in debt. If it just maintained its current level of debt, at

150 million, there is your -- there is your criminal fine.

And looking at these numbers, Techpack -- an asset that wasn't even considered by Starkist's expert -- and the future cash flow with the dismal CAGRs, that is more than enough money to pay the criminal fine and any civil settlements, even by Starkist's own projections. So, yes, there is a dispute about expert -- dispute about CAGRs. There is a dispute about civil settlement, and Starkist CAGRs -- the Government contends -- are out of step with industry reports. They are out of step with Starkist's own business decisions. Until two weeks ago Starkist was expanding its capacity stating -- it stated it needed to expand its capacity.

But the bottom line is there is not a dispute right now pertaining to the ultimate issue, an issue that Your Honor would need to hear testimony from experts, from each side who are going to parrot what their report says. Your Honor can conclude beyond doubt that Starkist hasn't met its burden. It is Starkist's burden to establish an inability to pay; and without showing that it sought and tried to obtain refinancing, without showing that it sought to liquidate Techpack, it can't meet its burden. It hasn't met its burden and it can't meet its burden.

And it has had ample opportunity to do so. A long pre-sentencing report, an extended briefing where the Government, Starkist, the Plaintiffs, all submitted hundreds of

pages of briefing. And so there is not a need for delay in this matter. And Starkist ultimately can pay and deserves a $100 million fine.

**THE COURT:** All right. So this boils down to you are taking their own word at future cash flow and adding to that Techpack?

**MR. MAST:** Correct.

**THE COURT:** And your response it is an illiquid asset?

**MR. LYNCH:** Correct. By contract we can't sell it off. It's also --

**THE COURT:** Contract with the lenders?

**MR. LYNCH:** Correct.

**THE COURT:** Well, what effort have you made -- anything can be done by consent.

**MR. LYNCH:** Correct. Correct.

**THE COURT:** So --

**MR. LYNCH:** But --

**THE COURT:** What indication is there? I understand by the letter of the agreement you need consent, but what indication is there that there would not be consent?

**MR. LYNCH:** We have not explored the idea of selling off our assets. The assets we own, we believe, are strategic assets that support our business, similar to our factories, similar to our office buildings. We think these are strategic assets that were invested as part of the business. It is a

packaging company. We don't want to sell off our strategic assets. In fact --

**THE COURT:** Well, I understand it is not ideal. There is -- there are future economies perhaps to be gained, et cetera, et cetera. But the question ultimately is whether or not you have met the burden of proof to show that this reduction -- preserving this asset, Techpack -- is necessary to avoid substantially jeopardizing the continued viability of the organization's existential investment or a preferred investment.

**MR. LYNCH:** We think it is a strategic key asset.

**THE COURT:** But it is existential to the organization, to Starkist?

**MR. LYNCH:** I will say this: I don't know what "existential" means in this context; but I will say it was sufficiently important enough that even before this investigation started -- before any of this started, they thought it was worthwhile as a business venture to invest in it, and they made that decision.

Now, the question about liquidation beyond the limitations by contract, who would buy this? This is most valuable to Starkist. If we were to have to go out and sell it, it would be a fire sale. We would lose substantial value. We don't even know if there would be a willing buyer out there. It is not the kind of asset you can easily sell or transfer.

And also I think -- I come back to disparate treatment between us and Bumblebee. Bumblebee was not required to sell off any of its assets. It wasn't -- it has all sorts of businesses. It has currently a business in Canada that is being considered for sale. It has an oyster business. It has all sorts of -- sells more products than Starkist does, and it was not forced to sell itself off to pay its fine. And we don't think we should be forced to do so either.

**MR. MAST:** Your Honor, this is a criminal fine. It is not a question of: We think we are more profitable if we maintain Starkist. It is --

**THE COURT:** You mean Tech --

**MR. MAST:** I'm sorry, if we maintain Techpack. The notion that Starkist hasn't explored this opportunity underscores that it hasn't met its burden. And, frankly, I believe Starkist could come up with more than sufficient money to reach that number -- the future cash flow number and its Techpack number -- by loaning additional money pursuant to exceptions within the loan agreement. The idea that they can't sell Techpack, it strikes me as odd because pursuant to their own reports, this investment has appreciated some-odd $30 million from the time they bought it in 2014 --

**THE COURT:** Is that a book value or is that -- what is that value?

**MR. LYNCH:** A book value.

**MR. MAST:** The book value, 155 million. What they paid for was 122 million over two payments or 122 million something.

**THE COURT:** How do you get the 155?

**MR. MAST:** The appreciation of the asset.

**MR. LYNCH:** That was through an audited assessment of its value.

**THE COURT:** I see. And majority of Techpack is owned by a Don Juan subsidiary?

**MR. LYNCH:** Don Juan Systems, which we purchase packaging from.

**MR. MAST:** So Starkist can't have it both ways. They can't say, Well, this asset is beyond sellable. It is not of any value. We won't be able to find a buyer; but then at the same time say, This is a really important strategic business for our enterprise. It is one or the other.

**MR. LYNCH:** No, it is strategic to us --

**THE COURT:** Hold on. Let him finish.

**MR. MAST:** And it is just -- the notion that Starkist's own expert just said, Well, I'm not going to count this asset because I assume it is going to be transferred to a parent company or a parent affiliate of the parent company, is -- the notion that that would be beyond the reach of a criminal fine is -- it would not be justice for that -- for that to be able to stay on Starkist's books not affecting its

business, it doesn't sell. It makes glass vials, according to the footnote in the expert report. It is not an essential asset. It is disposable and should be used to pay Starkist's criminal fine.

**MR. LYNCH:** Your Honor, just a couple -- if I could respond very briefly.

Techpack is just not available. We can't sell it. This 155 is not there for us. If we sold it --

**THE COURT:** The burden of proof would be on you to prove that fact.

**MR. LYNCH:** And we would present that -- we have already established that we entered into a contract with our lender that says we cannot do that.

**THE COURT:** Without consent.

**MR. LYNCH:** Without consent, correct.

So the other thing I would say, if you take that figure -- even taking their inflated figure of 171 --

**MR. MAST:** I'm sorry, Your Honor. That is your figure.

**MR. LYNCH:** Yeah, I'm sorry.

**THE COURT:** I thought that was your figure.

**MR. LYNCH:** Inflated in terms of adding the fact that we are not expanding on the American Samoa --

**THE COURT:** That decision has been made, yeah.

**MR. LYNCH:** You separate -- you take that figure and

you subtract our estimated minimum civil liability, which we have in our papers; and you end up with a figure less than $50 million. And that doesn't even take into account the Bumblebee cash cushion that Zuehls offered to Bumblebee and that he has seemingly not offered to us.

Now, the Government raised Mr. Zuehls and suggests that he is this unimpeachable expert. However, he has been hired by the Government 40 times. He has never been in a situation where there was a contested plea agreement or inability to pay was contested and you had another expert on the other side examining his analysis; poking holes in it. It has typically been in plea agreements where the -- both parties agreed, much like Bumblebee. So it was not -- people didn't look under the hood.

Moreover, more recently Judge Donato criticizes his analysis in the *Capacitors* case. And if their expert is so unimpeachable, why did they hide his iterations for nearly six months from us? We asked for them on more than one occasion. We said, What is your underlying analysis?

We didn't ask once. We asked twice by letter. We asked for his underlying analysis on Bumblebee because we said if you use different growth figures for Bumblebee than you are for Starkist, that would be subject to impeachment. And they didn't give it to us. And they didn't give it to the probation officer until 6:00 o'clock at night. 6:00 o'clock at night the

day that we filed our sentencing hearing they hand over these iterations, and they misleadingly put in their brief, Oh, we have handed these to the Government without disclosing to the Court that they handed them after -- at the end of the day, before we even had a chance to review them.

The Bumblebee stuff, we didn't even get the actually final version until the day before our reply brief. So the notion that this has been fully examined and fully litigated is not. We recently just got new information from them. I think that is entirely unfair.

Now, the Government also used the word "justice." And I think that is an important word and a word that has to be examined in terms of 3553. The Government is looking to penalize Starkist with a $100 million fine given its financial difficulties.

The other parties in this case -- Chicken of the Sea, is getting zero fine and no criminal prosecution of its individuals. Bumblebee, which was engaged in this conspiracy longer than us, is getting 25 million. Three of its executives have been charged including the CEO who remained the CEO up until the day he was indicted. That is in stark contrast to our situation where the one person who has been charged in our case was fired five and a half years ago, Steve Hodge.

I think it is simply not fair and not justice to penalize us four times Bumblebee for the same conduct, which, in fact,

is narrower and less culpable conduct than Bumblebee. That is simply not fair. And under 3553, the Court needs to examine disparate treatment between similarly situated parties.

It is the Government who brought up the concept of justice. I think justice supports the $50 million fine and not the higher fine.

**MR. MAST:** Your Honor, just a few points.

One, Dr. Zuehls has appeared at contested sentencings. I don't have the case at my fingerprints right now.

Second, the plea agreement already contemplates the factors set forth in 3553(a). The only issue for the Court is whether Starkist has met its burden proving its inability to pay. That's the only issue. And my point about justice is it is not just for Starkist to be able to maintain a strategic investment instead of paying for a criminal fine to address its wrongdoing involving a multi-year conspiracy for which it was an important part of. It was not a peripheral player.

**MR. LYNCH:** Your Honor, we have been going quite some time. I would look to you, what you would like to cover in an evidentiary hearing; but also just mindful of Mr. Soliai traveling from American Samoa to be here.

**THE COURT:** I want to hear from him. So why don't you bring him up.

**MR. LYNCH:** Okay.

Mr. Soliai.

**MR. SOLIAI:** Good afternoon, Your Honor.

**THE COURT:** Good afternoon.

**MR. SOLIAI:** My name is Archie Soliai. I'm the HR and Government Relations Manager for Starkist Samoa. I have been there since 2015. And my primary responsibility in that role is the recruitment and development of employees for Starkist, as well as an advocate for the best interests of the company to local government officials.

I previously served as an elected official within the American Samoa legislature and the House of Representatives, and I also managed a beverage distributorship for almost 20 years.

I was born and raised in American Samoa, and I have lived there all my life. Starkist first opened a cannery in American Samoa in 1963, and for the past 56 years it has been a staple of life on the island. Starkist is currently the largest private employer with approximately 2,500 employees.

The American Samoa Department of Commerce estimates that those 2,500 jobs have an employment multiplier between 1.7 to 2.0. This basically means that Starkist's presence on the island generates an additional 1,800 to 2,500 additional jobs in related and support industries. Starkist Samoa also benefits island residents by contributing to lower fuel, freight and electricity costs.

American Samoa is a small island, and the employment

situation is difficult particularly after the closure of the only other tuna cannery in 2016, which resulted in the loss of 800 jobs. Recent information provided by the Department of Commerce provides that the current unemployment rate is approximately 22.7 percent.

If the Starkist cannery ceased operations in American Samoa, their estimate is that it would result in the loss of approximately 5,000 jobs, which would increase the unemployment rate to 35.8 percent. The American Samoa Power Authority -- the semi-autonomous government utility that provides utility services to the island -- estimates that electricity rates would increase approximately 30 percent as a result of a Starkist Samoa plant closure.

The Starkist Samoa cannery output attributes to approximately 80 percent of the island's exports and 24 percent of imports. The loss of these freight volumes would also result in an estimated 30 to 40 percent increase in freight costs. These increased costs would be particularly impactful given the corresponding increase in unemployment.

A closure of the Starkist Samoa cannery would also drastically decrease government revenues and ultimately require additional federal resources to sustain the American Samoa economy.

The statistics relating to Starkist Samoa's impact on the island are clear, Your Honor; but as a lifelong resident of the

island, I'm here to tell you about the impact and important role that Starkist plays on a personal level.

Losing a job in American Samoa is not like losing a job on the mainland. Unlike the U.S., American Samoa has no unemployment compensation benefits to extend in hard times, nor does it have monetary policy or the fiscal capabilities to cushion such economic shocks. The continued viability of Starkist Samoa operations in American Samoa is a necessity for the livelihoods of thousands of people.

As the sole remaining tuna cannery and largest private sector employer on the island, a plant closure or even a reduction in operations, Your Honor, would undoubtedly be an economic, political and social nightmare.

When Chicken of the Sea closed its operations in 2009, the island lost close to 2,000 jobs, jobs that it never got back. If these current Starkist Samoa employees were to lose their jobs, they would be thrust into an economy with 30 percent unemployment. They would struggle to find another job. At the same time they would be faced with increased electricity, fuel, freight costs, each of which has a huge impact on everyday life. But for the 2,500 employees of Starkist Samoa that I'm responsible for, a plant closure would change their lives forever.

Your Honor, American Samoa is a small island with a population of less than 60,000. I respectfully present this

statement on behalf of the thousands of people that benefit, both directly and indirectly, from Starkist having its facility on that island.

Further, I'm hopeful that the information provided in the statement could provide some mitigation in your decision in this matter. I thank you for the time, and I thank you for allowing me the opportunity to address this Honorable Court.

**THE COURT:** All right. Thank you for your statement. I appreciate that.

**MR. MAST:** Your Honor, if I might briefly respond.

**THE COURT:** Yep.

**MR. MAST:** Starkist has not come close to demonstrating that the facility in American Samoa is going to close as a result of a fine of either 50 million or 100 million as a result of any of its civil damages exposure. That hasn't been presented during any portion of the pre-sentence investigation process.

Moreover, pursuant to the terms of the plea agreement -- the 11C1(c) plea agreement -- Starkist has already agreed that the plea agreement, the terms satisfy the factors set forth in 3553(a). That information is frankly not relevant to Your Honor's consideration. Your Honor's sole issue to address is whether or not Starkist has the ability to pay its fine, and it has not met its burden. That's all.

**THE COURT:** All right. Let me ask you: I had

initially indicated, because of the competing experts the potential value of an evidentiary hearing. Now, the closing presentation of Mr. Mast on behalf of the Government says that even if we ignore -- essentially ignore Dr. Zuehls' competing analysis and the fight over the CAGR and its accepting Dr. Gokhale --

**MR. LYNCH:** Mr. Gohkale.

**THE COURT:** He is not a doctor -- Mr. Gokhale's future cash analysis -- assuming that a decision has been made at least for now not to build the new facility, which I'm sure is a disappointment to the folks in Samoa, American Samoa -- it boils down to this question of the Techpack, an asset which it appeared that the Government thought, and I thought, did not exist because the representation was that it had been transferred out of the hands -- with or without compensation, et cetera, et cetera -- to either the parent or subsidiary of the parent; and now it has been represented and accepted as true that it remains to be an asset and a valuable asset, valued most recently at 155 million.

And so it does boil down to the question of whether or not that asset, which kind of takes the expert dispute out of play, with respect to all the things we have been talking about, gross margins, projections, whether we use the global numbers, whether we use Nielsen, et cetera, et cetera, because we are taking Mr. Gokhale's number as given. How do we treat that?

And it does seem to me that ultimately the burden of proof to seek the sort of discount in the otherwise available fine -- stipulated fine, by preponderance of the evidence is on Starkist.

And the question of its desirability, I think the burden would be to prove, number one, that sale of that asset, removal of that asset, if feasible, would so jeopardize the continued viability of Starkist that it could not be contemplated under Section 8C3.3(b).

If it is not -- and I use the word "existential" in that sense that trying to equate that with the 3.3(b) language, that without it, Starkist would not have continued viability as an economic organization -- I don't think that burden has been met. Everything I have seen is that this is a desirable, a smart, perhaps, and a good investment, but not one that is essential to the continued existence of Starkist.

Then it also raised the question, can it be liquidated? If it can't be liquidated, we can't count that as an asset. And the arguments I've heard -- the one piece of evidence I have heard in that regard has to do with the loan agreement that prohibits its sale because it exceeds what the threshold of 30 million -- was that the number of --

**MR. LYNCH:** Correct.

**THE COURT:** -- anything over 30 million cannot be sold without the consent of the lender?

**MR. LYNCH:** Right.

**THE COURT:** But that means consent with the lender, and plus given the fact that this loan is guaranteed by the parent, the burden of proof would be on Starkist to demonstrate that that consent could not be obtained. And given the fact that this is a guaranteed loan -- loan -- guaranteed by the parent, I don't see any evidence in that regard.

There is a question of, you know, who would buy it, whether it is viable or not. But, again, I don't see any evidence that a sale could not be had, even if, at this advantageous terms, we will use -- call it a fire sale -- if it could still fetch even a portion, half of what its value is, there would be enough cash flow combined with the future cash flows that have been projected by Mr. Gokhale to cover both the maximum fine and the projected -- and hopefully accurate -- maximums with respect to the civil damages payout.

So I'm having trouble seeing how the Defendant has met its burden of proof with respect to Techpack, to show that either its simply not salable or not salable for even a fraction of its value but enough to produce enough cash flow, that the bank would -- it would be impossible to get the loan. So if that's the case, I don't think Starkist has met its burden even putting aside Mr. Zuehls' report.

**MR. LYNCH:** So just a couple comments on that. What is the current evidence before the Court regarding Techpack?

It is that we have a contractual obligation not to sell it. That is the current state. The Court posits -- I don't want to say speculation, but the possibility that maybe we could get approval. As the evidence and the record stands today, we have a binding contract with our lenders that we cannot sell it. And if we sell it -- it is not that we get the money. If we sell it, the money, according to the terms of the contract, go to pay off the loan. So it is effectively going to pay the bankers. It's not like it's going to go to our pockets.

We have a $150 million loan from the bank. Under the terms, if we make asset sales over 30 million, we don't get to keep it. It goes to pay the loan. Then we have no future loan. We don't have Techpack. And we are still back to this free cash flow issue and whether or not we, in the future, will have money to pay our substantial civil liability and also a criminal fine in the amount that the Government wants.

**THE COURT:** What is the amount of the current loan?

**MR. LYNCH:** $150 million. That was renegotiated in October. Moreover, if we default on the loan -- and that would be a form of default --

**THE COURT:** If consent is not obtained?

**MR. LYNCH:** Correct. But that is total speculation at this point. Under the terms of the loan, the way it works is if you sell assets larger, the proceeds immediately go to prepay it.

**THE COURT:** All right. What about that point?

**MR. MAST:** Your Honor, the fact that the loan agreement by written consent permits the parties to waive -- the borrowing parties to waive these covenants and the lender to waive these covenants, and the fact that Starkist has not even attempted to address that issue, means it hasn't met its burden. Starkist -- a lender considering Starkist's overall financial picture, aware of Starkist's finances and aware of the prospect of a government fine set forth a loan agreement in which they refinance Starkist's debt and loaned $150 million to Starkist.

Techpack, they paid $122 million for that. The notion that Techpack could turn around and sell that at an increased value -- or even be compensated for what it paid -- would probably please the lenders because it would be financially stronger. It would have cash in the place of about a $155 million asset.

**THE COURT:** So the question is whether they would exercise the right to demand the proceeds go to the bank, and whether or not they would waive that, just as whether or not they would waive the ability to even sell that asset.

**MR. MAST:** Right. Or whether or not Starkist can refinance its debt with its existing lender or another lender --

**THE COURT:** Well, that is a third possibility, that --

recalled at that point, that there could be a further refinance.

**MR. MAST:** It could be a further refinance. And I remind you --

**THE COURT:** So the question is -- I know the response is this is speculative. This is -- we don't know. We have the letter of the agreement; yet you have the burden of proof by preponderance of the evidence that this can't happen.

**MR. LYNCH:** We have an existing contract that says it can't happen. What more could we show to show that?

**THE COURT:** Well, you can show that in the past any effort to do something like that has been met with resistance by the lender; that it is a practice in the industry to accelerate and to apply this to the principle and not allow refinance, that refinance is not possible in this market for one reason or another given the situation, if this lender decided not to waive that covenant --

**MR. LYNCH:** So, Your Honor, on that --

**THE COURT:** And when there is a parent guarantee, which seems like a very significant fact out there.

**MR. LYNCH:** So on that point, again, we have the burden. The burden is preponderance of the evidence. An actual contract that says we can't do that, I believe, meets that burden, which then switches it to the Government. The Government is literally grasping at straws. They are

completely speculating as to whether or not we can settle it, whether we can go back to the banks to renegotiate, whether we can get another guarantee.

If we were to somehow take action that triggered the repayment of the loan that would be considered as default, it would make it extraordinarily difficult to borrow money again. We would be viewed as very -- poor credit risk for anyone, even our own parent in the future.

I will refer the Court to -- the declaration of Niall Lynch in support of Starkist's Company's response to United States sentencing memorandum. We have the actual loan agreement attached as Exhibit 7, and it is paragraph 13.11, restriction on sale or disposition of assets. I would also say that the Government's record -- and in this regard it is Dale Zuehls, their own expert -- says we have no disposable assets that are not --

**THE COURT:** That's because he thought that the asset had been disposed of already.

**MR. LYNCH:** Well, it is what they said, in terms of meeting the burden --

**THE COURT:** Well, that's not --

**MR. LYNCH:** But I would say we stand on the terms of a contract that says we can't do that. And we believe that --

**THE COURT:** If we were to have an evidentiary hearing on, let's say, this question, what else could you produce,

besides -- anything else you can produce besides contract?

**MR. LYNCH:** Well, I guess the Techpack issue is taken outside, like influence on this discussion; and we would want further briefing to it -- to identify it. But we would want to be able to explore this issue; have, you know, one of our witnesses that we were proposing as the CEO who could testify as to the viability of this.

I never -- certainly -- the only thing I have heard from the company with regard to the lenders is that they have recently raised suspicions and questions about whether or not we are going to go bankrupt, and they want to ensure that their -- that their assets are preserved and that their loan will be paid back. So we might have people who negotiate the deal, who made the loan. They would be able to articulate, and possibly others who could shed light on --

**THE COURT:** Who speaks for the lender?

**MR. LYNCH:** I don't know. I mean, we could explore that. The lender is -- it is a consortium of banks, but the main lender is KEB Hana Bank, and they act on behalf of a series of banks that join together to make the loan. So it is a series of financial institutions that are listed in the loan agreement.

**MR. MAST:** Your Honor, just to note, the contract before the Court -- the evidence before the Court, is the entirety of the loan agreement. It is not simply the

restriction of the sale of assets. It is all the exceptions that come along with that. And Starkist has failed to even attempt to meet those exceptions.

I will note that 13 --

**THE COURT:** What exceptions are there that doesn't require consent to the lender?

**MR. MAST:** So with respect to debt financing, there are relevant exceptions, which are that Starkist can borrow in excess of $50 million beyond the restriction from its parent company; and it can borrow any amount so long as that debt is subsidiary to the existing financing. So that's one exception.

They can go to Don Juan Industries and say, We are in a jam. We need beyond $50 million. They haven't indicated that they have attempted to do that.

They could refinance the entirety of their debt and essentially tear up the loan covenant --

**THE COURT:** But that is not an exception. That is not a -- there is nothing --

**MR. MAST:** Well, in the loan agreement it is listed that if they pay down the additional debt, the $150 million, they are relieved from the covenants. It is not complicated and there may be minor repayment penalties; but they can pay down the existing debt, 150 million, by borrowing 160 million or 170 million from the bank.

**THE COURT:** All right. So your answer is -- it is not

that they can take unilateral action under the loan agreement absent consent to try to get value out of Techpack. Your -- I think your ultimate response is that one of the exceptions is that they could borrow from the parent?

**MR. MAST:** They can borrow from the parent or they can borrow from another bank.

**THE COURT:** So you would argue that it would be their burden to show that a bridge loan or some other kind of loan would not be available from the parent should this not work out with the lenders?

**MR. LYNCH:** Your Honor --

**THE COURT:** Hold on.

**MR. MAST:** Frankly, the sale of assets requires the majority of lenders. It doesn't require all of them. So that is notable. There are multiple lenders, and it doesn't require an absolute unanimous consent.

But my point more broadly about the loan agreement is that given Starkist's financial situation -- and as outlined -- again, more of Starkist's numbers in Robert Daine's reports -- Professor Daines -- Starkist has historically low levels of debt. And the notion that it has $290 million of debt and lenders weren't knocking on the door demanding payment or checking in on Starkist in 2011, but now that they are down to 150 million, they can't obtain additional money, just based on the assertion that, Oh, our loan agreement says we can't do it

even though the loan agreement from 2016 said they couldn't do it.

But, then, again, in 2018, they refinanced the entirety of that debt, and they could do that with Hana Bank or they could do that with another bank. Frankly, to meet their burden, coming back with one letter from a bank saying we have decided not to refinance your loan or provide this refinancing would be insufficient because there are perhaps dozens of lenders available, and Starkist hasn't shown that it has contacted a single one of them.

And the issue of Starkist's ability to borrow money has been litigated and discussed from the outset of this. Probation sent requests to Starkist saying, Why can't Starkist's debt finance its capital expenditures.

**MR. LYNCH:** Your Honor, just a couple --

**THE COURT:** Yep.

**MR. LYNCH:** I know we have been going a long time.

We can't borrow more money than we have already borrowed. We have $50 million in the loan. We have already borrowed that. DJI, Don Juan Industries, is our parent. They are a publicly traded company. They can't willy-nilly just offer us and lend us more money. They have shareholders that they have a fiduciary right to.

I can tell you this: Don Juan Industries has not offered to make any payments of our loans; has not offered to pay this

fine; has not made any kinds of offers of that nature. And also I think it really comes down to an issue of fundamental fairness.

Bumblebee is owned by an incredibly wealthy private equity firm with over $5 billion worth of assets. There was no inquiry there with regard to whether or not Lion Capital would lend Bumblebee money to pay the fine or whether they would bail them out.

And simply in terms of fair and disparate treatment, we should be treated the same. And, in fact, the Government went out of its way in its Bumblebee analysis to say that only the financial condition of Bumblebee should be examined and not Lion Capital. So I think, again, just a simple sense of fairness that we be treated the same way that the other defendants that have been presented to you before in this very same case, that the same rules apply. And I think in that regard you have to show that these speculative other sort of solutions aren't realistic. They are not fair. And they are not sort of burdens that were imposed upon Bumblebee when they were given their $25 million fine, even though they were involved in the conspiracy longer than us, even though more of their individuals were involved, and their existing CEO is currently facing trial and stayed at the company until the day of indictment.

**MR. MAST:** First, a couple of points, Your Honor.

Again, going back to Bumblebee. Bumblebee wasn't fined 25 million. It was fined 81 million if a prerequisite sale happened. And that took into account Bumblebee's ability to pay. So the comparison between Bumblebee and Starkist is inept.

But -- Bumblebee's parent did not guarantee Bumblebee's loan. And what is more, Bumblebee's loan was obtained far in advance of the investigation. Starkist's loan was obtained after signing the plea agreement. Its parent went into this with open eyes. Its lenders went into this with open eyes. For Starkist to say, Well, just based on the contract, we can't obtain any of these exceptions -- the numerous exceptions listed in the loan agreement to obtain additional financing or to sell off assets in excess of 30 million -- it is just insufficient to meet its burden. And it has had ample opportunity to do so.

**THE COURT:** All right. Any reason why sentence should not be imposed?

**MR. LYNCH:** Well, Your Honor, I guess two reasons. One is this issue -- this speculative issue with regard to Techpack and what we could do and couldn't do as somehow carrying seemingly sufficient weight with the Court that would consider ignoring the plain language of the contract that we think is not appropriate. We think the plain language of the contract which prohibits that meets the burden of

preponderance.

If the Court is to pursue sentencing at this point, then we would, again, request allocution from our CEO and General Counsel who are here as well. We anticipated there may have been an evidentiary hearing and we have more opportunity.

Again, I guess we would want to address this issue of Techpack since it has turned out to be a significant issue for you and explore some of the other areas that you have questions on.

**THE COURT:** Okay. So that is a fair question because now the issue of Techpack has become front and center, which I didn't expect. I don't know if you expected it, Mr. Mast, as we came into this hearing. It may be that the Techpack question renders moot the dispute over CAGR and the dispute between the two experts or it may not.

Although, as I sit here right now, it is hard for me -- based on this record, I don't think much has been shown to show that Techpack could not be used to finance cash flow necessary to meet the obligations of both the civil litigants, the victims, which I, again, emphasize as a priority in this matter, as well as the Government's fine.

However, because this has emerged in the context of this hearing and in the interest of having full information, I'm going to give the first -- a chance for the parties to further brief this specific issue about -- I don't need re-briefing on

everything else. The question about whether or not the value of Techpack can be factored in, in terms of ability to pay, now that we understand that it has been valued at 155 million, that it is in -- that ownership interest still resides with Starkist.

And keeping in mind that the burden of proof is on the Defendant to show inability to pay, and unless I'm convinced that Starkist has met that burden with respect to, number one, the feasibility of selling; number two, the ability to be able to do that and not trigger the loan consequences that cannot be addressed by other means -- which would include getting consent from the lender, getting -- refinance is a possibility, getting a loan from the parent. And that's where there is a difference here because, from Bumblebee, I don't think it is disparate to consider the parent's loan because the parent in this case guaranteed the loan.

**MR. LYNCH:** Well, on that point the parent is Don Juan Industries, a publicly traded company. They didn't guarantee the loan. Don Juan Enterprise, another entity, did.

**THE COURT:** All right. Well, whatever that entity is, that's --

**MR. LYNCH:** Yeah.

**THE COURT:** There is involvement of that entity.

So I would have to be convinced that you have shown by a preponderance of the evidence that this asset cannot be

deployed. You do have the contract provision but there are exceptions. There are alternatives. There is consent factor.

And, again, I would love to -- as the Government seems to allude to, both the context and the history of lending, the history of the relationship with the lender that I would consider with respect to the credibility of any assertion that it can't be done. But I need -- I think it is fair to give you a chance to respond, and then give you a chance to respond.

And if I feel at that point I need to hear witnesses, I will schedule an evidentiary hearing. If I do that, I may or may not decide -- well, just in case maybe we ought to hear from Mr. Gohkale and Mr. Zuehls because if we get to that point, I do have some questions.

I still have questions about the assumption that there is not going to be any growth when I see from Mr. Gokhale's own chart growth at least with respect to gross operating profit. I know that is different from net operating income and cash flow, but that is a pretty good indicator. It's a better indicator than just dead-on sales and number of units. And I calculate just roughly from 2014 to 2018 about a 2.678 percent annualized increase. I didn't count on it or anything, but just roughly.

If you go back to -- that's from 2014. If you go back to 2013, it is even higher because the starting point in 2013 was even lower, and it looks like about a 4 percent -- just roughly

speaking, but whatever it is, it is far in excess of .1 percent. So I would have to have some understanding as to why I shouldn't take a hard look at that.

So there are several branches here. We may not get to that because if I'm convinced -- as the Government argues -- that Techpack is a liquidable asset, even at a discount -- as I say, even at a fire sale -- there seems to be a lot of value there.

So how long do you need to put together a supplemental brief and any exhibits that you need to --

**MR. LYNCH:** How about -- are you anticipating single briefs from both sides?

**THE COURT:** A brief from you and a brief from the Government.

**MR. LYNCH:** Okay.

**MR. MAST:** And, Your Honor, I just want to make sure the record is clear that the Government does disagree with Dr. --

**THE COURT:** I know. That's why -- even if I resolve the Techpack question in Starkist's favor, that doesn't end the inquiry. Then we get to what I thought we were going to talk about here. That's why I reserved the authority and the ability to call an evidentiary and have both experts come.

**MR. LYNCH:** So, Your Honor, because it contemplates interacting with other people who aren't here, I would propose

our brief due in three weeks. Is that fine?

**THE COURT:** Okay.

And then you need two weeks after that, or what do you need?

**MR. MAST:** Two weeks would be fine, Your Honor.

**THE COURT:** All right. Then why don't we schedule something to come back here in seven or eight weeks from now. Where does that put us?

End of July or early August.

**THE CLERK:** July 31st.

**THE COURT:** That looks like a bad calendar. What does the August one look like? August 7?

**THE CLERK:** August 7.

**THE COURT:** Looks better.

**THE CLERK:** Much better.

**THE COURT:** All right. We will set the matter for August 7th -- at?

**THE CLERK:** 10:00 a.m.

**THE COURT:** We will do it in the morning, at 10:00 a.m.

If I decide I need an evidentiary hearing, I will let you know and we may change the date and figure out a date when we can set aside, I would assume, about a day to hear witnesses, but I won't know yet whether that's necessary.

**MR. MAST:** Your Honor, one point on -- if the Court is

inclined to open it up to a broader evidentiary hearing, the Government -- in addition to the witnesses proffered or tendered by Starkist, the Government has a few ideas of witnesses who we would like to call in that instance. Specifically the Government would like to call a bankruptcy expert to respond to Kenneth Klee's report, which was submitted not to probation but in Starkist's sentencing paperwork.

**THE COURT:** I actually -- I'm less interested in that. I understand the dispute about that. What I'm most interested in -- if we get into it -- are the projections. The thing that is driving this thing is the projections of future cash flows, and I understand the eventuality and the risk of bankruptcy and the risk of not bankruptcy. I'm not -- I don't need to get into that. I don't feel that I need to at this point.

I'm interested in the generation of these tables and these projections. And, frankly, it would be useful to have the same set of variables tweaked and each expert kind of look at it because I don't know what the assumptions have been with regards to profit margins, gross profit. I know there are certain assumptions about CAGR.

So we just lost our mic system here. It will come back on. It is a 6:00 o'clock reminder, which means we have to end.

I will specify in my order -- if I do want an evidentiary hearing -- what it is I want to focus on. What would be most useful to me, if we get into it, is to see these competing

projections and models because, frankly, the way it has been presented, there is a lot of narrative; and the tables are a bit opaque to me. But I want to see where it comes out.

So I want to ask the question, for instance, Mr. Gokhale instead of .1, we have .5 or 1 percent instead of 171, what are we looking at? Does it make a 20 million difference?

**MR. LYNCH:** Yeah, we can do that obviously.

**THE COURT:** That would be useful to know.

**MR. MAST:** Sure.

And I guess it may be that Your Honor is not interested, but Mr. Ingu Park is the president of Don Juan Enterprises as well as Starkist's loan signatory on the Starkist loan guarantee. He also signed the plea agreement and is a member of Starkist's board of directors. If we are not talking about financing and obtaining refinancing and loans, perhaps he is not a necessary witness.

However, if those issues are -- remain an area of concern after this briefing schedule, the Government would potentially want to call --

**THE COURT:** It might. It might. I mean, if we get into an evidentiary hearing that I feel is necessary on the question of whether Starkist has met its burden of proof on the viability or not of Techpack value being factored into the cash flow, that may -- those kind of witnesses -- in fact, it is probably those kind of witnesses as opposed to expert

witnesses, I would think, that might be particularly useful.

**MR. LYNCH:** Well, this is the first time the Government -- we have been very transparent on who we would present. This is the first time we have heard --

**THE COURT:** This is a whole new --

**MR. MAST:** We are proposing an evidentiary hearing.

**MR. LYNCH:** But I do -- just with regards to Mr. Park, he is an elderly businessman who lives in Korea. I don't know that he would be directly relevant, but this is the first we have ever heard about this.

**THE COURT:** Well, we may have to have another pre-hearing hearing if we were going to go that way and talk about -- on the question of Techpack, after I see the briefing, what it is that is going to be particularly relevant and which witnesses may be useful to have in that regard. But those are the issues, as I see it, in terms of the feasibility of looking to Techpack as a source of cash flow -- that is the bottom line -- in light of the loan agreement, but in light of the potential alternative available. That is the question.

**MR. MAST:** Understood, Your Honor.

**MR. LYNCH:** Thank you, Your Honor. And thank you for your time today.

**THE COURT:** Thank you. This is very interesting, to say the least.

Thank you. I appreciate both the victims' representatives

as well as the representative of the company and Mr. Solaia coming all the way out from American Samoa. And I heard and fully understood what you said. And obviously that's why the statute gives the Court discretion not to impose a fine that it threatens the viability of the company. So obviously I have that in mind and understand that. So I appreciate that.

**MR. MAST:** Thank you, Your Honor.

**MR. LYNCH:** Thank you, Your Honor.

(Proceedings adjourned at 6:07 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Monday, June 17, 2019

Marla Knox

Marla F. Knox, RPR, CRR
U.S. Court Reporter