Pages 1 - 49

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

UNITED STATES OF AMERICA, )
)
Plaintiff, )
VS. ) No. CR 18-00513 EMC
)
STARKIST COMPANY, )
)
Defendant. ) San Francisco, California
)
Wednesday, September 11, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
DAVID L. ANDERSON
United States Attorney
450 Golden Gate Avenue, 11th Floor
San Francisco, California 94102
**BY: ANDREW J. MAST**
**MANISH KUMAR**
**ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
LATHAM & WATKINS
505 Montgomery Street.
Suite 2000
San Francisco, California 94111
**BY: NIALL LYNCH, ESQ.**
**ASHLEY M. BAUER, ESQ.**
**GABRIELLA KAPP, ESQ.**

For Direct Purchaser Plaintiffs:
HAUSFELD
600 Montgomery Street
Suite 3200
San Francisco, California 94111
**BY: CHRISTOPHER L. LEBSOCK, ESQ.**

Reported By: **BELLE BALL, CSR 8785, CRR, RDR**
Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED**:

For Civil End Party Plaintiffs:
PRITZKER LEVINE, LLP
180 Grand Avenue
Suite 1390
Oakland, California 94612
**BY: BETHANY L. CARACUZZO, ESQ.**

WOLF, HALDENSTEIN, ADLER, FREEMAN & HERZ, LLP
Symphony Towers
750 B Street
Suite 1820
San Diego, California 92101
**BY: BETSY C. MANIFOLD, ESQ.**

Also Present:
**R. SCOTT MEECE, ESQ.**
StarKist Company

**JILL SPITALIERI**
U.S. Probation

**Wednesday - September 11, 2019** **10:09 a.m.**

**P R O C E E D I N G S**

**THE CLERK:** Calling Criminal Action 18-513, United States of America versus StarKist Company.

Counsel, please approach the podium and state your appearances for the Record.

**MR. LYNCH:** Good morning, Your Honor. Niall Lynch on behalf of StarKist Company. And with me are my colleagues, Ashley Bauer and Gabby Kapp from Latham & Watkins. And also the general counsel of StarKist, Scott Meece, who is present in the courtroom.

**THE COURT:** Welcome. Good morning.

**MR. MAST:** Good morning, Your Honor. Andrew Mast on behalf of the United States. I'm joined by my colleagues, Manish Kumar and Mikal Condon.

**THE COURT:** All right. Good morning.

**PROBATION OFFICER SPITALIERI:** Good morning, Your Honor. Jill Spitalieri, Probation.

**THE COURT:** All right. Good morning, Ms. Spitalieri.

All right. Well, hopefully we're coming to a conclusion to these proceedings with respect to the fine.

What is the government's reaction to the proposal that, besides the triggers that StarKist is suggesting, that somehow the Court could mandate the government bring a motion under -- is it 8-point --

**MR. MAST:** 18, 3573, Your Honor. I don't believe that is permissible. I think the statute is pretty clear that only the government can petition. I don't think it is within the Court's power to order the government to petition, even on -- under specified circumstances.

As we spelled out in our statement, however, that's not the only safety valve available. Your Honor had expressed interest in the parties exploring whether a safety valve would be available, should a $100 million fine be imposed, and StarKist face challenges in the future. And 3573 is just one. And 3573 permits the government to bring a motion.

However, 3572(d) states that if an installment schedule is imposed, StarKist can petition to modify that payment plan. And the Court can -- can modify the payment structure so long as such a modification is in the interests of justice.

This --

**THE COURT:** Up to a term of 20 years, under the statute.

**MR. MAST:** Theoretically, Your Honor, StarKist could seek a modification to extend the payments for up to a term of 20 years. There's another provision in 3572(d) that says the fine should be paid as soon as reasonably possible.

So the government's position would be that 20 years is -- is significantly longer than necessary. In fact, I think StarKist's proposed installment schedule is just five years.

But the fact that 3572(d) permits StarKist to petition to modify the payment plan really lays to rest any contention that StarKist is at the whims or the mercy of the government in seeking to adjust its payments down the road if its civil settlements become drastically higher than anticipated.

**THE COURT:** All right. So there are sort of two safety valves. One is, at least in the government's view, solely in the hands of the government to exercise its good-faith discretion in terms of the amount of the fine, but it is within StarKist's ability under 3572(d) to ask for an extended or a different payment schedule, should financial difficulties surface.

And I just pointed out that statutorily, I can go -- the Court, in responding to such a motion, could extend it out as far as 20 years, although it's supposed to be as soon as reasonably necessary.

So why isn't that a sufficient safety valve?

**MR. LYNCH:** Your Honor, that is true, you can change the payment period. You can't lower the fine, though. So it doesn't get us around, really, what is the fundamental concern for StarKist and the concern of the Court the last time we were here, which is to ensure that the civil plaintiffs are compensated, and to ensure that StarKist is in a financial position to compensate them.

The goal isn't to -- hopefully, the DOJ's position

throughout is that StarKist should not have to be liquidated in order to pay this fine, that it remain competitive, that it remain able to conduct its business in a competitive way. And so in order to address that, we had made various proposals, all of which were rejected by the DOJ.

If I could update the Court, since our filing, we have actually had further discussions with the DOJ. We have made further proposals, which the DOJ has rejected. And if I could just air those for a second.

When we were here the last time, you directed the parties to meet and confer to address your concerns about a safety valve, and also primarily address your concerns about civil plaintiffs being fully compensated, and for StarKist to have the resources to do that.

We had a very productive meeting with the probation officer. I think she was very creative in trying to find solutions, in trying to meet us halfway. And we were open to that as well. There were certain legal restrictions on that.

We made the proposals we did to the DOJ, including using all of our free cash flow that we have estimated to go towards criminal fine and civil liability with a sliding scale, depending on -- how much our civil liability would be in the future would determine how much of a fine.

We also addressed the Court's concerns about Techpack. And because StarKist owns and controls Techpack, we were

willing to say if we sold Techpack, given the revenue we get from that, we would pay the remaining $50 million. That's all in our papers. But, and those were all rejected by the DOJ.

Since we filed our papers, we went back to the DOJ and we said: Are there other ways in which we can accommodate the Court's concerns and your concerns and reach some sort of agreement or accommodation?

We proposed -- and obviously, some of these proposals are all subject to board approval. But we proposed what if the merger, the Techpack merger happens in the next five years, and those assets then become tradeable stocks on the Korean stock exchange? We proposed to them that if that were the case, would they be willing to accept that as a source of the remaining $50 million?

And again, because StarKist owns and controls those assets, we just asked, is this a possibility that they would be open to. And they rejected that.

We then talked to them about payment plans, and whether or not we could backload some of the payments in order to address our current civil liability concerns early in the five-year period of time, leaving a larger portion of the fine for later. And they rejected that as well.

We even proposed a payment plan that was essentially similar to the structure of the Bumble Bee payment plan, but it would be doubled if the fine is 50 or quadrupled if the fine

was 100, but in a similar sort of proportional structure. And they rejected that as well.

We have tried to be creative; we've tried to find a solution with them. They've simply not changed one inch from their original proposal. They have made no movement, whatsoever. They have not tried to address our concerns or the Court's concerns about payment to the civil plaintiffs.

And therefore we made -- presented to you the proposals that we offered to them, and were rejected.

**MR. MAST:** Your Honor, if I might briefly respond.

**THE COURT:** Yeah.

**MR. MAST:** I've noted this before in prior hearings. The government doesn't view this as a particularly close case.

In the context of 3572(d), and the ability to petition to modify the payment plan, I think that's ample relief for StarKist, should dire circumstances come to fruition. I mean, in real dollars, a later payment is a lower fine. That's just the reality.

If StarKist -- the DOJ has proposed a payment schedule, slightly backloaded, no interest. This installment payment plan was set forth by its retained expert, that the government retained at public expense. It provides for a $10 million -- just $10 million of a $100 million up front, to leave room for civil settlements, followed by five payments annually of $18 million.

And there's a few important points to note about this proposed installment plan. This came from Dr. Zuehls. It's the only installment plan that was set forth by an expert. StarKist's expert did not propose an installment schedule.

But when Dr. Zuehls was recommending this installment schedule, he thought Techpack was going to be transferred to Don Juan Systems. You'll recall the first hearing where there was confusion as to whether Techpack was in StarKist's -- part of StarKist's assets, or whether it was being transferred. He called it a "disguised dividend." So he came up with an installment plan, assuming Techpack was not available for any assets.

The second point I make about his proposed installment schedule is back in early 2019, in February, when he concluded his report, StarKist had not settled with many of the direct purchaser plaintiffs. Their civil liability was more uncertain. And in some of the iterations that Dr. Zuehls employed, he actually used iterations that exceeded StarKist's upper civil estimate.

The final point with Dr. Zuehls's report is that he estimated growth in the neighborhood of three to four percent, which he used, based on industry reports. On the record before Your Honor, as of May, 2019, StarKist is growing in 2019 at a rate of nearly double, at 9 percent. StarKist alluded to, at the last hearing, that that was because of Easter sales and the

spike in sales. But we haven't seen any supplemental balance sheets or cash flow statements that indicates that growth is not occurring.

So Techpack, civil liability, and growth were all estimated in StarKist's favor. So the government looked at it and said: This is already essentially a gift. We are asking for an installment schedule with no interest, just a $10 million payment up front.

And so that's where we have reached an impasse in terms of negotiations.

**MR. LYNCH:** Your Honor, just a couple points to address. And I don't want to belabor it, because this is obviously the third hearing we have had.

In our previous papers, we identified numerous errors in the government's expert. One third of his iterations show we couldn't pay a $100 million fine. If you corrected for the other very clear -- in some instances mathematical -- errors, it showed that 100 percent of his iterations show we could not pay $100 million.

That issue is a battle of the experts for which Probation and StarKist suggested an evidentiary hearing. The Court didn't want to go that way, and I understand that. But the DOJ's expert's should not be taken at face value. We have identified many errors in it. I don't want to belabor it. It's in our previous papers.

**THE COURT:** I don't want to belabor that either. But right now, StarKist, even under its more conservative projection, estimates 171 million in cash flow.

**MR. LYNCH:** Correct. Correct.

**THE COURT:** And from that, depending on the unknown in terms of civil-suit settlements, that's one of the unknowns. But the other is the Techpack factor. That's why we had that second hearing.

**MR. LYNCH:** Uh-huh.

**THE COURT:** And you know, we know that there was a merger planned in which StarKist will emerge with tradeable securities. It's going to happen, it seems to me. I have seen no indication it's not going to happen. I think the affirmation from StarKist is that it will happen, just uncertainty about exactly when, but something's going to happen. And it is something of value. I know there's some debate about whether Techpack value has actually gone down because of revenues have not been as robust.

But it seems to me that when all is said and done, there's a very high likelihood that there'll be enough assets to pay for the 100 million. But I think it's a question, number one, of timing.

**MR. LYNCH:** Uh-huh.

**THE COURT:** And with the flexibility of 3572(d), if it ends up that the civil lawsuits do cost another 150,

200 million to settle -- which seems unlikely, but you never know. But if that happens and the revenues don't produce, and for some reason the merger doesn't happen, that can be -- whatever -- the payment schedule can be elongated so that we do preserve the ability of StarKist, number one, mandatorily to pay off the restitution.

It is discretionary in this Court with respect to, you know, whether the financial viability of StarKist must be maintained. But I've already stated that that is a priority.

**MR. LYNCH:** Uh-huh.

**THE COURT:** And I think your representative from American Samoa talked of the importance of StarKist to that. And I think it is in the interest to competition and to the economy not to bankrupt or to drive out of business StarKist.

But it does seem to me that the -- even if the government doesn't make its motion -- and I don't have any reason to believe that they wouldn't if there is -- if we reach that point.

But even if they didn't, you have got the leverage and the Court has the leverage of stretching the payments out so that, frankly, it could be -- if you do it over 20 years, the amounts become very small at that point. And, and almost certainly affordable.

So there is -- there are the safety valves there, which I think weren't highlighted until this round, that gives me more

comfort in terms of imposing.

So I think the issue is what should the payment schedule be. I mean, that's -- I'm just laying my cards on the table. Seems to me that the 100 million is what was called for in the plea agreement, and that is the amount that, from all indications, is affordable, probably within the next five years. But there is a safety valve if it is not.

**MR. LYNCH:** Can I just make two points and then address the payment schedule?

**THE COURT:** Yes.

**MR. LYNCH:** The first point, on the free cash flow. Taking our free cash flow as -- as a given, and we support it, and you referenced it, take out the 50 million that we guarantee to pay under the plea agreement.

**THE COURT:** Yep.

**MR. LYNCH:** Take out what we've already paid this year. Because --

**THE COURT:** The 54 million?

**MR. LYNCH:** Correct. So take that out.

**THE COURT:** Okay.

**MR. LYNCH:** You have $67 million. We're willing to put that all towards payment of civil liability and criminal liability. If we settle for $10 million, they get it all. If more than 67, they don't.

The Techpack issue, again, just to be clear, because you

were concerned about it and we addressed it. Because we own and control those shares, StarKist does, and that's clear from our audited financial statements, we offered -- we -- we're limited in our ability to sell it today because of our lenders, which we explained the last time. But if we do sell it, we're saying regardless of what we sell it for, we'll pay the additional 50. That's the one condition.

The other thing we proposed and it was rejected out of hand was if, in fact, the merger goes through within the next five years, and our ownership turns into --

(Off-the-Record discussion between counsel)

**MR. LYNCH:** If we -- if we -- the other possibility we offered them was we will take our existing shares of Techpack at book value, and we will give those to the DOJ. We will give $100 million worth of Techpack shares at book value, we will give that, so that the full amount can be paid today.

We have said, and -- and obviously, there's risk that the DOJ, if they were to liquidate those, might not get the full 100 million; there's a risk that they could get more than 100 million. But it really puts to them their claims that we have this asset, and it's disposable. We're willing to hand it over to them, at book value -- it would be roughly two thirds of those shares -- as a full compensation for $100 million. And they rejected that.

We then came up with other proposals in the event of a

possible merger. I mean, they were just sort of suggestions to them: Would they be open to the possibility if there was in fact a merger in the next five years --

(Off-the-Record discussion between counsel)

**MR. LYNCH:** -- we would -- you know, is that something that they would be open to, having those shares. And they rejected that. Every offer of ours to address the Techpack issue has been rejected.

**MR. MAST:** And Your Honor, just very briefly?

**THE COURT:** Yeah.

**MR. MAST:** We spent weeks briefing where StarKist said that Techpack was untransferrable, couldn't be liquidated. And then we get an offer that they're willing to transfer the asset. Apparently their lenders would not accelerate payments on the debt after all. But the government is seeking a criminal fine. It's not seeking shares of Techpack. It has no use for shares of Techpack. I think that should be clear on its face.

The second point with respect to the merger and with respect to the sale of Techpack, this is a criminal fine. StarKist doesn't get to just say: If and when we decide to reap the benefit of this asset, we will -- we will pay our full responsibility. We'll pay the full fine.

It's -- they -- they have pled guilty to criminal conduct. And the Court is tasked with assessing the ability to pay. And

that asset is part of their ability to pay. And so, the proposals from StarKist were rejected. They were rejected summarily. But the government's not interested.

StarKist hasn't met its burden that it can't pay a $100 million fine.

**MR. LYNCH:** One last thing on the payment plan that you identified? I said I would address it.

**THE COURT:** Yeah.

**MR. LYNCH:** Our concerns about those as safety valves are this. Bumble Bee paid 25 million, it was a reduction from 81 million, based on inability to pay. They also had those safety valves that you've identified.

There's been public press statements -- I don't know what -- what will become of it -- that Bumble Bee is seriously considering bankruptcy. So even those safety valves have not aided Bumble Bee, even with their reduced fine, because it didn't take into account certain future contingencies. They had the benefit of those safety valves. And presumably, if they do in fact go forward with bankruptcy -- and I don't know, I'm just basing on what I've read publicly -- then those safety valves did no good for them.

And that's our concern as well, that it won't save us from that fate as well, if we don't have these very concrete contingencies that if our civil liability does turn out to be larger than we expect, then we have protection. And if it's

less than we anticipate, then the government will be fully rewarded with a $100 million fine.

**THE COURT:** Let me ask Probation, Ms. Spitalieri, if you have any comments.

**PROBATION OFFICER SPITALIERI:** Like I said, I met with both of them. And I had them lay out what my -- I guess it would be amended recommendation would be with all this.

The issue with us on Probation's side was that Mr. Raju recommended probation, and I felt that there was more issues with that. I don't feel that probation needs to be recommended in this case if the fine has a set schedule, and is paid the way that their -- either one of their recommendations.

But if the Court still thinks that there is some concern about them being able to pay the fine or wants to have updates on them every year or so, then I think probation could be a good turn.

**THE COURT:** Well, if I were to impose a fine with a schedule, --

**PROBATION OFFICER SPITALIERI:** Uh-huh.

**THE COURT:** -- but knowing, as you've heard, that there may be some safety valve, whether it's under 3573 or 3572(d), would it not be helpful to be able to have the assistance of Probation to --

**PROBATION OFFICER SPITALIERI:** Yes, because --

**THE COURT:** -- to look at the finances? Because they

may say: Well, you know, we've got a real problem here, et cetera, et cetera, and the government may have a different view.

**PROBATION OFFICER SPITALIERI:** I agree, Your Honor. I think that if -- because we would meet with the attorneys (Indicating), either by phone or -- it's not as stressful as like an individual probation. It's more: Send us your documents. We'll meet by phone if there is an issue, or if they want to come in.

But if they expressed any kind of concern with the ability to pay, or if they missed a couple payments or kind of defaulted on the loan, then we would bring it back to court, and we would bring it to your attention. So you would have that avenue kind of indirectly to them, to know that there was some issues going on.

So I think it would be helpful. I don't know if StarKist thinks it would be helpful, because it might be a little bit burdensome on them.

**THE COURT:** Well, there wouldn't be any involvement unless and until there is a potential 3572 or 3573 motion.

**PROBATION OFFICER SPITALIERI:** That's correct. However, they still would need to do the standard conditions of probation, and meet with us and -- so there still would be a little bit of an aspect of punishment to it.

**THE COURT:** Well, there would be some monitoring,

financial monitoring, right?

**PROBATION OFFICER SPITALIERI:** Right. Yes, Your Honor. I think I recommended quarterly, or even maybe bi-annually.

**THE COURT:** Yeah. Or semi-annually.

**PROBATION OFFICER SPITALIERI:** Yeah.

**THE COURT:** I don't think you need to meet with -- unless you had questions. This is really of matter of sharing financial reports with Probation.

**PROBATION OFFICER SPITALIERI:** It would be very driven by financial issues. As long as they're paying their fine on whatever schedule it is, and they don't bring any issues to us, I don't think it would be so extensive on them.

**THE COURT:** All right.

**MR. LYNCH:** Your Honor, just very briefly on that point?

**THE COURT:** Yeah.

**MR. LYNCH:** If the -- we were to petition -- again, the plea agreement, we have not recommended probation. The government supports us on that.

If we were to seek the government's assistance on a reduction of the fine, for them to petition, we would have to make our case to the government, and don't necessarily see Probation's role in that because we would have to convince the government.

On the other hand, 3572(d)(3), which you referred, is mandatory. And again, we don't necessarily think probation is necessary.

Again, we're not -- we had very good discussions with Probation. Our preference is not to have it, because although minimal, there are -- it is a burden on the company to provide, particularly with some of the conditions, you know, reporting requirements and so forth. I recognize it's maybe not as onerous as with an individual, but it -- nevertheless, it is a burden on the company.

**THE COURT:** The government's view on the probation question?

**MR. MAST:** Your Honor, I think the government stands by its recommendation in the plea agreement not to recommend probation. And so that's my first point.

The second point, though, I do -- I do note that StarKist is taking conflicting positions by simultaneously saying it cannot afford to pay a criminal fine, and that probation is not needed to safeguard the organization's ability to make payments on that fine.

Now, the government's view is probation's not necessary; they can afford to pay their fine on the installment schedule proposed by the government, and that is a sufficient criminal penalty. The government's not recommending probation.

But I do note that while at the same time saying "We can't

afford a fine," one of the conditions of probation or one of the considerations in imposing probation is to safeguard an organization's ability to make payments.

**MR. LYNCH:** Your Honor, it is not inconsistent. There's costs associated with probation. We have an inability to pay. It's absolutely consistent.

**THE COURT:** I'm actually more interested in the question of whether probation would be helpful to the Court, and perhaps to the parties, if there is, for instance, a 3572(d) motion down the road.

You know, otherwise you've got to deal -- I've got to deal directly with the parties, and I don't know, at some point maybe we have to undertake some kind of discovery or something -- I don't know how this plays out -- if there is a dispute as to whether or not the financial circumstances are as dire as the petitioner might seek. And I'm wondering whether probation would be helpful in there? Or it doesn't add anything to that process?

**PROBATION OFFICER SPITALIERI:** Your Honor, you're asking whether we would just be able to kind of filter through all of the documents before so that you don't have to --

**THE COURT:** Or, to undertake any -- for instance, if the Court wanted to undertake some inquiry into the bona-fides, for instance, of a claim of financial hardship.

**PROBATION OFFICER SPITALIERI:** You could absolutely

ask the Probation Office to dive into that and look to see --

**THE COURT:** That's where I -- you know, hopefully it will never come to pass, for all the reasons we have stated. But if it does, that's my main concern.

I'm, frankly, not that interested in ongoing monitoring. I don't know if we even need -- maybe annual reports or something. I don't think we need -- as long as the payments are being made. It's only when there's one of these motions.

**MR. LYNCH:** Your Honor, if you're inclined to go that way, the Probation Office recommendation is that probation be for a period of six to 12 months. So, and that will be -- six to 12 months is the period in which we'll have more clarity on our civil liability.

**THE COURT:** Yeah, that's one question I was going to ask. I know there's been developments, and there's been class certification and all that.

Is it your -- I am sure it's your hope, your expectation, that those -- the civil liability, that the remaining claims, that a year from now, they will either have been resolved one way or the other, or you'll have a very good sense of where --

**MR. LYNCH:** Well, if the plaintiffs are reasonable. And they're in the courtroom (Indicating), and they can decide. You know, it's totally out of our hands. We've made good-faith efforts to reach out and make settlement offers to each and every one of them.

We've obviously been very successful with the large customers that we have settled with. But, there are -- there are remaining --

**THE COURT:** Right.

**MR. LYNCH:** -- plaintiffs that have not reached a settlement with us.

But your other point you asked earlier is the payment schedule.

**THE COURT:** Yes.

**MR. LYNCH:** Again, the payment schedule, the government has not veered from its original payment schedule. Through all these hearings, it's stuck with it. The original payment schedule calls for 10 million. Even though, as you've seen over the last couple of months, there have been periods of time where our available cash is under 10 million.

We think, in line with the Court's concerns about having the resources to pay civil plaintiffs, that it be backloaded in the way that we've proposed, without interest. We think that that's a sensible approach. It's the approach they took with Bumble Bee. And we think it's the approach they should take with us, as well.

**MR. MAST:** And Your Honor, just to respond to the payment schedule.

First, StarKist's financial circumstances -- and we've said this before -- differ drastically from the circumstances

faced by Bumble Bee.

**THE COURT:** What do we know about the current -- the most current information about cash on hand? I mean, there was a figure earlier --

**MR. MAST:** Yeah, I haven't heard the current cash on hand from StarKist.

**MR. LYNCH:** So again, it changes day to day. The last time we were here it was under ten. We checked yesterday and it was, I believe, approximately 24. But again, it fluctuates day to day.

The first hearing we were out, it was just a little over ten. It was 11 million. So --

**MR. MAST:** And one other point about current cash available, Your Honor.

You will recall under the existing loan agreement, StarKist has the ability to borrow up to $50 million of short-term borrowing, in addition to the umbrella loan --

**THE COURT:** As I recall, but not the full 50; some of that has already been --

**MR. MAST:** Some of that has been eaten away.

**THE COURT:** Another 20 or 30.

**MR. LYNCH:** There's -- 30 has been used, another 20 remains.

**MR. MAST:** Twenty remains. So if I am hearing 24 million is in the bank account right now, you've got

$20 million available to borrow. That's $44 million that can be used for a criminal fine.

And the government, despite that, is only recommending an initial payment of $10 million.

**MR. LYNCH:** Your Honor, their own expert has said a company like StarKist needs, at a minimum, 25 million in cash on hand to be able to function and pay its bills. You can't take us down to zero, and if a bill comes in, we can't pay it.

The other thing he doesn't take into account is the fact that the civil liability claims are out there. And those are immediate. So, again, the notion that we somehow have $40 million lying around to pay the initial installment is not true.

**MR. MAST:** And we're not seeking $44 million, Your Honor. We're seeking $10 million. And I haven't heard anything that has caused me to veer off of that. What I've heard throughout these proceedings would have made the government inclined to steepen its installment schedule.

It proposed an initial installment schedule; it stuck with it. It hasn't penalized StarKist, so to speak, for the fact that it didn't -- the government didn't know Techpack was part of that equation.

But the government's installment schedule is backloaded or at least evenly weighted over five years. $10 million followed by five payments of $18 million. It's not seeking two

$50 million payments.

And, it's waived the requirement of interest in its proposed schedule.

**MR. LYNCH:** Your Honor, you are proposing to impose a fine four times as much as Bumble Bee. Bumble Bee's fine was graduated and backloaded in the way that we are proposing. We're simply asking for similar, comparable treatment.

And under 3553, it strikes me that you want to avoid disparate treatment in all aspects of the sentence, including the fine. And the fine payments. So we're just asking to be treated very similarly to Bumble Bee.

And even with that graduated payment that Bumble Bee experienced, based on public news reports, they may still face bankruptcy.

**MR. MAST:** Your Honor, one more point about Bumble Bee. And this has been briefed, and it's been -- there's been correspondence between the parties. But the plea agreement only permits StarKist to seek a reduction to its fine, based on its own inability to pay.

Now, the Court has to consider 3553 factors. But StarKist has agreed that a $100 million disposition is appropriate. And so its arguments about the comparable fine of Bumble Bee are frankly beyond the scope of the plea agreement.

**THE COURT:** All right. I'm ready to rule.

**MR. LYNCH:** Your Honor, before you do -- and I really

do not mean to test your patience -- Scott Meece is here, the representative of the company. He has not allocuted. Would you --

**THE COURT:** Sure.

**MR. LYNCH:** Would it be helpful to have him at least give his perspective?

**THE COURT:** Yes.

**MR. MAST:** And Your Honor, I think a few other housekeeping mechanisms to make sure that the victims who are present had an opportunity to be heard, but just so that the record reflects that the victims are there, and that the guideline range will be calculated in connection with the sentencing, that we address any outstanding objections to the PSR.

None of the objections ultimately, I think, impact the --

**THE COURT:** Well, let's address those.

First of all, are there any objections -- I thought we had gone through this, but perhaps not -- to the PSR? Any corrections that need to be made?

**MR. MAST:** The government did not have any objections, Your Honor. The defendant had several. I don't think any of them are -- are dispositive of the fine. I can summarize them.

The government -- StarKist made an objection that one of its employees, Hodge, along with several other StarKist

executives who are not involved in the alleged conspiracy, were responsible for setting list prices that appeared in the PSR. StarKist objected to that statement.

The government's response simply is that the fine doesn't hinge on this issue.

**THE COURT:** Is that Paragraph 10?

**PROBATION OFFICER SPITALIERI:** Yes, Your Honor.

**MR. MAST:** Yes, Your Honor.

**THE COURT:** So, is it the last sentence that StarKist objects to, that all three individuals were responsible for issuing list prices and setting price, pricing guidance at their respective companies?

**PROBATION OFFICER SPITALIERI:** That's my understanding, Your Honor.

**THE COURT:** And StarKist objects because of the inaccuracy of that, or the irrelevance of it? Or --

**MR. LYNCH:** The accuracy of it, Your Honor. As we've explained to the government, the decision on list prices was made collectively by a number of employees at the company, including finance, sales and marketing.

**THE COURT:** All right. So the implication that these three, alone, were responsible is not accurate.

**MR. LYNCH:** Correct.

**THE COURT:** Probation have any comments on the objection?

**PROBATION OFFICER SPITALIERI:** Your Honor, I don't -- I think it's just a difference of language. So I wouldn't have an issue with changing it, if the Court would like that.

**THE COURT:** Changing? Or striking it? Or how would you change it?

**PROBATION OFFICER SPITALIERI:** My understanding is that he wanted to change it to: Hodge, along with several other StarKist executives who were not involved in the alleged conspiracy were responsible for setting list prices and pricing guidance at StarKist

**THE COURT:** All right. I take it the government doesn't have any --

**MR. MAST:** Well, Your Honor, the government does have some concerns that StarKist seems to be sort of minimizing its conduct. It acknowledges that this issue has no bearing on the plea agreement.

In the record, however, the direct purchaser plaintiffs' opening statement does address the scope of sort of StarKist's involvement.

However, I think, for simplicity's sake, the government doesn't have a strong objection to -- or doesn't believe this objection has any bearing on the sentence.

**THE COURT:** All right. Well, if it doesn't, and I don't -- unless I take further evidence on this, I would grant that request.

**MR. LYNCH:** Okay.

**THE COURT:** To change that language.

**MR. LYNCH:** Thank you.

**THE COURT:** So Paragraph 10 should be changed to the language suggested.

What else?

**MR. MAST:** Your Honor, Objection No. 2, I think is an objection pertaining to the volume of commerce. The Probation Office, officer calculated volume of commerce at 744 million, indicating that the government is -- or indicating the Probation Office is not bound by the terms of the plea agreement. The plea agreement calculated volume of commerce of at least 600 million. That provides for a fine that exceeds the statutory maximum. And so really, the only issue we've been discussing is whether StarKist has the ability to pay that --

**THE COURT:** Right.

**MR. MAST:** That maximum fine. And this does not have bearing on -- on StarKist's fine. However, the government agrees with Probation in the sense that it is not bound by terms of the plea agreement in reaching its conclusion.

**THE COURT:** And the language suggested by StarKist is just simply to say: Is at least 600 million, as opposed to putting a figure?

**MR. LYNCH:** Correct. Yes, at least 600 million,

consistent with the plea agreement. The volume of commerce was a heavily debated and argued term of the plea agreement and so that is an important point for us.

**THE COURT:** All right. Ms. Spitalieri, any comments?

**PROBATION OFFICER SPITALIERI:** Your Honor, I don't know what Mr. Raju used to calculate the 744 number. So I feel like if it's kind of a moot point, with the fine --

**THE COURT:** As long as it's over 600 million, it doesn't make any difference, --

**PROBATION OFFICER SPITALIERI:** Right.

**THE COURT:** -- and that's consistent with what he calculated, without pinpointing --

**PROBATION OFFICER SPITALIERI:** Exactly, Your Honor.

**THE COURT:** So I'll make that change as well.

**MR. LYNCH:** Thank you, Your Honor.

**THE COURT:** All right.

**MR. MAST:** Your Honor, there was an objection to Probation's recommendation for -- or, excuse me, Probation Department's recommendation for imposing a term of probation. I believe we've sort of already discussed that objection.

**THE COURT:** Right.

**MR. MAST:** In another form.

**PROBATION OFFICER SPITALIERI:** I think that's it.

**MR. MAST:** And I think -- do I have -- there was an objection raised in briefing pertaining to the burden of proof

with respect to the inability to pay that I believe has been adequately litigated throughout this.

The government doesn't contend that StarKist needed to prove by clear and convincing evidence its inability to pay, but stands by that StarKist has failed to meet a preponderance standard.

**THE COURT:** All right. Is that in the -- that is not in the PSR, is it?

**MR. MAST:** It was not. It was simply a -- it was an objection lodged, based on, I think, I guess, what StarKist read to be an implicit burden. But it was nowhere stated in the PSR that a clear-and-convincing standard was employed.

**THE COURT:** All right, I will clarify for the record that the preponderance-of-the-evidence standard, not the clear-and-convincing standard applies, in terms of StarKist's' ability to demonstrate inability to pay.

**MR. LYNCH:** Yeah. And that -- the point on there, Your Honor, was there was language within the PSR where the probation officer -- and again, it was a previous probation officer who wrote it -- said that StarKist had not clearly shown that it could not pay. You know, said it was -- raised serious issues but had not clearly shown. And we thought that was possibly reflecting an incorrect assessment.

**THE COURT:** Should we strike the word "clearly," if that's what's in there? To the extent it seems to imply a

clear-and-convincing-evidence standard?

**MR. LYNCH:** Well, I guess the most important person is you, and as long as you recognize that it's a preponderance standard, I think we're fine.

**THE COURT:** All right. Well, I will restate that for the record, notwithstanding the word "clearly," clearly, preponderance of the evidence is the standard.

Anything else?

**MR. MAST:** I don't believe there are any other objections, Your Honor. I think, just as standard with sentencing, to make sure that the guidelines range is calculated, and that the Court considers 3553(a) despite the existence of the plea agreement, and make a finding as to whether or not the sentence is consistent with the plea agreement, which I expect it will be.

**THE COURT:** All right. And I don't know if I expressly accepted -- this is a (C) plea.

**MR. MAST:** Correct.

**MR. LYNCH:** Right.

**THE COURT:** And I don't remember now, because we've had so many proceedings, whether I formally accepted the (C) plea. But if I haven't, --

**MR. MAST:** Right.

**THE COURT:** -- I do. And I have done so, based on my review of the briefing and the presentence report, and the

guideline calculations contained therein, that the guideline calculations which provide ultimately for a total offense level of 24, and sets forth a base fine, and the culpability score as well as a guideline fine range which is limited in this case to the statutory maximum of 100,000, I find that the plea agreement is consistent with the statute and the guideline calculations, as well as considering the 3553(a) factors, in terms of the culpability of the defendant in this case, and its involvement in the price-fixing conspiracy --

**MR. LYNCH:** Your Honor, I believe you incorrectly said the statutory max was 100,000.

**THE COURT:** 100 million.

**MR. LYNCH:** Yeah.

**THE COURT:** I meant to say 100 million.

**MR. LYNCH:** And again, just because you seem to be on a roll, I want to make sure that Mr. Meece has an opportunity to allocute.

**THE COURT:** Yes, I'm going to.

**MR. MAST:** And Your Honor, I did get a word from my colleague that one of the plaintiffs who is present does desire to make a statement.

**THE COURT:** All right. I will allow both victims as well as a representative of the defendant to allocute.

But to complete that, I have considered the relevant factors under 3553(a), including the culpability of the

defendant, and factors including the need to avoid unwarranted disparities. I understand there has been a substantial amount of argument about Bumble Bee Tuna, but I have considered the differences in both the circumstances between the two defendants, and find that the plea agreement complies with 3553(a). Leaving only the question of whether the $100 million fine which is part of the plea agreement should be reduced, pursuant to 8C3.3, I believe.

**MR. MAST:** Yes, Your Honor.

**THE COURT:** So, so before I reach a conclusion on that, I would like to hear from the relevant parties. Perhaps first from the victims. Victim.

**MR. MAST:** Certainly, Your Honor.

**PROBATION OFFICER SPITALIERI:** Your Honor, also, if I might just clarify something.

In my recommendation I said six to 12 months. I think statutorily, it needs to be at least one year.

**THE COURT:** Okay.

**PROBATION OFFICER SPITALIERI:** So just, if you intend to do probation.

**THE COURT:** Okay. Thank you.

**PROBATION OFFICER SPITALIERI:** Uh-huh.

**MR. LEBSOCK:** Good morning, Your Honor. Chris Lebsock from the Hausfeld firm. I represent the direct purchaser plaintiffs. And I'm a civil lawyer, I'm not a criminal

lawyer. I want to make that clear. So, some of what was happening up here just a minute ago is a little unclear to me.

But I just wanted to point out to the Court that to the extent that the government and StarKist are negotiating language about who is responsible for pricing, in particular, that stood out to me.

Certainly, I suppose, they have the right to agree to things. But I just want to be careful that anything that happens here isn't used against us in the civil proceeding as a characterization of some findings from the Court or anything like that, about who actually is responsible for all of this. We'll litigate that with StarKist at an appropriate time.

**THE COURT:** I'm not aware of any, but I'm not going to opine as to whether there's some kind of collateral estoppel or binding effect. You know, what I'm doing is going through the presentence report here. And the parties have a right to correct what they believe are any misstatements.

I don't think I have to make any finding, and I haven't. In the way that that was phrased. I think it's phrased fairly generally. So --

**MR. LEBSOCK:** Thank you. I just wanted to make sure that we weren't doing anything that was going to bind us in the civil proceeding. So, okay.

**THE COURT:** I can't issue any guarantees, but I'm not aware of -- and that's certainly not the intent of this Court,

is to bind any civil trial or civil disposition of this matter.

**MR. LEBSOCK:** Okay. Thank you, Your Honor.

**THE COURT:** All right. Thank you.

Good morning.

**MR. MEECE:** Good morning, Your Honor. My name is Robert Scott Meece. I'm the general counsel and the senior vice-president of StarKist.

As I think you know, I've joined the company only about a year and a half ago, and joined the company out of retirement, to come and try to help resolve both the criminal and the civil antitrust matters, and to advance our compliance programs. And not just compliance with regard to antitrust, but with all -- all risks, broader risks. Especially in the legal area.

Now, I have a lot of material that's prepared that I was going to walk through with you, but I think you've heard the vast majority of this already. I would love to wax on about our compliance programs. We really have done a lot there. But you've heard that quite well, I think from our counsel (Indicating). So what I would like to do is just speak a little bit from the heart about the company.

We -- in a criminal proceeding -- and this is new to me. I have not been involved in criminal proceedings in the past, really, very much. So it's a bit odd to look at the company as a criminal defendant. And I look at a company as -- in a lot

of different facets.

The company is represented by the board of directors. The company is represented by the leadership team that runs the business on a daily basis, and which I meet with every week.

But I think one thing I would focus on is the employees. We -- we have about a little over 100 employees at headquarters, and about 2,500 at our American Samoa manufacturing facility.

So when I think about all this, I -- I think about one aspect is the employees, and what's going to happen with them. And as you know I'm not -- as I've said, I have not been with the company that long. But these employees have had this hanging over their heads for a long time. And I've met the vast majority of them. Great people. Sincerely want to do the right thing.

And they have concerns every day about what is going to happen with them, what is going to happen with their jobs. Are they going to get a bonus? Are they going to have an increase? Or are they not going to have a job at all?

And you know, I think both sides have tried to project what's going to happen in the future. I've worked in companies about 35 years. If you can project what's going to happen in the future with a company, you're amazing. And so I just say there's a lot of uncertainty there.

And one thing I do know from looking at the financials,

I'm not an expert here. I'm definitely not an expert. And I don't like to look at financials very much. But I will tell you this. I think there's a lot of uncertainty, and we're probably going to have to make some kind of cuts.

What does that mean? I don't know. You know, maybe it's cuts in one program or another. Maybe it's layoffs. Maybe we move a facility from American Samoa to Thailand. Those things have to be considered in any kind of company in any kind of situation. But in this situation, with all of the different potential liabilities we have, I think it's an onus upon us as a board and a leadership team to look at making those kinds of cuts.

And in considering all this, I know I can see sort of where we are heading, but I have to tell you that is something I have a concern about and it's -- again, speaking from the heart (Indicating) about the employees of the company, hopefully we can find ways that we don't in any way harm any employees. But I have concerns about that. And I just felt the need to speak for them, because I think that's something that doesn't come out in the proceedings.

So, having said all that, I would just like to say I thank the Court. You, Your Honor, and the court personnel, and, and the Department of Justice and -- and our attorneys for all their efforts here. I really hope that what we end up with is something that is an overall situation where this company

continues on being competitive, where the employees are not harmed. And, and where of course, we serve the important aspects of the criminal justice system in deterring these kinds of things for the future.

I thank you for your time. I really appreciate it. And, I will stop there.

**THE COURT:** All right. Thank you. I appreciate your comments.

And I will say, I don't know if you were at the earlier hearing, but when you had a number of representatives come, including your representative from American Samoa, he really put it in very human terms. The dependence of people on the viability of StarKist. And so I'm well aware of that.

**MR. MEECE:** Thank you very much. Thank you very much, Your Honor.

**THE COURT:** All right. So the question here, having accepted the 11(c)(1)(C) plea is pursuant to that plea, and the right of StarKist to seek a reduction -- and that's governed by Paragraph 11 of this plea agreement -- is whether there should be a reduction under 8C3.3, whether it's (a) or (b) -- (a) is discretionary? Or is it the other way around?

**MR. LYNCH:** (a) is mandatory.

**THE COURT:** (b) is discretionary. But as I've already indicated, I would exercise my discretion to try to make sure that StarKist's viability is maintained.

I do find, however, that StarKist has not demonstrated by a preponderance of the evidence that the amount of the fine should be reduced under either (a) or (b).

There are at least, it is estimated, on the conservative side, 171 million in cash that should be available from operations over the next several years. That number could well be higher, depending on the expert analysis.

But I'm assuming even if we take the conservative end of that, and not take into account what the government has -- it believes already has shown a hopefully robust beginning of this year for StarKist, but as we indicated at the second hearing, the Techpack value, particularly with an impending -- and I think it's been affirmed, a still-impending planned merger which will yield tradeable liquid securities in an amount that should be quite substantial, and along with the estimates of the civil liability which has varied from time to time. But it is my conclusion that there will be enough assets available. And the combination of being able to borrow to a certain extent at least up to the 50 million. Whether there might be an exception made by the banks or through some other process, other cash made available, it -- it -- and the Court concludes that there are sufficient funds available.

But, the Court is also aware of the unknown unknowns out there, which in addition to cash flow and profitability, the civil liability side.

And so the Court takes into account the ability and the indication by the government that it would take seriously into account any jeopardy to StarKist or its ability to pay restitution under 3573, and based on its history, have no reason to doubt the good faith of the government to do that, to make the motion, if appropriate.

But, as a second safety valve, there is Section 3572(d), which gives StarKist the ability to come to court, and if not reduce the absolute amount of the fine, to change the schedule and elongate and lengthen that schedule to a point where in effect, it is -- has a net effect, if you look at present discounted values, of reducing the value of the -- the monetary value of the fine to be paid, and proposing a schedule that is acceptable such that the annual payments could be reduced very substantially if the schedule has to be elongated beyond the five years, as much as 20 years.

Although the Court keeps in mind that it is -- the obligation is to pay the fine as early as possible, that flexibility is there. And that is a significant sort of safety valve.

So I am going to deny the motion to reduce the fine to less than 100 million. The $100 million fine, as stipulated to as the starting point in the (C) plea, will continue to obtain under this Court's approval. So that leaves the question of the payment.

And both of you have proposed fairly -- well, vastly different views of the payment structure. The goal of this Court is to -- to err on the side of providing some relief at the front end to StarKist because this, over the next year, perhaps two years, will be the crucial period, it seems to me, because hopefully the parties will know where it stands, where things stand with respect to the settlement of the civil matters.

We'll have a better indication also in terms of performance and cash flow, and there may be developments on the Techpack arena, one would hope in the next 12, 24 months, so the picture will be clear.

And so what I'm going to do is impose a -- the following schedule.

The initial payment -- and I forget what the timing -- is there an agreement --

**MR. LYNCH:** Thirty days.

**MR. MAST:** I agree, Your Honor.

**THE COURT:** All right -- will be $5 million.

The next payment, 2020, will be 11 million. And then the four annual payments thereafter in 2021, '22, '23 and '24, will be 21 million. That is putting things more in the back end than the government has requested. It is more. But I do think $5 million, in view of what is currently on hand and the ability to borrow some money, still gives some breathing room

to StarKist. As well as the reduction in the second year. It's not quite as much as StarKist had asked.

But again, if circumstances warrant even within the first year, that there's a problem, StarKist can come back to court on a motion under 3572(d). But otherwise, this, I think, attempts to account fairly and reasonably with the possible cash needs up front with respect to the other liabilities that may be incurred. And so that is the schedule.

With respect to Probation, I do think it is useful to have Probation involved, but to a very limited extent, to have Probation involved really to assist the Court if there is a motion under 3573 or 3572, to examine if there's some dispute about the financial situation, to assist the Court in helping to discern what the situation is.

Otherwise, I don't see any need to report, you know, or send financial statements. Unless Probation thinks otherwise, I don't think that's necessary, as long as the payments are made.

And I would like the probationary period to end with the payment of the second -- which would be -- would that be one year from the 30 days from now?

**MR. LYNCH:** Correct.

**THE COURT:** So the probation would be, you know, one year, one month?

**PROBATION OFFICER SPITALIERI:** One year, one month?

Thirteen months?

**THE COURT:** I guess. Because if we're underway then, then, you know, we're okay, and we can relieve the parties of probation through that second period.

**PROBATION OFFICER SPITALIERI:** Your Honor, you could make a statement that you waive all the standard conditions of probation and that -- I would say to keep the one to not commit another federal, state or local crime.

And you could even make note -- I could put in the judgment that there's no requirement for them to report, unless the Court makes a request for more --

**THE COURT:** So only Condition 1, and not 2.

**PROBATION OFFICER SPITALIERI:** Okay.

**THE COURT:** All right. So, let me formally pronounce sentence.

**MR. LYNCH:** Your Honor, one thing.

**THE COURT:** Yeah.

**MR. LYNCH:** You also will need to make a finding that the payments are made without interest. That's obviously our proposal, that's Probation's, and I believe that was the government's proposal, in their schedule.

**THE COURT:** Right. And that is the intent of the court, that these payments are to be made without interest.

Therefore, pursuant to the Sentencing Reform Act of 1984, it is the judgment of this Court that StarKist is hereby placed

on probation for a period of 13 months.

All the conditions and standard conditions of probation are waived, and so there'll be no reporting requirements unless specifically ordered by the Court.

The one condition on probation will be that while on probation, StarKist Company shall not commit another federal, state or local crime.

If there is a dispute over ability to pay and a motion is brought under 3573 or 3572, wherein the Court requires the assistance or seeks assistance of Probation, Probation will have the authority to assist the Court in addressing those motions. And, and to gather financial information, if necessary.

But otherwise I'm not requiring any reporting, financial reporting or otherwise, unless otherwise ordered by this Court.

**MR. LYNCH:** Thank you, Your Honor.

**THE COURT:** StarKist must pay to the United States a fine of $100 million on the schedule as follows: Within 30 days of this judgment, an initial payment of $5 million. A year thereafter, in 2020, $11 million. And then in each successive year thereafter, at the anniversary date of each payment, in years 2021, '22, '23 and '24, payments of $21 million in each of those years.

It is further ordered that StarKist Company must pay the mandatory special assessment of $400. Payment shall be made to

the Clerk of the U.S. District Court, 450 Golden Gate Avenue, Box 36060, San Francisco, California, 94102.

And so that is the judgment and order of this Court. And you will prepare a judgment, Ms. Spitalieri? I appreciate that.

**PROBATION OFFICER SPITALIERI:** I will, Your Honor. Just to make it clear, you are waiving interest?

**THE COURT:** Waiving interest.

**PROBATION OFFICER SPITALIERI:** Uh-huh.

**THE COURT:** Yes.

**PROBATION OFFICER SPITALIERI:** Okay.

**THE COURT:** Yes.

**MR. MAST:** Thank you, Your Honor.

**MR. LYNCH:** Thank Your Honor.

**THE COURT:** Well, I hope for the best for everyone's sake, that things go well.

My secretary did notice that StarKist now has flavored, different flavored -- and I think that's going to be a big hit, and I wish you success in that.

**MR. LYNCH:** Flavored pouches.

**THE COURT:** Flavored pouches. Anxious to try that.

**MR. LYNCH:** Your Honor, I want to thank you. You've been very patient. We have had three hearings. There's been extensive briefing. And we definitely appreciate all the time and effort you put in to this. So, thank you.

**THE COURT:** Well, there is a lot at stake here. And as both the company has pointed out and others, you know, these are important issues. I mean this is, this is -- what has happened here is significant, and obviously the -- the consequences are significant. This is -- could have material impact on the company.

On the other hand, we want to safeguard the livelihoods of people and keep the company viable, if possible.

**MR. LYNCH:** Uh-huh.

**THE COURT:** So --

**MR. MAST:** And Your Honor, I should have mentioned earlier, but -- I think it is implicit in the Court's ruling, but just to make explicit, the Court is not ordering restitution. That was agreed upon in the plea agreement.

**THE COURT:** Yes. Consistent with the plea agreement, the Court is not ordering restitution.

It does so with the knowledge that there is civil litigation pending, and the Court has treated that civil litigation as kind of a functional equivalent for purposes of Section 8C3.3 as the functional equivalent of restitution, which is exactly why we try to take into account the potential civil liability in assessing the criminal fine here.

**MR. MAST:** Thank you, Your Honor.

**THE COURT:** Okay?

**MR. LYNCH:** Thank Your Honor.

**PROBATION OFFICER SPITALIERI:** Thank you.

**THE COURT:** Thank you.

(Proceedings concluded)

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Thursday, September 12, 2019