MIKAL J. CONDON (CSBN 229208)
LESLIE A. WULFF (CSBN 277979)
ANDREW MAST (CSBN 284070)
United States Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, California 94102
Telephone: (415) 934-5300
Facsimile: (415) 934-5399
andrew.mast@usdoj.gov

Attorneys for the United States

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>STARKIST CO.<br>Defendant. | Case No. CR-18-0513 EMC<br><br>**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Date: June 12, 2019<br>Time: 2:30 p.m.<br>Judge: Hon. Edward M. Chen |

## TABLE OF CONTENTS

I. INTRODUCTION ........ 1
II. BACKGROUND ........ 2
A. Company Background ........ 2
B. Role in Conspiracy ........ 2
C. Plea Agreement ........ 3
D. StarKist's Financials and the Zuehls Report ........ 4
1. An Independent Expert Evaluated StarKist's Ability to Pay ........ 4
2. Dr. Zuehls's Conclusions ........ 6
III. LEGAL STANDARDS ........ 10
A. Sentencing Guidelines ........ 10
B. Inability to Pay ........ 10
A. StarKist Cannot Establish that a $100 Million Fine Would Threaten its Ongoing Financial Viability ........ 11
1. StarKist's Projected Zero Growth is Contradicted By Industry Projections, Its Past Performance, and Its Own Business Decisions ........ 12
2. StarKist Should Not Be Permitted to Undertake [redacted] Million in Cash Financed Capital Expenditures Instead of Paying Its Criminal Fine. ........ 14
3. [redacted] ........ 15
4. StarKist Artificially Reduced Its Assets to Avoid Paying a Criminal Fine.. 16
B. StarKist Cannot Establish that a $100 Million Fine Would Impair its Ability to Pay Restitution ........ 16
C. The Government Can Petition to Lower StarKist's Fine if StarKist's Dire Economic Predictions Come to Fruition ........ 19
D. An Evidentiary Hearing is not Necessary ........ 20
E. The Parties Agree that a $100M Guidelines Fine Satisfies 18 U.S.C. § 3553 ........ 21
V. CONCLUSION ........ 23

## TABLE OF AUTHORITIES

### Cases

*Firstmark Capital Corp. v. Hempel Financial Corp.*, 859 F.2d 92 (9th Cir. 1988) ..................... 16

*Gall v. United States*, 552 U.S. 38 (2007) ..................................................... 10

*United States v. Booker*, 543 U.S. 220 (2005) ..................................................... 10

*United States v. Eureka Laboratories, Inc.*, 103 F.3d 908 (9th Cir. 1996) ........................... 11, 15

*United States v. Horizon Lines, LLC*, No. 11-CR-71 DRD, (D.P.R. Apr. 28, 2011) .................... 19

*United States v. Nathan*, 188 F.3d 190 (3d Cir. 1999) ..................................................... 10, 15

### Statutes

18 U.S.C. § 3553(a) ..................................................... 22

18 U.S.C. § 3612(f) ..................................................... 19

18 U.S.C. § 3664(f) ..................................................... 10, 17

### Other Authorities

U.S.S.G. § 8B1.1 ..................................................... 10, 17

U.S.S.G. § 8C3.3 ..................................................... 10, 11

### Rules

Fed. R. Crim. P. 32 ..................................................... 20

## I. INTRODUCTION

StarKist, Co. is the last of three companies to take responsibility for selling hundreds of millions of dollars' worth of price-fixed tuna to consumers in the United States. It has entered into a Rule 11(c)(1)(C) plea agreement in which it has agreed to a guidelines fine of $100 million, capped by the statutory maximum of $100 million. But for the statutory maximum, StarKist's guidelines range would be $120 million to $240 million. The parties further agree that a fine of $100 million is an appropriate disposition in this case and comports with the sentencing factors articulated in 18 U.S.C. § 3553. The Plea Agreement provides that the only dispute between the parties is whether StarKist's fine should be *further* reduced based on its claimed inability to pay.

The Court, like Probation, should reject defendant's attempt to escape punishment for the crime it committed. StarKist's claimed inability to pay is based on financial projections created during pending litigation that grossly inflate its hypothetical future civil damages and substantially undervalue its estimated future earnings. StarKist's actual financial performance and existing civil settlements contradict the dismal future StarKist projects. StarKist also attempts to manipulate its forecasted financial condition by making significant and voluntary payments in cash, including large capital expenditures, increasing its inventory purchases by [redacted], and paying down debt to historical lows. In other words, StarKist is depleting its cash reserves by accelerating business-related expenditures in an attempt to avoid paying a guidelines fine. StarKist, however, committed a crime, and should not be permitted to spend money on itself at the expense of paying the price for its criminal acts. Just as an individual defendant cannot avoid a criminal fine by transferring assets to a spouse, StarKist's deliberate choice to spend down its cash reserves does not justify an inability-to-pay reduction.

StarKist cannot carry its burden to show the reduction in its criminal fine is necessary, which the guidelines reserve for only the most extraordinary situations. As the government's independent expert concluded, StarKist has more than sufficient funds to pay the guidelines criminal fine of $100 million, in reasonable installments without interest, without jeopardizing either its ability to pay restitution or its continued viability. After a lengthy presentence

investigation involving the submission of expert reports, Probation reached the same conclusion. For these reasons, the government respectfully requests that the Court deny StarKist's inability-to-pay request, and impose the guidelines fine of $100 million.

## II. BACKGROUND

### A. Company Background

StarKist is wholly owned by Dongwon Industries Co. Ltd., a global supplier of seafood based in Seoul, South Korea. From November 2011 to December 2013, the time period charged in the Information, StarKist sold approximately $1.4 billion in shelf-stable tuna products to customers in the United States. While StarKist sells directly to large retailers and wholesale distributor companies, its products were ultimately purchased by millions of American households and businesses at inflated prices.

Shelf-stable tuna can be sold in cans or foil pouches.[1] StarKist is the overwhelming market leader among the three major suppliers of shelf-stable seafood in the United States. This dominance is particularly apparent in pouch tuna, where StarKist controls approximately 80% of the market. Pouch tuna is a high-growth product and a higher margin product than canned tuna. StarKist's market dominance in pouch tuna has led the company to plan a significant $77 million expansion of its factory in American Samoa, which will allow StarKist to keep up with growing demand for pouch products and maintain its market position. (PSR ¶¶ 52-53.)

In addition to tuna, StarKist sells canned salmon, which is growing in popularity by StarKist's own admission. (May 14, 2019 Expert Report of Dale Zuehls (Zuehls Report) ¶ 43, Attach. 1 to the Declaration of Andrew J. Mast (hereinafter Mast Decl.).) StarKist has also recently introduced a new line of pouch chicken that is currently being sold at most major retailers. (*Id*. ¶ 34.)

### B. Role in Conspiracy

As the national leader in shelf-stable seafood, StarKist's participation in the conspiracy was essential to its success. Executives at Bumble Bee said it was particularly important to have StarKist participate in coordinated list price increases because it was the market leader; a

[1] StarKist was not charged with conspiring to fix prices of pouch tuna.

coordinated price increase would not be effective without StarKist. (PSR ¶ 8.) Further, maintaining agreed-upon pricing guidance and promotional pricing levels between the three companies also depended on StarKist's participation in the conspiracy. (*Id.*)

During the period charged in the Information, StarKist's participation occurred through a high-level executive: Stephen Hodge, StarKist's then-Senior Vice President of Sales. Hodge was introduced to his competitors in November 2011 by Joseph Tuza, the StarKist outgoing Senior Vice President of Marketing. (Mast Decl. ¶ 5.) Tuza informed Hodge that, in light of the departures of both Tuza and Charles (Chuck) Handford, the recently departed Vice President of Northeast Sales and Marketing, it was now Hodge's responsibility to speak directly with competitors regarding prices. (Mast Decl. ¶ 5.) After that introduction, Hodge engaged in ongoing, consistent, and blatantly collusive discussions with his competitors at Bumble Bee and Chicken of the Sea for over two years, and reached agreements on all aspects of pricing, including list prices, quarterly pricing guidance, and promotional price points. (PSR ¶¶ 11-13.)

StarKist's participation in the charged conspiracy ended when Hodge left the company in December 2013 for reasons unrelated to the investigation. (PSR ¶ 14.) While Hodge is the only StarKist executive to date who has been charged with fixing prices, he was not the only StarKist employee involved in the charged conspiracy. (*See* Addendum to PSR ¶ 4.) When interviewed by the government, Hodge indicated that it was commonly known within the company that StarKist was regularly aligning its prices with its competitors through discussions between executives. (Mast Decl. ¶ 5.) Hodge could not recall receiving formal antitrust training while working at the company. (PSR ¶ 38.) The Presentence Report concludes that StarKist did not have an effective antitrust compliance and ethics program during the relevant period. (*Id.*)

**C. Plea Agreement**

StarKist pleaded guilty on November 14, 2018 pursuant to a Plea Agreement filed under Federal Rule of Criminal Procedure 11(c)(1)(C). (Dkt. 24, hereinafter "Plea Agreement.") The Plea Agreement stipulates to a volume of affected commerce, the resulting sentencing guidelines

///

///

calculation, and other elements of the sentence relevant to determination of the guidelines fine.[2] The resulting, agreed-upon guidelines calculation is attached hereto as Appendix A. The parties agree that a fine based on the agreed-upon volume of affected commerce would be $120 million to $240 million, and, thus, that the guidelines fine is $100 million due to the statutory maximum for Sherman Act offenses. The guidelines calculation contained in the Presentence Report is consistent with the Plea Agreement.

The sole basis upon which StarKist can seek a reduction from the agreed-upon $100 million fine is pursuant to U.S.S.G. §8C3.3. (Plea Agreement ¶ 11.) U.S.S.G. §8C3.3 requires StarKist to prove that it cannot pay the guidelines fine, even with a reasonable installment schedule, without impairing its ability to make restitution to victims or without substantially jeopardizing its continued viability.

**D. StarKist's Financials and the Zuehls Report**

1. <u>An Independent Expert Evaluated StarKist's Ability to Pay</u>

The government retained Dr. Dale Zuehls, a forensic accounting expert, to independently evaluate the veracity of StarKist's claim that it cannot pay the guidelines fine of $100 million. Zuehls is a principal at the consulting firm of Zuehls, Legaspi & Company. He is a Certified Public Accountant with a PhD in Accounting and a Juris Doctor degree. He has over 40 years of experience in complex accounting, fraud, forensic, tax, and consulting matters. (Zuehls Report, Ex. A.)

The government has retained Zuehls on over 40 occasions to assess ability-to-pay claims by antitrust defendants. He has provided an independent assessment of a defendant's financial condition and ability to pay in matters involving, for example, the airline cargo and passenger industries, the computer memory industry, the domestic freight industry, the aftermarket auto lights industry, and the electrolytic capacitors industry, as well as for another pleading defendant in this packaged seafood conspiracy. (Zuehls Report ¶ 3.)

///

[2] Pursuant to the Plea Agreement, the government agrees not to request probation, though the other terms of the Plea Agreement remain enforceable even if the Court orders probation. (Plea Agreement ¶ 10(c).)

After the government retains Zuehls, he conducts an independent analysis of the defendant's ability to pay a guidelines fine. Zuehls's mandate is to reach whatever conclusion he believes is supported by the financial data he analyzes according to a methodology of his own choosing. The government does not specify a desired outcome for Zuehls's analysis. (*Id.* ¶ 6.) At times, as here, Zuehls recommends that a company can pay its fine, but on other occasions he concludes that a company is unable to pay a guidelines fine, as he did with Bumble Bee, StarKist's coconspirator. *United States v. Bumble Bee*, No. 17-CR-249, United States' Sentencing Memorandum and Motion for Departure, at 12-15 (Dkt. 25); *see also United States v. Rubycon*, No. 16-CR-367 JD (N.D. Cal.), Sentencing H'rng Tr. 11:17-16:22 (Dkt. 37).

The methodology Zuehls used to assess StarKist's ability to pay is set forth in his report. (Zuehls Report ¶¶ 5-7.) First, he reviewed and analyzed StarKist's historical and current financial data, including historic performance, current financial position, and the strength of its balance sheet. Second, he reviewed the company's financial forecasts. Finally, he created his own forecasts of future earnings to test the company's ability to pay a $100 million fine under a range of financial circumstances that could occur over the next five years. To do so, he prepared multiple iterations of StarKist's future cash flows by modifying certain assumptions of future events. Zuehls' assumptions are based on StarKist's historical performance, industry projections of future performance for the packaged-seafood industry as a whole, the likelihood of occurrence of particular events, and other relevant factors. In this case, the relevant assumptions that Zuehls tested in preparing his iterations were: StarKist's future compound annual growth rate ("CAGR"), the amounts of the civil settlements in the follow-on cases, and capital expenditures, including whether those expenditures were paid in cash or debt financed. In total, Zuehls performed 35 iterations of StarKist's possible future earnings to account for a range of future financial scenarios for the company.[3] After examining StarKist's projected annual earnings over the next five years under each of the 35 iterations, Zuehls opined that the company would be able

///

[3] The government has provided StarKist with these iterations as well as the iterations Zuehls performed in evaluating the ability to pay of Bumble Bee.

to pay a $100 million criminal fine in addition to civil damages while maintaining its business operations.[4] (*Id.* ¶¶ 82-88.)

StarKist also retained an expert to assess its ability to pay claim, Mr. Rajiv B. Gokhale. Unlike Zuehls, Gokhale did not conduct an independent analysis of StarKist's financial condition. Instead of testing StarKist's self-serving conclusions about its future performance or accounting for more than one possible future financial scenario for his client, Gokhale accepted at face value the single financial projection contained in StarKist's "Long Range Plan." This is an internal document prepared by StarKist in the course of this prosecution, and which contains a parade of horribles about StarKist's future that are contradicted by StarKist's recent historical performance, independent industry analysts, and common sense.[5] (February 1, 2019 Expert Report of Rajiv B. Gokhale (Gokhale Report) ¶ 13, n. 18, Attach. 2 to the Mast Decl.; *see also* Pouch Justification Summary, Attach. 3 to the Mast Decl.)

2. Dr. Zuehls's Conclusions

Zuehls concludes that StarKist has the ability to pay a $100 million fine in six interest-free installment payments made over a five-year period, make restitution to the victims, and continue as a viable enterprise. (Zuehls Report ¶¶ 4, 89-90.) His conclusions are summarized below and his report is attached as Attachment 1 to the Mast Declaration.

Zuehls's conclusion that StarKist can pay the $100 million guidelines fine is based on four primary points of disagreement with StarKist's financial projections: (1) StarKist's projected CAGR; (2) StarKist's proposal to pay cash for two significant capital expenditures totaling well over [redacted] million—including a voluntary $77 million plant expansion; (3) the likely amount of future settlements paid to the victims of StarKist's price-fixing conspiracy; and

///

[4] Zuehls initially performed 20 iterations which rovided the bases for his conclusions in a report submitted to Probation. [redacted] Zuehls used the [redacted] to determine StarKist's ability to pay coupled with differing CAGRs and financing rates for capital expenditures. (*Id.* ¶ 23.)

[5] StarKist asserts that it prepared its Long Range Plan in the ordinary course of its business. The LRP relied upon by Gokhale was prepared in January 2019, after StarKist had raised its inability-to-pay claim.

(4) recent actions taken to reduce StarKist's excess working capital—in other words, deplete its cash reserves in order to avoid paying a criminal fine.

First, StarKist projects a five-year CAGR of one-tenth of one percent (0.1%). In other words, StarKist assumes that it will make nearly no profit, across all product lines, for any year in the next five years. Zuehls concludes StarKist's dismal projection is at odds with:

- StarKist's recent past performance across product lines, where it has seen a CAGR of 6.6% for 2018 and 13.4% for 2017;
- StarKist's market dominance in pouch tuna, where it has seen exceptional growth and a CAGR of 10.4% between 2013 and 2017 and expected similar growth going forward;
- The fact that pouch tuna is a higher-margin product, so any decrease in unit sales in canned tuna are offset by the higher profits reaped in sales of pouch;
- Industry analysts' assessments for the packaged-seafood industry as a whole, which project an industry-wide CAGR for canned tuna of 4.18%-4.71%;
- StarKist's future business plans, which include a projected ***$77 million*** expansion of its plant in American Samoa into a pouch production facility in order to keep up with the demand for pouch tuna;
- StarKist's [redacted] increase in inventory purchases at year-end 2018 versus year-end 2017; and
- StarKist's performance in other product lines, including growing sales in canned salmon, which by StarKist's admission have offset decreased sales in canned tuna.

(*Id.* ¶¶ 32-48, 69.)

Second, StarKist assumes that it will pay [redacted] ***in cash*** to undertake two capital expenditures: (1) $77 million for a plant expansion to keep up with pouch demand; and (2) [redacted] million for EPA-mandated compliance-related improvements. Zuehls concludes that both capital expenditures could and should be debt-financed instead of paid in cash, leaving [redacted] cash available to pay the criminal fine. Alternatively, although StarKist has no choice but to

comply with the EPA judgement, its decision to spend nearly $80 million cash to expand its factory is a wholly voluntary expenditure, and StarKist should not be allowed to maximize profits at the expense of atoning for its criminal conduct. (*Id.* ¶¶ 67-69.)

Third, Zuehls concludes that StarKist's initial assumptions regarding the amounts of the civil settlements are inconsistent with (1) settlements that it has already made and (2) Zuehls' considerable experience estimating future civil settlements in antitrust cases. (*Id.* ¶¶ 49-57.) StarKist has already settled with its largest customers. StarKist settled with Walmart (which includes Sam's Club) for $20.5 million, half of which is for "favorable commercial terms" (i.e., future discounts). (*Id.* ¶ 50, Ex. J.) [redacted]

Finally, Zuehls concludes that StarKist has taken several recent actions to reduce its working capital, so that it has less cash on hand to pay the criminal fine. Those actions include:

///

[6] In addition to being sued by the direct purchasers, StarKist has been sued by indirect purchasers, who purchased tuna at inflated prices from StarKist's direct customers.

- Debt Paydowns: From 2013-2018, StarKist maintained an average debt of [redacted] In its 2018 financials, however, StarKist indicated that by 2024, it intends to maintain only [redacted] in debt. This amounts to a net debt pay-down of [redacted] during the forecast period. Zuehls concludes that debt pay-downs are a fairly common strategy for companies facing significant fines and claiming an inability to pay, because companies prefer spending available cash for any business purpose as opposed to a fine. (*Id.* ¶¶ 70-73.)
- Disguised Dividends: StarKist paid millions of dollars of disguised dividends to its parent company and related subsidiaries. In 2014 and 2017, StarKist invested a total of ***$122.4*** million to acquire an interest in TechPack Solutions, a manufacturer of plastic, glass, and aluminum bottles and cans. TechPack was merged into Dongwon Systems, an entity controlled by StarKist's parent, Dongwon Industries; that merger carried no corresponding benefit to StarKist. In sum, StarKist gave away $122.6 million to its parent company, including $66.6 million during the pendency of the criminal investigation. (*Id.* ¶¶ 77-80.)
- Increased Inventory Purchases: StarKist increased its purchase of inventory (primarily fish) by [redacted] amounting to [redacted] between 2017 and 2018. Not only does the increase in inventory purchases undermine StarKist's doomsday predictions of future growth—why would StarKist buy fish it did not believe it could sell?—but it also resulted in a cash pay-down of over half of the amount of the criminal fine. (*Id.* ¶¶ 38-40.)

After performing a series of 35 iterations on StarKist's future earnings in which he accounts for various possibilities in growth rates, civil damage settlements, and capital expenditures, Zuehls concludes that StarKist's future cash flows will be more than sufficient to allow StarKist to pay the $100 million guidelines fine, remain a viable enterprise, and pay its civil damages. (*Id.* ¶¶ 83-89.)

///

///

## III. LEGAL STANDARDS

### A. Sentencing Guidelines

Although the guidelines are advisory, a district court judge should begin all sentencing proceedings by correctly calculating the applicable range under the Sentencing Guidelines along with the other sentencing factors listed in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007); *United States v. Booker*, 543 U.S. 220, 256-60 (2005).

Here, the parties agree that the fine based on the agreed-upon volume of affected commerce would be $120 to $240 million, well over the statutory maximum fine of $100 million, and that the guidelines fine is thus $100 million. (*See* Appendix A.)

### B. Inability to Pay

As discussed above, the Plea Agreement makes clear that the only basis upon which StarKist can seek a reduction from its $100 million guidelines fine is if it can meet its burden of demonstrating an inability to pay that fine pursuant to U.S.S.G. § 8C3.3. The guidelines permit a sentencing court to adjust a criminal fine after taking into consideration the organization's ability to pay. U.S.S.G. § 8C3.3.

The defendant bears the burden of proving its inability to pay. *United States v. Nathan*, 188 F.3d 190, 215 (3d Cir. 1999). A company may only seek a fine reduction based on an inability to pay if paying a full fine impairs its ability to make restitution or threatens the company from remaining financially viable. Courts employ different standards depending on whether victims or the company are threatened by the fine. A court is required to reduce a defendant's fine if imposing the fine would impair the defendant from paying restitution to the victims of the offense. U.S.S.G. § 8C3.3(a). Restitution, however, is only coextensive with the charged criminal conduct, meaning a fine is only required to be reduced if it impairs a defendant from making restitution for the losses resulting from the charged criminal conduct. *See* 18 U.S.C. § 3664(f)( 1)(A) and U.S.S.G. § 8B1.1.

In contrast, a court ***may*** reduce a defendant's fine if imposing the fine would jeopardize the ongoing financial viability of the company. U.S.S.G. § 8C3.3(b). As long as a defendant can pay restitution, however, the court has discretion to impose a fine regardless of whether it could

jeopardize the financial viability of a company. *Compare* U.S.S.G. § 8C3.3(b) *with* U.S.S.G. § 8C3.3(a). In *United States v. Eureka Laboratories, Inc.*, 103 F.3d 908, 912 (9th Cir. 1996), the Ninth Circuit made clear that "Guideline Section 8C3.3 does not prohibit a court from imposing a fine that jeopardizes an organization's continued viability." *Id*. Further, the Ninth Circuit held that "even if the district court's fine would completely bankrupt [defendant], neither section 8C3.3(a) nor section 8C3.3(b) preclude[] the court from imposing such a fine so long as the fine did not impair [defendant's] ability to make restitution." *Id*.[7]

## IV. ARGUMENT

Based on a comprehensive analysis of StarKist's financials, Zuehls concluded StarKist has an ability to pay a guidelines fine of $100 million from future net cash flows. Zuehls analysis was based on StarKist's financial outlook alone and he did not assume that that StarKist's parent, Dongwon Industries, would necessarily provide loans or capital to StarKist to ensure its solvency despite Dongwon's ability to do so. (Zuehls Report ¶¶ 13-14.) Even ignoring the possibility of a bailout from its parent, however, StarKist has an ability to pay a guidelines fine and thus has not met its burden to demonstrate that a fine reduction is appropriate under either section 8C3.3(a) or (b). The Probation Office reaches the same conclusion.

### A. StarKist Cannot Establish that a $100 Million Fine Would Threaten its Ongoing Financial Viability

StarKist's latest Long Range Plan—prepared during the pendency of this litigation—projects zero growth, repayment of debt to historically low levels, and all-cash expenditures for factory improvements, effectively manipulating its forecasts to make it appear that the company cannot pay the guidelines fine. StarKist's actual performance, supported by industry projections of future growth, shows a vastly different picture.

///

///

[7] Although this is the applicable legal standard, the government is not asking the Court to bankrupt StarKist; as set forth below, Zuehls's analysis makes clear that StarKist can pay the guidelines $100 million fine, make full restitution to the victims of its criminal conduct, and continue as a healthy and viable enterprise.

1. StarKist's Projected Zero Growth is Contradicted By Industry Projections, Its Past Performance, and Its Own Business Decisions

StarKist's Long Range Plan assumes a five-year CAGR of one-tenth of one percent (0.1%). That stagnant figure bucks industry reports, StarKist's historical and current performance, the outlook of its competitors, and its own projected future business decisions. Thus, it should be disregarded by the Court when evaluating StarKist's ability to pay its criminal fine.

First, as explained in the Zuehls Report, industry reports project growth in the *canned* tuna market of between 3.8% and 4.7% over the next five years. Those projections do not account for rapid growth in pouch tuna, where StarKist controls 80% of the market. StarKist's competitors agree: Bumble Bee has indicated that pouch sales present "a runway for growth [that] is exceptionally long." (Zuehls Report, Ex. N.) StarKist's dire predictions in its Long Range Plan are based on a decline in consumption of *canned* tuna, but ignore the extreme growth in pouch and its own dominance in that market segment. Indeed, StarKist admits that it has maintained a CAGR of 10.4% in pouch tuna over the past five years and it projects the same growth going forward. (Gokhale Report ¶ 13.) In fact, StarKist argues that it must undertake costly plant expansion in order to keep up with the extreme growth in demand in this market. (*Id.*)

StarKist's anemic CAGR projection is further undermined by the fact that any decline in canned tuna sales is offset by increased sales in canned salmon. StarKist's expert admits as much (but fails to appreciate its significance) when he notes "the growing popularity of canned salmon has outweighed the decline of tuna, helping this segment grow during the period." (*Id.* ¶ 11, n. 12.) Profits to be reaped in the increasingly popular canned salmon market are also available to pay a criminal fine. Furthermore, Gokhale outright ignores StarKist's new line of *Chicken Creations*, which are currently being sold at most major retailers. (Zuehls Report ¶ 34.) Because StarKist sells products beyond canned tuna, its profitability does not hinge on the consumption of canned tuna alone.

///

Moreover, a decline in per-unit sales does not correspond to a decline in profits. Pouch tuna is a much higher margin product, so a decline in sales of canned tuna offset by sales of pouch tuna increase StarKist's margins. (*Id.* ¶¶ 42, 44.)

Second, StarKist's own performance further underscores the unreasonableness of its projected CAGR. In 2017 and 2018, StarKist maintained CAGRs of 13.4% and 6.6%, respectively. (*Id.* ¶ 35.) StarKist has not put forth an adequate justification for the dramatic reversal between the actual growth rates 2017 and 2018, and the projected growth rates in the next five years—all years during which it would have to pay a criminal fine. StarKist's claim that [redacted] and will not be able to reap the benefit of growing demand absent a $77 million proposed expansion to its plant in American Samoa is supported by a single page, internal document with no underlying data supporting its conclusions. (Attach. 3, Mast Decl.) This does not meet StarKist's burden to show an inability to pay.

Third, StarKist's projected business decisions undermine its assertion that it will maintain nearly-zero growth over the next five years. StarKist claims it needs to spend $77 million in cash to expand its plant in American Samoa in 2020 because, it alleges, [redacted] (Gokhale Report ¶ 13.) But StarKist continues to project a CAGR of 0.1% in 2021 through 2025, even after the proposed plant expansion. (Zuehls Report ¶ 41-47.) [redacted] it should see significant increases in CAGR after that expansion. The expansion cannot possibly be necessary if the anemic CAGR set forth in StarKist's Long Range Plan is correct. To the contrary, such an expensive expansion could only be justified if StarKist believes that its sales of pouched tuna will continue to grow, thus necessitating additional capacity. Similarly, in 2018 StarKist substantially increased its investment in inventory by [redacted] (*Id.* ¶ 38.) Unless StarKist anticipates selling that additional inventory, the increase in inventory does not make sense.

For the foregoing reasons, StarKist will have more than sufficient future cash flows to pay a $100 million fine, [redacted]

///

[redacted] and remain financially healthy.[8] (*Id.* ¶ 83-89.) Not only that, but Zuehls concluded StarKist has an ability to pay a $100 million fine using a CAGR of 1.0%—a CAGR he does not conclude is likely, as it is well below both well below historic performance and industry projections of future performance—so long as StarKist finances its over [redacted] in capital expenditures. (*Id.* ¶¶ 47, 86.)

2. <u>StarKist Should Not Be Permitted to Undertake [redacted] Million in Cash Financed Capital Expenditures Instead of Paying Its Criminal Fine.</u>

StarKist proposes paying cash for [redacted] million in capital expenditures: $77 million for capacity expansion to its American Samoa facility and [redacted] million in EPA-mandated compliance expenditures. Reducing StarKist's fine on this basis would allow the company to effectively transfer money to itself rather than paying a criminal fine. StarKist has provided no justification for why it cannot finance these expenditures rather than paying for them in cash because there is none. StarKist should debt finance the capital expenditures, which would allow it to pay the entirety of the criminal fine and more.

StarKist contends that "there is no practical difference in whether StarKist were to attempt to issue new debt or equity to pay a fine"—which it contends would be impossible—and an attempt to "issue new debt or equity to finance capital expenditures." (Gokhale Report ¶ 31.) Even assuming *arguendo* that StarKist could not raise or borrow funds to pay a criminal fine, it provides no support for the contention that financing a capital expenditure such as plant expansion would be similarly untenable. Rather, loaning money for a capital expenditure, which

///

///

---

[8] StarKist argues that the industry reports relied on by Zuehls are based on the global or North American sales of tuna, while nearly all of StarKist's sales are in the United States; and, thus, that the reports cannot be relied on. (Gokhale Report ¶ 30.b.) But StarKist has not provided any independent industry analysis regarding the packaged-seafood industry that pertains to the United States alone, or otherwise justified its claim that a United States-specific CAGR would differ so significantly from more global estimates. Indeed, the United States is typically the leader in the consumption canned seafood. Therefore, for StarKist's projected CAGR to be accurate, the rest of the Americas would have to project extremely high CAGRs to make up for the U.S.'s stagnated sales. StarKist bears the burden to establish its 0.1% CAGR is correct. It has failed to do so.

will generate additional revenue and thereby enable repayment of the loan, is materially different than loaning money for a criminal fine, which does not generate revenue.

StarKist has a low debt-to-equity ratio, and its debt is guaranteed by its parent, Dongwon Enterprises. Banks frequently provide loans for capital improvements, and there is no reason they would not do so here. Additionally, StarKist has given no indication that it has attempted, but failed, to secure financing for these capital expenditures. Yet it bears the burden to establish an inability to pay. *Nathan*, 188 F.3d at 215. In fact, StarKist indicates that some of its civil settlements are being paid through financing, defeating its own argument that it will be unable to obtain debt financing for the capital expenditures. StarKist should finance its capital expenditures and use the cash to pay its $100 million fine.

Moreover, nothing in the guidelines requires the Court to consider whether a guidelines fine will prohibit a corporation from being as profitable as it could be. *See Eureka Laboratories, Inc.*, 103 F.3d at 912. Put differently, StarKist committed a crime, and is not entitled to expend cash to maximize capacity and future sales in lieu of paying the price for its criminal activity. If StarKist cannot secure financing to pay for its plant expansion, it should not be allowed to spend cash on that expansion instead of paying its criminal fine. Instead, the $77 million should be paid to the United States, and StarKist should expand at some future date. Doing so will not jeopardize its continued viability—it will simply delay its ability to profit maximally from demand for pouch tuna. StarKist admits it engaged in a price-fixing conspiracy impacting hundreds of millions of dollars in commerce, and a delay in profitability is a reasonable and foreseeable consequence of this criminal conduct.

[redacted]. [redacted]

[redacted]

///

Additionally, plaintiffs in the civil case are seeking to pierce the corporate veil and hold StarKist's parent, Dongwon, liable for StarKist's actions. Moreover, it appears that StarKist, throughout the course of this investigation, has transferred substantial assets to Dongwon and related subsidiaries. If plaintiffs succeed in piercing the corporate veil, that provides an entirely new and substantially larger well from which civil damages can be paid.[9]

4. <u>StarKist Artificially Reduced Its Assets to Avoid Paying a Criminal Fine</u>

StarKist should also not be allowed to pay down debts to avoid paying a criminal fine. StarKist maintained an average of $217 million of debt from 2012-2017.[10] In its forecasts, however, StarKist contemplates that by the end of 2024, it will have only [redacted] in debt. From 2018 to 2024, this represents a debt pay down o [redacted] more than enough to pay the entire guidelines fine. StarKist has an exceptionally low debt-to-equity ratio, even at its current debt load. (*Id.* ¶ 67.) Moreover, StarKist's current debt-to equity ratio does not even factor in the extra $122 million StarKist would have if it had not transferred the entirety of its TechPack investment to Dongwon. Thus, StarKist has the ability to pay a guidelines fine without substantially jeopardizing its continued viability; it simply would rather spend those funds elsewhere. But StarKist has committed a crime of significant magnitude against American consumers and, like any other criminal defendant, does not have the right to seek reduction of an owed criminal penalty because it would rather use its money in an alternative fashion.

Thus, as the Presentence Report notes after a lengthy discussion, StarKist has failed to establish that a $100 million fine will jeopardize its ongoing financial viability.

**B. StarKist Cannot Establish that a $100 Million Fine Would Impair its Ability to Pay Restitution**

Just as a $100 million fine will not threaten StarKist's ongoing financial viability, so too can StarKist pay its fine without impairing its ability to pay victims of its offense. StarKist's

---

[9] Under the doctrine of piercing the corporate veil, plaintiffs can hold shareholders personally liable for the actions and debts of a corporation if they establish a unity of interests between the two corporate entities and an inequitable result if the corporate entity is upheld. *Firstmark Capital Corp. v. Hempel Financial Corp.*, 859 F.2d 92, 94 (9th Cir. 1988).

[10] This average does not apply the [redacted] liability for the criminal fine, which StarKist recorded in 2017. If it were recorded StarKist's average debt would be even higher.

arguments to the contrary fly in the face of its existing capital expenditures and likely future earnings. Those arguments also misinterpret the inability-to-pay analysis under the Sentencing Guidelines by conflating possible civil damages arising from a much broader conspiracy alleged in the follow-on civil cases with the restitution owed on the much narrower criminal conspiracy alleged in this case.

StarKist has not, and cannot, demonstrate an inability to pay based on its need to pay restitution to the victims of the criminal offense. In arguing for a fine reduction under U.S.S.G. § 8C3.3(a), StarKist erroneously conflates civil damages with restitution.

Restitution remedies the harm from the criminal conduct, and as such, is limited only to conduct within the scope of the criminal charge. *See* 18 U.S.C. § 3664(f)(1)(A) and U.S.S.G § 8B1.1. Here, the conduct charged in the Information is narrower than the conduct alleged in the civil lawsuits. For example, many of the civil claims allege StarKist's conspiratorial conduct extended for a longer time period and included other packaged-seafood products (such as pouch tuna) than the conspiracy charged in the Information. For this reason, the potential civil damages in the civil lawsuits exceed the scope of StarKist's criminal restitution and are not the proper basis for a reduction under § 8C3.3(a).

Here, "in light of the civil cases filed against the defendant[,]" the Plea Agreement allows payment of certain damages in the civil cases to substitute for StarKist's obligation to pay criminal restitution.[11] (Plea Agreement ¶ 10(c).) But it does not follow that *all* of the damages StarKist pays in the civil litigation become criminal restitution. StarKist's restitution obligations, as measured by the charge period and products in the Information, are significantly lower than the entirety of its potential civil damages:

///

///

///

---

[11] Under the Crime Victims' Rights Act, 18 U.S.C. § 3771, the government has notified crime victims of the plea and sentencing on June 12, 2019. The government will continue to comply with its obligations under the Crime Victims' Rights Act, including notifying crime victims of any public court proceedings in connection with this matter.

| | Criminal | Civil | Difference |
|---|---|---|---|
| **Charge/Class Period** | Nov. 2011 to Dec. 2013 | Oct. 2008 to 2015 or 2017 | 4-7 years |
| **Products** | Canned tuna | All tuna (pouch, food service, private label) | |
| **VOC** | $744M | $7.06B | $6.316B |
| | *Restitution* | *Damages* | |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

Thus, even by StarKist's inflated estimates of the overcharges arising from the conspiracy, the high end of its potential criminal restitution would be $74.4 million. StarKist's actual restitution payments are substantially less than that, however. For example, StarKist settled with Walmart—its largest customer—for $20.5 million, but the civil settlement encompassed a longer conspiracy time period and included more products than the Information included. Additionally, the Walmart settlement accounted for an overcharge assumption of just 2.69%. Were that overcharge applied to StarKist's total volume of commerce, StarKist's restitution obligation would be approximately $20 million. StarKist cannot claim that a fine reduction is *required* in order to pay restitution under 8C3.3(a) because it has sufficient money to pay a criminal fine and the smaller portion of its civil settlements that supplement restitution. Because StarKist has sufficient money to pay a criminal fine and restitution to its victims, there is no basis for reduction of the guidelines fine under § 8C3.3(a).

///

///

---

[12] [redacted]

[13] These figures were provided by StarKist as estimates of its civil exposure.

**C. The Government Can Petition to Lower StarKist's Fine if StarKist's Dire Economic Predictions Come to Fruition**

StarKist has not met its burden of demonstrating that the cataclysmic events it predicts—zero growth, astronomical civil settlements, and inability to finance capital expenditures—will come to pass. The Court should not assume that they will, as every defendant will hypothesize a future financial catastrophe to avoid payment of the guidelines fine. Nonetheless, the government has recommended that StarKist's $100 million fine be paid in six installment payments over five years. If, in that time, StarKist's doomsday forecasts materialize, the government can petition the Court to reduce StarKist's fine. As page 5 of the Presentence Report notes, upon a petition by the government under 18 U.S.C. § 3573 showing that "reasonable efforts to collect a fine or assessment are not likely to be effective, the court may, in the interest of justice—(1) remit all or part of the unpaid portion of the fine or special assessment, including interest and penalties; (2) defer payment of the fine or special assessment to a date certain or pursuant to an installment schedule; or (3) extend a date certain or an installment schedule previously ordered."

Here, under the installment schedule proposed by the government, StarKist is obligated to pay $10 million within a month of judgment and $18 million paid each year for the next five years.[14] (Zuehls Report ¶ 90.) While Zuehls's current analysis of StarKist's likely future financial position indicates that it will be able to shoulder a $100 million criminal fine and continue as a viable and healthy enterprise, if StarKist's viability is truly threatened by future developments—whether those it predicts in this proceeding or some other unforeseen catastrophe—StarKist can request that the government petition the Court for a reduction in StarKist's fine. *See, e.g., United States v. Horizon Lines, LLC*, No. 11-CR-71 DRD, (D.P.R. Apr. 28, 2011) (Dkt. 36) (Order Granting Motion for Modification of Fine Pursuant to 18 U.S.C. §3573). Consistent with the principles of § 3573, however, the government will not petition for a reduced fine to permit StarKist to accumulate excess inventory, pay down its debt, utilize cash

[14] The government recommends that StarKist be exempted from paying interest on its criminal fine. *See* 18 U.S.C. § 3612(f)(3)(1).

to pay for capital expenditures, or otherwise shield money to avoid the full payment of its criminal fine, regardless of the fine imposed.

The ability for the government to petition for a lower fine under § 3573 does not alter the importance of sentencing StarKist now. Every criminal defendant would rather do anything than serve its sentence, and StarKist is no different. StarKist has demonstrated that it will continue to do anything to avoid paying its criminal fine. Indeed, StarKist has already invested $122.4 million in TechPack, which it subsequently transferred to Dongwon. It should not be permitted to continue making business decisions that allocate its cash for voluntary expenditures to avoid its punishment. Delaying sentencing would only decrease the likelihood that StarKist would be sentenced to a criminal fine commensurate with its criminal actions.

**D. An Evidentiary Hearing is not Necessary**

An evidentiary hearing is not necessary to determine that StarKist has the ability to pay a $100 million fine. A defendant does not have a right to an evidentiary hearing at sentencing. *See* Fed. R. Crim. P. 32(i) ("The court *may* permit the parties to introduce evidence on the objections [to the presentence report].") (emphasis added).

Here, there is no reason to expend judicial resources on an evidentiary hearing litigating StarKist's meritless inability-to-pay claim. Most evidentiary issues are not in dispute. StarKist does not dispute that it intends to undertake a voluntary $77 million plant expansion, paid for in cash. StarKist does not dispute that its forecasts project suddenly paying down debt by more than $100 million. Neither scenario provides a basis to avoid its criminal fine. [redacted] While the government disputes the zero-growth CAGRs projected by StarKist's Long Range Plan, it is not in dispute that StarKist's actual performance and business decisions (accumulation of substantial inventory and capacity expansion) contradict StarKist's projections. No evidentiary hearing is necessary.

Additionally, the credibility of each expert is apparent from the parties' submissions. Zuehls is an independent expert, retained by the government to evaluate StarKist's finances and test the assumptions contained therein, without a predisposition to find an ability to pay. He

conducted an independent analysis of the industry in reaching his conclusions. In the more than 40 inability-to-pay analyses completed by Zuehls, more often than not he has concluded that the defendant was unable to pay the guidelines fine. Put simply, he does not have his finger on the scale for the government.

Zuehls reached his conclusion only after looking at various possibilities in the key variables that determine StarKist's future cash flows, namely its annual growth rate, the amount of its civil settlements, and the debt structure of its capital expenditures. Consistent with the forensic accounting principles that he has applied in over 40 prior cases, Zuehls tested 35 different financial projections after giving careful consideration to how each of these variables could play out over the next five years. His iterations on CAGR—a critical factor in StarKist's future earnings during the payment period—are illustrative: Zuehls neither assumed the doomsday CAGR of 0.1% used by Gokhale nor StarKist's actual 2017 CAGR of 13.4% or 2018 CAGR of 6.6%, which appeared to be aberrations. Instead, Zuehls assumed mid-range CAGRs ranging from 1% to 4.7%, taking into account the most likely possibilities for this variable based on his review of the industry literature. By accounting for a range of such possibilities, Zuehls's methodology is far more reliable than Gokhale's singular financial projection.

Gokhale has never completed an inability to pay analysis in a criminal case, and he simply accepted StarKist's self-serving Long Range Plan at face value without testing the assumptions and conclusions reached within. An evidentiary hearing is not required to understand the methodologies of each expert and whether StarKist has sustained its burden to demonstrate a true inability to pay.

### E. The Parties Agree that a $100M Guidelines Fine Satisfies 18 U.S.C. § 3553

Pursuant to the Plea Agreement, the only basis for any reduction of the $100 million guidelines fine is defendant's inability to pay, which StarKist has failed to prove. The parties agree that the $100 million guidelines fine satisfies the § 3553 factors and that no further reduction below $100 million is appropriate under § 3553. Therefore, § 3553 does not provide a basis to lower (or raise) StarKist's fine, but remains relevant in order for the Court to evaluate, as in any proposed sentence pursuant to a (c)(1)(C) agreement, whether the sentence proposed by

the parties comports with § 3553. Here, the proposed $100 million criminal fine comports with § 3553.

Section 3553(a) directs a court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in subparagraph two of § 3553(a): the need for the sentence imposed to, among other things, reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence. A court should also consider additional factors such as the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentencing disparities. Here, these factors demonstrate that the $100 million guidelines fine is reasonable.

StarKist engaged in a multi-year price-fixing conspiracy affecting millions of American consumers, many of whom purchase tuna as an economical source of protein. StarKist is the largest supplier of shelf-stable tuna in the country. For this reason, its participation in the conspiracy was particularly important: witnesses have said that the conspiracy would not have functioned effectively without StarKist's participation. (PSR ⁋ 8.) While the number of individual participants at StarKist may have been lower than at the other corporate coconspirators, the number of executives at StarKist who participated in the conspiracy is of no moment to the application of the § 3553(a) factors. StarKist has acknowledged its participation in the charged price-fixing conspiracy, thereby admitting it lacked the necessary corporate controls or compliance program to prevent, stop, or report the illegal conduct. In fact, StarKist did not begin to accept responsibility for its actions until Hodge entered his guilty plea in May 2017 [redacted]

The $100 million guidelines fine also avoids sentencing disparities between StarKist and the other corporate pleading defendant, Bumble Bee. Bumble Bee was sentenced to pay a $25 million fine, which escalates to a maximum fine of $81.5 million in the event of a qualifying transaction. For purposes of this sentencing, the appropriate point of comparison is between StarKist's $100 million guidelines fine and Bumble Bee's maximum possible fine of $81.5 million; Bumble Bee's $25 million fine was calculated based on its own circumstances indicating an inability to pay a fine above $25 million unless a qualifying transaction occurs.

StarKist's $100 million guidelines fine reflects a volume of commerce that is nearly a third larger than Bumble Bee's volume of commerce ($744 million as compared to $567.7 million). Additionally, Bumble Bee provided substantial and timely assistance in the investigation, justifying the government's 40% downward departure—Bumble Bee's guidelines fine was $136.2 million before the application of the substantial assistance reduction. By comparison, the government is not moving for a substantial assistance downward departure for StarKist, finding that StarKist has not provided cooperation to the investigation that would warrant any such recommendation. Finally, StarKist's $100 million guidelines fine already reflects a reduction in light of the cap imposed by the statutory maximum fine because the low end of its fine range would otherwise be $120 million.

## V. CONCLUSION

StarKist has failed to meet its burden of demonstrating that it is unable to pay the guidelines fine of $100 million. Instead, StarKist has attempted to obscure its cash flows by paying down its debt and providing disguised dividends to its parent company, without business justification. It has projected massive settlements in private-plaintiff actions that now appear likely to settle for less than a third of initial estimates, even by StarKist's own admission. It has projected zero growth in its forecasts at the same time that it has expanded its inventory and allocated cash for significant capital expenditures to expand its capacity. And, without providing any documentation, it insists it cannot finance these capital expenditures despite its admission that its parent company guarantees all of its loans and that it has financed civil settlements. StarKist can pay, and deserves to pay, a $100 million fine.

///

///

///

///

///

///

///

The government respectfully requests that the Court accept the Plea Agreement reached between the parties and sentence StarKist to pay the guidelines fine of $100 million on the installment schedule proposed by the government.

DATED: May 15, 2019

Respectfully submitted,

/s/ *Andrew J. Mast*
Andrew J. Mast, Trial Attorney
U.S. Department of Justice
Antitrust Division

# APPENDIX A

## BASE FINE CALCULATION FOR STARKIST

| | |
|---|---|
| **(a)** **Base Fine:** The base fine is 20% of the volume of affected commerce of at least $600 million[1] (§2R1.1(d)(1) and §8C2.4(b)).[2] | **$120 million** |
| **(b)** **Culpability Score** | |
| **(i)** **Base:** Five points are assigned as a starting point for calculating the culpability score (§8C2.5(a)). | **+5** |
| **(ii)** **Involvement in or Tolerance of Criminal Activity:** StarKist had 50 or more employees, and an individual with substantial authority participated in, condoned, or was willfully ignorant of the offense (§8C2.5(b)(4)). | **+2** |
| **(iii)** **Prior History:** StarKist does not have any prior history of misconduct (§8C2.5(c)). | **0** |
| **(iv)** **Violation of Order:** StarKist has not violated any orders (§8C2.5(d)). | **0** |
| **(v)** **Obstruction of Justice:** The government is not aware of any conduct by StarKist that impeded or obstructed justice (§8C2.5(e)). | **0** |
| **(vi)** **Effective Compliance and Ethics Program:** StarKist did not have an effective compliance and ethics program with respect to antitrust violations at the time the offense occurred so no downward adjustment is warranted (§8C2.5(f)). | **0** |
| **(vii)** **Self-Reporting, Cooperation, and Acceptance of Responsibility:** StarKist cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct (§8C2.5(g)(2)).[3] | **-2** |
| **TOTAL CULPABILITY SCORE** | **5** |

[1] In the Plea Agreement, the parties stipulated to a volume of commerce of "over $600 million," but did not specify the amount. To calculate the guidelines fine, the government used the minimum, $600 million, which results in a fine significantly above the $100 statutory maximum.

[2] Pursuant to U.S.S.G. § 8C2.4(a), the base fine for an organizational defendant is the greatest of the: (1) amount from the table in subsection (d) corresponding to the organization's offense level, (2) pecuniary gain to the organization from the offense, or (3) pecuniary loss from the offense. Section 2R1.1, which sets the base offense level for antitrust offenses, contains a special instruction providing that 20% of the volume of affected commerce should be used as a proxy for the pecuniary loss. *Id*. §§ 2R1.1(d)(1) and 8C2.4(b). The parties agree that calculating pecuniary loss using 20% of StarKist's volume of affected commerce results in the highest base fine. PSR ¶¶ 16-23.

[3] The nature, extent and timeliness of StarKist's cooperation rendered its assistance in the investigation less than substantial; accordingly, the Plea Agreement does not contemplate a downward departure pursuant to U.S.S.G. § 8C4.1.

Case 3:18-cr-00513-EMC Document 81-1 Filed 05/15/19 Page 2 of 2

**APPENDIX A**

**BASE FINE CALCULATION FOR STARKIST**

| | | |
|---|---|---|
| **(c)** | **Minimum and Maximum Multipliers:** Based on a culpability score of 5, the minimum multiplier is 1 and the maximum multiplier is 2 (§8C2.6). | **1.0-2.0** |
| **(d)** | **Minimum and Maximum Fine Range:** Applying the minimum and maximum multipliers to the base fine of $120 million, the fine range is between $120 million and $240 million (§8C2.7). | **at least $120-$240 million** |
| **(e)** | **Guidelines Fine:** The statutory maximum corporate fine for an antitrust offense is $100 million. 15 U.S.C. § 1. Under U.S.S.G. §8C3.1(b), if the minimum guideline fine is greater than the statutory maximum, the statutory maximum shall be the guidelines fine. | **$100 million** |