ANDREW J. MAST (CSBN 284070)
U.S. Department of Justice, Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
Telephone: (415) 934-5300
andrew.mast@usdoj.gov

Attorney for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>STARKIST CO.,<br><br>Defendant. | Case No. CR-18-0513 EMC<br><br>**UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**<br><br>**UNITED STATES' RESPONSE TO STARKIST'S MEMORANDUM REGARDING TECHPACK SOLUTIONS CO., LTD.**<br><br>Date: August 7, 2019<br>Time: 10:00 a.m.<br>Judge: Hon. Edward M. Chen |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 3

A. StarKist Only Needs A Third of Techpack's Value To Resolve All Claims Arising From Fixing Prices ..... 3

B. StarKist Has Not Established that It Cannot Monetize Techpack ..... 3

1. StarKist contradicted its own expert's report regarding the salability of Techpack. ..... 3

2. StarKist can sell Techpack without the consent of its lenders. ..... 5

3. StarKist failed to establish that it cannot find a buyer for Techpack. ..... 6

4. StarKist failed to establish its lenders will not waive the restriction on the sale of assets. ..... 9

5. StarKist can obtain value from Techpack after the Dongwon Systems merger. ..... 11

C. StarKist Failed to Establish that It Cannot Borrow Additional Money ..... 12

1. StarKist did not offer its lenders any consideration to waive the loan restriction. ..... 12

2. StarKist did not attempt to refinance its existing debt or contact other lenders. ..... 13

D. The Court Should Disregard StarKist's Arguments Regarding Updated Growth Projections ..... 14

E. StarKist May Not Seek to Reduce its Fine Based on a Comparison to Bumble Bee ..... 15

F. StarKist Failed to Establish That an Alternative Payment Schedule Is Necessary ..... 18

III. CONCLUSION ........................................................................................................ 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Harrison v. Ollison*, 519 F.3d 952 (9th Cir. 2008) ........................................................... 7

*United States Dep't of Justice v. Daniel Chapter One*, 89 F. Supp. 3d 132 (D.D.C. 2015)......... 19

*United States v. Eureka Labs Inc.*, 103 F.3d 908 (9th Cir. 1996)........................................... 7, 10

*United States v. Four Pillars Enter. Co., Ltd.*, 253 F. App'x 502 (6th Cir. 2007) ........................ 7

*United States v. Pappadopoulos*, 64 F.3d 522 (9th Cir. 1995) ...................................................... 7

**Statutes**

18 U.S.C. § 3572(d) ........................................................................................................... 18

**Other Authorities**

*Bumble Bee Foods S.à r.l. and Bumble Bee Holdco S.C.A. Announce Q2 2017 Results Release Date and Conference Call Date*, CISION PR NEWSWIRE (Aug. 3, 2017, 8:00 a.m. EDT) ........ 16

*Dongwon Industries Co Ltd Financial Statement*, REUTERS, https://www.reuters.com/finance/stocks/income-statement/006040.KS?stmtType=BAL&perType=ANN (last updated July 17, 2019). ............ 7

Felix Barber & Michael Goold, *The Strategic Secret of Private Equity*, HARV. BUS. REV. (Sept. 2007), https://hbr.org/2007/09/the-strategic-secret-of-private-equity ....................................... 8

*Korea SE Stock Quote – Dongwon Systems Corp*, BLOOMBERG LP, *https*://www.bloomberg.com/quote/014820:KS (last updated July 17, 2019 2:59 a.m. EDT). 12

*Moody's Downgrades Bumble Bee's CFR to Caa2; Ratings under review for downgrade*, MOODY'S (March 10, 2017), https://www.moodys.com/research/Moodys-Downgrades-Bumble-Bees-CFR-to-Caa2-Ratings-under-review--PR_363391 .......................................... 17

*Techpack Solutions*, DONGWON, https://www.dongwon.com/en/business/techpack-solution (last visited July 17, 2019)........................................................................................................ 8

**Rules**

Fed. R. Crim. P. 11(c) ...................................................................................................... 16

# I. INTRODUCTION

Defendant StarKist participated in a long-running price-fixing conspiracy that affected more than a half a billion dollars of commerce in a staple household product. Like any other criminal defendant, StarKist must shoulder the full financial consequences of its criminal acts. This is especially true because a fine is the only way to punish StarKist. StarKist's ownership of Techpack can and should be accounted for when determining its ability to pay a $100 million criminal fine. StarKist's arguments regarding why a $154 million asset cannot be used for this purpose are implausible, contradictory, and unsupported.

StarKist has not met its burden to show that it is unable to pay the Guidelines fine. Even by its own estimates—which grossly inflate its civil liability and underestimate growth—StarKist only needs [redacted] in addition to its projected free cash flows, to pay the full $100 million Guidelines fine, settle the civil claims against it, and remain viable as a company.

First, StarKist's own expert stated that the Techpack assets are available to creditors. Now that this fact has become inconvenient, StarKist contradicts its expert's admission.

Second, contrary to StarKist's arguments, its loan agreement (which it entered into a week after signing the plea agreement) does not prevent it from divesting Techpack. The value of Techpack exceeds StarKist's remaining balance on its loan. StarKist could sell Techpack, pay off its remaining debt, and the resulting savings on principal and interest payments would be more than sufficient to pay its criminal fine.

Third, StarKist fails to show there are no interested buyers in Techpack. StarKist did not make offers to the most-likely buyers and failed to provide any information regarding the terms under which it offered to sell its investment.

Fourth, StarKist's assertion that its lenders will not waive the provision restricting the sale of assets is unsupported because StarKist did not offer any consideration to its lenders in exchange for waiving the condition, and because its lenders have waived similar restrictions in the past. StarKist fails to explain why its creditors consider Techpack to be a "material asset" under the loan agreement, precluding divestiture, when StarKist [redacted]

[redacted] and claims Techpack cannot be sold. Moreover, StarKist has made no attempt to divest a non-material portion of Techpack, or to ask the lenders to agree to a smaller divestment [redacted]

Fifth, even if StarKist had established that it cannot divest Techpack at this time (it has not), StarKist should not be allowed to avoid punishment by sheltering its assets. StarKist invested $66 million in Techpack *after* becoming aware of the criminal investigation. StarKist admits that it still plans for Techpack to be merged into Dongwon Systems (another Dongwon Enterprises subsidiary), and that this plan "would give Starkist an ownership interest in Dongwon Systems," a publicly-traded company. (Decl. of Andrew Choe (hereinafter, "Choe Decl."), Dkt. No. 112-2 ¶¶ 12 and 14.) Therefore, even if Techpack is illiquid now (it is not), as soon as the planned merger is consummated, StarKist will have a liquid asset (Dongwon Systems stock) sufficient to pay its criminal fine. StarKist should not be permitted to avoid paying its criminal fine simply by delaying a merger between two related companies.

Finally, StarKist makes additional arguments that are outside the scope of the Court's briefing order, but those arguments also are unavailing. StarKist has failed to establish that it cannot borrow additional money. StarKist did not even attempt to refinance its existing debt and its bald assertion that it cannot borrow additional money, despite holding historically low levels of debt, fails to carry its inability to pay burden. Moreover, StarKist's argument that a $100 million fine is not equitable in comparison to Bumble Bee is foreclosed by its plea agreement—in which StarKist agreed that a $100 million fine is an "appropriate disposition" of this case absent a judicial finding of an inability to pay.[1] StarKist can afford and deserves a $100 million fine.

///

///

///

[1] Paragraph 10 of the Plea Agreement provides in relevant part, "[T]he United States and the defendant ***agree that the appropriate disposition of this case*** is, and agree to recommend jointly that the Court impose, a sentence requiring the defendant to pay to the United States: ***a criminal fine . . . in an amount of $100 million***, unless the defendant requests, and the Court imposes, a reduction pursuant to U.S.S.G. §8C3.3 to an amount no than $50 million based on a finding of an inability of the defendant to pay the Guidelines fine . . . ." (Dkt. No. 24 (emphasis added).)

## II. ARGUMENT

### A. StarKist Only Needs A Third of Techpack's Value To Resolve All Claims Arising From Fixing Prices

Using its forecasted cash flows as a starting point, defendant needs only to generate [redacted] from its $154 million investment in Techpack to pay its criminal fine and resolve the civil claims against it. Simple math demonstrates this point:

$100 million (Agreed-Upon Guidelines fine)

[redacted] It also pales in comparison to a conservative estimate of StarKist's net worth using the figures it has provided the Court:

| | Assets | Liabilities |
|---|---|---|
| StarKist's Projected Future Cash Flow | $171 million | |
| StarKist's Valuation of Techpack | $154 million | |
| StarKist's Upper Estimate of Civil Liability | | [redacted] |
| Guidelines Fine | | -$100 million |
| **Total** | **$325 million** | [redacted] |
| **Excess Funds** | [redacted] | |

(*See* Rebuttal Expert Report of Rajiv B. Gokhale, Dkt. No. 78-1 ¶¶ 13 and 34; Decl. of Jung Ki Ro (hereinafter, "Ro Decl."), Dkt. No 112-3, Ex. A, StarKist 2018 Audited Financials.) These numbers make clear that StarKist has ample cash flow and assets to resolve its criminal and civil liability with a substantial sum left over.

### B. StarKist Has Not Established that It Cannot Monetize Techpack

1. <u>StarKist contradicted its own expert's report regarding the salability of Techpack</u>.

///

During the course of the sentencing briefing, StarKist first argued that Techpack is an asset available to creditors, but, once it appeared that it might be ordered to sell it, StarKist argued Techpack cannot be sold. StarKist cannot have it both ways.

First, in response to arguments that the investment in Techpack was a disguised dividend to its parent, StarKist's own expert stated that Techpack was an asset available to creditors:

> StarKist's investment in Techpack is carried on the StarKist books at a value of nearly $155 million, and StarKist had invested less than $123 million in Techpack. These investments are more valuable on StarKist's books than the capital contributed, and they **represent assets potentially available to creditors**, so their ownership by StarKist is not indicative of stripping of assets and so lends no weight to a veil piercing claim.

(Expert Report of Professor Robert M. Daines (hereinafter, "Daines Report"), Dkt. No. 80-1 ¶ 84 (emphasis added).) Once the Court contemplated requiring StarKist to sell its stake in Techpack, StarKist switched course.[2] It now argues that it is legally prevented from selling Techpack and that it can find no meaningful buyers—essentially making Techpack an overvalued asset that StarKist is legally required to carry on its books.

These two arguments are in stark contradiction to one another. The Court should not allow StarKist to claim, on the one hand, that for veil-piercing purposes Techpack should be treated as an available StarKist asset, while for fine-calculation purposes Techpack should be

///

---

[2] StarKist wrongly criticizes the government for failing to recognize earlier that StarKist has not transferred its interest in Techpack to Dongwon Systems, but ignores that the government's understanding was based on StarKist's own submissions to the government and this Court. The government relied upon StarKist's expert report dated February 1, 2019, which *excluded* the value of StarKist's Techpack investment from his ability-to-pay report because "TechPack Solutions was planned to be merged into Dongwon Systems." (Expert Report of Rajiv B. Gokhale (hereinafter, "Gokhale Report"), Dkt. No. 54-1 ¶ 20 n.34.) It makes no sense for StarKist to exclude "the value of these investments in [its] ATP analysis" if StarKist retains an interest in Techpack. (*Id.*) Because StarKist admitted that it did not forecast any benefit from its Techpack investment, the government argued it amounted to a "disguised dividend." (Expert Report of Dale Zuehls (hereinafter, "Zuehls Report"), Dkt. No. 52-1, ¶¶ 77-80.) StarKist did not produce its 2018 audited financials until May 21, 2019—*after* the government filed its sentencing memorandum. (StarKist Mem. Regarding Techpack Solutions Co., Ltd. (hereinafter, "StarKist Techpack Mem."), Dkt. No. 111 at 4.) Regardless, StarKist now unequivocally admits it retains a $154 million interest in Techpack. Therefore, defendant can pay its criminal fine.

treated as unavailable. StarKist argued that Techpack was a valuable $154 million asset precluding corporate veil piercing. StarKist should not be allowed to abuse the sentencing process by now contradicting itself.

2. StarKist can sell Techpack without the consent of its lenders.

Conspicuously absent from StarKist's briefing is any acknowledgement that its loan agreement allows it to prepay its debt without penalty. (Decl. of Andrew J. Mast in Support of United States' Resp. to StarKist's Sentencing Mem. (hereinafter, "Mast Resp. Decl."), Ex. 1, 2018 Loan Agreement, Dkt. No. 75-1, § 13.11.) Instead, StarKist focuses on the fact that any proceeds from the Techpack sale would need to be used to pay off its loan. However, Techpack is valued at $154 million, whereas StarKist maintains only [redacted] in debt under its loan agreement. (Decl. of Andrew J. Mast in Support of United States' Resp. to StarKist's Techpack Mem. (hereinafter, "Mast Techpack Resp. Decl."), Ex. 2, StarKist May 31, 2019 Financials.) If StarKist used the proceeds of the sale of Techpack to pay off its loan, it would no longer need to pay off future principal and interest and the savings from no longer servicing its debt would be more than sufficient to pay a $100 million criminal fine.[3]

In the unlikely event a sale of Techpack does not generate sufficient funds to pay off the entirety of StarKist's debt and StarKist's lenders accelerate the collection of StarKist's debt, StarKist's lenders would be entitled to obtain whatever portion of the remaining balance that StarKist was unable to pay from StarKist's guarantor, Dongwon Enterprises. (2018 Loan Agreement, Ex. D, Guarantee, § 1.1(1).) StarKist pays a fee to obtain a guarantee from Dongwon Enterprises, StarKist's ultimate parent. Contrary to StarKist's assertions, there is nothing inequitable about requiring a guarantor to perform the function it has been paid to do—assist in resolving the guaranteed party's claims. This is especially true here, because Dongwon Enterprises knew StarKist faced a $100 million fine when it agreed to guarantee StarKist's loan.

///

[3] Over the next five years, StarKist projects it will pay off approximately $100 million in principal as well as millions in interest expenses. (*See* Gokhale Report ¶ 26 n.41 (indicating StarKist projects making bi-annual principal payments of $10 million).) Coupled with StarKist's projected future cash flow, these savings from no longer servicing its debt would be more than sufficient to pay a $100 million criminal fine.

(Mast Resp. Decl., Ex. 2, Dkt. No. 75-2.) Similar to StarKist's creditors, Dongwon Enterprises surely assessed StarKist's finances and determined that StarKist could withstand a $100 million fine and still make the required loan payments. To the extent Dongwon Enterprises had any concern about StarKist defaulting on its loan as a result of its criminal fine—and there is no evidence it had any such concern—it hedged that concern with the price it charged StarKist for its guarantee.

In either case, whether StarKist pays back its loan in its entirety from money obtained through the sale Techpack or its guarantor pays a portion of the remaining balance, the savings from interest and principal repayments are more than sufficient to allow StarKist to pay the full amount of its criminal fine. Obtaining permission from its lenders to sell Techpack, especially for a loan entered into after StarKist signed the plea agreement, is not a prerequisite to StarKist paying its criminal fine.

3. StarKist failed to establish that it cannot find a buyer for Techpack.

StarKist's claim that it cannot find a buyer at any price for Techpack is implausible. StarKist values the $122 million total in Techpack investments at $154 million. StarKist does not provide any evidentiary support for its assertion that Techpack performed poorly in 2018. In fact, that claim is contradicted by StarKist's audited financials, which show Techpack's value is appreciating: in 2017 StarKist valued Techpack at [redacted] million and in 2018 Techpack's value increased to [redacted] million. (*Compare* StarKist 2017 Audited Financials, Zuehls Report, Ex. C, *with* StarKist 2018 Audited Financials.) There is no evidence supporting defendant's claim that it cannot sell Techpack at its book value.

Moreover, as explained above, StarKist need not sell Techpack at its book value in order to generate sufficient funds to pay its criminal fine. In fact, StarKist could sell its interest in Techpack for just [redacted] o generate sufficient funds to pay its criminal fine and resolve its civil claims. StarKist suggests that any asset that cannot be sold at book value "should not be included in the calculation of funds available to the company to pay civil damages and a criminal fine." (StarKist Techpack Mem. at 9.) That standard appears nowhere in the law. Section 8C3.3 of the Sentencing

Guidelines says nothing about the value that a corporate defendant must get for its assets. Defendant provides no support for its claim that a company that reaped illicit profits from a serious financial crime should not be forced to sell an asset at a loss as punishment for having committed that crime. *See United States v. Eureka Labs Inc.*, 103 F.3d 908, 911, 912 n.3 (9th Cir. 1996) (considering liquidation value of corporate defendant's equipment at "10 to 20 cents on the dollar" in rejecting inability-to-pay claim); *United States v. Four Pillars Enter. Co., Ltd.*, 253 F. App'x 502, 515 (6th Cir. 2007) (unpublished) (corporate defendant had ability to pay under U.S.S.G. § 8C3.3 because "[t]o the extent that its resources are not liquid, [defendant] can convert its non-liquid assets to liquid assets in order to pay its fine."); *see also United States v. Pappadopoulos*, 64 F.3d 522, 530 (9th Cir. 1995) ("[T]he district court considered the liquidation value of the [defendant's] husband's assets . . . [including] vacation homes, business, stocks, etc."), *abrogation on other grounds recognized by Harrison v. Ollison*, 519 F.3d 952, 961 (9th Cir. 2008).

StarKist's assertion that neither Dongwon Systems nor Dongwon Industries is willing to purchase StarKist's interest in Techpack does not establish that there are no potential buyers for Techpack. StarKist failed to provide any information regarding the terms by which it offered to sell Techpack, such as whether it offered to sell Techpack at less than its book value. StarKist did not provide Dongwon Systems' financial information, or otherwise provide evidence supporting its claim that Dongwon Systems cannot purchase any of StarKist's interest in Techpack. A single-sentence declaration by a StarKist employee stating that Dongwon Systems' [redacted] does not meet StarKist's burden. (Decl. of Robert Scott Meece, Dkt No. 112-4 ¶ 5.) Likewise, simply asserting that StarKist's parent, Dongwon Industries, [redacted] does not satisfy defendant's burden, given that the annual report of Dongwon Industries indicates that its current assets exceed liabilities by approximately $130 million.[4] (*Id.* ¶ 6.)

///

[4] *Dongwon Industries Co Ltd Financial Statement*, REUTERS, https://www.reuters.com/finance/stocks/income-statement/006040.KS?stmtType=BAL&perType=ANN (last updated July 17, 2019).

Similarly, StarKist's claim that four private-equity firms were not interested in purchasing Techpack proves nothing. StarKist again does not provide any correspondence or details regarding the terms under which it offered to sell Techpack or how it selected these firms as potential buyers in the first place.[5] Without knowing StarKist's offer price, the Court should not give any weight to StarKist's assertion that it cannot find a buyer for Techpack.

StarKist did not inquire about selling its Techpack interest to the most-likely buyers. Because StarKist does not maintain a controlling share in Techpack, private equity firms are not likely purchasers, given that the investment strategy of a private equity firm is to exercise control over an investment through representation on the companies' board.[6] Techpack markets itself as Korea's leading glass bottle manufacturer, accounting for 40% of Korea's glass bottle demand.[7] Just as StarKist contends that it values Techpack because it [redacted] many of Techpack's existing customers might have likewise considered purchasing a portion of Techpack for the same type of "strategic business opportunity" that StarKist valued.[8] (Choe Decl. ¶ 12.) Given that defendant values its investment at $154 million and needs only [redacted] to pay its criminal fine, its claim that it cannot find a single buyer for its interest in Techpack is not credible. StarKist did not make a meaningful attempt to find a buyer.

///

[5] Likewise, the three emails from private equity firms declining to purchase Techpack do not set forth the terms of StarKist's offer. StarKist did not even provide any correspondence from [redacted] indicating it was not interested in Techpack. (Choe Decl., Exs. A-C.)

[6] Felix Barber & Michael Goold, *The Strategic Secret of Private Equity*, HARV. BUS. REV. (Sept. 2007), https://hbr.org/2007/09/the-strategic-secret-of-private-equity ("[P]rivate equity firms exercise control over portfolio companies through their representation on the companies' boards of directors.").

[7] Techpack indicates that it supplies "various packaging materials including can, bottle can and PET bottle to key companies in Korea and across the world, including Oriental Brewery and Coca-Cola, based on the largest production capacity, the best technology and quality." *Techpack Solutions*, DONGWON, https://www.dongwon.com/en/business/techpack-solution (last visited July 17, 2019).

[8] The fact that StarKist has not been approached by a potential buyer despite reporting in the "seafood press" is unremarkable. (*See* StarKist Techpack Mem. at 8.) At the hearing, StarKist indicated it had no desire to sell Techpack. Additionally, Techpack's leading customers, such as Coca-Cola and Oriental Brewing, do not necessarily review the "seafood press." (*Id.*)

4. StarKist failed to establish its lenders will not waive the restriction on the sale of assets.

StarKist's half-hearted efforts to obtain written consent from its lenders to sell Techpack are deficient and fail to meet StarKist's burden to establish it cannot obtain any money from its $154 million asset.[9] In purporting to determine whether the lenders deemed StarKist's Techpack investment to be "material" under the terms of the loan, StarKist wrote the lenders a letter. (Ro Decl., Ex. A, StarKist Letter to KEB Hana Bank.) StarKist did not, however, offer any consideration in exchange for waiving the restrictions on the sale of StarKist's assets, or otherwise engage the lenders in good faith negotiations to determine whether there were any options for divestiture that would not trigger default. (*See id.*) It is not surprising that StarKist's lenders would not waive their rights under the loan agreement for free. Given that StarKist's debt is already guaranteed, it has not demonstrated why it could not pay a fee to its lenders to allow it to sell its interest in Techpack without triggering default.

StarKist's failure to obtain a waiver is also undermined by the fact that its lenders must have previously waived restrictions in the loan agreement, if StarKist followed the approval procedure it now claims are mandated by the Loan Agreement. For example, when StarKist invested approximately $66 million in Techpack in 2017, it financed its investment through incurring additional debt. (StarKist 2017 Audited Financials at 5.) Under the terms of its loan agreement at the time (the same terms as the current loan agreement), StarKist was required to obtain a waiver from its lenders to make investments or incur additional indebtedness beyond $50 million. (Mast Techpack Resp. Decl., Ex. 1, 2016 Loan Agreement, § 1.1.) The fact that StarKist was able to obtain such consent from its lenders to incur additional debt to obtain a supposedly unsellable asset generating zero revenue—at a time when defendant's future fine and

///

///

///

[9] Pursuant to StarKist's loan agreement, StarKist shall not, "without the prior written consent" of the majority of lenders, dispose of assets deemed "material in the opinion of" the majority of lenders. (2018 Loan Agreement, § 13.11.)

civil liability were significantly more uncertain—undermines its assertion that it cannot obtain a waiver at this time.[10]

Additionally, StarKist failed to ask whether its lenders consider a smaller percentage of its Techpack investment to be material. StarKist owns [redacted] shares in Techpack, worth $154 million. (Ro Decl., Ex. A, StarKist Letter to KEB Hana Bank.) But StarKist need not sell its entire ownership in Techpack to have sufficient funds to pay a $100 million criminal fine and satisfy its civil liabilities, and a partial divestment of its Techpack interest would allow StarKist to obtain the additional [redacted] necessary to pay its criminal fine while maintaining its "strategic" interest in Techpack. (Choe Decl. ¶ 12.) StarKist failed to inquire whether the lenders deemed [redacted] of Techpack shares ([redacted]) to be material. (*See* Ro Decl., Ex. A, StarKist Letter to KEB Hana Bank.) In fact, the terms of the loan agreement make clear that a divestment of less than $30 million in assets (even income-generating assets) is immaterial to the lenders and can be done without permission. (*See* 2018 Loan Agreement, § 5.3.) Therefore, StarKist need not ask permission to divest $29.9 million of its Techpack shares.

StarKist's assertion that its creditors deem Techpack to be a material asset is inconsistent with the fact that StarKis[redacted] and claims it cannot be sold. StarKist's creditors would be in a significantly better position if they had access to cash rather than an interest in Techpack, an allegedly illiquid asset that [redacted] In contrast, the government has not argued that StarKist should sell its income-generating assets, even though they could appropriately be considered when determining StarKist's ability to pay.[11] *See Eureka Labs.*, 103 F.3d at 910-11.

///

[10] The government requested that StarKist produce correspondence related to any instance in which its lenders waived any terms of its 2016 or 2018 loan agreements. StarKist did not produce any correspondence, but based on the terms of its loan agreement, it must have obtained a waiver when it made investments beyond $50 million and incurred additional indebtedness to invest in Techpack. If StarKist did not, that fact casts considerable doubt upon StarKist's claims that it is bound by the supposedly draconian consent requirements of the Loan Agreement.

[11] StarKist has factories in American Samoa and Ecuador, as well as a nearly [redacted] investment in Silver Bay Seafoods, LLC. StarKist's expert inexplicably excluded the value of StarKist's [redacted] interest in Silver Bay from his inability-to-pay analysis even though

Finally, StarKist has a long-running relationship with its primary lender Hana Bank. Hana Bank has a financial interest in maintaining StarKist as a customer and making sure that StarKist pays as little fine as possible.[12] Given the circumstances of the requested waiver, it is not surprising that Hana Bank declined to consent to the sale of Techpack—an asset StarKist does not want to sell—to finance a fine StarKist does not want to pay. This only underscores the significance of the fact that defendant made no meaningful attempt to refinance its debt with a new lender.

5. <u>StarKist can obtain value from Techpack after the Dongwon Systems merger</u>.

Even assuming *arguendo* that StarKist cannot monetize Techpack at this time, it will soon receive publicly traded stock that it can readily sell on the open market. StarKist's submissions make clear that Techpack is expected to be merged into Dongwon Systems, which is currently traded on the Korean Stock Exchange.[13] (Choe Decl. ¶ 14.) Once StarKist's interest in Techpack is merged into an interest in Dongwon Systems, StarKist should receive an

///

///

---

StarKist received a dividend of [redacted] in 2018. (Gokhale Report ¶ 20 n.34; StarKist 2018 Audited Financials at 15.) The government has not proposed StarKist divest its interest in Silver Bay because it provides revenue to StarKist and may help StarKist expand in the market for canned salmon.

[12] Hana Bank has been a lender to StarKist since it was purchased by Dongwon Industries in 2008. (Mast Techpack Resp. Decl. ¶ 4.)

[13] StarKist represents that investing in Techpack provided a unique opportunity to own a portion of Dongwon Systems and specifically Talofa Systems because StarKist purchases cans from Talofa Systems. (Choe Decl. ¶¶ 12-13.) This assertion, however, is not supported by the board meeting minutes from the meeting where the board approved the 2014 Techpack investment. The meeting minutes do not refer to either Dongwon or Talofa Systems. (Decl. of Niall E. Lynch in Support of StarKist Co.'s Resp. to United States' Sentencing Mem., Ex. 6, Dkt. No. 78-6.) StarKist did not produce board meeting minutes memorializing when the 2017 Techpack investment was approved.

Regardless, if StarKist, as it now contends, merely wanted to obtain an ownership stake in Dongwon Systems, the opportunity was not "uniquely" available through a $66 million investment in Techpack: Dongwon Systems is publicly traded on the Korean Stock Exchange. (Choe Decl. ¶ 8.) StarKist could simply have directly purchased $66 million worth of stock in Dongwon Systems. Notably, had it done so, that ownership interest would have been easily liquidated through a sale of stock—and would have been more likely to generate revenue for defendant in the event of a criminal or civil judgment.

equivalent value in shares of Dongwon Systems.[14] Thus, the Dongwon Systems merger will convert its Techpack interest into a liquid asset. The government is puzzled by StarKist's unexplained assertion that "market conditions" have "delayed" the anticipated merger between Dongwon Systems and Techpack. (*Id.*) Dongwon Systems, which has a market capitalization of nearly $1 billion,[15] owns a controlling share of Techpack and can effectuate the merger at any time. (*See id.* ¶ 8.) It appears the "market conditions" precluding a merger are StarKist's pending criminal fine. (*See id.* ¶ 14.) StarKist cannot shelter its asset from a criminal fine by delaying a merger that would make its interest in Techpack liquid. This is especially true because StarKist invested $66 million in Techpack *after* it became aware of the criminal investigation and the anticipated merger is with another subsidiary of Dongwon Enterprises. Ignoring Techpack's value at sentencing would simply result in a windfall for StarKist when Dongwon Systems consummates the Techpack merger.

### C. StarKist Failed to Establish that It Cannot Borrow Additional Money

StarKist's arguments about why it cannot borrow money are outside the scope of the briefing ordered by the Court and are ultimately meritless. StarKist has had ample opportunity to demonstrate it cannot borrow money and again fails to make an adequate showing.

1. StarKist did not offer its lenders any consideration to waive the loan restriction.

The only inquiry StarKist made concerning its ability to borrow additional money was to ask its current lenders whether they would waive the provision in StarKist's existing loan agreement restricting StarKist from borrowing more than $50 million. (Ro Decl., Ex. A, StarKist Letter to KEB Hana Bank.) Again, StarKist did not offer its lenders any consideration for waiving the restriction on borrowing. (*Id.*) In other words, StarKist asked if its lenders would give it a waiver for free.

///

///

[14] StarKist has not produced the terms of the anticipated merger. StarKist is adamant, however, that it did not, and does not intend to, issue a disguised dividend to Dongwon Systems.

[15] *Korea SE Stock Quote – Dongwon Systems Corp*, BLOOMBERG LP, https://www.bloomberg.com/quote/014820:KS (last updated July 17, 2019 2:59 a.m. EDT).

Moreover, as discussed above, StarKist apparently was previously able to obtain waivers under this term of its loan agreement, when it suited its interests to do so. StarKist offers no explanation for why its lenders are unwilling to waive the restriction on obtaining additional indebtedness at this time, or what consideration would be required for such a waiver, despite the debt being guaranteed.[16] Thus, defendant has failed to meet its burden establishing that its lenders will not permit it to borrow additional money.

2. StarKist did not attempt to refinance its existing debt or contact other lenders.

StarKist did not ask either its current lenders or any other lenders about refinancing its existing debt to incur additional debt. StarKist's assertion, without evidence, that refinancing its existing debt or obtaining interest-only loans is not feasible cannot satisfy its burden. (StarKist Techpack Mem. at 10-11.) The fact that StarKist has not undertaken interest-only loans in the past does not mean an interest-only loan is not available at this time. Likewise, StarKist fails to show it cannot borrow additional money by refinancing its existing debt. From 2011 to 2018 StarKist maintained an average of [redacted] in debt. (Daines Report, Figure 10.) If StarKist refinanced its existing debt with a loan for [redacted]—far below its historical average—it would have more than sufficient funds to pay its $100 million criminal fine. Even if the terms of additional indebtedness would be "onerous," as StarKist asserts, "onerous" loan terms do not provide a basis to reduce StarKist's fine unless it substantially threatens the viability of the company, which StarKist has not established. (StarKist Techpack Mem. at 10.)

StarKist repeats the flawed analysis of its bankruptcy expert in support of the proposition that it cannot borrow money outside of Chapter 11. As discussed in the United States' Response to StarKist's Sentencing Memorandum (Dkt. No. 74 at 1-8), based on his own disclosures StarKist's expert did not even review StarKist's financials or the entirety of the loan agreement

---

[16] StarKist suggests that the restriction on obtaining additional indebtedness in StarKist's loan agreement was unique to StarKist's 2016 and 2018 loan agreements because of the uncertainty of StarKist's criminal fine and civil liability. Yet the restriction on additional indebtedness was included in 2008 and 2011 loan agreements when StarKist was not facing criminal or civil liability for its criminal conduct (StarKist has not produced its final 2011 loan agreement, however, a draft agreement contains the same restriction on incurring additional indebtedness). Dongwon Enterprise has guaranteed all of StarKist's loan agreements since Dongwon acquired StarKist in 2008. (Mast Techpack Resp. Decl. ¶¶ 4-6.)

on which he opines. (Expert Report of Kenneth N. Klee, Dkt. No. 54-2, Ex. 3.) Nor did he review the report of StarKist's other expert Professor Robert Daines, who opined at length about the relative financial health of StarKist. (*Id.*) Daines concluded that "[t]he assets StarKist holds, relative to its liabilities, compares favorably to the cash held by its publicly-traded North American Packaged Food peers." (Daines Report ¶ 140.) He also found that StarKist's debt-to-equity ratio is significantly better than many other major packaged food companies, and that StarKist's debt of approximately $149 million at the end of 2018 was significantly less than the $290 million it carried in 2011.[17] (*Id.* ¶¶ 140-41.) Thus, StarKist's self-serving claim that it cannot borrow additional [redacted] in debt is contradicted by its own expert and defies common sense.

Moreover, StarKist *has* been able to borrow money. Its most-recent financial statements show that StarKist borrowed [redacted] in 2019 and already paid back [redacted] to its lenders. (StarKist May 31, 2019 Financials.) Not only does this undermine StarKist's assertion that it cannot borrow more money, but it also shows that StarKist is still $20 million away from reaching its alleged limitation on borrowing under its loan agreement.

StarKist's contention that it would prefer to file for bankruptcy before seeking to borrow additional money is irrational and is nothing more than an idle threat. When StarKist obtained its loan in 2018, it had already signed its plea agreement and disclosed to its lenders that it was facing a $100 million fine. (Mast Resp. Decl., Ex. 2.) Still, its lenders provided StarKist with a $150 million loan and StarKist secured a loan guarantee from its ultimate parent. StarKist's lenders would not have approved, and its parent would not have guaranteed, StarKist's loan unless they were confident StarKist could weather a $100 million fine. StarKist is not on the verge of bankruptcy.

**D. The Court Should Disregard StarKist's Arguments Regarding Updated Growth Projections**

---

[17] StarKist asserts that Dongwon Systems maintains [redacted] in debt, which further underscores StarKist's relatively low level of debt versus both its peers and its own historical norms. Although StarKist asserts without evidentiary support that [redacted] StarKist has not produced any of Dongwon Systems' financials.

StarKist provides additional estimates regarding its projected cash flow with higher, albeit still deflated, growth projections. These arguments should be disregarded because they are beyond the scope of the limited briefing ordered by the Court, which the Court made clear should only address StarKist's ability to monetize Techpack and borrow additional money. (Criminal Mins., June 12, 2019 Sentencing Hr'g, Dkt. No. 104.)

Regardless, StarKist's new cash flow estimates suffer from the same flaws as its cash flow estimates based on its original Long Range Plan. For example, StarKist repeats its argument that the industry is declining when measured by units sold, but ignores that its profits are rising. (*See* StarKist May 31, 2019 Financials.) As the government addressed in prior briefing, StarKist's growth projections are inconsistent with industry reports and StarKist's recent financial performance and business decisions.[18] In fact, based on StarKist's financials showing its 2019 performance through May 31, if StarKist's sales continue at the same rate for the remainder of the year, StarKist will grow at ***9.6%*** on an annualized basis. (StarKist May 31, 2019 Financials.) [redacted] (Gokhale Report, Ex. 2.) This is significantly higher than the dismal 0.1% growth rate predicted by StarKist as part of the sentencing submissions. (Gokhale Report ¶ 11.) Based on StarKist's current growth in 2019, the 3.8%-4.7% growth rates estimated by Zuehls are conservative and likely understate StarKist's future growth.

### E. StarKist May Not Seek to Reduce its Fine Based on a Comparison to Bumble Bee

StarKist impermissibly attempts to argue that its fine should be reduced based on inequities with Bumble Bee's criminal fine. This argument is outside the scope of the plea agreement and the limited briefing requested by the Court. (Criminal Mins., June 12, 2019 Sentencing Hr'g, Dkt. No. 104; *see also* June 12, 2019 Sentencing Hr'g Tr. 27:8-16.) StarKist

---

[18] StarKist purports to share its Long Range Plan with its lenders, but has not produced any correspondence supporting its assertion despite the government's request that StarKist produce all correspondence with its lenders pertaining to its 2018 loan agreement. This casts significant doubt on the accuracy of StarKist's dismal growth projections, but as the government explained at the sentencing hearing, the Court need not resolve the disputed growth projections to conclude StarKist has the ability to pay a $100 million fine.

already agreed, under the terms if the plea agreement, that a $100 million fine satisfies the factors set forth in § 3553(a) and that the "***only*** basis on which the defendant may seek, and the Court may impose, a reduction from a $100 million fine is pursuant to U.S.S.G. §8C 3.3." (Plea Agreement ¶ 10 (emphasis added).) Thus, under the terms of the plea agreement, StarKist is not permitted to seek a reduced fine based on Bumble Bee's sentence.[19] StarKist can afford a $100 million fine and has agreed that a $100 million fine satisfies § 3553(a).

Defendant's improper attempt to make arguments precluded by the plea agreement should serve as a tacit admission that its financial arguments are insufficient to meet its burden. It would be no different than if the government argued for a more severe Guidelines calculation rather than honoring the agreement it signed with the defendant. The government has done no such thing, and neither should defendant. The Court should hold defendant to the terms of the plea agreement and disregard any arguments for a fine reduction based on anything other than its ability to pay.

Regardless, Bumble Bee's sentence does not support a fine reduction for StarKist. StarKist complains that Bumble Bee was not forced to sell its assets to pay a fine, but that it is now in the process of selling Clover Leaf Seafoods, Co. Bumble Bee, LLC, the defendant in that case, does not own Clover Leaf. Clover Leaf is owned by Bumble Bee's parent company, Bumble Bee Holdco S.C.A.[20] StarKist, in contrast, directly owns a 44% stake in Techpack. Therefore, contrary to StarKist's assertion, the government was not "ignoring the value" of

///

---

[19] StarKist acknowledges that its plea agreement prohibits it from seeking a fine reduction based on anything other than StarKist's inability to pay, but nevertheless implies that the Court should reduce StarKist's fine "to avoid unwarranted sentence disparities" with Bumble Bee. (StarKist Techpack Mem. at 11 n.6.)

The Court should indeed independently consider the factors set forth in 18 U.S.C. § 3553(a) before accepting the plea agreement and imposing judgment on StarKist, but under the terms of the plea agreement, the Court cannot reduce StarKist's fine based on anything other than StarKist's ability to pay under U.S.S.G. § 8C3.3. *See* Fed. R. Crim. P. 11(c)(1)(C). Here, given the seriousness of StarKist's criminal conduct, a $100 million fine satisfies § 3553.

[20] *See Bumble Bee Foods S.à r.l. and Bumble Bee Holdco S.C.A. Announce Q2 2017 Results Release Date and Conference Call Date*, CISION PR NEWSWIRE (Aug. 3, 2017, 8:00 a.m. EDT), https://www.prnewswire.com/news-releases/bumble-bee-foods-sa-rl-and-bumble-bee-holdco-sca-announce-q2-2017-results-release-date-and-conference-call-date-300498942.html.

Clover Leaf when it recommended Bumble Bee's fine. (StarKist Techpack Mem. at 11-12.) Moreover, as detailed in the filings pertaining to Bumble Bee's sentencing, Bumble Bee's sentence subjects its parent, Big Catch Cayman L.P., to a portion of Bumble Bee's fine in the event of a qualifying sale of Bumble Bee or related assets.[21] *United States v. Bumble Bee*, No. 17-CR-249, Plea Agreement, Dkt. No. 32 ¶ 9. Thus, a sale of Clover Leaf could result in an increased fine (to be paid by Big Catch Cayman) if it meets the requirements of a "Qualifying Transaction." (*Id.*) In contrast, the government is not seeking to hold any other entity in the Dongwon Group responsible for StarKist's fine, despite the substantial assets under control of StarKist's parent.

Additionally, Bumble Bee's financial health varied dramatically from StarKist's. Bumble Bee was highly leveraged and carried approximately more than half a billion dollars in third-party debt, which was reaching maturity in less than a year.[22] StarKist maintains less than $150 million in debt, which it incurred after signing its plea agreement. Unlike StarKist, Bumble Bee entered its loan agreements well before becoming aware of the criminal investigation. StarKist, in contrast, fully disclosed to its lenders that it was facing a criminal fine of up to $100 million, as well as less certain civil settlements, and still was able to secure its $150 million loan after signing its plea agreement.[23] (Mast Resp. Decl., Ex. 2.) Contrary to defendant's impermissible argument, the government is not "arbitrarily" using a different ability-to-pay methodology for StarKist. (StarKist Techpack Mem. at 12.) Rather, it analyzed both companies' finances consistently and determined that StarKist's different financial position gives it the ability to pay a $100 million fine.

---

[21] The fine reduction from $136.2 million to $81.5 million was based on Bumble Bee's substantial assistance with the investigation under U.S.S.G §8C4.1. StarKist did not provide substantial assistance.

[22] In contrast to StarKist, Bumble Bee's debt was publicly traded and was downgraded by the ratings agencies during the presentence investigation. *Moody's Downgrades Bumble Bee's CFR to Caa2; Ratings under review for downgrade*, MOODY'S (March 10, 2017), https://www.moodys.com/research/Moodys-Downgrades-Bumble-Bees-CFR-to-Caa2-Ratings-under-review--PR_363391.

[23] StarKist was also able to obtain a guarantee from its parent, Dongwon Enterprise Co., Ltd., the ultimate parent of the Dongwon Group. In contrast, none of the Lion Capital entities guaranteed Bumble Bee's loans.

Moreover, in contrast to Bumble Bee, StarKist altered the liquidity of its assets *after* becoming aware of the criminal investigation. In 2017, StarKist made an additional $66 million investment in Techpack, despite the possibility of criminal liability and the numerous civil complaints already filed against it. StarKist paid significantly more per share for its investment in Techpack than it did in 2014, and as discussed above, [redacted][24] (Gokhale Report ¶ 20 n. 34.) A corporate criminal defendant should not benefit from converting liquid to illiquid assets *after* becoming aware it faced a substantial criminal fine.

### F. StarKist Failed to Establish That an Alternative Payment Schedule Is Necessary

StarKist also presents an alternative payment schedule that is beyond the scope of this limited briefing. StarKist proposes that the Court impose a payment schedule by which StarKist pays only $250,000 within 30 days, $20 million over the next four years, and then the remaining balance of nearly $80 million on the five-year anniversary of its fine. StarKist has failed to show this back-loaded installment schedule is in the "interests of justice." 18 U.S.C. § 3572(d). It is not. StarKist's expert, Professor Daines, concluded in May 2019 that StarKist was not "cash-poor." (Daines Report ¶ 140.) To the extent StarKist complains about low levels of cash on hand, it is a problem of its own making. Since signing its plea agreement, StarKist refinanced its debt, requiring a steeper repayment plan resulting in historically low levels of debt within the fine payment period. (*See* Gokhale Report ¶ 26 n. 41.) It has increased its inventory by 22%, an amount of more than $50 million dollars. (Zuehls Report ¶¶ 38-40.) Defendant has had ample opportunity to prepare to pay its criminal fine. It fails to justify such a skewed installment schedule. *See United States Dep't of Justice v. Daniel Chapter One*, 89 F. Supp. 3d 132, 153

///

///

[24] In 2014, StarKist paid $56.5 million to acquire a 24% stake in TechPack. In 2017, StarKist paid $65.8 million to acquire an additional 20%. (Choe Decl. ¶ 7.) Even modest dividends of 5% from StarKist's $122 million investment would yield $6.1 million per year in additional revenue for StarKist. The [redacted] dividend StarKist received from Silver Bay in 2018 represented a [redacted] rate of return on StarKist's [redacted] Silver Bay investment.

(D.D.C. 2015) ("[T]he Court will not allow the defendants to benefit from their blatant attempt to dissipate their assets during this litigation.").

If the Court is inclined to depart from the government's proposed installment schedule, however, the plea agreement provides that the Court may set an appropriate installment schedule as set forth under 18 U.S.C. § 3612.

**III. CONCLUSION**

StarKist has utterly failed to meet its burden establishing its inability to pay. By StarKist's own admission, after it learned of the investigation, it invested $66 million in an illiquid asset; and after it signed the plea agreement establishing up to a $100 million fine, it entered into a $150 million loan agreement. It now complains that because of Techpack's illiquidity and the terms of its loan agreement, it is unable to pay the fine. Starkist should not be rewarded for sheltering its assets before sentencing.

Techpack is not essential to StarKist's ongoing operations, as StarKist concedes. (*See* June 12, 2019 Sentencing Hr'g Tr. 101:3-19.) It simply would prefer to hold on to Techpack so it can reap the benefits of its future merger with Dongwon Systems, rather than sell or leverage it to pay StarKist's fine. But the law does not entitle StarKist to do so. The Guidelines do not provide for a fine reduction simply to preserve potential future profits and justice requires that a corporate criminal defendant be treated like all other criminal defendants: it should divest itself of a non-essential asset to pay for its criminal actions. Just as other criminal defendants may have to sell luxury cars, second homes, or other assets to satisfy criminal judgments, StarKist should sell Techpack if needed to pay its fine.

Defendant has not established that its $154 million interest in Techpack cannot be sold or otherwise leveraged to obtain the money necessary to pay a $100 million criminal fine. Nor has StarKist established that it cannot borrow additional money. Even using StarKist's own dismal projections of free cash flow and inflated estimates of civil settlements, StarKist has more than

///

///

///

enough money to pay a Guidelines fine of $100 million. No evidentiary hearing is necessary. StarKist deserves a $100 million fine.

Dated: July 17, 2019

Respectfully submitted,

/s/ *Andrew J. Mast*_____
ANDREW J. MAST
Trial Attorney
U.S. Department of Justice
Antitrust Division