LATHAM & WATKINS LLP
Niall E. Lynch (CA 157959)
Ashley M. Bauer (CA 231626)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095
*niall.lynch@lw.com*
*ashley.bauer@lw.com*

Sean M. Berkowitz (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: +1.312.876.7700
Facsimile: +1.312.993.9767
*sean.berkowitz@lw.com*

*Counsel for Defendant StarKist Co.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STARKIST CO.,<br><br>Defendant. | CASE NO. 18-CR-0513 EMC<br><br>**STARKIST CO.'S SENTENCING MEMORANDUM AND REQUEST FOR EVIDENTIARY HEARING**<br><br>Judge: Hon. Edward M. Chen<br>Date: June 12, 2019<br>Courtroom: 5 – 17th Floor |

**<u>REVISED REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED</u>**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 3
- A. StarKist and the Packaged Tuna Industry ..... 3
- B. Investigation and Related Cases ..... 5
- C. StarKist's Role in the Conspiracy and Plea Agreement ..... 7
- D. Presentence Investigation Report ..... 8

III. DISCUSSION ..... 9
- A. Legal Standard ..... 9
- B. Civil Restitution Is a Valid Basis for Finding Inability to Pay ..... 10
- C. StarKist's Projected Free Cash Flow ..... 12
- D. Response to the Report of Dr. Dale Zuehls ..... 13
  - 1. Projected Sales Growth ..... 13
  - 2. Debt Financing ..... 15
  - 3. Inventory Levels ..... 16
  - 4. Debt Payments ..... 16
- E. Estimate of Civil Liability ..... 17
- F. Potential Consequences of StarKist's Inability to Pay ..... 19
- G. Financial Impact of a $100 Million Fine ..... 22
- H. A $50 Million Fine Satisfies the 18 U.S.C. § 3553 Factors ..... 23
- I. Remaining Objections to PSR ..... 24
- J. An Evidentiary Hearing Is Necessary to Determine Whether StarKist Has the Ability to Pay a Fine Greater than $50 Million ..... 26

IV. CONCLUSION ..... 28

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re: Packaged Seafood Products Antitrust Litigation*
(15-md-02670-JLS-MDD)....................11

*U.S. v. Berger*,
587 F.3d 1038 (9th Cir. 2009)....................9

*U.S. v. Bumble Bee Foods, LLC*,
Case No. 3:17-cr-00249-EMC....................6, 7, 11, 25

*U.S. v. Christopher Lischewski*,
Case No. 18-cr-00203-EMC....................6

*U.S. v. Elna Co., Ltd.*,
Case No. 16-CR-365-JD....................17, 28

*U.S. v. Eureka Labs., Inc.*,
103 F.3d 908 (9th Cir. 1996)....................10

*U.S. v. Hardy*,
935 F.2d 276 (9th Cir. 1991)....................25

*U.S. v. Kenneth Worsham*,
Case No. 16-cr-00535-EMC....................6

*U.S. v. Lopez-Gonzales*,
688 F.2d 1275 (9th Cir. 1982)....................10

*U.S. v. Maxzone Vehicle Lighting Corp.*,
Case No. 3:11-cr-00653-RS....................10, 11

*U.S. v. Morales*,
328 F.3d 1202 (9th Cir. 2003)....................25

*U.S. v. Navarro*,
979 F.2d 786 (9th Cir. 1992)....................9, 26

*U.S. v. Polar Air Cargo, Inc.*,
Case No. 10-cr-00242-JBD....................12

*U.S. v. Robinson*,
20 F.3d 1030 (9th Cir. 1994)....................9, 25, 26

*U.S. v. Rubycon Corp.*,
Case No. 4:16-cr-00367-JD....................11

*U.S. v. Samsung SDI Co., Ltd.*, Case No. 11-cr-00162 .....12

*U.S. v. Stephen L. Hodge*, Case No. 3:17-cr-00297 .....7, 8

*U.S. v. Tucker*, 404 U.S. 443 (1972) .....10

*U.S. v. Vargem*, 747 F.3d 724 (9th Cir. 2014) .....9

*U.S. v. Waknine*, 543 F.3d 546 (9th Cir. 2008) .....10

*U.S. v. Walter Scott Cameron*, Case No. 16-cr-00501-EMC .....6

**STATUTES**

15 U.S.C. § 1 .....3, 6, 18

18 U.S.C. § 3553 .....2, 23

18 U.S.C. § 3561(c)(1) .....24

18 U.S.C. § 3572(b) .....9, 10, 22

18 U.S.C. § 3571 .....27

18 U.S.C. § 3573 .....25

18 U.S.C. § 3612(f)(3)(A) .....9

**RULES**

Federal Rule of Criminal Procedure 11(c)(1)(C) .....3

U.S.S.G. § 6A1.3 .....27

U.S.S.G § 8C3.3 ..... *passim*

**OTHER AUTHORITIES**

American Samoa Government Department of Commerce, *American Samoa – Forging a Path Towards a Resilient Economic Future*, http://doc.as.gov/wp-content/uploads/2019/03/CEDS-AS-2018-2022-Public-Comment-040119.pdf .....21

Crowell & Moring LLP, *Antitrust Risks Beyond the Deal: When Merger Investigations Lead to Civil/Criminal Antitrust Charges and Costly Follow-On Litigation*, Lexology (Jan. 14, 2019) .....6

Eric Kroh, *Tri-Union Admits to Blowing Whistle in DOJ Tuna Probe*, Law360 (Sep. 11, 2017) ....................6

Roberto A. Ferdman, *How America Fell Out of Love with Canned Tuna*, The Washington Post (August 18, 2014) ....................4

*Thai Union Group (TUF) Announces the Acquisition of Bumble Bee Seafoods – the Largest Branded Shelf-Stable Seafood Company in North America*, Thai Union (Dec. 19, 2014) ....................5

## I. INTRODUCTION

Faced with limited financial resources, declining demand for canned tuna, and substantial civil liability, StarKist Co. ("StarKist") respectfully asks the Court to impose a $50 million fine to be paid in installments over five years, without interest.[1] The Presentence Investigation Report ("PSR") correctly states [redacted] And experts for both StarKist and DOJ agree that StarKist cannot issue new stock or borrow money to pay the fine. *Id.* at 12. Thus, the only remaining source of money to pay a fine is StarKist's future cash flows over the next five years. As explained below, StarKist cannot pay more than a $50 million fine, and even a fine of that amount may still impair its ability to make restitution and possibly "substantially jeopardize the ongoing viability of the organization." *See* U.S.S.G § 8C3.3.

StarKist's financial expert projects that the Company will have $94.8 million in free cash flow[2] over the next five years to pay for a criminal fine and restitution through the related civil antitrust lawsuits. In 2019, StarKist reached settlements with the vast majority of Direct Action Plaintiffs who have filed individual claims for the charged conduct and, to date, StarKist has agreed to enter civil settlements valued at more than $54.4 million [redacted] (thereby reducing its expected free cash flow to [redacted] million over the next five years, which has a discounted present value of $[redacted] million). But the remaining civil Plaintiffs, including the three class action groups and four remaining Direct Action Plaintiffs, claim that StarKist is jointly and severally liable for $[redacted] in treble damages. [redacted] Therefore, even a $50 million fine paid in installments without interest will leave StarKist with a significant financial deficit from which

---

[1] StarKist requests installment payments on the following schedule: $5 million within 30 days of the judgment; $5 million each year from 2020-2023 on the anniversary of the judgment, and $25 million on the anniversary of the judgment in 2024.

[2] "Free Cash Flow" is the cash that StarKist will have available to it after all operating expenses, planned investments, and expected liabilities have been paid.

to pay a criminal fine, and any fine above $50 million would substantially impair StarKist's ability to make restitution and jeopardize the continued viability of the company. *See* U.S.S.G § 8C3.3.

Further, the Court need not be concerned that a $50 million fine would create "unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6)-(7). This case involves a three-company price-fixing conspiracy among Bumble Bee Foods, LLC ("Bumble Bee"), Tri-Union Seafoods LLC d/b/a Chicken of the Sea International, Inc. ("Chicken of the Sea") and StarKist. StarKist's Plea Agreement covers the narrowest time period and product scope of any company or individual charged, and only one StarKist employee—who was terminated more than five years ago—was charged in this matter. By comparison, Bumble Bee pled guilty to a longer conspiracy period and broader product scope than StarKist, three of its senior executives were charged (including the President and CEO), and it received a sentence of $25 million,[3] based in large part on the same inability to pay arguments StarKist is making here. Even a $50 million fine will be twice the amount of Bumble Bee's fine. Chicken of the Sea was the first company to report the illegal conduct to the DOJ, and under the Antitrust Division's Corporate Leniency Policy received no criminal fine and all of its employees were immunized from criminal prosecution.

This sentencing hearing raises novel legal issues, complex financial analysis, and potentially enterprise-threatening consequences for StarKist. In order for StarKist to have a meaningful opportunity to present all relevant information to the Court, StarKist requests an evidentiary hearing on the issue of StarKist's ability to pay a fine greater than $50 million. [redacted]

---

[3] Bumble Bee, which operates in the same industry as StarKist, was fined $81.5 million dollars, however that fine was reduced to $25 million as a result of Bumble Bee's inability to pay.

[redacted] Should the Court grant the request for an evidentiary hearing, StarKist intends to call its financial expert, Rajiv Gokhale, as well as two current StarKist executives, to establish the basis for Mr. Gokhale's estimated free cash flow analysis and to explain the financial consequences to the Company of a fine over $50 million. StarKist would also like an opportunity to cross-examine DOJ's expert, Dr. Dale Zuehls, on the gaps, misleading growth assumptions, and mathematical errors in his analysis and to test his reliability and credibility.

## II. BACKGROUND

On November 14, 2018, StarKist pled guilty to a single count violation of the Sherman Antitrust Act, 15 U.S.C. § 1, for its participation in a conspiracy to fix the price of canned tuna in the United States between November 2011 and December 31, 2013. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties agreed to a criminal fine in the amount of $100 million "unless the defendant requests, and the Court imposes, a reduction pursuant to U.S.S.G. § 8C3.3 to an amount no less than $50 million based on a finding of an inability of the defendant to pay the Guidelines fine; and no order of restitution[.]" *See* Plea Agreement, ECF No. 24 ¶ 10. StarKist is seeking a fine of $50 million payable in installments over five years, without interest.

### A. StarKist and the Packaged Tuna Industry

StarKist originated as the French Sardine Company, founded in 1917, and has been marketing tuna under the name StarKist since 1942. Today, StarKist is the leading tuna brand in the United States, and it is the only remaining tuna manufacturer that processes tuna completely in the United States at a plant located in American Samoa. StarKist employs 114 people in the United States. And its subsidiary in American Samoa, StarKist Samoa, employs 2,400 people, making it American Samoa's largest private-sector employer. StarKist also has a processing facility in Ecuador that employs approximately 1,800 people.

In the domestic market for packaged tuna, StarKist's primary competitors are Bumble Bee and Chicken of the Sea. The packaged tuna industry has faced a significant reduction in demand in the United States over the last three decades, with per capita consumption of canned

tuna dropping 43%, from 3.7 pounds of tuna per person in 1990 to 2.1 pounds of tuna per person in 2016:




In 2012, canned tuna made up only 16% of all U.S. fish and seafood consumption in the country, the lowest percentage in nearly sixty years.[4] Concerns regarding health, sustainability, and an overall shift away from canned foods were some of the key drivers of this decline.[5] While innovation in the sector—like selling tuna in pouches[6] and other value-added products—has invigorated the category, these new products will not offset the overall reduction in demand for canned tuna. [redacted] These expansion plans will be delayed, or

---

[4] Roberto A. Ferdman, *How America Fell Out of Love with Canned Tuna*, The Washington Post (August 18, 2014), https://www.washingtonpost.com/news/wonk/wp/2014/08/18/how-america-fell-out-of-love-with-canned-tuna/?noredirect=on&utm_term=.8170d2724a5c.

[5] *Id.*

[6] Pouch tuna, as its name suggests, is packaged in an easy-to-open foil pouch; no can opener is required. Unlike canned tuna, pouch tuna does not require draining. Pouch tuna is currently a slightly higher-margin product than canned tuna.

abandoned, if StarKist is faced with a fine above $50 million, furthering the downward spiral of StarKist's financial condition.

Even on an installment schedule, payment of a $50 million fine presents StarKist with significant financial challenges and will significantly inhibit StarKist's ability to compete. The erosion of the domestic tuna market has had a severe impact on StarKist's financial condition. From 2012 to 2016, StarKist's compound annual growth rate ("CAGR") was [redacted]%, meaning that the company experienced negative sales growth. While growth rebounded in 2017 to [redacted]%, that growth was related in part to [redacted] In 2018, growth fell back down to [redacted]%. Contrary to Dr. Zuehls' claims, StarKist has not underestimated its expected growth rate over the next five years; in fact, it has consistently overestimated the growth of its business in the past. [redacted] Even the industry data cited by Dr. Zuehls, shows flat growth in the shelf stable seafood market (which includes canned and pouch tuna) as sales declined between 2012 and 2018 by $8 million. *See* Supplement to Ability-To-Pay Report by Dale Zuehls ("Zuehls Supplement"), Ex. A at 2, February 1, 2019.

**B. Investigation and Related Cases**

The origins of the DOJ investigation began in December 2014, when Thai Union, the owner of Chicken of the Sea, announced its agreement to acquire Bumble Bee for $1.5 billion.[7] During DOJ's antitrust review of the proposed merger, Chicken of the Sea discovered documents

---

[7] *Thai Union Group (TUF) Announces the Acquisition of Bumble Bee Seafoods – the Largest Branded Shelf-Stable Seafood Company in North America*, Thai Union (Dec. 19, 2014), http://www.thaiunion.com/en/newsroom/press-release/570/thai-union-group-tuf-announces-the-acquisition-of-bumble-bee-seafoods-the-largest-branded-shelf-stable-seafood-company-in-north-america.

indicating the company's involvement in a price fixing conspiracy for shelf-stable tuna.[8] Bumble Bee, subject to the same DOJ merger review, apparently reached the same conclusion, and determined it too was involved in price fixing conduct. Chicken of the Sea was the first company to apply for amnesty under the Antitrust Division's Corporate Leniency Policy. It faces no criminal liability for its role in the conspiracy, and its senior executives were also granted immunity for their involvement in the illegal conduct.[9] [redacted]

On January 25, 2017, Bumble Bee's Senior Vice President of Sales, Scott Cameron, pled guilty to participating in a conspiracy to fix, raise, and maintain the prices of packaged seafood in the U.S. from at least 2011 to at least 2013. *See U.S. v. Walter Scott Cameron*, Case No. 16-cr-00501-EMC, ECF No. 18. On March 15, 2017, Kenneth Worsham, Bumble Bee's Senior Vice President of Trade Marketing, pled guilty to the same crime under similar terms. *See U.S. v. Kenneth Worsham*, Case No. 16-cr-00535-EMC, ECF No. 14. Finally, the former President and CEO of Bumble Bee, Chris Lischewski, became the third and highest-ranking employee of Bumble Bee criminally charged when he was indicted for price-fixing in violation of Section 1 of the Sherman Act on May 16, 2018. *See U.S. v. Christopher Lischewski*, Case No. 18-cr-00203-EMC, ECF No. 1. Mr. Lischewski has entered a plea of not guilty, and he is scheduled to go to trial in November 2019.

On August 2, 2017, Bumble Bee pled guilty to participating in a conspiracy to fix, raise, and maintain the prices of packaged seafood sold in the U.S. as early as the first quarter of 2011, and continuing through at least as late as the fourth quarter of 2013. *See U.S. v. Bumble Bee Foods, LLC*, Case No. 3:17-cr-00249-EMC, ECF No. 32. Under the Sentencing Guidelines the

---

[8] Crowell & Moring LLP, *Antitrust Risks Beyond the Deal: When Merger Investigations Lead to Civil/Criminal Antitrust Charges and Costly Follow-On Litigation*, Lexology (Jan. 14, 2019), https://www.lexology.com/library/detail.aspx?g=78fff1af-e75c-4da4-a28a-2f8eaa659fbb.

[9] Eric Kroh, *Tri-Union Admits to Blowing Whistle in DOJ Tuna Probe*, Law360 (Sep. 11, 2017), https://www.law360.com/articles/962648/tri-union-admits-to-blowing-whistle-in-doj-tuna-probe.

Court calculated Bumble Bee's criminal fine range as $136.2 million to $272.4 million. *Id.* at ECF No. 36. Pursuant to the terms of the Bumble Bee plea agreement, DOJ agreed to give Bumble Bee a 40% downward departure from the bottom of the Guidelines range for substantial assistance, pursuant to §8C4.1, resulting in a fine of $81.5 million. DOJ then agreed to a further departure, pursuant to §8C3.3, "due to the inability of [Bumble Bee] to pay a greater fine without substantially jeopardizing its continued viability," arriving at a final fine of $25 million, to be paid in installments over five years without interest. *Id.* at ECF No. 32 ¶ 10.

**C. StarKist's Role in the Conspiracy and Plea Agreement**

Months after the DOJ investigation began, and after Chicken of the Sea had applied for leniency, StarKist became aware that it was the subject of the investigation when it received a grand jury subpoena in July 2015. Only one StarKist employee has been charged in the investigation—former Senior Vice President of Sales Stephen L. Hodge. On June 28, 2017, Mr. Hodge pled guilty to fixing prices from at least 2011 through at least 2013. *See U.S. v. Stephen L. Hodge*, Case No. 3:17-cr-00297, ECF No. 13. StarKist fired Mr. Hodge for unrelated reasons effective December 31, 2013.[10] Other members of StarKist's management team were not aware of Mr. Hodge's conduct at the time. In fact, as correctly detailed in the PSR, the industry-wide price-fixing conspiracy ended when StarKist terminated Mr. Hodge in December 2013. *See* PSR ¶ 14.

On November 14, 2018, StarKist pled guilty to participating in a conspiracy to fix canned tuna prices in the United States between November 2011 and December 31, 2013. StarKist's involvement in the conspiracy was the shortest period of any company or individual charged in this case. By comparison, Bumble Bee's CEO's, Christopher Lischewski, conspiracy period started in "November 2010," one year prior to the beginning of StarKist's charged period. In addition, StarKist was charged only with fixing prices on "canned tuna fish," while other defendants were charged with fixing prices on all "shelf-stable tuna" (including cans and pouches). *See* Plea Agreement ¶ 4. StarKist has accepted responsibility for the actions of Mr.

[10] StarKist was not aware of Mr. Hodge's purported agreements, and therefore his firing was not related to the conduct for which he pled guilty.

Hodge, and has chosen to plead guilty. The factual terms of StarKist's plea agreement, which relate to a specific time frame and to specific products, reflect StarKist's acceptance of its role in this conspiracy.

**D. Presentence Investigation Report**

[redacted] StarKist has only $6.3 million in the bank, as of May 13, 2019, which is significantly less than the amount of cash on hand that the Company typically maintains for daily operations. Thus, a criminal fine of any amount has to be paid from future cash flows. [redacted] Nevertheless, the Probation Office recommends a $100 million fine because "*it is not clear* to the [Probation Office] that a $100 million fine will *necessarily* substantially jeopardize the organization[.]" *Id.* at 24 (emphasis added). Based on its

interpretation of the Sentencing Guidelines, the Probation Office did not consider the impact of a $100 million fine on StarKist's ability to pay restitution.

## III. DISCUSSION

### A. Legal Standard

The Sentencing Guidelines provide two paths for a reduced fine when an organization lacks the ability to pay—one mandatory and the other permissive. Where imposition of a fine impairs the ability of an organization to make restitution to victims, consistent with 18 U.S.C. § 3572(b), reduction of the fine is mandatory: "The court *shall* reduce the fine below that otherwise required by [the Guidelines]." U.S.S.G § 8C3.3(a) (emphasis added). Section 8C3.3(b) provides that a court "may" impose a reduced fine when payment of the fine would "substantially jeopardize the continued viability of the organization." U.S.S.G § 8C3.3(b). StarKist invokes both sub-sections of the Guidelines as well as 18 U.S.C. § 3572(b) in seeking a fine of $50 million. StarKist's inability to pay argument falls under both the mandatory and permissive subsections, §§ 8C3.3(a) & (b). As noted, the Plea Agreement expressly provides that the parties jointly recommend that the Court impose:

> . . . a sentence requiring the defendant to pay to the United States: a criminal fine, payable on a schedule and with the applicability of 18 U.S.C. § 3612(f)(3)(A) determined by the Court, in an amount of $100 million, unless the defendant requests, and the Court imposes, a reduction pursuant to U.S.S.G. §8C3.3 to an amount of no less than $50 million based on a finding of an inability of the defendant to pay the Guidelines fine; and no order of restitution.

Plea Agreement ¶ 10.

StarKist need only demonstrate its inability to pay by a preponderance of the evidence. *See U.S. v. Robinson*, 20 F.3d 1030, 1033 (9th Cir. 1994) (quoting *U.S. v. Navarro*, 979 F.2d 786, 788 (9th Cir. 1992)) (rejecting the district court's use of the clear and convincing standard to determine inability to pay and holding that "the appropriate standard . . . is 'preponderance of the evidence.'"); *see also U.S. v. Vargem*, 747 F.3d 724, 732 (9th Cir. 2014) ("[T]he burden is on [the defendant] to show inability to pay by a preponderance of evidence."); *U.S. v. Berger*, 587 F.3d 1038, 1047 (9th Cir. 2009) (holding that a district court "uses a preponderance of the

evidence standard when finding facts pertinent to sentencing").[11] Therefore, StarKist need only prove that it is more likely than not that it will be unable to make restitution to its victims or remain viable if the fine is more than $50 million. *See U.S. v. Waknine*, 543 F.3d 546, 557 (9th Cir. 2008). The Court has broad discretion in determining the appropriate sentence and may exercise its discretion with respect to finding an inability to pay. *See U.S. v. Eureka Labs., Inc.*, 103 F.3d 908, 911 (9th Cir. 1996) ("The extent to which a district court chooses to exercise its discretion to depart downward in sentencing is not reviewable on appeal."); *see also U.S. v. Tucker*, 404 U.S. 443, 446 (1972); *U.S. v. Lopez-Gonzales*, 688 F.2d 1275, 1276 (9th Cir. 1982).

**B. Civil Restitution Is a Valid Basis for Finding Inability to Pay**

In its submission to the Probation Office, DOJ argued that a mandatory reduction of a criminal fine under § 8C3.3(a) only applies when the Guidelines fine would interfere with the defendant company's ability to pay criminal restitution, not civil damages. The Probation Office incorrectly adopts DOJ's argument based on the language of § 8C3.3(a). *See* PSR at 23. DOJ and the Probation Office are mistaken. The relevant statutory provision, 18 U.S.C. § 3572(b), prohibits the Court from imposing a fine that will impair "the ability of the defendant to make restitution." The Sentencing Guidelines and the statute do not refer specifically to "criminal restitution," and the parties have expressly agreed that civil liability adequately substitutes for an order of restitution. The Probation Office's reading of the Guidelines also ignores DOJ policy and case law to the contrary.

For example, in *U.S. v. Maxzone Vehicle Lighting Corp.*, DOJ agreed not to seek restitution "in light of the civil class action cases filed against" the defendant because those cases would "potentially provide for a recovery of a multiple of actual damages." United States' and Defendant Maxzone's Joint Sentencing Memorandum at 6, *U.S. v. Maxzone Vehicle Lighting Corp.*, No. 3:11-cr-00653-RS (N.D. Cal. Nov. 16, 2011), ECF No. 21. There, DOJ and the defendant agreed that the defendant could not pay the full Guidelines fine "without substantially

---

[11] The Probation Office appears to have applied, incorrectly, a "clear and convincing" standard to StarKist's inability to pay argument. *See* PSR at 24 ("*it is not clear* to the undersigned officer that a $100 million will *necessarily* substantially jeopardize the organization.") (emphasis added).

jeopardizing its continued viability and its ability to pay restitution to possible victims of its conduct" even though restitution would actually be paid as damages in related civil cases. *Id.* at 6-7. The *Maxzone* court ultimately accepted the parties' plea agreement and imposed the recommended lower fine. Transcript of Proceedings at 20–21, *U.S. v. Maxzone Vehicle Lighting Corp.*, No. 3:11-cr-00653-RS (N.D. Cal. Nov. 17, 2011), ECF No. 24. Other courts have also considered a defendant's ability to pay civil damages when assessing whether to impose a fine below the Sentencing Guidelines range, including in this same investigation when this Court sentenced Bumble Bee and granted its request for a reduced fine based on its inability to pay.[12]

Moreover, StarKist's Plea Agreement expressly replaces criminal restitution with StarKist's civil liability:

> In light of the civil cases filed against the defendant, including *In re: Packaged Seafood Products Antitrust Litigation*, (15-md-02670-JLS-MDD), in the United States District Court, Southern District of California, which potentially provide for a recovery of a multiple of actual damages, the recommended sentence does not include a restitution order for the offense charged in the Information.

*Id.* In antitrust cases, courts regularly accept plea agreements in which civil liability stands in place of criminal restitution, and thus for the purposes of reduction of the criminal fine under U.S.S.G § 8C3.3(a), the Court should consider civil liability the functional equivalent of criminal restitution. *See e.g.*, Judgment, *U.S. v. Maxzone Vehicle Lighting Corp.*, No. 3:11-cr-00653-RS (N.D. Cal. Nov. 15, 2011), ECF No. 22 ("[r]estitution is not ordered in light of the civil cases filed against the defendant including In re Aftermarket Automotive Lighting Products Antitrust Litigation"); Judgment, *U.S. v. Samsung SDI Co., Ltd.*, No. 11-cr-00162 (N.D. Cal. Aug. 19, 2011), ECF No. 56 (ordering no criminal restitution in light of the fact that "over 40 separate

---

[12] *See, e.g.*, Transcript of Proceedings at 10, 15, 19–23, *U.S. v. Bumble Bee Foods, LLC*, No. 3:17-cr-00249-EMC (N.D. Cal. Aug. 4, 2017), ECF No. 36 (explaining that an order of no restitution in addition to a fine lower than Guidelines recommendation was appropriate for several reasons, in part because a contrary ruling could "defeat[] any potential restitution" in the corresponding civil cases); Transcript of Proceedings at 10–11, 23-24, *U.S. v. Rubycon Corp.*, No. 4:16-cr-00367-JD (N.D. Cal. Feb. 3, 2017), ECF No. 37 (agreeing to reduce the defendant's fine to below the Guidelines recommendation and not impose criminal restitution in light of a corresponding civil case after, among other things, Dr. Zuehls "asses[sed] potential civil fines [in] coming to the conclusion of what [the defendant] [could] afford in its criminal fine," which was ultimately lower than the Guidelines recommendation).

civil cases filed on behalf of direct and/or indirect purchasers have been coordinated and [are] pending."); Transcript of Sentencing Hearing Proceedings, *U.S. v. Polar Air Cargo, Inc.*, No. 10-cr-00242-JBD (D.D.C. Nov. 5, 2010), ECF No. 21 (refusing to order restitution in light of availability of multiple-damages award in civil case).

Here, the parties in the parallel civil litigation are currently in the midst of expert discovery, one purpose of which is to determine the damages caused by the civil defendants' conduct. The damages paid in the civil case will adequately compensate the civil plaintiffs, particularly because the civil plaintiffs are represented by zealous counsel who seek treble damages available in civil antitrust cases. As it did in the Bumble Bee matter, the Court should accept the parties' agreement to allow civil damages to take the place of criminal restitution. Furthermore, the same policy goals animating § 8C3.3(a) apply equally to criminal restitution and civil damages standing in lieu of criminal restitution—in both instances, the intent of the statute is to ensure that criminal liability does not undercut victims' recovery.

Without a significant reduction of the criminal fine, StarKist will not be able to fully compensate all of the civil plaintiffs from its projected free cash flow, nor will it continue as a viable competitor in the market.

### C. StarKist's Projected Free Cash Flow

StarKist engaged Mr. Rajiv Gokhale, an expert in corporate finance, valuation, and financial statement analysis at Compass Lexecon to conduct a thorough examination of the Company's current and projected financial condition. Mr. Gokhale evaluated cash on hand, capital improvements, annual operating plans, debt obligations, tax obligations, and projected performance to determine StarKist's "free cash flow." Free cash flow refers to the money beyond what is necessary to operate its business that will be available to StarKist to pay the sum of its criminal fine and civil liability.[13] Mr. Gokhale's five-year free cash flow analysis indicates

---

[13] "Free Cash Flow" is different than "operating income." While operating income is a measure of the company's performance, it is *not* a representation of the amount of money StarKist has for spending purposes. StarKist must use its operating income for costs such as interest expenses on loans and capital expenditures. Operating income also includes inventory, which is not cash available to StarKist because the company must maintain an appropriate level of inventory to address fluctuating seasonal demand and unpredictable raw fish supply. Thus, StarKist's

that, over the next five years, StarKist will have a maximum of $94.8 million in nominal dollars, as of December 31, 2018, available to settle all claims (criminal and civil) arising from the conduct outlined in the Plea Agreement. Translated into present value dollars, the total free cash flow is $73.1 million.

Based on Mr. Gokhale's conclusions, a criminal fine of $50 million dollars would leave approximately $44.8 million for civil restitution. StarKist has already entered into more than $54.4 million in civil settlements, which leaves StarKist with negative free cash flow today and no money left under its current long-range plan to compensate the remaining plaintiffs. At the time of signing the Plea Agreement, StarKist believed that a $50 million fine would be achievable without impairing its ability to make restitution in the civil cases. While StarKist still believes a $50 million fine is appropriate, the Company's current financial outlook is worse than it was in November 2018, when the company pled guilty.

Mr. Gokhale's complete analysis and the assumptions underlying his analysis are filed concurrently as Exhibit 1 to the Declaration of Niall E. Lynch ("Lynch Decl.").

**D. Response to the Report of Dr. Dale Zuehls**

DOJ provided a report by Dr. Dale Zuehls in response to the analysis by Mr. Gokhale. For the reasons detailed below, Dr. Zuehls' report is unreliable and fails to project accurately the amount of money available to StarKist to pay a criminal fine and civil damages.

1. Projected Sales Growth

Dr. Zuehls does not use the best tool to forecast StarKist's free cash flow: StarKist's own five-year long-range plan, a tool StarKist, its auditors, and its creditors rely on in the ordinary course of business, when projecting StarKist's growth rate. Because of the continuing decline in the overall consumption of canned tuna, StarKist projects sales growth of 0.1% in its most recent long-range plan.[14] This is reasonable in light of prior history and projections. After analyzing

---

operating income is necessarily larger than its free cash flow, which is a measure of what StarKist can actually spend on a criminal fine and restitution *after* expenditures necessary for the operation of the business.

[14] Dr. Zuehls' analysis is based on StarKist's 2018 long-range plan, not StarKist's current, more accurate plan. StarKist's 2018 plan was more optimistic than its 2019 plan. The downward projection is the result of [redacted]

StarKist's historical performance, as well as market trends and relevant literature, Mr. Gokhale concluded that 0.1% was an appropriate growth rate to use in his model. *See* Ex. 1 to Lynch Decl. ¶ ¶ 11, 30. Dr. Zuehls rejected this analysis, and instead assumes growth rates of 3.8–4.7%, which are unrealistic and incorrect for several reasons.

*First*, Dr. Zuehls' 3.8–4.7% growth rates are based on the *global* canned tuna market and the canned tuna market in the entire Americas (North and South), even though StarKist only sells tuna products in the United States, where demand has been dropping dramatically over the last three decades. *See* Zuehls Supplement at 2. [redacted]

---

[15] In 2017, three major hurricanes, Harvey, Irma and Maria, hit the United States. These were three of the five costliest hurricanes in U.S. history, and caused widespread destruction in Texas, Florida, Puerto Rico and the Virgin Islands. In periods of major natural disasters, StarKist's customers, and government relief agencies, typically make substantial additional purchases of tuna products to provide relief to the victims of these natural disasters. [redacted]

[redacted]

2. Debt Financing

Dr. Zuehls suggests that StarKist could raise capital through debt financing to pay both the criminal fine and fund the capital expenditures, but he is mistaken. As Dr. Zuehls admits, lenders will be reluctant to allow StarKist to use loan proceeds to pay government fines. If banks will not loan money to StarKist to pay a criminal fine, then they will be equally reluctant to loan money to finance a new facility in full knowledge that the need for additional capital was necessitated by the fine. *See id.* ¶ 31. In other words, in terms of credit, it makes no difference if the bank's money is used for the criminal fine directly or for the capital expenditure if the bank knows that the reason for the lack of funds is due to a criminal fine. *Id.* [redacted]

[redacted]

[redacted] As it stands, a $100 million fine may trigger covenants in StarKist's existing loans, which could require immediate repayment of approximately $150 million in outstanding debt. Recent press reports about the prospect of a StarKist bankruptcy have already generated calls from StarKist's lenders inquiring about the Company's solvency and its ability to pay its existing loans. In the face of these concerns, it is difficult to see how StarKist can take on substantial amounts of additional debt to pay a criminal fine, civil damage claims, and large capital expenditures.

3. Inventory Levels

StarKist also disagrees with Dr. Zuehls' conclusion that StarKist has excess working capital of $50 million resulting from too much inventory. Due to unpredictable catch rates and volatile fish prices, StarKist historically has been forced to "go on allocation" or limit its sales to customers as a result of insufficient inventory of its tuna products. In order to mitigate this supply risk, StarKist must keep its inventory at appropriate levels. Dr. Zuehls has no legitimate basis for assuming otherwise, and he has no apparent experience in tuna procurement practices. These practices are commonplace in the tuna market and Dr. Zuehls' criticism of them demonstrates his lack of expertise in the industry.

4. Debt Payments

Next, Dr. Zuehls incorrectly asserts that StarKist "appears to be utilizing its excess annual cash flows to pay down its debt faster than mandated by the debt agreement," that StarKist "has the financial ability to carry and service normal levels of debt," and that he "revised debt payments and total debt [in StarKist's projections] to historical norms." Zuehls

---

[17] Faced with a deteriorating financial situation, and the prospect of a $100 million fine, StarKist recently retained a leading expert on bankruptcy law, Mr. Kenneth Klee, to provide an opinion regarding StarKist's ability to borrow money to pay a criminal fine, whether a $100 million fine will trigger the covenants on StarKist's existing loans, and the likelihood of a bankruptcy filing if the Court imposes a $100 million fine. This report was not available in time to provide to the Probation Officer for inclusion in his PSR. *See* Ex. 2 to Lynch Decl. ("Klee Report").

Report at 12, 2, 8. Again, Dr. Zuehls is incorrect. *First*, StarKist is only re-paying debt on the schedule on which it is required to make payments. In StarKist's expert report, Mr. Gokhale based debt repayments on the actual terms of the most recent refinancing, which contractually requires repayment of $20 million per year. Dr. Zuehls does not explain how his "revised debt payments" can satisfy the requirements of StarKist's actual loan. [redacted]

This is not the first time that the Dr. Zuehls has submitted a questionable and conclusory report. Recently, his analysis was criticized in another antitrust sentencing involving a corporate defendant that manufactured capacitors, an electronic component. There, Judge Donato complained that Dr. Zuehls' financial report was filled with "wholly conclusory statements with a raft of unexplained and incomprehensible attachments."[19] Here, Dr. Zuehls' report makes similar logical leaps without adequate explanation.

[redacted] In the civil cases, StarKist and its codefendants have been sued by three separate classes: Direct Purchaser Plaintiffs, Commercial Food Preparer Plaintiffs, and Indirect Purchaser End Payer Plaintiffs. They have also been named as defendants in twenty (20) direct action suits by plaintiffs representing over 100

---

[18] In fact, when recent press reports raised the possibility that StarKist might go bankrupt if the Court imposes a fine of $100 million, StarKist's current lenders reached out to the Company to raise their concerns about StarKist's ability to repay its existing loans.

[19] *See*, Initial Change of Plea Transcript at 21, *U.S. v. Elna Co., Ltd.*, No. 16-CR-365-JD, June 14, 2017.

retailers, distributors and other customers who have opted out of the putative direct purchaser class.[20] Nearly every complaint alleges a conspiracy period longer than the period charged by DOJ, [redacted] And, of course, liability in the civil context is joint and several, and damages are trebled. [redacted]

[redacted]

[redacted] Walmart, [redacted] settled for $20.5 million. [redacted]

---

[20] Affiliated Foods, AWG, CVS, Dollar General, Krasdale, Kroger, Meijer, Moran Foods, Publix, SpartanNash, Super Store Industries, Supervalu, Sysco, Target, U.S. Foods, W. Lee Flowers, Walmart, Wegmans, Winn-Dixie.

[redacted]

[redacted] In total, StarKist has entered into settlements amounting to approximately $54.4 million thus far. [redacted]

**F. Potential Consequences of StarKist's Inability to Pay**

If the criminal fine is greater than $50 million, there will be severe consequences that will harm the Company, U.S. workers, the domestic tuna market, direct purchasers (such as retailers and wholesalers) and ultimately consumers. StarKist is already experiencing a negative impact from its civil settlements, even before taking into account the criminal fine or remaining civil claims. While StarKist generally targets a $25–30 million cash balance in order to effectively

run the business,[22] its cash balance is currently dangerously low at $6.3 million. In order to pay the settlements StarKist has reached to date, it has drawn down its cash balance to below targeted levels, reduced its inventory levels more than is commercially prudent, and has taken out a $20 million short-term loan, which was not included in Mr. Gokhale's inability-to-pay analysis. [redacted] This approach is not sustainable, and StarKist cannot borrow money to pay a criminal fine and the remaining civil claims. These short-term loans are 12 months in duration, and in order to refinance them each year, StarKist must be financially solvent.

[redacted] StarKist Samoa, a wholly-owned subsidiary of StarKist, is the largest private-sector employer in American Samoa, providing approximately 2,400 jobs on the island. On an island of only 56,000 people, StarKist

---

[22] Even Dr. Zuehls has opined that StarKist should maintain at least a $25 million cash balance to safely run its business. *See* First Zhuels report Ex. P. footnote 2.

Samoa employs about 4% of the population, but directly and indirectly creates approximately 30% of the jobs on the island. StarKist's operations on the island also contribute to other industries, including fueling, stevedoring, and trucking, and allow cannery workers to spend money at local establishments on the island. *See* Exs. 3 and 4 to Lynch Decl. The American Samoa Commerce Department recently issued a report stating that closure of the StarKist plant would result in "catastrophic economic disaster" and likely send the island into a "deep recession from which [it] may never recover."[23] *Id.* [redacted]

Finally, as described below, a fine above $50 million may compel StarKist to file for bankruptcy, which would further reduce competition in the market, lead to an increase in prices, and ultimately harm consumers. That result would also frustrate the goal articulated in the Sentencing Guidelines of allowing for the continued viability of the organization and the payment of restitution to victims. U.S.S.G. § 8C3.3; 18 U.S.C. § 3572(b). The Company will do

[23] American Samoa Government Department of Commerce, *American Samoa – Forging a Path Towards a Resilient Economic Future*, http://doc.as.gov/wp-content/uploads/2019/03/CEDS-AS-2018-2022-Public-Comment-040119.pdf.

all that it can to avoid these negative outcomes, but—in the face of massive combined civil and criminal liability—these are very real possibilities.

**G. Financial Impact of a $100 Million Fine**

In light of a potential $100 million fine, StarKist recently retained a bankruptcy expert, Kenneth N. Klee, to analyze the impact to StarKist of a $100 million fine paid in installments over five years without interest. Mr. Klee's complete report is filed concurrently as Exhibit 2 to the Declaration of Niall E. Lynch ("Klee Report"). Mr. Klee is a Professor of Law Emeritus at the University of California at Los Angeles School of Law and was a principal draftsman of the Bankruptcy Reform Act of 1978 and its legislative history. He has practiced law for over 40 years, specializing in bankruptcy, insolvency, corporate reorganization, and bankruptcy litigation.

Based on his experience as a bankruptcy practitioner and professor with over 40 years of experience, Mr. Klee opines on three issues. [redacted]

Forcing StarKist into bankruptcy is inconsistent with the Sentencing Guidelines' provisions to "avoid substantially jeopardizing the continued viability of an organization." U.S.S.G. § 8C3.3(b). Moreover, it is also inconsistent with the goal and purpose of the U.S. antitrust laws to ensure robust competition in the marketplace. Even a Chapter 11 reorganization

will substantially impair StarKist's ability to compete in this market at this critical juncture where consumer demand is switching from declining canned tuna sales to pouches. Failure to take advantage of and adapt to this strategic change in the market will leave StarKist permanently impaired in its ability to effectively compete in the future and lead to long-term negative consequences, which will remain well after this case and the related civil cases have been resolved.

### H. A $50 Million Fine Satisfies the 18 U.S.C. § 3553 Factors

By the terms of the plea agreement, StarKist may only seek a reduction from the $100 million dollar criminal fine on the basis of its inability to pay. *See* Plea Agreement ¶ 10. The Court, however, has an independent duty to consider whether the ultimate sentence is "sufficient, but not greater than necessary" to comply with the purposes of the statute. 18 U.S.C. § 3553(a). A criminal fine of $50 million dollars satisfies the Section 3553 factors.

As explained above, StarKist's plea has a shorter time period and a narrower product definition than Bumble Bee or any individual defendant sentenced in this matter. Only one former employee of StarKist has been charged, while two high-ranking executives of Bumble Bee have pled guilty and its former President and CEO has been indicted and awaits trial. A $50 million dollar fine is more than double the fine assessed against Bumble Bee, and therefore adequately reflects the seriousness and nature of the offense and provides adequate deterrence by addressing StarKist's position as the last remaining corporate defendant to plead guilty. In addition, a $50 million fine imposed on StarKist stands in stark contrast to Chicken of the Sea, which will face no criminal fine or prosecution of its employees, despite its comparative role in the offense.

[redacted] StarKist acknowledges that proof of actual harm is not required in a criminal price-fixing case. During the period of the charged conspiracy, however, StarKist either lost money or earned income at the low end of its operating income averages.

Finally, as detailed above, a $50 million dollar fine will allow StarKist to provide restitution in the civil cases, and continue to effectively compete and provide high quality products at low prices to its customers.

**I. Remaining Objections to PSR**

StarKist submits four remaining objections to the Probation Office's PSR. *First*, StarKist objects to the Probation Office's unilateral recommendation of a five-year probation term. *Second*, StarKist objects to the Probation Office's suggestion that, if it becomes certain that StarKist is unable to pay the $100 million fine at some point in the future, StarKist can petition the government to reopen the issue. *Third*, StarKist objects to the Probation Office's application of the incorrect burden of proof on StarKist's inability-to-pay argument.[24] And *fourth*, StarKist objects to the Probation Office's calculation of volume of affected commerce.

*First*, probation is not mandatory or necessary here, and both parties have agreed to recommend that there be no term of probation. *See* 18 U.S.C. § 3561(c)(1); Plea Agreement ¶ 10(c). StarKist's involvement in the charged conspiracy was based on the conduct of one former employee who was terminated by StarKist in December of 2013. None of the current senior management at StarKist was involved in, or aware of, the charged conduct until DOJ initiated this investigation. Further, StarKist has accepted responsibility for the conduct of its former employee and has taken a number of steps to ensure that the conduct at issue is not repeated. StarKist has added a General Counsel, instituted regular, mandatory antitrust trainings, and adopted a formal antitrust policy. Despite these facts, the Probation Office recommends a five-year term of probation "to ensure the defendant satisfies its monetary obligations." PSR at 25. But probation is not necessary to ensure StarKist's payment of a criminal fine—criminal fines are often levied without an accompanying term of probation. *See, e.g.*, *U.S. v. Bumble Bee Foods, LLC*, Case No. 3:17-cr-00249-EMC, ECF No. 37. Further, a term of probation would create sentencing disparities between StarKist and Bumble Bee, which did not receive probation.

---

[24] As noted above, StarKist also objects to the Probation Office's incorrect assertion that the text of § 8C3.3(a) allows for mandatory reductions only when the inability to pay is attributable to criminal restitution, not civil damages which are intended to replace criminal restitution. *See* PSR at 23.

*Second*, the Probation Office's suggestion that the parties can return to Court if StarKist has not generated sufficient income to afford the installment payments misunderstands the law. In *U.S. v. Robinson*, the Ninth Circuit clearly holds that the district court must determine the defendant's ability to pay *before* imposing a fine. 20 F.3d at 1034. There, the district court "left it up to the probation officers to make, at some future time, the determination whether defendants are then able to pay a fine," and the Ninth Circuit rejected this approach in light of the language and structure of the Sentencing Guidelines, as well as the Court's prior holdings. *Id.* Further, criminal defendants cannot petition the court for a modification of a criminal fine under 18 U.S.C. § 3573. *See U.S. v. Hardy*, 935 F.2d 276 (9th Cir. 1991) ("The current version of section 3573 is also not available to Hardy. That statute authorizes only the government to petition the court to stay payment of a fine."). And even if the government (not StarKist) chooses to petition the Court for a modification of the fine, it must show that reasonable efforts to collect the fine are not likely to be effective. *See U.S. v. Morales*, 328 F.3d 1202, 1205 (9th Cir. 2003). Contrary to the Probation Office's recommendation, StarKist has no ability on its own to ask the Court to lower its fine, even if its financial condition continues to deteriorate. Moreover, in order to run its business and plan for the future, StarKist needs certainty now regarding its potential criminal and civil liabilities. If the Court imposes a fine beyond StarKist's ability to pay, seeking a remedy years down the road will likely come too late. The damage will already be done, and StarKist's business, and ultimately its customers, will suffer.

[redacted] "*it is not clear* to the undersigned officer that a $100 million will *necessarily* substantially jeopardize the organization." PSR at 24 (emphasis added). But the law does not require StarKist to satisfy the "clear and convincing" burden that the Probation Office implies. As noted above, StarKist must only show by a preponderance of the evidence that it is unable to pay a $100 million fine. *See Robinson*, 20 F.3d at 1033 (quoting *U.S. v. Navarro*, 979 F.2d 786, 788 (9th Cir. 1992)) (rejecting the district court's use of the clear and convincing standard to determine inability to pay and holding that "the appropriate standard . . . is 'preponderance of the

evidence.'"). StarKist has met that burden through the expert report of Mr. Gokhale and supporting data and exhibits. StarKist has shown by a preponderance of the evidence that a $100 million fine will substantially jeopardize the continued viability of the organization as well as its ability to pay restitution.

*Fourth*, the Probation Office has stated that the volume of affected commerce, for purposes of calculating the Sentencing Guidelines fine, is $744 million. *See* PSR ¶ 21. But DOJ and StarKist have agreed that, for purposes of calculating the Sentencing Guidelines range, the appropriate volume of commerce is "at least 600 million." *See* Plea Agreement ¶ 9. In response to StarKist's objection to the $744 million figure, the Probation Office states that it is "not bound to the terms of the Plea Agreement and may make determinations contrary to facts agreed to in the Plea Agreement." *See* PSR at 20. [redacted] StarKist does not agree that the volume of affected commerce is $744 million. [redacted] Thus, this dispute should not affect the Court's conclusion regarding the open issue—StarKist's ability to pay more than a $50 million fine.

**J. An Evidentiary Hearing Is Necessary**

As is evident from the PSR, there exists a significant dispute as to whether StarKist has the ability to pay a fine greater than $50 million. The Sentencing Guidelines state that "[w]hen a dispute exists about any factor important to the sentencing determination, the court must ensure

that the parties have an adequate opportunity to present relevant information." U.S.S.G. § 6A1.3. Further, in certain cases "[a]n evidentiary hearing may . . . be the only reliable way to resolve disputed issues." *Id.* StarKist believes that the factual disputes amongst the competing experts here, as reflected in the PSR, merit an evidentiary hearing. [redacted] Live testimony of StarKist's and DOJ's experts would provide the Court with the most effective means to adjudicate dueling opinions and ultimately decide whether StarKist has shown by a preponderance of the evidence that it is unable to pay more than a $50 million fine. At the hearing, StarKist intends to call Mr. Gokhale and Dr. Zuehls so the Court can test the assumptions and conclusions in their reports.

StarKist should be permitted to cross-examine Dr. Zuehls because there are significant gaps in his analysis. Dr. Zuehls fails to provide the "bases and reasons" for the assumptions and opinions in his report. For example, Dr. Zuehls states that he made up "20 different iterations of future forecast iterations" by changing the inputs to various assumptions. *See* Zuehls Report at 17. But Dr. Zuehls does not provide details regarding the combinations of inputs and assumptions he uses to get to each of these 20 forecasts. StarKist requested access to the data underlying Dr. Zuehls' analysis, but the DOJ refused to provide it on two separate occasions, claiming that Dr. Zuehls' analysis was sufficient. *See* Lynch Decl. ¶ 6. But without Dr. Zuehls' underlying data, it is impossible for StarKist's expert to test Dr. Zuehls' conclusions. [redacted] Finally, Dr. Zuehls made mathematical errors in his report, which undermine the reliability of his calculations. And other Courts have found reason to question Dr. Zuehls' reliability. Judge Donato recently criticized Dr. Zuehls' work in the corporate sentencing of a company that manufactures capacitors, stating

that if he saw Dr. Zuehls' report in a civil context, he "would have no problem Dauberting because it consists of about eight pages of wholly conclusory statements with a raft of unexplained and incomprehensible attachments." Initial Change of Plea Transcript at 21, *U.S. v. Elna Co., Ltd.*, Case No. 16-CR-365-JD, June 14, 2017. Live testimony will allow the Court to test each expert's credibility.

Additionally, and to the extent necessary, StarKist will call two StarKist employees, Andrew Choe (CEO) and Dennis Adams (Director of Finance), to give the Court the opportunity to question them on StarKist's business and financial situation. Mr. Choe will testify to StarKist's production requirements, its shifting product mix, the necessity of capital expenditures in American Samoa, and anything else the Court deems helpful. Mr. Adams will testify regarding StarKist's long-range plan, as well as StarKist's historical and current financial performance. StarKist is also willing to consider calling other witnesses as the Court deems necessary to aid in its determination.

## IV. CONCLUSION

StarKist respectfully requests a reduction of its sentence to $50 million dollars paid in installments over five years without interest. A $50 million dollar fine will adequately serve the cause of justice, while allowing StarKist to pay restitution in the civil cases and remain a viable competitor in the domestic tuna marketplace.

Dated: May 15, 2019

Respectfully submitted,

LATHAM & WATKINS LLP
Niall E. Lynch
Sean M. Berkowitz
Ashley M. Bauer

By: [signature]
Niall E. Lynch

*Counsel for Defendant StarKist Co.*