LATHAM & WATKINS LLP
Niall E. Lynch (CA 157959)
Ashley M. Bauer (CA 231626)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095
*niall.lynch@lw.com*
*ashley.bauer@lw.com*

Sean M. Berkowitz (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: +1.312.876.7700
Facsimile: +1.312.993.9767
*sean.berkowitz@lw.com*

*Counsel for Defendant StarKist Co.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STARKIST CO.,<br><br>Defendant. | CASE NO. 18-CR-0513 EMC<br><br>**STARKIST CO.'S RESPONSE TO UNITED STATES OF AMERICA'S SENTENCING MEMORANDUM**<br><br>Judge: Hon. Edward M. Chen<br>Date: June 12, 2019<br>Courtroom: 5 – 17th Floor |

**<u>REVISED REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED</u>**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................ 1

II. DISCUSSION ........................................................................................ 3

A. Nearly One Third of Dr. Zuehls' Analyses Show that StarKist Is Unable to Pay ........................................................................................ 3

B. When Objective Errors in Dr. Zuehls' Analysis Are Corrected, His Iterations Show StarKist Is Unable to Pay ........................................................................................ 4

C. StarKist's Ability to Pay Analysis Is Reliable ........................................................................................ 6

D. Dongwon Industries Is Not Legally Required to Pay StarKist's Fine ........................................................................................ 15

E. DOJ's Ability to Petition to Lower StarKist's Fine in the Future Is Irrelevant ........................................................................................ 16

F. An Evidentiary Hearing Is Necessary ........................................................................................ 17

G. A $50 Million Dollar Fine Satisfies 18 U.S.C. § 3553 ........................................................................................ 17

III. CONCLUSION ........................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Fletcher v. Atex, Inc.*,
68 F.3d 1451 (2d Cir. 1995)....................15

*In re Packaged Seafood Products Antitrust Litigation*,
15-MD-2670-JLS-MDD (S.D. Cal.)....................12

*United States v. Bestfoods*,
524 U.S. 51 (1998)....................15

*United States v. Brock-Davis*,
504 F.3d 991 (9th Cir. 2007)....................13

*United States v. Bumble Bee Foods, LLC*,
No. 17-CR-249....................8, 16

*United States v. Foreman*,
329 F.3d 1037 (9th Cir. 2003)....................12

*United States v. Sensmeier*,
361 F.3d 982 (7th Cir. 2004)....................12

*United States v. Thomsen*,
830 F.3d 1049 (9th Cir. 2016)....................13

## STATUTES

18 U.S.C. § 3553....................17

18 U.S.C. § 3572(b)....................3

18 U.S.C. § 3573....................16

18 U.S.C. § 3664(h)....................12

28 U.S.C. § 991(b)....................16

## RULES

U.S.S.G. § 8C3.3....................3, 18

## I. INTRODUCTION

Defendant StarKist Co. ("StarKist") has accepted responsibility for its participation in this price-fixing conspiracy, instituted enhanced compliance training for its employees, and made substantial progress in compensating its customers for the conduct charged in this case. Far from attempting to "escape punishment" as the Department of Justice ("DOJ") contends, StarKist has committed to pay at least a $50 million dollar criminal fine, which is double the fine leveled against Bumble Bee, a co-conspirator that played a longer and more substantial role in the conspiracy. StarKist has also already agreed to pay $54.4 million [redacted] through civil settlements with its customers. Indeed, it is concern for paying the remaining civil Plaintiffs that animates StarKist's argument for a reduction based on inability to pay. The Company does not expect a windfall. To the contrary, StarKist proposed to DOJ that, in the unlikely event that the remaining civil claims are settled for less than the $50 million at issue here, the remainder revert to DOJ in the form of a fine. DOJ rejected that proposal, and now argues that StarKist is "manipulating" figures, paying "disguised dividends," and "grossly inflating" estimates in what DOJ views as an effort to avoid "atoning for its criminal conduct." Nothing could be further from the truth. StarKist has been transparent about the health of its industry and DOJ has full access to all of its sales data and accounting records. There is nothing deceptive about StarKist's request: StarKist simply cannot pay a $100 million dollar fine, make full restitution to civil plaintiffs, and remain viable in the packaged tuna industry.

StarKist has no interest in engaging with DOJ's inflammatory rhetoric, but it must bring to the Court's attention DOJ's inexplicable withholding, and belated disclosure, of relevant and exculpatory information relating to DOJ's expert's analysis. First, the report by Dr. Zuehls referenced in DOJ's Sentencing Memorandum is *not* the same report by Dr. Zuehls that DOJ presented to the Probation Office. The most recent version of Dr. Zuehls' report, which was submitted to the Court on May 15 as ECF No. 52-1, was—to our knowledge—never disclosed to the Probation Office, and it was not disclosed to the Company until after StarKist had already lodged its Sentencing Memorandum with the Court earlier the same day. DOJ does not explain

why Dr. Zuehls changed his report or why it did not disclose the new report until the filing of its Sentencing Memorandum. DOJ's delay is unfair and disappointing.

Second, with respect to Dr. Zuehls' first report dated January 14, 2019,[1] StarKist repeatedly asked DOJ to produce the data underlying Dr. Zuehls' "iterations" and any other analysis he relied upon so that the Company could understand, evaluate, and test his claims. DOJ refused without explanation.[2] Now, in its Sentencing Memorandum, DOJ misleadingly states that "the government has provided StarKist with these iterations and as well as the iterations Zuehls performed in evaluating the ability to pay of Bumble Bee." U.S. Sentencing Mem. at 5, fn 3, ECF No. 51. This footnote fails to acknowledge that DOJ served these materials on StarKist at 6:15 p.m. the very same day it filed its Sentencing Memorandum, May 15, 2019, *after* StarKist had already lodged its Sentencing Memorandum with the Court earlier that day. DOJ's gamesmanship has denied StarKist the opportunity to meaningfully rebut Dr. Zuehls' claims to the Probation Office and the Court in a timely manner. Nevertheless, StarKist and its expert have now analyzed the new May 14, 2019 Zuehls Report and the new data. Unsurprisingly, much of the late-produced data supports StarKist's inability-to-pay arguments. And once errors in Dr. Zuehls' iterations are corrected, Dr. Zuehls' iterations strongly support a finding of an inability to pay. That DOJ withheld both the results of Dr. Zeuhls' iterations and his updated report from the Probation Office, is yet another reason (in addition to the others noted in StarKist's Sentencing Memorandum and the reasons set forth below) that the Court should not rely upon the conclusion in the Presentence Investigation Report that StarKist can pay a fine of $100 million.

Finally, and most importantly, nothing in Dr. Zuehls' new May 14, 2019 Report changes the salient facts. StarKist is facing serious financial difficulty and is operating in a struggling industry—the same industry as Bumble Bee, for which Dr. Zuehls curiously used a significantly

---

[1] The first time that DOJ shared a version of its expert's analysis with StarKist was when DOJ disclosed Dr. Zuehls' report dated January 14, 2019. *See* Declaration of Niall E. Lynch in Support of StarKist's Response to U.S. Sentencing Mem. ("Lynch Decl. ISO Response") at ¶ 3.

[2] Decl. of Niall E. Lynch in Support of StarKist Co.'s Sentencing Mem. and Req. for Evid. Hr'g. ("Lynch Decl. ISO Sentencing Mem."), Ex. 5, ECF No. 54.

lower growth projection and higher civil damages estimates in his inability-to-pay analysis. Despite DOJ's claims that StarKist can borrow its way out of its financial situation, StarKist is contractually prohibited by its current lenders from borrowing any additional money for any purpose. The Court has the authority, and the statutory duty, to lower fines where a Company shows by a preponderance of the evidence that the criminal fine will impair its ability to make restitution or substantially jeopardize the ongoing viability of the organization. *See* 18 U.S.C. § 3572(b); U.S.S.G. § 8C3.3. To order a $100 million fine here would defeat the purpose of the antitrust laws under which StarKist was prosecuted—rather than protecting the market, it would redistribute money away from victims toward the government and markedly *reduce* competition in the packaged tuna industry. Thus, for the reasons set out in its Sentencing Memorandum and as set forth below, StarKist respectfully requests a criminal fine of $50 million, paid in reasonable installments over five years, without interest.

## II. DISCUSSION

### A. Nearly One Third of Dr. Zuehls' Analyses Show that StarKist Is Unable to Pay[3]

In his May 14, 2019 Report, Dr. Zuehls concludes that StarKist "is financially capable of paying a fine of $100 million in a series interest-free installment payments. . ." U.S. Sentencing Mem., Attach. 1 to Decl. of A. Mast at ¶ 4, ECF No. 52 ("May 14, 2019 Zuehls Report"). In support of his May 14, 2019 Report, Dr. Zuehls created "iterations" of what he calls "probable future outcomes" for StarKist, adjusting certain variables in each one. May 14, 2019 Zuehls Report at ¶ 23. But the 35 iterations that DOJ belatedly produced just hours before serving Dr. Zuehls' May 14, 2019 Report belie his conclusory opinion that StarKist can pay a $100 million fine.

---

[3] DOJ refers to Dr. Zuehls several times as an "independent" expert, despite the fact that he was retained by DOJ in this case and apparently in at least forty other matters. As a retained expert, Dr. Zuehls is no more or less independent than Rajiv Gokhale, the expert retained in this matter by StarKist. There is nothing inherently wrong about the Government retaining an expert—but to insist that an expert who DOJ has retained over forty times is somehow more independent than the expert StarKist has retained once is simply wrong.

Setting aside the fact that DOJ failed to produce any iterations to the Probation Office or StarKist until after StarKist filed its Sentencing Memorandum, the one-page summary of Dr. Zuehls' 35 iterations shows that under nearly a third of his analyses, StarKist *will not* be able to pay a $100 million dollar fine. Lynch Decl. ISO Response, Ex. 4. In 11 of 35 "iterations," StarKist either cannot pay or may not be able to pay according to Dr. Zuehls' own analyses. *Id.* Most notably, under the assumptions of a [redacted] CAGR [redacted] and [redacted] in civil damages [redacted] Dr. Zuehls still concedes that StarKist does not have the ability to pay a $100 million fine. *Id.*

**B. When Objective Errors in Dr. Zuehls' Analysis Are Corrected, His Iterations Show StarKist Is Unable to Pay**

There are fundamental errors across all of Dr. Zuehls' iterations that systematically overstate StarKist's ability to pay. *See* Lynch Decl. ISO Response, Ex. 1 at ¶ 18 ("Gokhale Rebuttal"). First, Dr. Zuehls includes StarKist's [redacted] million cash on hand (as of December 2018) in its free cash flow, even though he concedes that StarKist needs a certain amount of cash on hand to run its business, and does not have any current excess working capital. May 14, 2019 Zuehls Report at 5. A business must have cash on hand to continue to operate as a going concern—Dr. Zuehls acknowledges this and recommends that StarKist maintain at least $25 million on hand to operate safely. *See* Lynch Decl. ISO Response, Ex. 2 at Ex. P, n.2 ("January 14, 2019 Zuehls Report"). Because of this obvious error, StarKist's free cash flow is overstated by [redacted] million in every iteration. Gokhale Rebuttal ¶ 24.

Second, in multiple iterations, Dr. Zuehls neglected to subtract StarKist's interest expense. *Id.* at ¶ 25. Instead, he added it. This is a blatant error. *Id.* Again, wherever this error occurred it overstated StarKist's future free cash flow, and thus its ability to pay. *Id.* Third, Dr. Zuehls counts *all* of the projected free cash flow through the end of 2024 (*i.e.*, the full year) in his simulations, even though the last fine installment will be paid in the first part of the year. *Id.* In essence, he is including in StarKist's' ability to pay a fine in early 2024, money that StarKist

is not projected to receive until later that same year. *Id.* This is obviously impossible, and counting the entire year significantly overstates future free cash flow. *Id.*

Finally, Dr. Zuehls made several mistakes with respect to StarKist's future capital expenditures in American Samoa. *Id.* at ¶¶ 22–23. While in his first report he notes that the capital expenditures will cost [redacted] million (by StarKist's projection), in his second report that amount is reduced to [redacted] million without explanation. January 14, 2019 Zuehls Report at 14; May 14, 2019 Zuehls Report at 12. Dr. Zuehls also runs most of his iterations assuming that StarKist will be able to borrow additional money, despite his own acknowledgment that lenders would not lend money for the payment of a criminal fine. May 14, 2019 Report at 4. Dr. Zuehls' loan variable is also inconsistent with the clause in StarKist's long-term debt facility agreement that caps additional borrowing at $50 million (a cap which StarKist has nearly reached). Lynch Decl. ISO Response, Ex. 7 (SKC_ITP_000002253). Dr. Zuehls' use of an inaccurate CAPEX figure and his implausible assumption that StarKist will be able to borrow additional funds both cause him to overstate the amount of free cash available to the Company over the next five years.

After recognizing these errors, StarKist's expert Mr. Gokhale was able to correct for each one in the data set. Gokhale Rebuttal ¶ 27. The result is that *all* of Dr. Zuehls' iterations result in an "unable to pay" conclusion. *Id.* Even assuming that StarKist will not undertake the capital expenditures to expand in American Samoa, Dr. Zuehls' analysis, including the payment of a $100 million fine, still results in StarKist having negative [redacted] million cash balance as of the first quarter of 2024. *Id.* at ¶ 33. Stated differently, after fixing his mistakes, Dr. Zuehls' report is not only consistent with StarKist's arguments, it affirmatively supports them.

* * *

Given that Dr. Zuehls agrees that [redacted] (and a CAGR ten times higher than StarKist's reasonable projection) could, under some conditions, leave the Company unable to pay, demonstrates that this is not a battle of experts with different ultimate conclusions. What actually remains is a factual dispute about the validity of the assumptions regarding future growth, the possibility of additional debt financing, and the

amount of expected civil damages. With these fundamental factual assumptions in dispute, an evidentiary hearing is necessary. Even without such a hearing, StarKist carries its burden by a preponderance of the evidence on each of these issues, as discussed below.

### C. StarKist's Ability to Pay Analysis Is Reliable

#### 1. StarKist's Growth Estimate Is Reasonable

StarKist's Long Rang Plan ("LRP"), with its five-year forecast of StarKist's expected unit sales and revenue, is the foundation of Mr. Gokhale's inability to pay analysis. The LRP is principally created by [redacted] The LRP is prepared annually in the ordinary course of business and is the most comprehensive and reliable future-looking analysis of StarKist's business over the next five years. StarKist *actually uses* these projections in the course of operating its business. *Id*. at ¶ 3. StarKist provides the LRP projections annually to creditors who rely on the projections in the LRP to evaluate StarKist's creditworthiness. *Id*. And StarKist also provides its LRP to its auditors who rely on the projections to perform annual intangible asset impairment tests on StarKist's trade dress for financial reporting purposes. *Id*. Contrary to DOJ's assertion, it would make no sense for StarKist to "manipulate" projections that it uses to support critical components of its business. *Id.* at ¶ 4. Nor does it make sense for StarKist to understate its financial condition in the LRP and run the risk of not obtaining loans or auditors impairing StarKist's trademarks. *Id.* Moreover, the CAGR estimates in the LRP are developed with reference both to external industry data as well as data regarding StarKist's recent historic growth and take into consideration StarKist's experience and knowledge of the packaged tuna business. *Id*. at ¶ 5. StarKist's considered business judgment should not be swept aside in favor of Dr. Zuehls' estimates, which are based on nothing more than an unreliable and incorrect industry report on global tuna sales.

StarKist's LRP contains a compound annual growth rate or "CAGR" projection of 0.1% from 2018 to 2023. *Id.* This growth rate is consistent with the most recent 2018 Nielsen data[4] (reflecting actual consumer purchases in retail outlets), which shows that the entire packaged tuna category in the U.S. (including canned tuna, pouches, and specialty tuna items) declined in 2018 by -0.8%. *Id.* at ¶ 6. The 2018 Nielsen data also demonstrates, contrary to Dr. Zuehls' report, that increasing pouch demand is not sufficient to overcome the historical and substantial decline in canned tuna purchases. *Id.* Unlike Dr. Zuehls' irrelevant global tuna forecast, this Nielsen data reflects the actual packaged tuna purchases made in the United States in 2018.

By Dr. Zuehls' admission, the best predictor of future growth is past performance. *See* January 14, 2019 Zuehls Report at 9; May 14, 2019 Report at 7. StarKist's historic growth as a measure of Stat Cases and as a measure of Net Sales is [redacted] A look at five-year period ending in 2018 demonstrates an average Stat Case CAGR of [redacted]%, but that five years includes 2017, which is a statistical outlier. Gokhale Rebuttal ¶ 30. In 2017, StarKist's Stat Case CAGR was [redacted] higher than the next closest Stat Case CAGR of the last five years. *Id.* The 2017 Stat Case increase is largely attributable to increased volume of hurricane relief sales and the introduction of new products, and even Dr. Zuehls agrees that numbers in 2017 and 2018 should be removed from his "iterations." *See* Attachment 1 to U.S. Sentencing Memorandum ("May 14, 2019 Zuehls Report"), ¶37. Removing 2017 outlier numbers results in a five-year average Stat Case CAGR of [redacted] *Id.* By that metric, StarKist's Stat Case CAGR projection of 0.1% from 2018–2023 is, perhaps, overly optimistic. Even looking at Net Sales CAGR, as Dr. Zuehls does, demonstrates that StarKist's projections are reasonable. A look at the five-year period ending in 2018 demonstrates a Net Sales CAGR of only [redacted] which includes the [redacted] growth in 2017. Gokhale Rebuttal ¶ 30. Removing the 2017 and 2018 results as outliers, as Dr. Zuehls himself does, results in a five-year Net Sales CAGR of [redacted] *Id.* At a minimum, it is not the "parade of horribles" that DOJ suggests. U.S. Sentencing Mem. at 6.

---

[4] Lynch Decl. ISO Response, Ex. 5 at ¶ 6.

Nor does StarKist's projected growth rate account for any increased competition in the pouch market. StarKist's year-to-date sales demonstrate that competition in the pouch segment is increasing, largely due to Bumble Bee's aggressive promotional activity. Lynch Decl. ISO Response, Ex. 5 at ¶ 7. As competition increases, the profit margin on pouch will decline. Dr. Zuehls' suggestion that the decline in canned tuna will be offset by StarKist's salmon and chicken sales further exposes his unreliability and lack of knowledge of this industry. In 2018, salmon sales represented only 0.6% of StarKist's total Stat Cases and 0.8% of its Net Sales. *Id.* at ¶ 9. StarKist's new line of chicken products was introduced in 2018. StarKist's 2018 chicken sales were similarly low at [redacted] of total Stat Cases and [redacted] of Net Sales. *Id.* Under no reasonable scenario, no matter how optimistic, could salmon and chicken sales compensate for the historic and substantial decline in canned tuna demand.

**2. Dr. Zuehls' New Growth Estimate Differs from His Prior Bumble Bee Analysis**

Dr. Zuehls concluded that Bumble Bee's fine should be lowered from $81.5 million to $25 million based on its inability to pay. U.S. Sentencing Mem. and Mot. for Departure at 14, *United States v. Bumble Bee Foods, LLC*, No. 17-CR-249, ECF No. 25 (relying on Dr. Zuehls' report to conclude that "$25 million without interest represents the fine that Bumble Bee can pay without substantially jeopardizing its continued viability"). On May 15, 2019, DOJ belatedly produced Dr. Zuehls' Bumble Bee ability to pay analysis.[5] *See* Lynch Decl. ISO Response ¶ 5. Troublingly, even though Bumble Bee and StarKist are direct competitors operating under the same market conditions, Dr. Zuehls used different and lower growth rates for Bumble Bee. *See* Lynch Decl. ISO Response, Ex. 4. In fact, Dr. Zuehls used *negative* growth rates in half of his forecasts analyzing Bumble Bee's ability to pay a criminal fine. *See* Lynch Decl. ISO Response, Ex. 4. Had Dr. Zuehls used the same growth rate for StarKist that he used for Bumble Bee, most, if not all, of his iterations would have resulted in a finding of an inability to pay. Gokhale

[5] Even this version of Dr. Zuehls' Bumble Bee analysis, which DOJ belatedly produced on May 15, 2019, was an incorrect version of Dr. Zuehls' analysis. DOJ did not produce the corrected version until Tuesday May 28, 2019, one day before this response brief was due. *See* Lynch Decl. ISO Response ¶ 5.

Rebuttal ¶ 31. Instead, in his 35 StarKist iterations, the lowest CAGR Dr. Zuehls uses is 1%, and most of his iterations use CAGR of 3.8% to 4.7%. Lynch Decl. ISO Response, Ex. 4. Neither Dr. Zuehls nor DOJ provide any basis or explanation for this disparate and uneven treatment of the two companies. DOJ also fails to acknowledge that StarKist *specifically* requested Dr. Zuehls' Bumble Bee analysis, as potential *Brady/Giglio* material, months before DOJ finally produced the forecasts on the day the sentencing memoranda were due. [redacted]

**3. StarKist Cannot Borrow to Finance Capital Expenditures**

DOJ takes issue with StarKist's planned capital expenditures in American Samoa. StarKist's ability to pay analysis identified two major areas of potential capital expenditures; specifically (1) $77 million to purchase and renovate a factory in order to increase StarKist's capacity to manufacture pouch tuna in American Samoa and (2) [redacted] in EPA-mandated compliance expenditures. DOJ does not appear to contest that the EPA-mandated compliance expenditures are necessary, non-voluntary expenditures. DOJ characterizes the $77 million expansion, however, as a means for StarKist to "transfer money to itself" or "maximize capacity and future sales." U.S. Sentencing Mem. at 14, 15. DOJ argues that StarKist should defer the $77 million plant expansion. *Id.* at 15. Given StarKist's inability to borrow additional funds, its increased short-term pouch production sources (including third-party sourcing), its looming civil exposure and future civil settlements, and the certainty of a criminal fine of at least $50 million, StarKist has come to the conclusion that it will not invest in the American Samoa manufacturing facilities in 2020 beyond the required EPA compliance upgrades. However, even if StarKist does not invest $77 million to expand its pouch manufacturing in American Samoa, after correcting the obvious mistakes in Dr. Zuehls' analysis, Dr. Zuehls' iterations still find that

StarKist would be unable to pay a $100 million fine. Gokhale Rebuttal ¶ 33. Mr. Gokhale also concludes that StarKist would *still* be unable to pay a $100 million fine, without the $77 million plant expansion in American Samoa. *Id.* at ¶ 34.

Alternatively, rather than forgoing the necessary capital expenditures, DOJ argues that that they "could and should be debt-financed." U.S. Sentencing Mem. at 7. But Mr. Gokhale, Professor Klee, and even Dr. Zuehls agree that sophisticated financial institutions will not loan money to StarKist to pay a criminal fine. Lynch Decl. ISO Sentencing Mem., ECF No. 54, Ex. 1, Gokhale Report ¶ 31; Ex. 2, Klee Report ¶ 35; May 14, 2019 Zuehls Report ¶ 14 ("Most banks and other potential creditors would be reluctant to allow such borrowings predominately for the purpose of paying a government fine.").[6] Dr. Zuehls claims, however, that where StarKist cannot borrow money to pay a criminal fine, it could borrow money for capital expenditures in American Samoa. May 14, 2019 Zuehls Report ¶ 67. Both Mr. Gokhale and Professor Klee agree that this suggestion defies common sense. Lynch Decl. ISO Sentencing Mem., ECF No. 54, Ex. 1, Gokhale Report ¶ 31; Ex. 2, Klee Report ¶ 35. A sophisticated financial institution understands that money is fungible. If it would not loan money for a criminal fine it similarly would not loan money for capital expenditures so that an entity could pay a criminal fine with hypothetical cash. *Id.*

More importantly, StarKist is contractually prohibited from borrowing any more money for any purpose. Section 13.1 of StarKist's Senior Facility Agreement, which governs StarKist's current bank debt, mandates that StarKist's indebtedness outside of the Senior Facility Agreement "shall not exceed USD 50,000,000 at any time." Lynch Decl. ISO Response, Ex. 7 (SKC_ITP_000002253). StarKist has nearly reached that maximum [redacted] Thus, even if StarKist could find a financial institution willing to loan money to a business that needs resources for both a fine and capital expenditures, it would be prohibited from entering into such

---

[redacted] StarKist has not yet (but will soon) come up against the debt cap in the Senior Facility Agreement. *See* Lynch Decl. ISO Response, Exs. 9, 10.

a loan agreement by the Senior Facility Agreement governing its current loans. The inability of StarKist to take out additional loans for the American Samoa plant, undermines one of the key assumptions in 30 of the 35 iterations conducted by Dr. Zuehls, and underscores the unreliability of his analysis.

**4. StarKist's Civil Liability Estimate Is Reasonable**

In the same filing that accuses StarKist of "grossly inflat[ing] its hypothetical future civil damages" and postulates that "every defendant will hypothesize a future financial catastrophe to avoid payment of the guidelines fine," DOJ acknowledges that StarKist has recently revised its estimated civil exposure *downward*. U.S. Sentencing Mem. at 15. StarKist's revised settlement estimate is clearly at odds with DOJ's theory that the Company is manipulating numbers to avoid a criminal fine. In any event, StarKist has already entered into approximately $54.4 million in settlements thus far, and anticipates, [redacted] DOJ, using outdated figures, estimates that StarKist has [redacted] and thereby extrapolates that its total civil liability "will likely be no more than [redacted] U.S. Sentencing Mem. at 8. Dr. Zuehls' faulty estimate [redacted] where StarKist already agreed to pay civil settlements valued at $54.4 million in 2019, [redacted] As noted in their submission in this matter, one of the civil classes consists of Indirect Purchaser End Payer Plaintiffs ("EPPs") who allege that StarKist is jointly and severally liable for over [redacted] million in damages, which they claim direct purchasers passed through to them. *See* Indirect Purchaser End Payer Pls.' Statement in Connection with Def. StarKist Co.'s Evid. H'rg Pursuant to the CVRA at 3. In the civil cases, StarKist disputes Plaintiffs' damages calculations, but at a minimum, the Court should consider [redacted] And EPPs have recently asked this Court to set aside a fund of $[redacted] for a civil settlement or judgment with respect to EPPs' claims only. *See* Indirect Purchaser End Payer Pls.' Statement in Connection with Def. StarKist Co.'s Evid. H'rg Pursuant to the CVRA at 4. Further, the other putative class of indirect

purchaser commercial food preparers ("CFPs") recently filed a motion for preliminary approval of a settlement with Chicken of the Sea valued at $6,500,000. *See* Commercial Food Preparer Pls.' Mot. for Prelim. Approval of Proposed Settlement with Tri-Union Seafoods LLC D/B/A Chicken of the Sea International and Thai Union Group PCL and Provisional Certification of Settlement Class, *In re Packaged Seafood Products Antitrust Litigation*, 15-MD-2670-JLS-MDD (S.D. Cal.), ECF No. 1910. Chicken of the Sea as the ACPERA candidate is only liable for single damages, [redacted]

As noted above, Dr. Zuehls' civil damages estimate is also inaccurate because it fails to account for StarKist's joint and several liability with its co-conspirators. Under the Sherman Act, StarKist is vulnerable to lawsuits and damages based not only on its own sales, but also on the sales of the other participants in the conspiracy, Bumble Bee and Chicken of the Sea. Under 18 U.S.C. § 3664(h), courts may impose full restitution liability on each defendant, and in practice, courts often order criminal defendants to pay restitution on a joint and several basis. *United States v. Foreman*, 329 F.3d 1037, 1039 (9th Cir. 2003) (affirming an order of joint and several liability amongst defendants after a conviction for check fraud); *see also United States v. Sensmeier*, 361 F.3d 982, 991 (7th Cir. 2004) (affirming a restitution order holding co-defendants jointly and severally liable after fraud convictions). Thus, even though the executed settlements account for a large percentage of StarKist's sales, it must still negotiate with victims of the conspiracy who purchased significant amounts from StarKist's competitors. [redacted]

DOJ also argues that only portions of StarKist settlements should qualify as restitution because the alleged conspiracy periods and product definitions in the various civil suits are different from the conspiracy period and product definition in the plea agreement. [redacted]

---

[redacted]

[redacted] Even if StarKist had not done so, where, as here, "the crime of conviction includes a scheme, conspiracy, or pattern of criminal activity as an element of the offense, . . . the restitution order [may] include acts of related conduct for which the defendant was not convicted.'" *United States v. Thomsen*, 830 F.3d 1049, 1066 (9th Cir. 2016) (quoting *United States v. Brock-Davis*, 504 F.3d 991, 999 (9th Cir. 2007)) (internal quotation marks omitted). Thus, while the settlements entered into thus far were [redacted], it is black-letter law that criminal restitution related to a conspiracy conviction may extend beyond the conduct charged in the indictment or information. *Id*.

It bears noting that two of the classes from the civil case (Direct Purchaser Plaintiffs and EPPs) have filed statements in this criminal case. While StarKist will respond separately to those filings, the fact that class counsel felt it necessary to appear in this setting is further evidence of the magnitude of the civil liability that remains outstanding. While the Court should not countenance class counsel's attempt to use the criminal proceedings to create leverage in the civil cases, the fact they try to do so demonstrates that StarKist's estimation of civil liability is not imagined nor inflated.

Finally, and most crucially, even if the Court were to credit Dr. Zuehls' erroneous estimates and decide that [redacted] is a reasonable estimate of total civil damages, Dr. Zuehls *admits* in one of his iterations that at that amount of civil damages (and at a growth rate 10 times higher than StarKist reasonably predicts) StarKist *cannot pay a $100 million dollar fine*. Lynch Decl., Ex. 4. While that admission is contingent upon StarKist's inability to finance its capital expenditures in American Samoa through new bank loans, such financing is not possible as explained above. Even if the Court finds (1) lower civil liability than the low end of StarKist's estimates and (2) a growth rate ten times higher than StarKist reasonably expects, DOJ's expert admits that StarKist would have established an inability to pay. *Id*.

### 5. StarKist Has Not "Artificially Reduced Its Assets"

DOJ next accuses StarKist of paying down its debts to "artificially" reduce its assets in an effort to avoid paying a fine. DOJ, through Dr. Zuehls, states that StarKist forecasts that it will have only [redacted] million in debt by the end of 2024, a debt pay down of [redacted] million from 2018-2024. U.S. Sentencing Mem. at 16. StarKist's expert has calculated StarKist's outstanding debt at [redacted] in 2023, based on the payment schedule in StarKist's existing loan agreement. Regardless, Dr. Zuehls ignores the obvious fact that StarKist is bound to pay down its debt based on the repayment schedule set forth in the Senior Facility Agreement. Furthermore, StarKist has historically paid down its debts at a similar rate—between 2011 and 2018 StarKist paid down approximately [redacted] in debt.[8] This is not opportunistic behavior or artificially reducing assets—it is adherence to the contractual terms that lenders required, and consistent with past practices.

Relatedly, DOJ states that StarKist "has demonstrated that it will continue to do anything to avoid paying its criminal fine," citing for evidence StarKist's $122.4 million investment in "TechPack" (a reference to Techpack Solutions Co. Ltd., hereinafter "Techpack"). U.S. Sentencing Mem. at 8-9, 20. DOJ and Dr. Zuehls label the investment as a "disguised dividends," claiming that:

> In 2014 and 2017, StarKist invested a total of ***$122.4*** million to acquire an interest in TechPack Solutions, a manufacturer of plastic, glass, and aluminum bottles and cans. TechPack was merged into Dongwon Systems, an entity controlled by StarKist's parent, Dongwon Industries; that merger carried no corresponding benefit to StarKist. In sum, StarKist gave away $122.6 million to its parent company, including $66.6 million during the pendency of the criminal investigation.

*Id.* at 9. DOJ's story is wrong, and its argument makes no sense. As DOJ concedes, StarKist's initial investment in Techpack was in 2014, a year before it received a Grand Jury Subpoena. At that time, StarKist was wholly-owned by Dongwon Industries, and had no incentive to "disguise" any dividend payment to its shareholder. The investment in Techpack, however, was

---

[8] *See* Decl. of Niall E. Lynch in Support of StarKist Co.'s Response to Direct Purchaser Pls.' Opening Statement Regarding StarKist's Sentencing Pursuant to the CVRA, and Indirect Purchaser End Payer Pls.' Statement in Connection with StarKist's Evid. Hr'g Pursuant to the CVRA, Ex. 1 ("Daines Report" ¶ 138).

not a dividend, it was a strategic investment opportunity pursued by StarKist's management and approved by StarKist's Board of Directors. Lynch Decl. ISO Response, Ex. 6. Dongwon Systems Co., Ltd. ("Dongwon Systems") is not a StarKist shareholder, and StarKist's interest in the Techpack investment was never "transferred" to Dongwon Systems or anyone else. It is carried on StarKist's books at a value of nearly $155 million—worth nearly 27 percent more than the $122.4 million in capital StarKist contributed. Daines Report ¶ 84. Professor Robert M. Daines of Stanford Law School [redacted]

Finally, Dr. Zuehls contends that StarKist increased its inventory by [redacted] at the end of 2018 in what DOJ believes was an attempt to reduce the assets available to pay a criminal fine. U.S. Sentencing Mem. at 9. This is another inaccurate and offensive effort by DOJ to claim that StarKist is hiding assets. Neither DOJ nor Dr. Zuehls are experts in tuna procurement or inventory management, but they appear to think that StarKist's inventory in late 2018 is inconsistent with the Company's projection of flat growth. However, Dr. Zuehls fails to compare the 2018 inventory levels with years other than 2017. Had he done so, he would note that the inventory levels at 2017 year-end were abnormally low, due to a five week factory shut down in American Samoa to install EPA mandated environmental compliance equipment. Lynch Decl., Ex. 5 ¶ 10. As a percentage of sales, the inventory level in December 2018 was historically low (not high) at 37.2%. *Id.* In December 2015 and 2016, inventory levels were 40.7% and 39.9% respectively. *Id.*

**D. Dongwon Industries Is Not Legally Required to Pay StarKist's Fine**

"It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). Courts will only disregard this principle in extreme circumstances—this is not such a case. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir.

1995). Dr. Zuehls concedes that Dongwon Industries, StarKist's immediate parent, is not legally required to make any loans or provide any additional capital to StarKist. *See* May 14, 2019 Zuehls Report ¶ 13. DOJ similarly conceded this point in the related Bumble Bee case, despite the strong financial condition of its parent Lion Capital. U.S. Sentencing Mem. and Mot. for Departure at 14, *United States v. Bumble Bee Foods, LLC*, No. 17-CR-249-EMC, ECF No. 25 ("Bumble Bee is the only entity that the government can legally obligate to pay a criminal fine in light of the conduct under investigation."). StarKist is the only corporate entity that has been charged with a crime, and it is the only corporate entity obligated and available to pay the associated criminal fine and restitution.

Moreover, Dongwon Industries, as a publicly traded company on the Korea Stock Exchange, has a fiduciary duty to its shareholders. If it is not in the best financial interest of its shareholders to pay StarKist's criminal fine, then it is prohibited from taking such action. Given StarKist's financial condition, and the declining growth in the canned tuna market, it is unclear how it would be in its shareholders' interest for Dongwon Industries to pay StarKist's fine.

**E. DOJ's Ability to Petition to Lower StarKist's Fine in the Future Is Irrelevant**

Imposing a fine beyond StarKist's ability to pay on the premise that the Court can revisit the issue if StarKist's projections are in fact correct ignores clear congressional intent for certainty in sentencing. *See* 28 U.S.C. § 991(b). It also undermines Congress's decision to limit the ability of a criminal defendant to request a reduction of its fine after sentencing, leaving the option open only to DOJ. *See* 18 U.S.C. § 3573.

Forcing StarKist to rely on the potential good graces of DOJ at some point in the future increases the uncertainty that StarKist is facing. With the imposition of a $100 million fine, StarKist will have to make hard decisions assuming that the fine will not be reduced. If StarKist assumes otherwise and makes capital expenditures (assuming it could even obtain financing), it runs the risk of DOJ claiming StarKist was simply attempting to "shield money to avoid the full payment of its criminal fine." U.S. Sentencing Mem. at 20. StarKist could not and would not take that risk. DOJ's thin argument that "every defendant will hypothesize a future financial catastrophe to avoid payment of the guidelines fine" and that StarKist "will continue to do

anything to avoid paying its criminal fine" is unfounded and easily refuted. *Id.* at 20. StarKist has accepted responsibility for its conduct, will pay a criminal fine of at least $50 million (even where such payment is already a financial hardship for the Company under its expert's projected free cash flow analysis), and continues to settle with civil plaintiffs.

StarKist has presented significant evidence that it is unable to pay a fine greater than $50 million. Even a $50 million fine raises concern for StarKist's future. An additional $50 million, even coupled with DOJ's empty promise to petition the Court should StarKist's predictions come to fruition, would be enough to drastically change StarKist's entire business model, undermine its ability to compete, and threaten its continued viability.

### F. An Evidentiary Hearing Is Necessary

The dispute between the parties' experts boils down to the validity of the assumptions regarding StarKist's future growth, the possibility of additional debt financing, and the quantity of civil damages. Factual disputes of this nature are best explored through live testimony of the individuals who make and rely on these assumptions in the ordinary course of business. At the proposed evidentiary hearing, StarKist plans to call its expert, Mr. Rajiv Gokhale, and its Director of Finance, Dennis Adams, to explain the Company's LRP and the assumptions that support it. StarKist also plans to call its General Counsel, Scott Meece, to testify regarding StarKist's civil settlement estimates and certain planned capital expenditures. Furthermore, the Court and StarKist should have the opportunity to question Dr. Zuehls on the discrepancies between the industry growth assumptions applied to Bumble Bee and StarKist, as well as the many errors in his analysis. This is particularly necessary in this situation where DOJ has withheld relevant and exculpatory evidence concerning their expert's analysis. Without an evidentiary hearing, the Court will not have sufficient information to determine the credibility of Dr. Zuehls' or Mr. Gokhale's reports.

### G. A $50 Million Dollar Fine Satisfies 18 U.S.C. § 3553

A fine of $50 million will also satisfy the Section 3553 factors and is more aligned with the purposes of the statute. Under Section 3553, the Court is instructed to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of set forth in the

statute. 18 U.S.C. § 3553(a). Particularly relevant here is the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense." *Id.* StarKist pled guilty to a shorter time period and narrower product scope than Bumble Bee or any individual defendant in this matter. Only one former employee of StarKist has been charged, while two high-ranking executives of Bumble Bee have pled guilty and Bumble Bee's former President and CEO has been indicted and awaits trial. DOJ argues that StarKist did not begin to take responsibility for its actions until Mr. Hodge, the only former employee of StarKist who engaged in the conduct at issue, entered his guilty plea. U.S. Sentencing Mem. at 22. This is not true. [redacted] Moreover, StarKist promptly accepted responsibility as soon as the conduct was apparent, and the only delay was the result of a good faith disagreement between the parties on the amount of the fine, which is now being resolved by this Court.

A $50 million dollar fine is double the fine assessed against Bumble Bee, and therefore adequately reflects the seriousness and nature of the offense and provides adequate deterrence by addressing StarKist's position as the last remaining corporate defendant to plead guilty. In addition, a $50 million fine imposed on StarKist stands in stark contrast to Chicken of the Sea, which will face no criminal fine or prosecution of its employees, despite its comparative role in the offense.[9] Finally, a $50 million fine will allow StarKist to provide restitution in the civil cases, which is the most critical factor in the inability-to-pay analysis. *See* U.S.S.G. § 8C3.3.

---

[redacted]

## III. CONCLUSION

StarKist has demonstrated by a preponderance of the evidence that it is unable to pay a fine greater than $50 million without impacting its ability to pay restitution in the civil cases and continue as a viable competitor in the market. StarKist maintains its original request for a reduction to a $50 million fine paid out over five years in reasonable installments, without interest. But in order to ensure StarKist's ability to pay restitution and assuage any fears regarding an unjustified windfall, StarKist remains willing to allocate $50 million in future cash flows to the criminal fine and an additional $50 million in future cash flows to civil damages (as it proposed to DOJ during settlement negotiations).[10] Under such an agreement, any funds allocated to civil damages that go unused after the conclusion of the civil matters would revert to the government.

Dated: May 29, 2019

Respectfully submitted,

LATHAM & WATKINS LLP
Niall E. Lynch
Sean M. Berkowitz
Ashley M. Bauer

By: ______________________
Niall E. Lynch

*Counsel for Defendant StarKist Co.*

---

[redacted]

[10] *See* Lynch Decl. ISO Response ¶ 13.