LATHAM & WATKINS LLP
Niall E. Lynch (CA 157959)
Ashley M. Bauer (CA 231626)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095
*niall.lynch@lw.com*
*ashley.bauer@lw.com*

Sean M. Berkowitz (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: +1.312.876.7700
Facsimile: +1.312.993.9767
*sean.berkowitz@lw.com*

*Counsel for Defendant StarKist Co.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>STARKIST CO.,<br>Defendant. | CASE NO. 18-CR-0513 EMC<br>**STARKIST CO.'S MEMORANDUM OF POINTS AND AUTHORITIES REGARDING TECHPACK SOLUTIONS CO., LTD.**<br>Judge: Hon. Edward M. Chen<br>Date: August 7, 2019<br>Time: 10:00 a.m.<br>Courtroom: 5 – 17th Floor |

**<u>REVISED REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED</u>**

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. DISCUSSION .......... 2

A. Legal Standard .......... 2

B. DOJ Contradicted Its Own Expert's Report .......... 3

C. DOJ's Inaccurate Claims Distorted StarKist's Representations .......... 4

D. Techpack Cannot Be Sold to Pay a Fine .......... 6

E. StarKist Cannot Obtain Additional Loans .......... 9

F. Bumble Bee Was Not Forced to Sell Any of Its Assets .......... 11

G. Mr. Gokhale's Updated Analysis Reaffirms StarKist's Inability to Pay a Fine Greater than $50 Million .......... 12

H. If the Court Imposes a $100 Million Fine, StarKist Will Consider Entering Bankruptcy .......... 14

I. DOJ's Proposed Payment Schedule Is Unworkable .......... 14

III. CONCLUSION .......... 15

# TABLE OF AUTHORITIES

## CASES

*Addington v. Texas*,
441 U.S. 418 (1979) ........ 3

*Buckwalter v. ICI Explosives USA, Inc.*,
No. 96-CV-4795, 1998 WL 54355 (E.D. Pa. Jan. 8, 1998) ........ 3

*United States v. Bumble Bee Foods, LLC*,
Case No. 17-CR-249-EMC ........ 12

*United States v. Kadonsky*,
242 F.3d 516 (3d Cir. 2001) ........ 3

*United States v. Robinson*,
20 F.3d 1030 (9th Cir. 1994) ........ 2

## STATUTES

18 U.S.C. § 3553 ........ 11

18 U.S.C. § 3572 ........ 14

## OTHER AUTHORITIES

About Us, Clover Leaf, https://www.cloverleaf.ca/en/about-us (last visited June 28, 2019) ........ 11

Tom Seaman, *Amid Ocean Beauty Deal Talks, Cooke Vies with Bolton for Bumble Bee's Canadian Ops*, Undercurrent News (June 6, 2019, 4:33 p.m. BST), https://www.undercurrentnews.com/2019/06/06/bolton-cooke-vie-for-bumble-bees-canadian-ops/ ........ 11

Defendant StarKist Co. ("StarKist") respectfully submits this Memorandum of Points and Authorities Regarding Techpack Solutions Co., Ltd. ("Techpack") in support of its argument that StarKist is unable to pay a fine greater than $50 million, as set forth in StarKist's Sentencing Memorandum and Request for Evidentiary Hearing (ECF No. 53).

## I. INTRODUCTION

Despite StarKist's extensive and early disclosures regarding its financial condition, which included audited financial statements that explicitly state the existence and value of StarKist's investment in Techpack, Dr. Dale Zuehls and the Department of Justice ("DOJ") incorrectly argued that the Techpack investment was a "disguised dividend" that was transferred to an affiliated entity for "no return consideration." Decl. of Andrew J. Mast in Support of U.S. Sentencing Mem. ¶ 2, Attach. 1 ("Zuehls May 2019 Report") ¶ 80, ECF No. 52. Once DOJ belatedly realized its error—after StarKist pointed to information that was clearly apparent from StarKist's financials showing that StarKist still owns all of its equity in Techpack—DOJ changed tack at the June 12 hearing, arguing ***for the first time*** that StarKist should sell its strategic asset in order to pay a higher fine. DOJ's newly minted argument directly contradicts Dr. Zuehls' conclusion that in his "review of SK's business" he "did not find any material disposable assets." Decl. of Niall E. Lynch in Support of StarKist Co.'s Response to U.S. Sentencing Mem. ("Lynch Decl. ISO StarKist's Response") ¶ 3, Ex. 2 ("Zuehls January 2019 Report") at 4, ECF No. 78.

DOJ incorrectly assumes, without support, that StarKist's Techpack shares can be sold, at book value, in order to pay a higher criminal fine. DOJ is wrong. DOJ ignores clear evidence in the record that StarKist cannot sell Techpack under its current Senior Facility Agreement, the contract that governs StarKist's loans. And, even if StarKist could sell Techpack, all of the proceeds from the sale would go to pay off the existing loans and could not be used to pay a fine, civil settlements, or any other expenses. Furthermore, there is no obvious buyer for Techpack, either within the Dongwon Group or by an outside third party. [redacted]

Seeking an alternative buyer, StarKist reached out to four different leading private equity firms to gauge their interest in purchasing Techpack, and all four firms declined. In short, there are contractual, legal, and market-related obstacles to selling StarKist's shares in Techpack.

There are also equitable arguments against selling Techpack. For the same reasons that the Court has not asked StarKist to value and sell its manufacturing facility in American Samoa or Ecuador (and did not ask Bumble Bee to sell its strategic assets), it should not require the sale of StarKist's other non-disposable assets in determining StarKist's ability to pay a fine greater than $50 million.

Additionally, at the June 12 hearing, the Court expressed an interest in understanding StarKist's ability to obtain additional loans or refinance its current loan. After further investigation, StarKist has confirmed that it is unable to obtain a loan from its parent company, unable to obtain loans from other banks, and unable to refinance its Senior Facility Agreement to pay a criminal fine.

The Court also expressed an interest in additional expert analysis demonstrating what effect changing StarKist's projected growth rates would have on its ability to pay. StarKist's expert, Mr. Rajiv Gokhale, has completed this analysis. As set forth below and in further detail in Mr. Gokhale's accompanying supplemental report, even at higher growth rates, StarKist is still unable to pay a fine greater than $50 million.

The Court should not entertain DOJ's unsubstantiated argument that StarKist's ownership interest in Techpack somehow establishes that StarKist can afford a $100 million fine. Rather, the Court should proceed with an evidentiary hearing as it was originally inclined to do, so that it can adequately evaluate the evidence proffered by both sides before the June 12 hearing. StarKist therefore respectfully renews its request for an evidentiary hearing with respect to the Company's ability to pay a fine.

## II. DISCUSSION

### A. Legal Standard

StarKist need only establish its inability to pay a fine above $50 million by a preponderance of the evidence. *See United States v. Robinson*, 20 F.3d 1030, 1033 (9th Cir.

1994). The preponderance-of-the-evidence standard is the least stringent standard of proof in the United States legal system. *See Addington v. Texas*, 441 U.S. 418, 423–24 (1979); *see also United States v. Sparkman*, 500 F.3d 678, 685 (8th Cir. 2007); *Buckwalter v. ICI Explosives USA, Inc.*, No. 96-CV-4795, 1998 WL 54355, at *6 (E.D. Pa. Jan. 8, 1998) ("Preponderance of the evidence has never been viewed as a very difficult burden of proof—in fact it is one of the lowest burdens available to a litigant in court."). Under that standard, the defendant must simply establish that it is "more likely than not" it will be unable to pay the fine imposed by the Sentencing Guidelines. *United States v. Kadonsky*, 242 F.3d 516, 520 (3d Cir. 2001). Thus, "[w]here a sentencing court looks to the possibility of future income to satisfy the contemplated fine, it is crucial that the court take carefully into account the risk that such income will not in fact be realized." *Id.* "[S]ome remote fortuity" that a defendant might come upon a substantial amount of money in the future is not enough to justify imposing a fine that a defendant cannot currently afford. *United States v. Wong*, 40 F.3d 1347, 1383 (2d Cir. 1994).

**B. DOJ Contradicted Its Own Expert's Report**

At StarKist's sentencing hearing on June 12, 2019, DOJ stated that it was not aware of StarKist's ownership interest in Techpack. Tr. of Proceedings at 38:8–13, June 12, 2019, ECF No. 105. But in January 2018, 18 months before the sentencing hearing, StarKist produced financial statements to DOJ that clearly showed Techpack as a StarKist asset. Decl. of Niall E. Lynch in Support of StarKist Co.'s Brief Regarding Techpack ("Lynch Decl. ISO Techpack Brief") ¶ 2. Based on those financial statements, Dr. Zuehls, DOJ's expert, opined in January 2019 that in his review of StarKist's business, he "did not find any material disposable assets." Zuehls January 2019 Report at 4, ECF No. 78. Dr. Zuehls attached as an exhibit to his report StarKist's 2017 audited financial statements, which explicitly referenced StarKist's partial "ownership of Techpack Solutions Co., Ltd." and stated that "the carrying amount of the investment in Techpack was $152,786,130 as of December 30, 2017." *Id.*, Ex. C. Dr. Zuehls issued a new report in May 2019, the day the Sentencing Memorandum was due, in which he again concluded that StarKist has no disposable assets, relying on StarKist's 2017 audited financial statements and 2018 unaudited financial statements. Zuehls May 2019 Report ¶ 16,

ECF No. 52. On May 21, 2019, StarKist produced its 2018 audited financial statements to DOJ. Lynch Decl. ISO Techpack Brief ¶ 3. StarKist's 2017 and 2018 audited financial statements clearly identify StarKist's "ownership" interest in Techpack and its book value.

In its Sentencing Memorandum, DOJ argued for the first time that StarKist's investment in Techpack was a "disguised dividend" paid to StarKist's parent company and affiliates. *See* U.S. Sentencing Mem. at 9, ECF No. 51. But DOJ did not make this argument in its January 2019 submission to the Probation Office. DOJ only raised the issue after DOJ received the civil Plaintiffs' flawed expert reports. Instead of independently investigating the Techpack investment, which would have been as simple as asking StarKist whether its financial statements are accurate, DOJ simply adopted Plaintiffs' incorrect characterization of StarKist's financials and presented them to the Court as accurate. Over the course of more than a year of inability-to-pay discussions, DOJ had every opportunity to ask StarKist about the Techpack investment but failed to do so. Instead, DOJ waited until the day of the sentencing hearing to make, for the first time, the argument that one of StarKist's strategic investments must be sold in a fire sale in order to pay a criminal fine.

### C. DOJ's Inaccurate Claims Distorted StarKist's Representations

At the June 12 hearing, DOJ claimed that it "assumed that the Techpack investment had been transferred . . . because Starkist's [sic] expert, Rajiv Gokhale . . . assumed it would be transferred to an entity affiliated with [Dongwon] Industries." Tr. of Proceedings at 38:8–13, June 12, 2019, ECF No. 105. But neither StarKist nor Mr. Gokhale has ever made that representation. And StarKist has never intended to transfer, and has not transferred, its shares of Techpack to any other entity. DOJ's assertion to the contrary reflects a fundamental misunderstanding of the history of StarKist's Techpack investment.

In October 2014, almost one year before the DOJ price-fixing investigation began, StarKist invested $[redacted] million for a 24% interest in Techpack.[1] Lynch Decl. ISO Techpack Brief, ¶ 6, Ex. 2 ("Choe Decl.") ¶ 7. At the time, StarKist's Board of Directors viewed this

[1] In February 2017, StarKist invested an additional $65.9 million for another 20% of Techpack, bringing StarKist's total investment in Techpack to approximately $[redacted] million for a 44% ownership interest. Choe Decl. ¶ 7.

investment as a strategic business opportunity. *Id.* ¶ 12. Techpack is uniquely attractive to StarKist because Techpack is an innovative packaging manufacturer, and originally, the plan was for Techpack to be merged into Dongwon Systems. *Id.* ¶¶ 12–13. Dongwon Systems is a publicly traded corporation on the Korea Stock Exchange headquartered in Seoul, South Korea, and a sister company of StarKist's parent, Dongwon Industries Co., Ltd. ("Dongwon Industries"). *See id.* ¶¶ 8–9.

At the same time StarKist made its initial investment, Dongwon Systems made an investment of its own for a [redacted] ownership interest in Techpack. *Id.* ¶ 8. Dongwon Systems also owns Talofa Systems American Samoa, Inc. ("Talofa Systems"), which is the only can supplier based on American Samoa. *Id.* ¶ 13. StarKist purchases cans from Talofa Systems because it would be prohibitively expensive to import empty cans to American Samoa. *Id.* When StarKist purchased Techpack, StarKist believed that Techpack would likely be merged into Dongwon Systems, which would give StarKist an ownership interest in Dongwon Systems, the parent company of Talofa Systems. *Id.* ¶¶ 12–13. In StarKist's view, an ownership stake in Dongwon Systems—the parent company to the sole supplier of packaging to StarKist's primary manufacturing facility in American Samoa—would lead to several beneficial results.[2] *Id.* ¶ 13.

At the sentencing hearing, DOJ referenced a footnote in Mr. Gokhale's expert report that refers to the contemplated merger of Techpack into Dongwon Systems. Tr. of Proceedings at 38:8–13, June 12, 2019, ECF No. 105. Mr. Gokhale does not state, as DOJ suggests, that StarKist intended to transfer its interest in Techpack to Dongwon Systems. *See* Decl. of Niall E. Lynch in Support of StarKist's Sentencing Mem. and Request for Evid. Hr'g ("Lynch Decl. ISO Sentencing Mem."), Ex. 1, ECF No. 54. Rather, Mr. Gokhale states "[u]ltimately, TechPack Solutions was planned to be merged into Dongwon Systems. Due to the related nature of these equity investments to StarKist's operations and prospects, [Mr. Gokhale] did not separately include the value of these investments in [his] ATP analysis." *Id.* at 10–11 n.34. Contrary to DOJ's and the civil Plaintiffs' argument, StarKist has never transferred beneficial ownership of its shares in Techpack to Dongwon Systems. Choe Decl. ¶ 15. Finally, while current market

[2] StarKist also buys most of its empty pouches from Dongwon Systems. Choe Decl. ¶ 13.

conditions have delayed the Techpack-Dongwon Systems merger, the plan remains intact. *Id.* ¶ 14.

**D. Techpack Cannot Be Sold to Pay a Fine**

Regardless of DOJ's contradictions, misrepresentations, and misunderstandings, one thing is certain: StarKist cannot sell its interest in Techpack to pay a criminal fine. First, StarKist is contractually barred under its Senior Facility Agreement from selling its interest in Techpack to pay a fine, or for any other reason, unless it obtains written consent from its lenders. *See* Lynch Decl. ISO StarKist's Response, Ex. 7 ("Senior Facility Agreement") § 13.11. Following the June 12, 2019 hearing, StarKist asked its lenders for permission to sell its shares of Techpack. Lynch Decl. ISO Techpack Brief, ¶ 7, Ex. 3 ("Ro Decl.") ¶ 7, Ex. A. StarKist's lenders view the Techpack investment as a material asset and they have not consented to the sale of StarKist's interest in Techpack. *Id.* ¶ 8, Exs. A-B. Second, even if the lenders allowed StarKist to sell Techpack, they have explicitly informed StarKist that, under the terms of the loan, any proceeds from the sale would be used to pay off the loans, and would not be provided to StarKist. *Id.* Third, even if StarKist was allowed to sell its interest in Techpack, no one is likely to buy it. Choe Decl. ¶¶ 16–18. There are no interested third parties, and the [redacted] *Id.*; Lynch Decl. ISO Techpack Brief, ¶ 8, Ex. 4 ("Meece Decl.") ¶ 3–6, Ex. A. Lastly, it is unrealistic to expect that under these circumstances, StarKist could sell its interest in Techpack—which again, is impossible—for its full and fair value. StarKist expands upon each of these points below.

**1. StarKist's Senior Facility Agreement Prohibits the Sale of Techpack**

As StarKist explained at the June 12 hearing, StarKist's Senior Facility Agreement contractually bars StarKist from selling material assets without prior written consent from its lenders. *See* Senior Facility Agreement § 13.11. In the event that StarKist sells a material asset without prior written consent, proceeds of the sale must be used to fully repay StarKist's loan. *See id.* §§ 5.6, 13.11 In fact, even if StarKist's lenders consented to the Techpack sale (which they have not), StarKist would still be obligated to use all of the proceeds from the sale to repay

its loan if those proceeds exceed $30,000,000. *Id.* § 5.3(1)(a). In short, if StarKist were forced to sell Techpack, the proceeds would go directly to StarKist's lenders and would be unavailable to pay a criminal fine or civil damages.

In light of the Court's comments at the June 12 hearing, StarKist recently reached out to its lenders regarding the application of these restrictions to the hypothetical sale of Techpack. Ro Decl. ¶ 7, Ex. A. The lenders stated that they consider StarKist's interest in Techpack to be a material asset. *Id.* ¶ 8, Ex. B. They have not consented to a Techpack sale. *Id.* They also explained that they are unwilling to waive the requirement that the proceeds of this hypothetical sale—if it goes forward with or without the lenders' consent—must be used to repay StarKist's loan. *Id.*

Moreover, forcing StarKist to sell Techpack without the opportunity to realize the full value of the transaction would doubly penalize StarKist because StarKist would lose out on the value of the investment in addition to paying a fine to DOJ.

**2. There Is No Realistic Buyer for Techpack**

Even if StarKist was not contractually prohibited from selling Techpack, there is no realistic buyer for the asset. Given its strategic importance, and its relationship with its current packaging supplier, Talofa Systems, Techpack is most valuable to StarKist and not any other third party. [redacted]

[redacted]

There is also no third-party buyer. News of the last hearing, and the possibility that StarKist may need to sell Techpack, spread quickly in the seafood press in the United States and Korea. Lynch Decl. ISO Techpack Brief ¶ 9, Exs. 5–7. Nevertheless, no potential buyer came forward to inquire into the purchase of these assets. Choe Decl. ¶ 16. In fact, StarKist reached out to four leading private equity firms about the possible sale of Techpack, and each informed StarKist that it was not interested in purchasing the asset. *Id.* ¶¶ 17–18, Exs. A–C. Some of the concerns expressed were about the declining market in the packaged food industry, [redacted] and the minority interest in the company, which limits a third-party buyer's ability to influence and benefit from an ownership interest. *Id.* ¶ 18. This result is not surprising given StarKist's unique relationship with Techpack and Dongwon Systems.

### 3. Techpack Cannot Be Sold for Its Book Value

The current book value of StarKist's investment in Techpack is approximately $154 million according to StarKist's 2018 audited financial statements.[4] Ro Decl. ¶ 7, Ex. A. Book value, however, is an accounting figure, not a valuation at which the business could be sold. Techpack performed poorly in 2018 and, if sold in a fire sale, would likely fetch significantly less than its year-end book value. Furthermore, StarKist is only a minority owner in Techpack, making it an even less attractive investment to potential buyers. The minority stake is valuable to StarKist, particularly given its purchases from Talofa Systems (a Dongwon Systems subsidiary), but it would be less valuable to a purchaser on the open market. If StarKist were able to sell its shares of Techpack today, it anticipates that the shares would be worth far less

---

[3] Moreover, regardless of any Dongwon entity's legal or financial ability to purchase StarKist's Techpack shares, it is not their duty to shoulder that burden. StarKist has—and is the only entity that should—accept responsibility for the conduct to which it has pled guilty. StarKist, therefore, cannot require any other entity to purchase its Techpack shares. Nor should any other entity be obligated to do so.

[4] While the investment in Techpack is on StarKist's balance sheet, it is not income-producing at this time and therefore is not included in StarKist's free-cash flow analysis.

than $155 million. It is unremarkable that StarKist values its stake in Techpack more than potential buyers do. That is precisely the reason the transaction made sense. Given the large disparity between market value and StarKist's value of the equity position, StarKist cannot recover anywhere near its full value on the open market.

For all of these reasons, StarKist's equity position in Techpack is not a disposable asset that can be sold for its book value. Thus, whatever value the shares might have to StarKist should not be included in the calculation of funds available to the company to pay civil damages and a criminal fine.

**E. StarKist Cannot Obtain Additional Loans**

StarKist entered into its Senior Facility Agreement in October 2018. Although StarKist's lenders were aware of the ongoing criminal investigation, the exact amount of the fine was unknown at the time. StarKist accurately explained to its lenders that the Court could impose a fine of between $50 million and $100 million, but that the exact amount of the fine was uncertain. The extent of StarKist's civil liability was also uncertain. In light of these contingencies, StarKist's lenders protected themselves in a number of ways, including by limiting StarKist's additional permitted indebtedness. *See* Senior Facility Agreement at 12. Specifically, StarKist's Senior Facility Agreement does not permit StarKist to enter into loans outside of the Agreement in excess of $50 million. *See id.* And StarKist has nearly reached that limit [redacted] Further, StarKist's loans are guaranteed by Dongwon Enterprise, giving StarKist's lenders additional comfort that they will be repaid. StarKist pays a fee to Dongwon Enterprise in exchange for the guarantee. Ro Decl. ¶ 3. Without those protections, the terms of StarKist's loans would likely be far worse.[5]

At the sentencing hearing, the Court asked a number of questions regarding StarKist's borrowing capabilities, but none of the Court's or DOJ's proposals are feasible. First, StarKist

[5] During the sentencing hearing on June 12, 2019, DOJ noted that StarKist's 2016 loan contained similar restrictions. Tr. of Proceedings at 97:10–16, June 12, 2019, ECF No. 105. At the time that the 2016 loan was negotiated, StarKist was subject to the government's investigation, and the civil cases were proceeding before Judge Sammartino in the Southern District of California. It is reasonable in those circumstances that the lenders required similar protections. The lenders' demand for guarantees also reflects the declining growth and uncertain nature of the packaged seafood market.

confirmed that its lenders will not allow StarKist to borrow money outside of the Senior Facility Agreement in excess of the Agreement's $50 million cap. *Id.* ¶ 8, Ex. B. And as explained above, StarKist has already almost reached that $50 million limit. In addition, StarKist confirmed that its lenders will not loan StarKist any more money to pay the fine in this case even if that additional loan was guaranteed. *Id.* ¶ 9. [redacted] it is unlikely that its Board of Directors or shareholders would approve a decision to loan StarKist money. *Id.* Dongwon Industries is a publicly traded corporation with a duty to act in the best interest of its shareholders. Dongwon Industries is not able to loan money to a struggling subsidiary facing criminal fines and civil damages. [redacted]

Third, StarKist cannot refinance its loan for the sole purpose of paying a criminal fine. If it were to pursue such a refinancing, the terms would be so onerous that entering bankruptcy would be a more attractive option. DOJ repeatedly suggests—without economic or logical support—that StarKist could maintain its current level of debt instead of making payments on its loan. *See* Tr. of Proceedings at 55:14–23, June 12, 2019, ECF No. 105. Yet at no point since 2008—the year that StarKist Co. was formed—has StarKist had any interest-only loans. Ro Decl. ¶ 4. StarKist has always paid down principal under the terms of its loan agreements. *Id.* To suggest that StarKist could simply refinance its loans to maintain its current level of debt with no consequences demonstrates an overall lack of economic understanding.

Finally, StarKist cannot obtain loans from other lenders. [redacted]

[redacted] StarKist is facing crippling criminal and civil liability and has considered all of its viable options. Obtaining additional loans is not one of them.

### F. Bumble Bee Was Not Forced to Sell Any of Its Assets

Forcing StarKist to sell Techpack—which again, StarKist cannot do—would lead to unwarranted disparities between the inability-to-pay standards applied to Bumble Bee and StarKist.[6] DOJ now insists that StarKist sell its minority interest in Techpack. But DOJ never insisted that Bumble Bee sell any of its assets to pay its criminal fine. In fact, there is nothing in Dr. Zuehls' analysis to suggest that DOJ ever even considered the salability of Bumble Bee's assets in assessing Bumble Bee's ability to pay the Guidelines fine. And recent events confirm that, at the time it was sentenced, Bumble Bee had assets it could have sold: Bumble Bee is now in the process of selling Clover Leaf Seafoods Co.[7] Clover Leaf is the "leading branded marketer of canned seafood in Canada, with a 46.7% share of the Canadian canned seafood market."[8] Despite Bumble Bee's apparent ability to sell Clover Leaf, DOJ was comfortable

---

[6] Per StarKist's plea agreement, StarKist only seeks a fine reduction on inability-to-pay grounds, *see* Plea Agreement ¶ 10, ECF No. 24. However, the Court is still required to independently consider the factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records." 18 U.S.C. § 3553(a)(6). A fine of $50 million easily satisfies the § 3553 factors.

[7] Tom Seaman, *Amid Ocean Beauty Deal Talks, Cooke Vies with Bolton for Bumble Bee's Canadian Ops*, Undercurrent News (June 6, 2019, 4:33 p.m. BST), https://www.undercurrentnews.com/2019/06/06/bolton-cooke-vie-for-bumble-bees-canadian-ops/.

[8] About Us, Clover Leaf, https://www.cloverleaf.ca/en/about-us (last visited June 28, 2019).

ignoring the value of that asset when it asked the Court to reduce Bumble Bee's fine to $25 million. With this backdrop, DOJ's current proposition—that StarKist pay the maximum fine because it can sell its interest in Techpack—is unreasonable and inequitable. DOJ should not be permitted to arbitrarily pick and choose how it assesses a defendant's ability to pay under section 8C3.3 of the Sentencing Guidelines.[9]

DOJ also incorrectly suggests that the Court should look to StarKist's parent company, Dongwon Industries, in making its ability-to-pay determination in this case. That suggestion is misguided and improper. DOJ never asked the Court to consider whether Lion Capital, a $5 billion private-equity firm and Bumble Bee's parent, could help Bumble Bee pay its criminal fine or outstanding debt. Indeed, it conceded that the Court lacked such authority. U.S. Sentencing Mem. & Mot. for Departure at 14, *United States v. Bumble Bee Foods, LLC*, No. 17-CR-249-EMC (N.D. Cal. July 31, 2017), ECF No. 25 ("[T]he financial condition of Bumble Bee, not Lion Capital, should be used to assess the company's ability to pay a guidelines range criminal fine."). So too here. Dongwon Industries' ability to pay the fine or StarKist's debt is irrelevant. What matters is StarKist's own future cash flows, and the Court should look to nothing else.

### G. Mr. Gokhale's Updated Analysis Reaffirms StarKist's Inability to Pay a Fine Greater than $50 Million

In response to the Court's request for additional analysis of StarKist's ability to pay at different growth rates, StarKist asked Mr. Gokhale to reevaluate StarKist's five-year free cash flow with growth rates of 0.5% and 1%. As discussed in further detail in his attached report, StarKist's free cash flow at a growth rate of 0.5% is [redacted] and its free cash flow at a growth rate of 1% is [redacted].[10] Lynch Decl. ISO Techpack Brief, ¶ 4, Ex. 1 ("Gokhale July

[9] At the sentencing hearing, DOJ said that Bumble Bee's fine was capped at $25 million because a fine above that amount would trigger default provisions in Bumble Bee's loan documents. Tr. of Proceedings at 93:19–94:21, June 12, 2019, ECF No. 105. If that is true, StarKist should not be forced to sell Techpack for the same reason. The sale of Techpack would also require StarKist to accelerate its loan payments, and the proceeds of that sale would simply go to StarKist's lenders. If this was enough to justify reducing Bumble Bee's fine by over $50 million, it should also be enough to show that selling Techpack is not a viable option.

[10] [redacted]

2019 Report") ¶ 7. The present value of the [redacted] as of December 31, 2018 equals [redacted] respectively. *Id.*

Although these inflated growth rates have limited effect on StarKist's future free cash flow, StarKist remains convinced that its original five-year growth projection of 0.1% is accurate. To reexamine the accuracy of its projected growth, StarKist calculated its own growth since 2011 using company data and then, using Nielsen data, calculated the industry's growth for that same period. StarKist's own historical growth—which Dr. Zuehls admits "is usually the best indicator of likely future performance"—was consistent with its projections of future growth.[11] StarKist also used Nielsen register scan data to analyze the historical growth of the United States packaged-tuna industry as a whole.[12] Both data sets confirm that StarKist's projected growth rate is reasonable and that DOJ's is not.

Internally, StarKist tracks several data points to assess its financial health. Most of these metrics should not be used for projecting the company's future free-cash-flow growth. Revenue, for example, would imperfectly measure free-cash-flow growth because when a revenue increase is paired with a corresponding increase in costs, there is no actual free-cash-flow growth (the increased costs offset any gains for the company). In other words, looking at revenue alone might misleadingly suggest free-cash-flow growth that does not actually exist. Gross profits and operating income also are not accurate benchmarks of a company's growth for similar reasons. Neither takes into account substantial additional costs incurred by the company. For instance, gross profits do not account for general and administrative expenses. And operating income does not account for taxes or interest payments. The growth number that matters for the company is its free cash, which is the profit that the company makes after paying all of its taxes and its operating expenses. Because it is difficult to predict what will happen with respect to input costs, when tracking its own past performance and projecting future performance, StarKist generally focuses on the volume of units sold. Nevertheless, StarKist evaluated its historical

---

[11] Zuehls May 2019 Report ¶ 25.

[12] Dr. Zuehls also relied heavily on industry-wide data (albeit data from the wrong industry) in his assessment of StarKist's future growth. Zuehls May 2019 Report ¶¶ 36–37.

growth based on units sold and revenue. Both figures clearly show that StarKist's growth projections are accurate.

Specifically, StarKist's historic growth in terms of units sold (including both pouches and cans) from 2011 to 2016 was [redacted] Gokhale July 2019 Report ¶ 4 n.6. The industry's growth as a matter of units sold during that period was even worse at ***negative*** 2.2%. *Id.* [redacted] as Dr. Zuehls admits, StarKist's growth in those years was abnormally high. *See* Zuehls May 2019 Report ¶ 37. But even if packaged-tuna sales from 2017 and 2018 are taken into account, StarKist's unit sales growth [redacted] and the industry's unit sales growth [redacted] are significantly lower than DOJ's estimates. *Id.* Finally, when we look at revenues over the 2011 to 2016 time period, StarKist's data and the Nielsen data both showed minimal growth [redacted] and ***negative*** 0.4%, respectively. *Id*.

In short, the historical growth of both StarKist and the packaged-tuna industry underscore the defects in DOJ's ability-to-pay analysis and, at the same time, confirm the accuracy of StarKist's own growth projections.

### H. If the Court Imposes a $100 Million Fine, StarKist Will Consider Entering Bankruptcy

If the Court imposes a $100 million fine, StarKist may have no choice but to enter chapter 11 bankruptcy. Reorganization under chapter 11 will undoubtedly affect the amount of recovery for civil plaintiffs—which, of course, is the very reason why StarKist's inability to pay should be taken into account at this juncture.

If StarKist files for chapter 11 bankruptcy, the civil actions will be stayed. This stay can only be lifted with specific court authorization, which would likely occur at the conclusion of the chapter 11 proceedings, delaying the civil Plaintiffs' compensation.

### I. DOJ's Proposed Payment Schedule Is Unworkable

Regardless of the fine the Court ultimately imposes—whether it is $50 million, $100 million, or some amount in between—StarKist requests that the Court impose a realistic payment schedule. *See* 18 U.S.C. § 3572(d) ("If the court provides for payment in installments, the

installments shall be in equal monthly payments over the period provided by the court, *unless the court establishes another schedule*." (emphasis added)). Under DOJ's proposed payment schedule, StarKist will be required pay $10 million within thirty (30) days of the Court's final judgment and $18 million every year thereafter for five years. This is not feasible for StarKist. As of the June 12 hearing, StarKist had approximately $6 million in the bank,[13] which is already a dangerously low amount of cash on hand. StarKist also cannot be expected to generate enough cash to afford annual payments of $18 million. StarKist accordingly proposes the following payment schedule: (1) an initial payment of $250,000 due within 30 days after the Court enters a final judgment; (2) four annual payments of $5 million, the first of which will be due one year after the Court enters a final judgment; and (3) a final payment for the remaining amount of the fine due five years after the Court enters a final judgment.

## III. CONCLUSION

StarKist has demonstrated by a preponderance of the evidence that it cannot pay a fine of over $50 million. None of the new arguments DOJ raised at the June 12 hearing change that conclusion. Thus, the Court should align with its original inclination to grant StarKist's evidentiary-hearing request and assess the substantial amount of other evidence proffered by StarKist and the Government related to each party's inability-to-pay arguments.

Dated: July 3, 2019

Respectfully submitted,

LATHAM & WATKINS LLP
Niall E. Lynch
Sean M. Berkowitz
Ashley M. Bauer

By: /s/ Niall E. Lynch
Niall E. Lynch

*Counsel for Defendant StarKist Co.*

---

[13] StarKist's cash balance changes daily. StarKist will therefore provide the Court with its current cash-balance figures at the next hearing, or at any other time upon the Court's request.