LATHAM & WATKINS LLP
Niall E. Lynch (CA 157959)
Ashley M. Bauer (CA 231626)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095
*niall.lynch@lw.com*
*ashley.bauer@lw.com*

Sean M. Berkowitz (*pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: +1.312.876.7700
Facsimile: +1.312.993.9767
*sean.berkowitz@lw.com*

*Counsel for Defendant StarKist Co.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STARKIST CO.,<br><br>Defendant. | CASE NO. 18-CR-0513 EMC<br><br>**STARKIST CO.'S REPLY TO UNITED STATES' RESPONSE TO STARKIST'S MEMORANDUM REGARDING TECHPACK SOLUTIONS CO., LTD.**<br><br>Judge: Hon. Edward M. Chen<br>Date: August 7, 2019<br>Time: 10:00 a.m.<br>Courtroom: 5 – 17th Floor |

**<u>REVISED REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED</u>**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. DISCUSSION ..... 2

A. Legal Standard ..... 2

B. DOJ's Arguments Inappropriately Suggest that StarKist Must Meet a Heightened Standard of Proof ..... 3

C. StarKist Cannot Pay a $100 Million Fine ..... 3

D. Bankruptcy Is Not an "Idle Threat" ..... 14

E. The Court Must Consider the § 3553 Factors ..... 14

F. DOJ's Proposed Payment Schedule Is Unworkable ..... 17

III. CONCLUSION ..... 17

## TABLE OF AUTHORITIES

### CASES

*Addington v. Texas*,
441 U.S. 418 (1979) ... 3

*Brady v. Maryland*,
373 U.S. 83 (1963) ... 16

*Giglio v. United States*,
405 U.S. 150 (1972) ... 16

*In re Packaged Seafood Products Antitrust Litigation*,
No. 15-MD-2670-JLS-MDD (S.D. Cal.) ... 10

*United States v. Robinson*,
20 F.3d 1030 (9th Cir. 1994) ... 2

*United States v. Wolfson*,
634 F.2d 1217 (9th Cir. 1980) ... 16

*United States v. Wong*,
40 F.3d 1347 (2d Cir. 1994) ... 9

### STATUTES

18 U.S.C. § 3553 ... 14, 15

### OTHER AUTHORITIES

James R. Hitchner, *Financial Valuation: Application and Models*
(John Wiley & Sons, 2003) ... 6

Defendant StarKist Co. ("StarKist") respectfully submits this Reply to the United States' Response to StarKist's Memorandum Regarding Techpack Solutions Co., Ltd. ("Techpack") (ECF No. 126) in support of its argument that StarKist is unable to pay a fine greater than $50 million, as set forth in StarKist's Sentencing Memorandum and Request for Evidentiary Hearing (ECF No. 53).

## I. INTRODUCTION

The Department of Justice ("DOJ") asks the Court to ignore the unrebutted evidence that StarKist has proffered to support its inability-to-pay claims. Instead, DOJ argues that StarKist should pay a $100 million fine because StarKist did not disprove the hypothetical and counter-factual scenarios that DOJ conjured up in its opposition. Indeed, no matter what evidence StarKist offers, it appears that DOJ will counter with speculative and unrealistic suggestions of how StarKist might afford to pay much more. DOJ does not proffer any new evidence in support of its contentions. Instead, DOJ faults StarKist for not anticipating its hypotheticals and disproving them. In doing so, DOJ is arguing for a different and higher standard of proof. DOJ seeks to require StarKist to prove its ability to pay beyond a reasonable doubt, or at least by clear and convincing evidence. But those are not the correct standards. StarKist need only prove its inability to pay a $100 million fine by a preponderance of the evidence. And StarKist has done so.

The facts regarding Techpack are clear and uncontested. Techpack is an asset of StarKist, and this fact was explicitly disclosed in StarKist's audited financial statements, which have been in DOJ's possession for more than a year. Under StarKist's current loan agreement, Techpack is a "material asset" which cannot be sold without the "Majority Lenders" permission, which they have not granted. And, even if Techpack were sold, all of the proceeds of the sale would go towards repayment of the loans and would not be available to pay a fine. In addition, StarKist may not take out any further loans under its current loan agreement, and three of the five lenders under the loan agreement have explicitly refused to waive that limitation. [redacted]

[redacted] Furthermore, even if StarKist could sell Techpack, there are no buyers. [redacted] Four large and highly respected private-equity firms also informed StarKist they were not interested in purchasing the Techpack shares, and no other buyer has contacted the company with an interest in purchasing the assets. DOJ has not rebutted a single one of these established facts.

Setting aside the problems with DOJ's heightened ability-to-pay standard, StarKist responds here to DOJ's speculative and unrealistic hypotheticals, corrects DOJ's misstatements of fact, and notes the absence of any credible evidence rebutting StarKist's position. In so doing, StarKist surpasses its burden of proof and demonstrates yet again that it cannot afford a fine over $50 million.

StarKist is requesting a $50 million fine based solely on its ability to pay. Nevertheless, StarKist reiterates that the Plea Agreement contemplates, and the statute requires, that the Court assess whether the fine amount satisfies the § 3553 factors. Despite DOJ's objections to the contrary, this obligation cannot be negotiated away. If the Court finds that StarKist is only able to pay a $50 million fine based on its ability to pay, the Court must also be satisfied that the § 3553 factors are met. And even if the Court finds that StarKist has the ability to pay a $100 million fine, the Court must still be satisfied that a $100 million fine is fair under the § 3553 factors. If the Court determines that a fine of $100 million is not consistent with the factors under § 3553, then the Court must reject the Plea Agreement in its entirety. Under the express terms of the Plea Agreement, the Court has an independent obligation to determine whether the fine is appropriate under § 3553.

## II. DISCUSSION

### A. Legal Standard

Despite DOJ's suggestions otherwise, StarKist need only establish its inability to pay a fine above $50 million by a preponderance of the evidence. *See United States v. Robinson*, 20

F.3d 1030, 1033 (9th Cir. 1994). The preponderance-of-the-evidence standard is the least stringent standard of proof in the United States legal system. *See Addington v. Texas*, 441 U.S. 418, 423–24 (1979).

**B. DOJ's Arguments Inappropriately Suggest that StarKist Must Meet a Heightened Standard of Proof**

In the three weeks between the sentencing hearing and StarKist's initial Techpack submission, StarKist went to extraordinary lengths to respond to every suggestion raised by DOJ at the June 12 sentencing hearing. StarKist presented unrebutted evidence that it cannot sell Techpack and established that (1) there is no realistic buyer; (2) StarKist's loan agreement forbids the sale if it is for less than the amount outstanding on the loan ($149 million) without lender approval (which its lenders will not give); and (3) even if Techpack could be sold for more than the amount outstanding on the loan (i.e., more than $149 million), its lenders will not waive the covenant that requires StarKist to use the proceeds to pay off the entirety of its loan. DOJ has engaged in a year-long ability-to-pay analysis, during which time it had every opportunity to ask StarKist for more details on its various assets, but DOJ failed to raise the Techpack issue prior to the sentencing hearing on June 12. And now, DOJ does not offer a single piece of evidence to rebut StarKist's showing that Techpack cannot be sold to pay its fine. DOJ has not even withdrawn or amended Dr. Zuehls' May 14, 2019 report, which states that Dr. Zuehls "did not find any material disposable assets." *See* Decl. of A. Mast, Ex. 1, May 15, 2019, ECF No. 52. Moreover, DOJ has not proffered any evidence of actual willing buyers. Nor has it identified any lender who will loan StarKist money to pay for a criminal fine. DOJ simply hypothesizes that potential buyers or alternative lenders might exist without any proof that they actually do exist.

**C. StarKist Cannot Pay a $100 Million Fine**

StarKist has proffered unrebutted evidence that it cannot sell Techpack and cannot obtain additional loans. DOJ's hypotheticals to the contrary are unsupported and this Court should ignore them. But, even if StarKist could sell Techpack at a reasonable price, StarKist still cannot

afford a $100 million criminal fine in addition to paying restitution in the civil cases, given the high projected civil exposure. This Court should not impose a fine that jeopardizes restitution.

**1. There Is No Realistic Buyer for Techpack**

StarKist has presented uncontroverted evidence that there is no available buyer for Techpack and went to great lengths to find a potential buyer in the marketplace. [redacted] Looking beyond the Dongwon entities, StarKist also reached out to four leading private-equity firms, some with prior experience in the food-packaging market, to gauge any interest in acquiring StarKist's Techpack shares. *See* StarKist's Techpack Brief at 8. StarKist was met with blanket rejections. *See id.* DOJ argues that "StarKist did not make a meaningful attempt to find a buyer." U.S. Response at 8. The record shows otherwise.

DOJ attempts to counter StarKist's showing by suggesting hypothetical alternative buyers and claiming that it needs more details on the terms of StarKist's offers to give StarKist's efforts any credit. *See* U.S. Response at 7. Notably, DOJ has not come forward with a willing buyer. It has only hypothesized that StarKist could (1) sell the shares to other existing Techpack

---

[1] [redacted]

customers, none of whom have ever indicated interest in purchasing Techpack from StarKist; (2) sell the shares for significantly less than book value; or (3) sell only a portion of the shares. U.S. Response at 8; Decl. of N. Lynch ISO Reply, Ex. 2 ¶ 2 ("R.S. Meece Decl. ISO Reply"). But Techpack's customers are no more likely than a private-equity firm to buy a minority stake in a struggling company—the investment was, and is, uniquely valuable to StarKist. DOJ fails to acknowledge the possibility that StarKist cannot find a buyer at any reasonable price. But StarKist has never been approached by any party, including Techpack customers, regarding the sale of Techpack shares. R.S. Meece Decl. ISO Reply ¶ 2. And the private-equity firms StarKist approached did not even express an interest in opening negotiations or signing a non-disclosure agreement, let alone inquire about share price. *See* Decl. of N. Lynch ISO Techpack Brief, Ex. 2 ("Choe Decl."), Exs. A–C, July 3, 2019, ECF No. 112. The private-equity firms cited the minority stake of the asset, the limited top-line growth with decreasing margins due to increasing raw material costs and market saturation, and [redacted] as reasons the investment was not attractive at this time. *See id.* Indeed, selling a partial stake in Techpack is even less likely to be attractive to any buyer (let alone a different Techpack customer) because investors are not looking for minority shares in this industry. Notably, one of the private-equity firms that StarKist approached had previously invested in a packaging company a few years ago, but it was not interested in the Techpack shares. *Id.* at Choe Decl., Ex. C. Simply put, investors with direct experience in the packaging industry in Asia were not interested in purchasing Techpack shares from StarKist. StarKist has demonstrated, regardless of the price, that there are no realistic buyers for StarKist's minority stake in Techpack.

### 2. StarKist Cannot Sell Techpack Without Its Lenders' Consent, and StarKist's Lenders Will Not Waive Its Loan Covenants

DOJ mistakenly argues that StarKist could sell Techpack without its lenders' consent by selling its shares at book value. U.S. Response at 5. DOJ then takes issue with StarKist's efforts to obtain a waiver from its lenders that would allow StarKist to sell its interest in Techpack, claiming, without any supporting evidence, that StarKist's efforts were "half-hearted." U.S.

Response at 9. They were not. StarKist's loan agreement contains the following restrictions and requirements: (1) StarKist cannot sell a material asset without prior written consent unless the proceeds would exceed the balance of the loan; (2) if the proceeds exceed the loan balance, StarKist must immediately repay the loan. *See* Decl. of A. Mast, Ex. 1 ("2018 Loan Agreement"), May 29, 2019, ECF No. 75. At the sentencing hearing, the Court stated that the burden was on StarKist to show that the lenders "would exercise the right to demand the proceeds go to the bank, and whether or not they would waive that, just as whether or not they would waive the ability to even sell that asset." Tr. of Proceedings 116:19–21, June 12, 2019, ECF No. 105. StarKist has done so. The banks explicitly stated that they would not consent to the sale of Techpack and would not waive the right to obtain all proceeds if there was a sale. *See* Decl. of N. Lynch ISO Techpack Brief, Ex. 3 ("Ro Decl."), Ex. B, July 3, 2019, ECF No. 112.

DOJ's first mistake is assuming that StarKist can receive book value for its investment in a hypothetical sale. U.S. Response at 5. As StarKist has explained, book value does not equal the market price StarKist would receive if it sold its minority stake in Techpack. The book value of Techpack, $154 million, is determined using the equity method, in accordance with U.S. Generally Accepted Accounting Principles. Decl. of N. Lynch ISO Reply, Ex. 1 ¶ 3 ("Decl. of C. Lee"). StarKist therefore calculates Techpack's book value by taking the original purchase price of the investment ($122,402,704), *see* Choe Decl. ¶ 7, and thereafter adding StarKist's share of Techpack's yearly undistributed earnings or losses. Decl. of C. Lee ¶ 4. In other words, no discounts are taken to account for StarKist's minority stake. In a fair-market valuation, the minority stake would result in a substantial discount. James R. Hitchner, *Financial Valuation: Application and Models* at 287, 254 (John Wiley & Sons, 2003) ("There is no dissension in the valuation community concerning the applicability of a lack of marketability discount to a minority interest in a privately held company . . . . [T]hese discounts can reduce the entity-level value by 50 percent or more. . . .").

DOJ also mistakenly argues that StarKist failed to establish that its lenders will not waive its loan covenants. U.S. Response at 9. StarKist sent a letter to its lenders asking the exact

questions raised by the Court. Ro Decl., Ex. A. Three of StarKist's lenders, [redacted] summarily denied StarKist's requests, stating that they consider Techpack a material asset, would not waive the loan covenants, and would not allow additional indebtedness. *See id.* Ro Decl., Ex. B. Yet DOJ claims that this showing is insufficient to meet the preponderance of the evidence standard, instead suggesting that the banks are interested parties or that StarKist should have offered to pay a fee in exchange for the waiver, thereby worsening StarKist's financial condition. U.S. Response at 9, 11. DOJ has no reason to believe, and it would be absurd to assume, that three international banks would misrepresent evidence in federal court in order to assist a financially struggling U.S. tuna company. StarKist's lenders have no interest in StarKist's criminal fine and StarKist is a relatively small borrower for these banks. Furthermore, these banks are not owners or affiliates of StarKist and their only interest is receiving full and timely repayment of their loans.[2] [redacted] because StarKist can borrow short-term funds up to $50 million without the lenders' consent. [redacted]

DOJ takes yet another unsupported leap and suggests that StarKist could sell its shares in Techpack for $50 million, breach its loan agreement, put the proceeds of the hypothetical sale towards the loan, and force Dongwon Enterprise to foot the remaining bill as the guarantor of the loan. U.S. Response at 5–6. This proposal is misguided for several reasons. Even assuming StarKist could find a willing buyer at that price (it cannot), punishing Dongwon Enterprise

---

[2] DOJ repeats its incorrect argument that StarKist is repaying its debt on an expedited schedule. U.S. Response at 18. It is not. StarKist's debt repayment plan under its 2018 loan agreement is the same as its repayment plan under its 2016 loan agreement. *See* 2018 Loan Agreement at 19; 2016 Loan Agreement at 23. And the Company is re-paying its debt on the agreed timeline. *Id.*

(which is not even StarKist's direct parent) for the actions of a former StarKist employee, especially where Bumble Bee's *actual* parent company did not receive such treatment, is fundamentally unfair.

StarKist has done exactly what the Court requested, showing by a preponderance of the evidence that it could not sell its interest in Techpack, but it appears that nothing StarKist does will satisfy DOJ.

**3. The Mere Possibility that StarKist Will Obtain Publicly-Traded Stock Does Not Defeat Its Showing**

DOJ argues that the potential merger between Techpack and Dongwon Systems means that StarKist will "soon" receive publicly-traded stock. U.S. Response at 11. But there is no way to know when and if a merger actually will take place. The Techpack-Dongwon Systems merger has been delayed for business reasons unrelated to StarKist. R.S. Meece Decl. ISO Reply ¶ 3. Techpack's 2018 net income dropped 25.65% from the prior year. *Id.* ¶ 4. Even though StarKist believes that the plan is for a merger to occur at a future date, the timing of a merger is unknown. The Techpack merger was delayed well before this issue was raised before the Court for the first time in June 2019. *Id.* ¶ 5. StarKist did not make the decision to delay the merger and, indeed, StarKist never sought to delay the merger. *Id.* ¶ 6.

Just because Dongwon Systems, as majority owner of Techpack, *can* control the timing of the merger, does not mean that it will effectuate a merger in the near future or that it is delaying the merger because of StarKist's financial condition. Dongwon Systems is not a defendant in this case and has every right to act in its own best interest and an obligation, as a publicly traded company, to act in the best interest of its shareholders. Dongwon Systems is not an owner of StarKist, meaning that it has no obligation or duty to StarKist. *Id.* ¶ 7. And StarKist is not presently an owner of any shares in Dongwon Systems, meaning it has no control over Dongwon Systems. *Id.* Nor does StarKist, as the minority shareholder of Techpack, control the timing of when a merger might occur. Regardless of their corporate affiliation, StarKist need not proffer evidence regarding Dongwon Systems' business decisions in order to meet its burden

here. And the argument that there is "some remote fortuity" that StarKist might receive shares of Dongwon Systems is not enough to justify imposing a fine that StarKist cannot currently afford. *See United States v. Wong*, 40 F.3d 1347, 1383 (2d Cir. 1994). The mere possibility that StarKist will have liquid assets at some unknown point in the future does not defeat StarKist's showing.

**4. StarKist Cannot Refinance Its Loans with Other Lenders**

DOJ takes issue with the fact that StarKist did not approach other unidentified lenders about refinancing its current loans. U.S. Response at 13–14. However, StarKist is contractually barred from borrowing more money, and three of its lenders refused to waive that term of the current loan. Moreover, as StarKist and its expert have explained, StarKist is not an attractive loan candidate. In fact, [redacted] informed StarKist that none of the five lenders under the existing loan agreement were willing to loan StarKist any additional money to pay a criminal fine, [redacted] DOJ points to StarKist's short-term borrowings in 2019 to argue that StarKist is capable of borrowing more money. U.S. Response at 14. But StarKist borrowed these short-term funds from one of its long-term lenders consistent with the terms of its long-term loan agreement. *See* 2018 Loan Agreement at 12. The Senior Facilities Agreement allows a limited amount (no more than $50 million) of additional permitted indebtedness. *Id.* And short-term borrowing is fundamentally different than long-term borrowing; a short-term loan's very nature (the fact that it must be repaid within the calendar year) makes it a less risky venture. It is therefore not surprising that StarKist was able to obtain a short-term loan. Further, StarKist's short-term lender is also one of its long-term lenders, so it is not as if StarKist proved its creditworthiness to another lender.

**5. DOJ's Repeated Mischaracterizations of StarKist's Evidence Are Improper**

On top of the string of hypotheticals that DOJ has proposed, it also misconstrues the positions that StarKist has taken throughout the sentencing proceedings. First, DOJ has repeatedly misrepresented StarKist's estimates of its civil liability, now claiming that StarKist's

estimates are "grossly inflate[d]." U.S. Response at 1. [redacted], specifically qualifying that its estimates could be "substantially higher" and that they "represent the lowest settlement amounts that StarKist is likely to reach with these Plaintiffs." StarKist Co.'s Sentencing Mem. at 19, May 15, 2019, ECF No. 53. Again at the sentencing hearing, StarKist referred to its "estimated minimum civil liability." Tr. of Proceedings 105:1, June 12, 2019, ECF No. 105. [redacted]. *See* U.S. Sentencing Mem. at 20, May 15, 2019, ECF No. 51; U.S. Response to StarKist's Sentencing Mem. at 13, May 29, 2019, ECF No. 74. DOJ repeatedly and intentionally misrepresents that a minimum estimate is a maximum estimate in order to inflate StarKist's ability to pay.

DOJ also faults StarKist for decreasing its civil liability estimates over time. Tr. of Proceedings 29:10–12, June 12, 2019, ECF No. 105; U.S. Sentencing Mem. at 15. The reason StarKist's civil liability estimates have decreased over time is because StarKist has updated its estimates as it receives additional data points on successful civil settlements. But now that settlement negotiations with the remaining civil plaintiffs have come to a standstill, it has become apparent that StarKist in fact *underestimated* its civil liability at [redacted] Moreover, on July 30, 2019, Judge Sammartino issued an order granting all three classes' motions for class certification in the related civil antitrust MDL, which substantially increases those plaintiffs' settlement leverage against StarKist. Order Granting Motions for Class Certification, *In re Packaged Seafood Products Antitrust Litigation*, No. 15-MD-2670-JLS-MDD, July 30, 2019, ECF No. 1931.

StarKist still has not reached settlements with three Direct Action Plaintiffs (AWG, Winn Dixie, and W. Lee Flowers) and the three class actions (Direct Purchaser Plaintiffs, End Payer Plaintiffs, and Commercial Food Prepares). [redacted]

[redacted] Based on these recent developments, [redacted][4] DOJ cannot meaningfully dispute StarKist's revised estimates when its own expert, Dr. Zuehls, estimated significantly higher civil damages in both the Bumble Bee case and in this case.[5] *See* StarKist Co.'s Sentencing Mem. at 3, May 15, 2019, ECF No. 53. [redacted] Bumble Bee, which is subject to the same claims and faces joint and several liability with StarKist and Chicken of the Sea, reportedly recently sought a $200 million loan to fund its civil liability. Decl. of N. Lynch ISO Reply ¶ 6, Ex. 5.

---

[3] *See* StarKist Co.'s Sentencing Mem. at 19, May 15, 2019, ECF No. 53.

[4] [redacted] recent press reports about Bumble Bee's estimated remaining civil liability. A recent article stated that Bumble Bee was in the process of seeking a $200 million loan to cover their estimated remaining civil liability. Decl. of N. Lynch ISO Reply ¶ 6, Ex. 5.

[5] [redacted]

DOJ also claims StarKist is contradicting its own expert's report by stating that Techpack is not saleable. U.S. Response at 4. Not so. StarKist offered the report of Professor Daines in order to rebut DOJ's argument (which DOJ adopted from civil plaintiffs without investigation) that the Techpack investment was a disguised dividend. Professor Daines of Stanford Law School opined that Techpack is an asset "potentially available to creditors." *Id.* StarKist does not dispute this statement. Just because Techpack is not a liquid asset and cannot be immediately sold to pay a criminal fine does not mean that Techpack is not potentially available to creditors. In fact, as StarKist has demonstrated, StarKist's lenders view Techpack as a material asset and as collateral for StarKist's loans. *See* Ro Decl., Ex. B.

Finally, DOJ argues that StarKist was not permitted to submit the revised growth calculations that the Court requested at the June 12 hearing. DOJ also argues that StarKist's actual 2019 growth is considerably higher than the estimated growth in StarKist's long-range plan. DOJ overstates StarKist's 2019 growth.[6] Looking at register scan data from Nielsen, StarKist's volume (measured in statistical cases) is up just 2 percent over 2018 data during the same time period. Meece Decl. ISO Reply ¶ 8. And the revenue associated with those increased sales is up 0.9 percent over last year for the same time period. *Id.* As Mr. Gokhale's July 3, 2019 report shows, when StarKist's projected compound annual growth is adjusted to [redacted], StarKist's free cash flow increases by [redacted] and StarKist still does not have sufficient funds under that scenario to pay a $100 million fine. Decl. of N. Lynch ISO Techpack Brief, Ex. 1 at 4, July 3, 2019, ECF No. 112.

### 6. DOJ's Math Does Not Add Up

DOJ argues that StarKist can sell Techpack and pay a $100 million fine. But even if StarKist could sell Techpack (which it cannot), the math does not add up to a $100 million fine.

---

[6] DOJ cites StarKist's year-to-date financial statements for the proposition that StarKist's revenues have increased. DOJ fails to mention that, as of May 2019, StarKist's year-to-date operating income is [redacted] than it was for the same time period the year before. R.S. Meece Decl. ISO Reply ¶ 9. As of the end of June 2019, StarKist's year-to-date operating income had [redacted] its operating income compared to the same time period in 2018. *Id.* ¶ 10. In other words, even if StarKist is selling more tuna, it is not in a better financial condition than it was last year at this time.

Assuming arguendo that StarKist could sell Techpack for half of its book value (or $77 million), which is consistent with the market price for a minority stake in a company, StarKist still cannot pay a fine of more than $50 million.

| | DOJ's Model | | Corrected | |
|---|---|---|---|---|
| | **Assets** | **Liabilities** | **Assets** | **Liabilities** |
| StarKist's Projected Future Cash Flow | $171 million | | $171 million | |
| StarKist's ~~Valuation~~ [**Potential Sale**] of Techpack | ~~$154 million~~ | | $0–$77 million | |
| StarKist's ~~Upper~~ Estimate of Civil Liability | | [redacted] | | [redacted] |
| **Total** | **$325 million** | [redacted] | **$171 to 248 million** | [redacted] |
| **Available Funds for Criminal Fine** | [redacted] | | [redacted] | |

Even under the best-case scenario, where StarKist [redacted] (2) sells its Techpack shares at a standard 50% minority share discount; [redacted] StarKist cannot afford a $100 million fine. And a best-case scenario is improbable. StarKist has shown that it cannot sell Techpack. If it could, the proceeds would go to re-pay its loans. And its civil exposure is significant. Critically, StarKist's current estimated civil liability does not include the potential liability from the recently filed class action litigation against the company relating to the labeling of dolphin-safe tuna. As the chart above shows, in a worst-case scenario, which StarKist hopes to avoid but is likely, the Company would be unable to pay even a $50 million fine.

**D. Bankruptcy Is Not an "Idle Threat"**

DOJ continues to second-guess StarKist's assertions that a $100 million fine would cause it to meaningfully consider entering bankruptcy. U.S. Response at 14. As is evidenced by Bumble Bee's recent engagement of reorganization experts,[7] StarKist is operating in a difficult industry where significant, unforeseen liabilities have severe consequences. [redacted] DOJ has not proffered any expert opinion to rebut the Klee opinion or otherwise opine as to bankruptcy issues.

**E. The Court Must Consider the § 3553 Factors**

DOJ's efforts to limit the Court's ability to consider the § 3553 factors are heavy-handed and improper. [redacted] Moreover, in its response to StarKist's opening brief, DOJ contends that StarKist's arguments regarding the application of § 3553 are "foreclosed by its plea agreement." U.S. Response at 2. They are not. StarKist's Plea Agreement makes clear that the parties will "provide sufficient information concerning the defendant, the crime charged in this case, and the defendant's role in the crime to enable the meaningful exercise of sentencing authority by the Court under 18 U.S.C. § 3553." Plea Agreement ¶ 10(d), ECF No. 24. The reason for this is obvious: The Court must consider the § 3553 factors before coming to an ultimate conclusion on the fine.[8] The obligation to assess the fine under § 3553 cannot be negotiated away. Regardless

---

[7] Alexander Gladstone, *Canned Tuna Seller Bumble Bee Hires Turnaround Advisor*, Wall Street Journal (July 19, 2019), https://www.wsj.com/articles/canned-tuna-seller-bumble-bee-hires-turnaround-adviser-11563558889.

[8] StarKist has not advanced arguments that the Court should fine StarKist $50 million based solely on the § 3553 factors. This Court correctly recognized that StarKist's request for a fine of $50 million is based on the Company's ability to pay, and specifically "not jeopardizing restitution." Tr. of Proceedings 27:10–22, June 12, 2019, ECF No. 105. StarKist has presented facts to the Court to demonstrate that a fine of $50 million satisfies the requirements of § 3553, consistent with the Court's obligation to make such a finding.

of whether the Court determines that StarKist can afford a $100 million fine or a $50 million fine, the Court must be satisfied that whatever fine it imposes meets the requirements of § 3553.

At the time of signing, StarKist reasonably understood its Plea Agreement to require the Court to make an independent fairness determination with regard to StarKist's fine amount. This Court should fully evaluate all the relevant factors under § 3553 when determining the appropriate sentence. Under § 3553, and the express terms of the Plea Agreement, the Court "shall consider" various factors, including the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct and the need to provide restitution to victims. *See* 18 U.S.C. § 3553. The Court correctly recognized at the June 12 hearing that "there are arguments about unwarranted disparity, and . . . relative culpability has some relevance" to the Court's determination of the fine. Tr. of Proceedings 27:10–22, June 12, 2019, ECF No. 105. Indeed, the Court should give weight to disparities between StarKist and Bumble Bee.

DOJ complains that StarKist should not be able to compare the methodology used by the DOJ's expert to determine Bumble Bee's fine, under an ability to pay analysis, with the methodology used by the same expert in analyzing StarKist's ability to pay. This makes no sense and is contrary to the § 3553 factors relating to disparate treatment of defendants. StarKist's review of Dr. Zuehls' Bumble Bee ability-to-pay materials found that Dr. Zuehls applied the ability-to-pay analysis differently to Bumble Bee than to StarKist, which is improper under § 3553. The fact that DOJ and Dr. Zuehls applied different ability-to-pay standards and methodology to StarKist than to Bumble Bee also undermines Dr. Zuehls' analysis and credibility. For example, Dr. Zuehls used significantly lower growth projections and higher civil damages estimates in his ability-to-pay analysis of Bumble Bee, despite the fact that StarKist and Bumble Bee are operating in the same struggling industry and face the same joint and several civil liability. *See* StarKist Co.'s Response to U.S. Sentencing Mem. at 8, May 29, 2019, ECF No. 77.

Throughout briefing and during the sentencing hearing, DOJ actually cited information regarding Bumble Bee's financial condition and its ability-to-pay analysis in arguing in favor of a $100 million fine for StarKist. Thus, even DOJ recognizes that Bumble Bee's ability to pay analysis is relevant to StarKist's sentencing. For example, at the sentencing hearing, DOJ argued that StarKist had not met its burden because it had not adduced evidence similar to the evidence Bumble Bee proffered. Tr. of Proceedings 98:17–21, June 12, 2019, ECF No. 105 ("Bumble Bee came forward and said, Here is a loan we tried to obtain. We couldn't do it . . . StarKist, in contrast to Bumblebee [sic], has historic low levels of debt right now."). But when StarKist asked DOJ for information to corroborate these underlying facts, DOJ refused. Decl. of N. Lynch ISO Reply, Ex. 3. This is a recurring pattern with DOJ in this case: DOJ has repeatedly refused to provide exculpatory evidence to StarKist even though DOJ has relied on the information and cited it in its argument to the Court. StarKist has a right to test the accuracy of the information DOJ presented the Court, especially where, like here, the Court may have access to the underlying information regarding Bumble Bee and StarKist does not. *See United States v. Wolfson*, 634 F.2d 1217, 1221 (9th Cir. 1980). Also, to the extent that this information suggests additional inconsistencies in Dr. Zuehls' ability-to-pay analysis, it may be grounds for impeachment. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

DOJ also now seeks to force StarKist to sell non-disposable assets, something that was never raised in the Bumble Bee case. Finally, DOJ argues that Bumble Bee's fine reduction was based largely on its cooperation, "a reduction that StarKist did not earn or receive." U.S. Response to StarKist's Sentencing Mem. at 16–17, May 29, 2019, ECF No. 74. DOJ's cooperation credit appears to be nothing more than a credit to the party who pleads first, no matter the circumstances. StarKist has cooperated and continues to cooperate with DOJ by providing witnesses and document authentication that DOJ needs in its prosecution of the related cases. DOJ's suggestions to the contrary are untrue.

### F. DOJ's Proposed Payment Schedule Is Unworkable

DOJ continues to advance an unworkable payment schedule, claiming that StarKist fails to justify its proposed back-loaded installment schedule. U.S. Response at 18. DOJ proposes that StarKist pay $10 million within a month of judgment and $18 million each year for the next five years. U.S. Sentencing Mem. at 19, May 15, 2019, ECF No. 51. But as of the June 12 hearing, StarKist had approximately $6 million in the bank,[9] which is already a dangerously low amount of cash on hand. As of July 30, 2019, StarKist has [redacted] R.S. Meece Decl. ISO Reply ¶ 12. StarKist also cannot be expected to generate enough cash to afford annual payments of $18 million. StarKist accordingly reiterates its proposal for the following payment schedule: (1) an initial payment of $250,000 due within 30 days after the Court enters a final judgment; (2) four annual payments of $5 million, the first of which will be due one year after the Court enters a final judgment; and (3) a final payment for the remaining amount of the fine due five years after the Court enters a final judgment.

## III. CONCLUSION

StarKist has demonstrated beyond a preponderance of the evidence that it cannot pay a fine of over $50 million. DOJ's far-fetched and unsubstantiated suggestions as to how StarKist could afford a $100 million fine do not defeat StarKist's showing. Thus, the Court should grant StarKist's evidentiary-hearing request and assess the substantial amount of other evidence proffered by StarKist and the government related to each party's inability-to-pay arguments.

Dated: August 2, 2019

Respectfully submitted,

LATHAM & WATKINS LLP
Niall E. Lynch
Sean M. Berkowitz
Ashley M. Bauer

By: /s/ Niall E. Lynch
Niall E. Lynch

*Counsel for Defendant StarKist Co.*

---

[9] StarKist's cash balance changes daily. StarKist will therefore provide the Court with its current cash-balance figures at the next hearing, or at any other time upon the Court's request.